QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Frederick A. Lorig (Bar No. 057645)
  fredlorig@quinnemanuel.com
  Kevin Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
  Adam Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Plaintiff Complete
Entertainment Resources LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Complete Entertainment Resources LLC d/b/a Songkick,<br><br>              Plaintiff,<br><br>       vs.<br><br>Live Nation Entertainment, Inc.; Ticketmaster LLC,<br><br>              Defendants. | CASE NO. 15-cv-9814<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

1

2

## **TABLE OF CONTENTS**

**Page**

3

PRELIMINARY STATEMENT ....................................................................... 1

4

PARTIES ........................................................................................................... 9

5

      A.     Defendants........................................................................................ 9

6

      B.     Plaintiff........................................................................................... 11

7

JURISDICTION AND VENUE ..................................................................... 14

8

ADDITIONAL FACTS ................................................................................... 15

9

     General Background on the Live Music Industry .................................. 15

10

     Defendants' Market Power in the Live Music Industry........................ 18

11

     The Market For Artist Presale Ticketing Services ............................... 22

12

     Relevant Markets.................................................................................... 24

13

     Market Power ......................................................................................... 28

14

      A.     Ticketmaster ......................................................................... 28

15

      B.     Live Nation............................................................................ 31

16

     Defendants' Intent To Destroy Competition in the Artist Presale
           Ticketing Services Market ....................................................... 33

17

18

     Songkick Threatens Ticketmaster's Monopoly Power in the Artist
           Presale Ticketing Services Market.......................................... 35

19

      A.     Songkick's Early Interactions With Defendants: The Introduction
              of the "Fan Club Policy" ........................................................ 35

20

21

      B.     2014-2015: Defendants Seek To Fully Exclude Competition in
             the Artist Presale Ticketing Service Market ........................... 39

22

      C.     To Enhance Their Monopoly Power, Defendants Place No
             Similar Restrictions on Their Own Artist Presales..................... 50

23

24

     Defendants' Efforts To Preserve Ticketmaster's  Monopoly Power
           Have Already Had Far-Reaching  Anticompetitive Effects, and
           They Will Continue To Increase if Not Enjoined................................ 51

25

26

     Where the Defendants Do Not Have a Stranglehold, There Exists a
           Vibrant, Competitive Market for Artist Presale Ticketing
           Services ..................................................................................... 52

27

CLAIMS FOR RELIEF.................................................................................. 54

28

COMPLAINT

1

PRAYER FOR RELIEF ............................................................................ 64

2

DEMAND FOR JURY TRIAL ................................................................. 65

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

**PRELIMINARY STATEMENT**

1.     Plaintiff brings this action against Defendants for violations of the federal antitrust laws (sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 7 of the Clayton Act, 15 U.S.C. § 18), violations of the California unfair competition law (section 17200 of the California Business and Professions Code), intentional interference with contractual and prospective economic relations, and promissory estoppel.

2.     For decades, Defendant Ticketmaster LLC ("Ticketmaster") and its predecessor, Ticketmaster Entertainment, Inc., has been the world's largest and most dominant primary ticketing services company.[1] Today, it has a market share exceeding 80% of ticketing services for major concert venues in the live music industry in the United States,[2] which has come about by virtue of a web of long-term exclusive dealing agreements with those concert venues.  By Defendants' own count, Ticketmaster provides concert venue ticketing services to over 12,000 venues.

3.     On average, only 60% of available tickets to all live music concerts are sold on an annual basis.  This is the result of the high fees Ticketmaster imposes on the tickets it sells and poor marketing from Defendants, resulting in decreased demand for live music concerts.  Notwithstanding this and concertgoers' general distaste for Ticketmaster (because of its high service fees), the company has continued to flourish by: securing its long-term exclusive dealing contracts with concert venue operators; acquiring, merging with, or destroying rivals; tying undesired services to services and/or markets in which it has market power; and unfair and anticompetitive acts aimed at eliminating and/or minimizing all competitors (including Plaintiff).

---

[1]  "Primary" ticketing refers to the initial distribution of tickets for a show.  This is as compared to "secondary" ticketing, which refers to the resale of previously-purchased tickets, typically at a higher price.  Secondary ticketing is often more colloquially referred to as "scalping."

[2]  As used in this complaint, "major concert venues" refers to the top 500 revenue generating venues in the United States as reported by Pollstar.

COMPLAINT

4.      This dominance was greatly strengthened and expanded by Ticketmaster's recent merger with Defendant Live Nation Entertainment, Inc. ("Live Nation"), the largest concert promotion company in the world.  In the United States alone, Live Nation controls more than 60% of the concert promotion services market and it promoted 22 of the top 25 global tours in 2014.  As a result of the merger, within the past four years, Ticketmaster has used Live Nation's market power (with Live Nation's active assistance, and under its direction and control) to enhance and expand its own market power.

5.      Before the two companies combined, Live Nation sought to compete with Ticketmaster and reduce the latter's market power in concert venue ticketing services.  At the time, Live Nation owned or controlled numerous major concert venues in the United States, and the events it promoted represented over 60% of all United States major live music concerts.  In an effort to break Ticketmaster's monopoly power in concert venue ticketing, Live Nation established its own concert venue ticketing service for both its own and other venues, and began to compete directly against Ticketmaster in that space.  Almost overnight, Live Nation became the second-largest concert venue ticketing service provider in the United States.  To remove that significant competitive threat to its monopoly power, Ticketmaster announced its plans to merge with Live Nation only months after Live Nation entered the market.

6.      The merger of Ticketmaster and Live Nation not only removed Live Nation as a threat to Ticketmaster's monopoly power, but enhanced that dominance by creating a vertically integrated monopoly with dominant market power in multiple segments of the live music industry, including concert venue ticketing services (where Ticketmaster has over 80% of the market), artist presale ticketing services (where Ticketmaster also has approximately 80% of the market), concert promotion services (where Live Nation has over 60% of the market), concert venue ownership and management (where Live Nation owns, controls, or manages numerous major concert venues in the United States), and artist management (where Live Nation is the largest

manager in the world, with over 280 artists under its control, including many of today's most recognizable acts).  The merger thus combined the largest and second-largest concert venue ticketing services companies, the largest and second-largest artist presale ticketing services companies, the largest concert promotion company, the second-largest owner and manager of concert venues, and a leading artist management company.

7.     Plaintiff Complete Entertainment Resources LLC (formerly d/b/a CrowdSurge, now d/b/a Songkick) ("Songkick"), through its Songkick-branded website and mobile applications and its white label technology, is a leading platform for concert "discovery" (*i.e.*, informing fans about newly-announced and upcoming concerts) and artist presale ticketing services, which are specialized ticketing services that help artists sell tickets directly to fans before tickets are put on general sale.  For decades prior to Ticketmaster and Live Nation's merger, concert venue operators allocated artists a percentage of the venue's concert ticket inventory to sell directly to the artist's most engaged fans before tickets were put on "general sale" by Ticketmaster or competing services.[3]  This "artist presale" has long been a distinct type of ticket sale, and artist presale ticketing services are themselves distinct from other types of primary ticketing services.

8.     The artist presale has been embodied as standard industry practice.  As Ticketmaster has publicly admitted, "Our contract permits our clients [concert venues and concert venue operators], and with their consent the acts working with them, to hold back tickets for legitimate promotional purposes with the understanding that these tickets will not be sold to the general public by any other ticketing provider," and that "under many written agreements between promoters and our clients, the client often allocates certain tickets for artist, promoter, agent and venue use and does not make

---

[3]     For the vast majority of major concert venues, Ticketmaster was and is the primary ticketing service provider contracted to conduct these general sales.

those tickets available for sale by us."  Speaking to the commercial rationale for these "artist presale allocations" (also sometimes called "artist holdback allocations"), Ticketmaster has also admitted that "[d]uring the course of dealings with our clients, we have come to understand that some holdbacks must be tolerated by Ticketmaster so that they may book high caliber acts at the events they promote."

9.     Artists use these presales for a variety of reasons, including promotional and marketing purposes, and—by not charging the same high service fees as Ticketmaster—typically sell their artist presale allocations at lower net prices than fans face in the general sale.  Artist presales generate several benefits for artists, including (among other things) helping the artist grow their database of fans and learn more about the fans buying their tickets; rewarding their most engaged fans for their continued support with first access to tickets; generating "buzz" and demand for their shows by offering tickets from an artist-branded site that does not include supracompetitive service fees; preventing scalping by targeting sales to artists' most engaged fans; driving revenue by bundling music, merchandise and VIP experiences alongside tickets; raising money for charity; and creating greater awareness for the artists' concerts through bespoke, creative, artist-branded marketing opportunities.  Additionally, marketing by the promoter and concert venue ticketing service provider (*e.g.*, Ticketmaster) often does not reach fans, meaning that many fans may not know that an artist will be performing at a venue in their area.  Thus, artist presales provide an important additional marketing and sales channel that can help fill seats that may otherwise go empty and more broadly help market an artist's tours.  Artist presales also generate meaningful consumer data (email addresses, demographic information, consumption behavior, etc.) for the artist regarding their fan base.  Artist presale ticketing service providers (such as Songkick) share such fan consumer data with their artist-clients to aid them in their future marketing efforts, but concert venue ticketing service providers have historically refused to share much, if any, of that consumer data with the artists.

10.     As an artist presale ticketing services provider, Songkick helps artists offer artist presales to fans, and designs bespoke direct-to-fan marketing strategies to excite the audience for such presales.  Songkick also streamlines the artist presale purchasing process by building what it believes to be the best-in-class ticket stores within artist-clients' websites, executes on merchandise upselling and charitable giving initiatives for its artist-clients alongside presales, and generates substantial email leads before a presale even begins through a variety of registration ("data capture") tools and fan-engagement applications.

11.     Unlike Ticketmaster, which has sought to link its primary ticketing services to its secondary ticketing services (*i.e.*, scalping) businesses (TicketExchange, TicketsNow, TM+, and Verified Tickets, among others), Songkick has developed a suite of data analytics and proprietary, patent-pending technologies designed to help artists prevent scalping and ensure tickets are purchased by their most engaged fans. Artists' use of these analytics and proprietary technologies increases the likelihood that concerts will be more fully attended by the artist's dedicated fans while at the same time saving them significant money and generating for the artist the targeted, functional consumer data mentioned above.

12.     Since its inception, Songkick's popularity has grown because it offers better artist presale ticketing and marketing services than any other company (including Ticketmaster).  Songkick has grown so popular that, in 2014 alone, it worked with over 150 premier artists on more than 3,000 shows.  Songkick's clients include a wide variety of today's most recognizable music artists.

13.     Within the past four years, Defendants have begun using their post-merger monopoly power to stifle that competition.  Unlike before the merger (when it put artists and maximizing ticket sales first), today's Live Nation now wants to help its subsidiary, Ticketmaster, avoid competitive artist presales and keep all ticket sales on the high-priced Ticketmaster platform.  Before the merger, Ticketmaster was pressured by artists and promoters (including Live Nation) into reluctantly tolerating competition

in the artist presale space because Ticketmaster was motivated to keep "high-caliber acts" in its contracted venues rather than see them diverted to non-Ticketmaster venues. Similarly, pre-merger, Live Nation took advantage of artist presales because they improved aggregate ticket sales for Live Nation's promoted shows and put competitive pressure on Ticketmaster. Following the merger and the changes in the competitive dynamic between the companies that it created, Live Nation completely reversed its position on artist presales and Ticketmaster became much more aggressive in preventing competitors from entering or thriving in the market. This change only occurred within the past four years, but it stems directly from the companies' now joint incentives to maintain Ticketmaster's market power to the exclusion of competition and all competitors.

14. Defendants have also recently attempted to aggressively grow Ticketmaster's secondary ticketing platforms. These attempts have been mostly successful—Ticketmaster's secondary ticketing volume grew 50% in 2014. The FTC intervened to prevent Ticketmaster from moving concert ticket buyers from its primary to secondary platform (*i.e.*, by implying tickets offered at much higher prices than their face value were primary, as opposed to secondary, ticket sales). Songkick's artist presales combat Ticketmaster's deceptive practices and sharply reduce scalping.

15. Within the past four years, Defendants have attempted to destroy competition in the artist presale ticketing services market in a number of different ways. For one, Defendants intentionally created artificial barriers in the artist allocation and presale process and thereby sought to dissuade—and succeeded in blocking—numerous artists from exercising their right to conduct artist presales and/or using Songkick's services in connection with such sales. Using their monopoly power, Defendants also tried to force Songkick and/or its artist-clients to agree to fix service fees for artist presale tickets at the same price Ticketmaster charged or at a fee amount dictated by Ticketmaster. On multiple occasions, Ticketmaster stated that it would allocate Songkick's artist-clients their artist presale allocations only if Songkick agreed to

charge at least Ticketmaster's dictated service fee and pay such fee to Ticketmaster.  If successful, these demands would have had the effect of increasing the all-in price of the artist presale tickets to be the same or more than general sale tickets.

16.     Defendants have also exploited their monopoly power to interfere with and intimidate venues into abandoning past practices of supplying artist presale allocations if artists select non-Ticketmaster ticketing services to sell those allocations.  Leveraging Live Nation's roles as artist manager and/or guarantor of billions of dollars to the artists it promotes, Defendants have also coerced artists to permit Ticketmaster—and only Ticketmaster—to sell their artist presale allocations, despite the artists' preference to have someone other than the monopolist Ticketmaster provide the artist presale ticketing services for those allocations.  Defendants have also recently begun using their unique multi-level leverage (which arose from their merger) to prevent artists from using Songkick's competitive services, and to tie (1) Live Nation's concert promotion services, Live Nation's artist management services, Ticketmaster's concert venue ticketing services, and/or use of the venues Defendants own, manage, and/or control; to (2) the artists' use of Ticketmaster's own artist presale ticketing services (recently rebranded as Ticketmaster's "OnTour" division).

17.     Over the past two years, Defendants' anticompetitive acts have increased and today threaten not only continued competition from Songkick, but the entirety of competition within the artist presale ticketing services market.  Michael Rapino, Live Nation's CEO and Director, has admitted that artists today make 95% of their income from live music events and that Live Nation is now the "largest single financer" of artists worldwide (more than record companies).  Armed as he is with this power over artists' careers, Mr. Rapino has used this position to intimidate artists into using Ticketmaster over any other artist presale ticketing service.  Indeed, Mr. Rapino made several threats to withhold Defendants' services if artists insisted on using Songkick's artist presale ticketing services.  He also told several artists that they could not take a single ticket off of the Ticketmaster system, period, and at least one artist that hurting

Ticketmaster was like hurting Live Nation itself.  He has stated that he does not want "companies like CrowdSurge coming in and taking our tickets," and has acted accordingly.

18.     No artist has been safe from these threats and anticompetitive acts.  As just one example, in early 2014, a global superstar whose identity will be disclosed once a protective order is in place announced an artist presale for a concert for which Songkick was the artist presale ticketing service provider.  Later that day, that artist's promoter discovered that the show was not being featured as expected on Ticketmaster's website, and submitted an inquiry to Ticketmaster, the concert venue ticketing service provider for that event, as to why the marketing had been withheld.  Ticketmaster responded, "[A]rtists/tours who keep 100% of their tickets on the TM platform are able to unlock the home page placement marketing asset…we will not be able to offer homepage placement for [the artist's] tour at this time."  That artist had one of the biggest music tours of 2014, grossing over $100 million and performing for hundreds of thousands fans worldwide.  Despite the fact that Ticketmaster was the concert venue ticketing service provider for the majority of this artist's United States concerts, Ticketmaster refused to provide prominent marketing for the artist's show on the ticketmaster.com website because the artist used Songkick as its artist presale ticketing service provider.  Thus, Ticketmaster sacrificed its own profits in order to punish the artist for doing business with a competitor.  Ticketmaster and Mr. Rapino's anticompetitive acts went so far that, in the summer of 2015, they told the artist that it did not have a "legitimate" fan club and therefore could not use Songkick for artist presale ticketing services.  This was an absurd claim.  The artist's fan club membership runs into the hundreds of thousands and is a longstanding club.

19.     Songkick has for years sought reasonably and in good faith to reach a resolution with Ticketmaster and Live Nation, but, despite assurances to the contrary by senior Defendant executives that artists who utilized CrowdSurge/Songkick for their artist presales would not be punished by Defendants, and that Defendants' fan club

policy (described below) would be applied uniformly to both Songkick and Ticketmaster in order to provide a level playing field, Defendants engaged in the predatory acts herein to monopolize, attempt to monopolize, unfairly compete, and interfere with Songkick's ability to provide the artist presale ticketing services that today's artists and their fans demand.

## PARTIES

**A.**     **Defendants**

20.     Defendant Live Nation Entertainment, Inc. is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.  Live Nation is the largest live entertainment company in the world, connecting nearly 519 million fans across all of its platforms in 33 countries.  Live Nation states on its website that it "annually issues over 450 million tickets, promotes 23,000 events, partners with over 750 sponsors and manages the careers of 280+ artists."  Live Nation's 2014 revenues were approximately $6.87 billion, but nearly 60% of its adjusted operating income came from Ticketmaster (even though Ticketmaster represented only 23% of Live Nation's revenues).

21.     Defendant Ticketmaster LLC is today a wholly-owned subsidiary of Live Nation Entertainment, Inc.  Ticketmaster is a limited liability company organized and existing under the laws of Virginia with its principal place of business at 7060 Hollywood Boulevard, Hollywood, California 90028.  Ticketmaster LLC is the successor in interest to Ticketmaster Entertainment, Inc., a Delaware corporation, and is the largest ticketing company in the United States and the world, with 2014 revenues of approximately $1.55 billion and a gross profit margin exceeding 50%.  As discussed further below, Ticketmaster's business includes two main arms:  its legacy concert venue ticketing services business and a newer, but steadily-growing, secondary ticketing service business.  Ticketmaster also has several additional divisions that provide ancillary services to these ticketing businesses.  In performing the anticompetitive acts herein alleged, Ticketmaster acted as the agent of; under the

1 direction and control of; and in coordination with Defendant Live Nation and its senior-
2 most executives.

3      22.     After Live Nation and Ticketmaster merged in an all-stock transaction, the
4 resulting company reorganized into the following four divisions:

5           (a)     In its Concerts division, Live Nation acts as a promoter.  It and AEG
6 Live are the only promoters that can operate on a United States national and global
7 scale.  Live Nation often serves as the exclusive promoter for artists on national tours,
8 and uses cross-collateralization across concerts and its deep pockets, including
9 operating profits from its Ticketmaster and sponsorship divisions, to routinely offer
10 artists higher guaranteed compensation than its only other national competitor, a
11 company called AEG Live.[4]  Live Nation has over 60% of the concert promotion
12 services market.  Revenue streams from this division are numerous and significant, but
13 margins are below cost or very thin.  (Adjusted operating margins for 2014 were 1%.)
14 Live Nation's promoted artists obtain the vast majority of the Concerts division's
15 revenue.

16           (b)     By contrast, Live Nation's Ticketing division (*i.e.*, Ticketmaster) is
17 highly profitable with gross profit margins exceeding 50%.  This division primarily
18 consists of the legacy Ticketmaster business, which focuses on primary ticket sales.
19 Ticketmaster sells tickets to the public under contract with the venues, and earns service
20 and other ancillary fees on the sale of each ticket.  Ticketmaster also has a growing
21 secondary ticketing marketplace, with $1 billion of gross transaction value in 2014
22 (50% growth from 2013) in a market currently worth approximately $8 billion.  This
23 high-margin secondary ticketing business has provided an additional income stream for
24 Ticketmaster on the same shows for which it sells primary tickets.  This means

25

26      [4] The Anschutz Entertainment Group (AEG) is an American worldwide sporting
and music entertainment presenter and a subsidiary of The Anschutz Corporation.
27 AEG owns a variety of major concert venues throughout the U.S. that compete with
Live Nation and third party-owned concert venues for major live music concerts.
28 AEG Live is AEG's promotion arm for live music concerts.

-10-

Ticketmaster can generate revenues two or more times on the exact same tickets. Ticketmaster also maintains a database containing the contact information of over 130 million customers, a valuable resource that it has generally refused to provide to the very artists who create the demand that drives ticket sales.

(c)      Live Nation's Media & Sponsorship division leverages the 60 million or so fans Live Nation draws to its shows, the 130 million names in its Ticketmaster database, their stable of managed and promoted artists, and the venues they control to sell targeted advertising to major companies.  In 2014, this division generated adjusted operating profit of $213 million on revenue of $300 million—a 71% operating margin.

(d)      Through its Artist Nation division, Live Nation also provides management services to artists in exchange for a commission on these artists' earnings. This division also manages the licensing and production of merchandise, and its sale online and at concerts.

23.      In 2014, Live Nation's Ticketing and Media & Sponsorship divisions generated only 27% of the company's revenues, but over **90%** of its adjusted operating income.  As discussed herein, Songkick and other artist presale ticketing service providers directly cut into these two profit streams, which are Live Nation's most valuable.

**B.** <u>**Plaintiff**</u>

24.      Plaintiff Complete Entertainment Resources LLC d/b/a Songkick is organized under the laws of Delaware with its principal place of business at 45 Main Street, Brooklyn, New York 11201. Complete Entertainment Resources LLC became a wholly-owned subsidiary of Songkick.com B.V. following the merger of equals between Songkick and CrowdSurge, which occurred in June 2015 (discussed further below).  Before that merger, Complete Entertainment Resources LLC did business as CrowdSurge.  CrowdSurge merged with Songkick and the merged company assumed the latter's name.  In this complaint, the term "CrowdSurge" refers to the pre-merger

1  Complete Entertainment Resources LLC entity.  References to "pre-merger Songkick"
2  refer to the company with which CrowdSurge merged in June 2015.  "Songkick" refers
3  to the present day merged company and to Complete Entertainment Resources LLC in
4  general, when allegations relate to both pre- and post-merger facts.

5      25.  CrowdSurge (and, now, Songkick) offers artists the means to sell tickets
6  for their concerts directly to their fans in a manner that provides substantial,
7  longstanding benefits to the artist and to concertgoers.  The company opened its first
8  United States office in 2011.  Unlike that of a company primarily focused on venue
9  ticketing services, CrowdSurge's (and, now, Songkick's) goal has always been to
10  deliver value to the artist by creatively using technology to:  (a) grow and help artists
11  better understand their fan base, (b) market concerts to increase ticket sales, primarily
12  by leveraging artists' own websites (using CrowdSurge's white label ecommerce
13  solution) and other distribution channels (*e.g.*, social media); (c) reduce scalping,
14  including through the use of proprietary, patent pending technology, (d) help artists
15  develop their brands and connect with fans; (e) generate consumer data through direct-
16  to-fan artist ticket presales so that the artist develops the ability to directly connect with,
17  and market to, its fans over the long term; and (f) leverage fan data to help artists
18  pinpoint demand and route world tours.  The thesis underlying Songkick's business is
19  that artists are their own best marketers.  Songkick empowers artists with data, design,
20  branding, and marketing services to maximize their touring revenues and increase their
21  independence from third parties such as Live Nation and Ticketmaster.  Part of this
22  empowerment involves the activation of all of the artists' online "channels," including
23  their websites, mailing lists, social media pages, etc.  Notably, CrowdSurge was one of
24  the first to develop the technologies to enable ticket sales through music streaming and
25  social media platforms such as Facebook.

26      26.  Traditional concert venue ticketing service providers, most notably the
27  monopolist Ticketmaster, typically resist sharing ticket purchaser data with artists.
28  Songkick, which always provides such data to the artist, thus distinguishes itself by

-12-

being truly artist-focused and by actively working with artists to leverage such data and to provide them with the marketing and promotional tools to help them develop their careers and independence through more efficient means of identifying and communicating with their core audience.

27.     Pre-merger Songkick began as an innovative service that notified users about upcoming and newly-announced concerts in their area that they would likely be interested in attending.  Specifically, users share their music interests, or allow Songkick to search their music streaming and download histories, so that Songkick can develop a library of data about each user's individual musical preferences.  Songkick then uses this library to identify concerts that should be of interest to the user and sends announcements to the user about upcoming or newly-announced shows in relevant geographic areas.  Songkick also powers concert discovery services and listings for several major online music platforms, including Spotify, MTV, and SoundCloud. While artists, promoters, concert venue operators, and concert venue ticketing service providers would all benefit from such a service, none existed in a fan- or user-friendly format before pre-merger Songkick arrived.  Since its formation, the company continued to grow and today provides one of the best lead generators for concert venues and artists, with approximately 10,000,000 unique fans on a monthly basis.

28.     In June 2015, CrowdSurge and pre-merger Songkick brought together their two services into one company.  As one of the main music industry publications, *Billboard*, put it, "Concert discovery and ticket sales go together like peanut butter and jelly – at least for Americans.  The 50/50 merger of Songkick and CrowdSurge, announced Thursday, should make finding and buying concert tickets much easier."  In response to a perceived threat from this merger, Ticketmaster has escalated its efforts to remove Songkick as a competitor to preserve and enhance its monopoly of both the artist presale ticketing services market and the concert venue ticketing services market.

29.     The merged Songkick's offering, which allows artists to control how and where their artist presale tickets are sold to their fans (whether on their own websites,

on social networking sites, on Songkick.com and its mobile applications or via streaming services), has captivated the artist community and obtained approximately 15% of the market for artist presale ticketing services, in spite of the predatory and anticompetitive actions of Ticketmaster and Live Nation.  Live Nation's CEO and Director, Michael Rapino, has recognized that this approach to ticket sales is the future of the industry.  As he admitted to the U.S. Senate Subcommittee on Antitrust, Competition Policy and Consumer Rights when he sought to merge Live Nation with Ticketmaster in 2010, the future of the ticketing industry is "a world in which a fan doesn't have to go to Ticketmaster or any other single source or portal to purchase tickets.  Instead they can buy them anywhere the artist wants to make them available— a proprietary fan site, a social networking site, a TV show tie-in site, a grocery store, wherever."  This is exactly the worldview that Songkick seeks to implement (and the service it provides), and which Mr. Rapino, enriched as he, Live Nation, and Ticketmaster have been post-merger, seeks to prevent Songkick and other competitors from achieving.

## JURISDICTION AND VENUE

30.    Songkick brings this action under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18.  This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

31.    Songkick also brings this action for violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*  Songkick further brings this action under state law for intentional interference with contractual and prospective economic relations, as well as promissory estoppel.

32.    This Court has supplemental jurisdiction over these pendant state law claims under 28 U.S.C. §§ 1332(d) and 1367 because the claims arise from the same nucleus of operative facts as the federal antitrust law claims.

## **ADDITIONAL FACTS**

### **General Background on the Live Music Industry**

33.    As pertinent to this case, the components of the live music entertainment industry include the following:



34.    Artists are the draw for a live music event and drive demand for the services of every subsequent link and participant in the live music industry chain. Without artists, there is no live music industry.

35.    An artist manager serves as the "CEO" of an artist's business activities, advising in some or all phases of the artist's professional life (tours, appearances, recording deals, publicity, endorsements, etc.).  Managers often are compensated based on a share of all of the artist's revenues or profit streams.  Defendant Live Nation is currently the largest manager of artists in the music industry.

36.    The artist manager often hires booking agents to assist in arranging a concert event or tour.  The manager or booking agent contracts with promoters, such as Live Nation, to secure payment terms for artists as compensation for their live performances.  Agents are typically paid a portion of an artist's receipts from live performances.

37.    The promoter is responsible for promoting the concert to the public, which requires several different types of work.  The promoter typically receives the proceeds from gross ticket receipts for each concert it promotes and is responsible for paying the artist, venue, and other expenses associated with the event.  For example, the promoter hires the artist for the performance (often guaranteeing more popular artists millions of dollars for that performance or a national tour), generally contracts with the venue (or uses its own venues), pays the concert venue operator a fixed fee (rental payment) to host the concert at the venue, arranges for local production services, and advertises and

markets the concert.  The promoter bears the downside risk of an event if tickets sell poorly and reaps the upside benefit with the artists if tickets sell well.  Put simply, the more tickets a promoter is able to sell for a show, the more money the promoter (and artist) should make.  Defendant Live Nation is the largest promoter in the United States, with over 60% of the concert promotion services market.

38.    Concert venue operators provide access to and maintain the facilities where concerts are held and oversee the venue's associated services, such as concessions, parking, and security.  Along with a rental fee received from the promoter, venues generally take a share of the proceeds from concessions, parking, and artist merchandise sales.  Although the fixed fee does not change based on show attendance, the concert venue operator's ancillary revenue streams are tied to the number of patrons who attend the show.  By agreement, custom, and practice, concert venue operators (upon request) generally provide an allotment of tickets to artists for presale to fans.  Similar to the promoter, the more tickets sold (and the more patrons that attend the venue), the more money the concert venue operator makes.

39.    In terms of ticket sales, concert venue operators have two options:  either manage the sale of primary ticket inventory themselves or contract with a third party to handle the sale process for them.  Managing and selling concert venue tickets is technologically and operationally complex, so most concert venue operators choose the latter option and contract with concert venue ticketing service providers (generally Ticketmaster for major concert venues) for comprehensive ticketing solutions.  Of particular note for this complaint is that Live Nation is the second-largest concert venue operator/owner in the United States and exclusively utilizes Ticketmaster for these services.

40.    Concert venue ticketing service providers contract with venues to manage and sell primary ticket inventory for events at that venue.  Concert venue ticketing service providers create "back-end" inventory management systems and provide "front-end" support, including customer service, shipping, and fulfillment services, as well as

the technology (and staff) to allow concert venue operators to sell tickets through their box offices. The concert venue ticketing service providers sell the primary ticket inventory made available to them through means such as the Internet, call centers, and retail outlets and/or help the venue sell tickets at its box office. Ticketmaster's historical role has been that of a concert venue ticketing service provider for "general sale" tickets (*i.e.*, primary tickets sold to the general public beginning on a specified date and concluding at the time of the live show). This is distinguished from artist presale ticketing services for sales of artist presale tickets to fans, which take place before general sale tickets are offered to the public, and secondary ticketing services, the latter of which facilitate the resale of previously-purchased tickets. Today, secondary ticketing services have progressed from scalpers standing outside a venue before a show to sophisticated online marketplaces, the largest of which are StubHub and Ticketmaster's own TicketExchange / TicketsNow / TM+ / Verified Tickets platforms.

41. Concert venue ticketing service providers generate profits by applying additional charges to the price of tickets. The overall price a consumer pays on a primary ticket purchase therefore generally includes the "face value" of the ticket (which is set by the artist and promoter), as well as a variety of service fees on top of/in addition to the face value of the ticket. As noted, these fees are generally charged and retained by the concert venue ticketing service provider, although they may be split with other parties, including the concert venue operator. Typically described as "convenience," "processing," "service," "facility," and/or "delivery" fees, these service fees can constitute a substantial portion of the overall cost of the ticket to the consumer.

42. Substantially all of the nation's major music concert venues have entered into long-term exclusive agreements with concert venue ticketing service providers— over 80% with Ticketmaster—whereby the ticketing service provider contracts for the exclusive rights to a portion of all primary ticket sales for all events held at the venue. Ticketmaster has long-term exclusive dealing agreements with at least 80% of the top

arenas and amphitheaters in the United States. By Defendants' own count, Ticketmaster provides concert venue ticketing services to over 12,000 venues and has a renewal rate "exceeding 100%," because there is no effective competition to Ticketmaster when these long-term exclusive dealing contracts expire.

43. According to Ticketmaster, its agreements with concert venues have terms that may exceed ten or more years in length. In order to induce concert venue owners/managers to enter into such exclusive dealing agreements, Ticketmaster offers up-front payments and other subsidies that can run into the millions of dollars that are conditioned on such exclusivity. Those up-front payments act as a barrier to entry for smaller competitors and act as an additional mechanism to maintain Ticketmaster's dominance.

**Defendants' Market Power in the Live Music Industry**

44. As previously noted, Ticketmaster has dominated concert venue ticketing for decades, dominance that has increased over the past four years in part because of the merger with Live Nation. Other companies have sought to compete against Ticketmaster for primary ticketing to concert venues over the years, but none have been successful because Ticketmaster either acquired them, drove them out of business, or minimized their market share through a variety of tactics. In 2014, Ticketmaster's share of concert venue ticketing services in the United States exceeded 80% among major concert venues and, as noted, its market power is growing as a result of renewals and extensions of existing agreements.

45. High market shares are not the only indicators of Ticketmaster's market power. Ticketmaster's revenues are much greater than those of the next several largest concert venue ticketing service competitors combined, and its gross profit margins exceed 50%. (Even Live Nation's competing concert venue ticketing business was only ever a fraction of the size of Ticketmaster's before the two companies merged.) Moreover, although a small number of other concert venue ticketing competitors attempt to compete against Ticketmaster for primary ticketing rights at venues not

controlled by Defendants, Defendants have boasted that, for every year since Ticketmaster and Live Nation merged, Ticketmaster's net renewal rate with venues has been "*over* 100%." In other words, since it merged with Live Nation, Ticketmaster has increased its market share and dominance every single year. It now counts over 12,000 venues as clients, compared to "only" 10,000 prior to the merger, an increase of 20% in five years.

46.    Before its merger with Ticketmaster, Live Nation was the world's largest promoter of live concerts. The company continues to hold that title today. Live Nation's Concerts business principally involves the promotion of live music events at concert venues throughout the world, although its largest footprint is in the United States. Live Nation is also the second-largest owner or manager of concert venues and owns, leases, operates, has booking rights for, or has equity interests in over 110 live entertainment venues of various sizes in the United States.

47.    Before the merger, Live Nation had been using Ticketmaster as its concert venue ticketing service provider and was one of Ticketmaster's largest customers. In late 2006, Live Nation (run then, as now, by Mr. Rapino) concluded that it would be better served by entering the concert venue ticketing service business itself. Live Nation believed that, as the nation's foremost concert promoter, its prominence would give it immediate access to the concert venue ticketing services market.

48.    That is exactly what happened. Shortly after rolling out its concert venue ticketing service strategy in 2008—which involved (a) licensing ticketing software from CTS Eventim, the leading German concert venue ticketing service provider, for both Live Nation and third party venues to use within the United States, and (b) engaging in price competition with Ticketmaster on ticket service fees—Live Nation became the second-largest provider of concert venue ticketing services in the United States almost overnight (by signing up both itself *and* the largest venue operator of the time, SMG).

49.     In order to protect and preserve its monopoly power in concert venue ticketing services and to remove Live Nation as a competitor, Ticketmaster decided to merge with Live Nation.  The U.S. Department of Justice, California, and sixteen other states disagreed that this was permissible and, in January 2010, sued to block the merger between Ticketmaster and Live Nation.  The primary concern expressed in the complaint was that the merger would eliminate competition and innovation in the market for concert venue ticketing services (defined in the complaint as "primary ticketing services"), by eliminating Live Nation as a competitor of Ticketmaster.  To reduce the government's concerns, Defendants entered into a consent judgment.  That judgment, however, did not address artist presale ticketing services.  Moreover, the merger's anticompetitive effects on the market for artist presale ticketing services did not occur or become apparent until the past four years, when Defendants began their joint campaign against competition in that market as herein alleged.

50.     Today, as a result of the merger, Defendants have acquired unparalleled dominance within the live music industry.  Ticketmaster provides the vast bulk of concert venue ticketing services in the United States, just as it has for decades.  Post-merger, however, Ticketmaster is perfectly aligned with (and owned by) Live Nation, the largest concert promoter in the United States, whose market power has been used to preserve and enhance Ticketmaster's monopoly power in both concert venue ticketing services and artist presale ticketing services.  Whereas, pre-merger, Ticketmaster needed to be cognizant of promoters and artists taking business away from Ticketmaster's contracted venues, that concern has now disappeared because the post-merger Live Nation business promotes, manages, and/or hosts concerts for most of the biggest acts that tour in the United States—*i.e.*, the artists that Ticketmaster and its venue clients most care about.  Indeed, as herein alleged, Live Nation has had no qualms pushing Ticketmaster's services on artists and venues alike.  Similarly, Live Nation has directly participated in, encouraged, aided, and facilitated Ticketmaster's anticompetitive activities.

51.     Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), the post-Live Nation and Ticketmaster merger HHI for venue ticketing services increased by over 2,190 points, resulting in a post-merger HHI of over 6,900. The U.S. Department of Justice considers any market with an HHI of more than 2,500 to be highly concentrated.   If Ticketmaster is successful in its quest to destroy competition in the artist presale ticketing services market (such as those provided by Songkick), the HHI would rise even higher, to nearly single-competitor—*i.e.*, pure monopoly—levels.

52.     The merger of Ticketmaster and Live Nation has had at least the following additional effects:

(a)     actual and potential competition between Ticketmaster and Live Nation in the provision and sale of concert venue ticketing services has been eliminated;

(b)     competition generally in the market for concert venue ticketing services has been substantially lessened since the remaining competitors have lost market share in favor of the monopolist Ticketmaster; and

(c)     competition generally in the market for artist presale ticketing services has been substantially lessened because Defendants are now able to coerce artists into selecting Ticketmaster's artist presale ticketing services over those of Songkick and other third-party providers through a variety of means alleged herein.

53.     Defendants' market power thus maximizes market inefficiencies and heavily restricts competition in an industry where Defendants themselves estimate that an average of 40% of tickets go unsold, with industry insiders believing this number to be closer to 50%.   Defendants also admit that 80% of Live Nation's shows do not sell out, primarily because fans do not know about the shows.   Songkick's goal is to change those statistics, and doing so would benefit nearly every player in the live music industry, artists and concertgoers most of all.

COMPLAINT

### The Market For Artist Presale Ticketing Services

54.     As alleged above, Defendants have admitted and agreed that venues have the right to hold back blocks or groups of tickets from the general sale for various parties, including (among others) the concert promoter, record companies, the artist and its management.  The tickets that a venue, upon request, holds back for an artist presale are sold by the artist directly to their fans, generally through an artist presale ticketing service provider.  Those allocations vary in amount from eight to fifty percent (or more) of the venue's available seats for the artist's concerts.

55.     Because the widespread practice of artist presale allocations is and has long been industry standard, Defendants have, as alleged herein, repeatedly agreed and acknowledged that the venues with which Ticketmaster contracts have the right to make this allocation to artists.  Artists then use their artist presale allocations to conduct an "artist presale," whereby they typically charge fans lower prices than what they would otherwise face in the general sale and try to ensure that these seats go to their most engaged fans.  Artists accomplish this by negotiating deals with artist presale ticketing service providers (which typically charge lower service fees than concert venue ticketing service providers).

56.     Artist presales generally benefit the artist in multiple ways that are not prioritized by concert venue ticketing service providers.  For example, the presales generate and deepen goodwill among the artist's biggest fans, which turns into higher ticket sales overall and helps promote a longer musical career.  Artist presale tickets are often offered with significantly lower service fees than general sale primary tickets, and, with effective marketing and promotion, also help create demand and "buzz" for the artist's shows.   They also help an artist increase revenue through music, merchandise, and VIP package sales, and promote causes and charities the artist favors.  Yet another benefit is that the artist can gather consumer data from an artist presale that they can then use to promote their shows and brand in the future without having to rely on third parties, such as Ticketmaster or Live Nation.

57.   Artist presales are economically unique and distinct from other types of ticket sales for a variety of reasons.  Most notably, they differ because the artist sells tickets directly to their fans and does so at a different time than the general sale (*i.e.*, artist presale tickets must be sold before the venue ticketing service provider offers concert tickets in the general sale).  Artist presales also involve contracts between the artist and the ticketing services provider rather than between the concert venue and the ticketing services provider.  Likewise, artist presales are only available for a discrete amount of time to potential purchasers, which allows the artist to reward its most engaged fans who are following, or who have created a communication channel with, the artist on social media, through a tracking service such as Songkick, or via the artist's mailing list.  This promotes the artist's long-term success with its fan base, not merely the success of a particular concert.  No general sale tickets are available during an artist presale and no artist presale tickets are available after the general sale begins.

58.   Several other factors also demonstrate the unique and separate nature of artist presale ticketing services (as opposed to concert venue ticketing services and different types of presale ticketing services):

(a)   *First*, customers for artist presale ticketing services (*i.e.*, artists and their management) recognize the distinction between artist presale ticketing service providers and other types of primary ticketing service providers.  Artists, managers, promoters, venues, and primary ticketing service providers themselves (including Ticketmaster) all view artist presales and artist presale ticketing services as separate from general sales and concert venue ticketing services.  Indeed, Defendants refer to their own version of artist presale ticketing services as a "specialty ticketing service" and they have noted in documents distributed to artists and other live music industry participants that there is an "important distinction between 'general public ticketing' and 'artist fan club ticketing.'"

(b)   *Second*, all these entities (including Ticketmaster itself) recognize that the artist presale has unique purposes from the general sale and even other types of

presales:  it rewards the artist's most engaged fans while acting as a promotional tool to help drive demand for the overall show and further the artist's career.  Artist presale ticketing services help the artist achieve these unique purposes.

(c)     *Third*, the customers for artist presale ticketing services are distinct from the customers for concert venue ticketing services.  The customers for the latter are generally the concert venue operators.  The customers for the former are generally the artists.  There is very little overlap between these two customer bases, although they are aligned in wanting to sell more tickets for the artist's shows.

(d)     *Fourth*, there are distinct pricing models between the two markets.  Artist presale ticketing service providers (other than Ticketmaster) typically charge lower fees on artist presale tickets than venue ticketing service providers charge on their allocated tickets, because one of the key reasons for artist presales is to charge lower prices for primary tickets than general sales.  Unlike in the general sale, artists can control the service fee charged to fans in the artist presale through their selection of the artist presale ticketing service provider.

(e)     *Fifth*, demand for artist presale ticketing services is not sensitive to changes in prices for other types of primary ticketing services, because such changes do not cause artists to choose a different set of services.  For artists, the point of artist presales (*i.e.*, the economic benefit the artist receives), as outlined above, is to provide a variety of marketing, promotional, and long-term career benefits to the artist.  Price changes for other types of ticketing services do not affect these demand drivers for artist presales in any significant way.

## **Relevant Markets**

59.     There are at least three relevant product markets applicable to this dispute.  The first two are:  (1) the market for the provision of marketing and ticketing services for artists before primary tickets are offered in the general sale at major concert venues (the "artist presale ticketing services market"), which is, in the alternative, a separate relevant market or a relevant submarket of primary ticketing services; and (2) the

market for the provision of primary ticketing services for a major concert venue's general sales (the "concert venue ticketing services market"). Songkick and Ticketmaster are competitors in the artist presale ticketing services market.

60. Based on the number of tickets Ticketmaster claims to have sold in artist presales, Ticketmaster currently controls at least 80% of the artist presale ticketing services market. Songkick is its largest competitor in this market. As noted herein, Ticketmaster is now seeking to remove Songkick as a threat to its monopoly power in this artist presale ticketing services market, or, alternatively, submarket of primary ticketing services.

61. The United States is the relevant geographic scope of both the artist presale and the concert venue ticketing services markets. Concert venue operators purchase concert venue ticketing services from their locations within the United States and look to United States-based service providers to provide the concert venue ticketing services for their shows. Similarly, for artists that make a tour of United States venues and conduct artist presales as part of that tour, they look to artist presale ticketing service providers that are based in, or have locations in, the United States. If artist presale or concert venue ticketing service providers within the United States raised their prices by a small but significant and non-transitory amount, that would not cause their respective types of customers to seek ticketing services from providers based entirely outside of the United States. Furthermore, only ticketing service providers with one or more locations in the United States compete with each other for customers requiring ticketing services at concert venues in the United States or for United States-based concert tours.

62. In the alternative, the relevant geographic markets for artist presale and concert venue ticketing services are the sub-national regions from which major concert venues and artists respectively require, purchase, and look for concert venue and artist presale ticketing services. Although Songkick has not yet had the discovery needed to

COMPLAINT

finally define these regions, on information and belief, they include at least the following greater metropolitan and surrounding areas:

Birmingham, Alabama
Northern California
Southern California
Hartford, Connecticut
Washington, D.C.
Miami, Florida
Atlanta, Georgia
Honolulu, Hawaii
Chicago, Illinois
Indianapolis, Indiana
Louisville, Kentucky
New Orleans, Louisiana
Boston, Massachusetts
Portland, Maine
Detroit, Michigan
St. Louis, Missouri
Charlotte, North Carolina
Raleigh, North Carolina
Omaha, Nebraska
Holmdel/Atlantic City, New Jersey
Albuquerque, New Mexico
New York, New York
Cincinnati, Ohio
Columbus, Ohio
Cleveland, Ohio
Oklahoma City, Oklahoma
Pittsburgh, Pennsylvania
Philadelphia, Pennsylvania
Providence, Rhode Island
Charleston, South Carolina
Memphis, Tennessee
Nashville, Tennessee
Dallas/Ft. Worth, Texas
Austin, Texas
Houston, Texas
Richmond, Virginia
Norfolk/Virginia Beach, Virginia
Seattle, Washington
Milwaukee, Wisconsin

Once afforded further discovery into this issue, Songkick will allege and refine further relevant geographic markets to conform to the proof (including narrowing or broadening them according to the evidence).

63.     The third relevant product market at issue in this complaint is the market for concert promotion services because, as discussed below, Live Nation uses its market power in that market to force artists to use Ticketmaster's artist presale ticketing

-26-

services.  Artists planning to conduct a national tour often use a single company to provide and/or coordinate promotions for the entire tour.  SFX Entertainment, Live Nation's predecessor company, was the first to achieve this feat at scale across the industry by acquiring multiple regional promoters and integrating them into one national organization (while a handful of artists were able to obtain national concert promotion services prior to the SFX consolidation, national concert promotion services were at that time the exception rather than the rule).  The unique, nation-spanning services such a company provided to artists led them to view SFX (and, later, Live Nation) as their promoter of choice for concert tours, large and small. Although some artists still use multiple regional concert promoters for a single national tour, the pre-SFX *status quo* has been reversed, and this practice is now the exception for larger artists, rather than the rule.

64.     Today, Live Nation controls at least 60% of the concert promotion services market.  AEG Live is Live Nation's closest competitor, with 21% of the market.  Live Nation, however, promotes at least 22 of the top grossing 25 touring acts in the world, and it is the only promoter, national or regional, that has a direct corporate relationship with the nation's most dominant concert venue and artist presale ticketing service provider, Ticketmaster.

65.     The geographic scope of the concert promotion services market is the United States.  Artists look to concert promotion service providers that operate within the United States in order to put on any leg of a concert tour in the United States.  Live Nation and AEG Live have promotion networks established throughout the country and are considered viable alternatives to promoters with a more regional focus. Accordingly, even if an artist is focused on conducting a concert tour in only a limited region of the United States, the alternatives from which they can choose for concert promotions services are national.

66.     In the alternative, the relevant geographic markets of the concert promotion services market are the sub-national regions in which artists require,

purchase, and look for promoters to provide promotion services for one or more legs of a concert tour.  Although Songkick has not yet had the discovery needed to finally define these regions, on information and belief, they include at least the following regions:

Pacific Northwest
Northern California
Southern California
Intermountain West
Southwest
Upper Midwest
Lower Midwest
Texas
Ohio Valley
New England
Tri-State
Pennsylvania
D.C. Metropolitan
South
Southeast

Once afforded further discovery into this issue, Songkick will allege and refine further relevant geographic markets to conform to the proof (including narrowing or broadening them according to the evidence).

## **Market Power**

### A.    **Ticketmaster**

67.    As discussed above, Ticketmaster is the largest primary ticketing services provider in the nation.  Ticketmaster has historically possessed multiple competitive advantages.  As a result, smaller primary ticketing service providers (of all types) have been limited in their ability to compete.

68.    The primary source of, and barrier surrounding, Ticketmaster's market dominance is a nationwide web of long-term, exclusive dealing contracts with the vast majority of major concert venues throughout the United States.  General sales under these contracts typically involve the sale of available tickets to the venue's shows, excluding artist presale allocations.  In exchange, Ticketmaster pays the venue a high fixed fee (often including undisclosed rebates and other subsidies), which, depending

on the venue and the term of the contract, can be many millions of dollars.  Given the amounts at issue, this is a substantial barrier to entry and has allowed Ticketmaster to steadily grow its venue contracts since its merger with Live Nation.

69.     The long-term exclusive dealing contracts with venues also create market power and barriers to entry because of their length and ubiquity.  Ticketmaster's exclusive dealing arrangements with venues have terms that may range to ten or more years in length and presumably much longer for Live Nation-controlled venues. According to published industry data, Ticketmaster controls the distribution for approximately 80% of major concert venues, and works with over 12,000 venues total. Published industry data also indicates that approximately 70% of all online concert ticket sales are completed through ticketmaster.com or Ticketmaster-run websites.

70.     Ticketmaster has also entered into long-term exclusive dealing arrangements with concert promoters, which is another barrier to entry and source of market power.  Live Nation, the largest of these promoters, utilizes its subsidiary and agent, Ticketmaster, almost exclusively and actively seeks to dissuade its artists from using any other presale ticketing platform.

71.     In addition to Ticketmaster's exclusive contracts, new entry into the provision and sale of ticketing services, whether artist presale, concert venue, or other types, is costly and time-consuming, thus constituting a substantial, additional barrier to entry.  A ticketing service provider must develop, maintain, and efficiently operate the required ticketing software and hardware computer systems, and possess the ability to demonstrate the reliability of its computer systems.  Moreover, for *concert venue* ticketing service providers in the current marketplace, the company must possess the ability to provide substantial up-front payments to customers.  Given these baseline requirements, no new entrant has developed or can develop the combination of comparable business characteristics and abilities in order to compete in concert venue ticketing services with the combination of Ticketmaster and Live Nation.

COMPLAINT

72. Within the last four years, additional entry barriers protecting Ticketmaster's dominance have emerged. The merged firm's promotion and artist management businesses, for example, provide a steady stream of business to Ticketmaster and its venue clients that smaller ticketing companies cannot overcome. Pre-merger, Live Nation began to challenge Ticketmaster's dominance by using its stable of artists as an inducement to venue operators to select its own concert venue ticketing services over Ticketmaster's. Without that constraint in the market—and with Live Nation's now perfect alignment with the company against which it previously sought to compete—Ticketmaster has only grown its market share and ability to set prices without fear of serious competition from any new entrant. In the last four years, Ticketmaster has increased its market dominance and claims it is renewing over 100% of its long-term exclusive dealing contracts as they expire, which necessarily occurs at the expense of rivals. Ticketmaster has also, within the past four years, sought to extend this monopoly power to artist presale ticketing services.

73. In addition to barriers to entry based on the current market structure and conditions (including Defendants' corporate structure), Ticketmaster's and Live Nation's anticompetitive practices, discussed herein, including but not limited to tying agreements, long-term exclusive dealing contracts, group boycotts with various third parties against Ticketmaster's competitors, and coercion of and threats against disloyal customers and others, also act as a barrier to entry.

74. Ticketmaster's market power is evidenced by the high and supracompetitive fees that it charges for ticketing services, and the restricted output those fees cause. Ticketmaster's fees can collectively increase the price of a ticket to the consumer by 20-80% over the ticket's face value, which, in turn, generates gross profits (after all rebates and other payments) to Ticketmaster of over 50%. There are no effective constraints on Ticketmaster's ability to charge these supracompetitive fees because box office sales for most concerts and other events are minimal and are continuing to decrease. This is because (a) in certain cases, Ticketmaster dictates that

-30-

box office sales cannot begin until a specified time period following commencement of the online general sale (*e.g.*, for Madison Square Garden, box office sales are prohibited until one day after the general sale commences on ticketmaster.com), (b) consumers realize they have a better chance of obtaining a better seat online, and (c) consumers continue to increasingly prefer online purchases through mobile- or web-based applications. As noted above, these factors also lead to restricted output in overall ticket sales, as is demonstrated by the fact that 40-50% of tickets to concerts at Ticketmaster-contracted venues go unsold every year.

**B.     Live Nation**

75.     As discussed above, Live Nation is the largest concert promoter in the nation and the world. Live Nation has distinct competitive advantages as compared to AEG Live, the only other major national concert promoter currently in the market. Neither AEG Live nor any likely entrant to the concert promotion services market possesses the combination of attributes to prevent Live Nation's selective exercise of market power over artists and major concert venues by the merged firm. New entry into the provision and sale of concert promotion services at the scale of Live Nation is costly and time-consuming. Promoters must have the ability to provide substantial up-front payments to artists, and artists seeking to conduct a concert tour, particularly a national tour in the United States, require employees with the expertise, contacts, and business acumen to organize and promote such a tour. Furthermore, given that a United States concert tour is specifically tied to the United States venues and regions in which it is conducted, and requires specialized knowledge and skills regarding those markets (among other related factors), artists require that concert promotion services be provided in the United States by service personnel located in and throughout the United States. It would take a prospective new entrant a substantial investment of money and over multiple years to develop the combination of comparable characteristics necessary to compete with the merged firm in concert promotion services and, even then, there is no assurance that it could in any way reduce Live Nation's market power.

76.     For nearly two decades, Live Nation has dominated concert promotion services overall.  It has maintained its dominance by virtue of its size and scope, and (post-merger) anticompetitive and unfair business tactics, including acquisitions of competing promoters, and incurring losses via significant overpayment to artists from tour revenues with the aim of reducing rival promoters' access to clients.

77.     Following the merger with Ticketmaster, additional entry barriers are emerging.  Ticketmaster provides the bulk of the merged firm's annual operating income.  With that income stream from Ticketmaster, Live Nation is able to offer higher payments to artists than AEG Live and other concert promoters, and to use its promotion business as a loss leader to generate outsized profits for its ticketing and sponsorship businesses.  The ability to price in this way and nevertheless ensure massive profits for the overall company is one of the reasons why Live Nation has durable market power over its smaller competitors.  Armed with that unique pricing ability, Live Nation has only grown its market share and power without fear of serious competition.  Live Nation has also recently acquired four of the five largest annual festivals in the United States.  Playing in those festivals—which provide massive exposure and large paychecks—is hugely important to today's touring artists' careers.  Live Nation's ownership of these festivals therefore gives it an additional point of leverage to pressure artists to comply with its demands.

78.     Live Nation's market power is also supported by current trends in the music industry.  Whereas, in previous decades, revenues from recorded music were musicians' main source of income, with touring revenues providing a smaller income stream, those statistics have since reversed themselves.  This reversal is largely due to the advent of modern music streaming and download technologies, and it requires artists to place much more emphasis on the touring portion of their careers.  This reality has greatly increased Live Nation's power and control over the shape of artists' careers, making them more reluctant than ever to defy Live Nation.  Mr. Rapino has admitted that artists today make "about 95%" of their income from live music events and that

Live Nation is now the "largest single financer" of artists worldwide (more than record companies). Mr. Rapino uses this position to intimidate artists, claiming, for example, that using an artist presale ticketing service other than Ticketmaster is like hurting Live Nation itself.

79.     Live Nation holds over 60% of the concert promotion services market and promotes at least 80% of the top-billing global touring acts, which tour the United States. Within the last four years, Live Nation has used its market dominance to aid its subsidiary Ticketmaster in its efforts to destroy rivals such as Songkick.

<u>**Defendants' Intent To Destroy Competition in the<br>Artist Presale Ticketing Services Market**</u>

80.     The merged Ticketmaster and Live Nation want to avoid third party-run artist presales entirely because they take tickets and web traffic off the Ticketmaster platform and give artists access to information (*e.g.*, fans' consumer data) that the merged company has long preferred to keep to itself in order to maximize their revenue streams and bolster Live Nation's various divisions. Refusing artists access to their fans' consumer data also keeps them dependent on Defendants for marketing and distribution (even though it is the artists, not Defendants, that generate the demand for ticket sales that generate this data). For example, Mr. Rapino expressed this intent when he told several artists (whose identities will be disclosed once a protective order is in place) that they could not take a single ticket off of the Ticketmaster system, period. Mr. Rapino similarly told at least one artist that hurting Ticketmaster (by using anyone other than Ticketmaster for artist presale ticketing services) was like hurting Live Nation itself—a powerful threat in light of Live Nation's position as the "single largest financer" of the artist community in the world.

81.     Defendants also intend to remove competition within the artist presale ticketing service market because effective artist presales—like those Songkick conducts—inhibit scalping, which is directly contrary to Defendants' recent push to grow and funnel tickets to Ticketmaster's secondary ticketing platforms, including

TicketExchange, TicketsNow, TM+, and Verified Tickets, a significant and growing revenue stream for Defendants.

82.     Moreover, the merged company's sponsorship and advertising business unit is the highest-margin division within Live Nation.  When artists conduct presales on non-Ticketmaster platforms, thereby directing their fans to their own websites, and sell tickets directly to those fans, the artists retain the consumer data their concerts generate, and draw users away from ticketmaster.com, thereby directly drawing dollars away from two of Defendants' strongest revenue generators (ticketing and advertising) and undermining a significant portion of the supposed value derived from Ticketmaster's business model.

83.     Ticketmaster has a massive database of email addresses—approximately 130 million email addresses—that it has collected over the years from its online ticket sales and which it generally refuses to provide to the artists who create the demand for those tickets.  Today, market access to Defendants' database forces many artists to use Ticketmaster's services.  Removing artist presale ticketing service providers (which provide this type of direct contact information to their artist-clients) from the market will therefore enhance and/or maintain Defendants' monopoly power.

84.     Ticketmaster also has an ecommerce website, ticketmaster.com, through which every one of its online ticket purchasers must pass.  As such, ticketmaster.com is an extremely valuable advertising opportunity for any company looking to reach millions of consumers on a daily and annual basis.  Less traffic to ticketmaster.com means less advertising revenue to Defendants.

85.     For these reasons, Ticketmaster (under Live Nation's direction and control, and with its direct assistance) intends to remove Songkick and similar companies as its competitors because it prefers to keep control over every aspect of the ticketing process for a show.  It is far more valuable to Defendants to do so than to allow artists to create their own online ticketing locations, which enables artists to (a) direct web traffic to their own online properties (which decreases Ticketmaster's ad

-34-

revenues), (b) collect fans' email addresses and other contact information themselves (which reduces future reliance on Ticketmaster's database), and/or (c) otherwise run an artist presale without Ticketmaster's help (which reduces Ticketmaster's fees for that artist's shows and greatly inhibits their ability to generate secondary ticketing revenues from those tickets).

86. But the artists' fans are antagonistic to Ticketmaster because of its monopolistic service fees, and Ticketmaster (as demonstrated by the vast number of empty seats for most concerts) is simply not very good at adequately marketing shows, nor is it very good at driving demand. Defendants themselves estimate that an average of 40% of tickets to live music shows within the United States go unsold, with industry insiders believing this figure to be closer to 50%. They also estimate that 80% of Live Nation's shows do not sell out.

87. It was into this gaping hole that Songkick first stepped several years ago, all with the goal of increasing ticket sales overall and thereby benefiting every part of the live music industry, particularly the artists whose artist presale allocations Songkick helps market and sell. As John Pleasants, Ticketmaster's CEO from 1999-2005, once admitted, "If you sell two percent more tickets in a year for a building, literally, it just dwarfs any amount of economics that might have been negotiated in what the revenue splits are on conveniences charges and things like that." Songkick sought to improve the economics of the industry and most benefit the individuals and entities that actually drive demand for ticket sales: the artists and their fans.

### Songkick Threatens Ticketmaster's Monopoly Power in the Artist Presale Ticketing Services Market

**A.    Songkick's Early Interactions With Defendants: The Introduction of the "Fan Club Policy"**

88. Songkick delivers value to artists by creatively using technology to: (a) grow and help artists better understand their fan base; (b) market concerts to increase ticket sales, primarily by leveraging artists' own websites (using Songkick's white label

ecommerce solution) and other distribution channels (*e.g.*, social media); (c) reduce scalping, including through the use of proprietary, patent pending technology; (d) help artists develop their brands and connect with fans; (e) generate consumer data through direct-to-fan artist ticket presales so that the artist develops the ability to directly connect with, and market to, its fans over the long term; and (f) leverage fan data to help artists pinpoint demand and route world tours.  The thesis underlying Songkick's business is that artists are their own best marketers.  Songkick empowers artists with data, design, branding, marketing and ticketing services to maximize their touring revenues and increase their independence from third parties such as Live Nation and Ticketmaster.  Songkick has grown so popular that it most recently worked with over 150 premier artists on more than 3,000 shows in a single year, and its clients have included a wide variety of today's most recognizable music artists.

89.     Early on, CrowdSurge received little attention from Ticketmaster. However, once CrowdSurge began attracting significant clients and growing its artist presale ticketing services market share, Ticketmaster finally contacted CrowdSurge regarding artist presales.  At that time, Ticketmaster claimed that CrowdSurge's artist-clients, who had no contract with Ticketmaster for artist presale ticketing services or concert venue ticketing services, must comply with a so-called "fan club policy" or else not receive their artist presale allocations.  Under this "policy," artists could only sell their artist presale allocation tickets as part of presales to "legitimate" fan clubs (the definition of which was supposedly up to Ticketmaster and subject to redefinition at Ticketmaster's whim).  The first time Ticketmaster ever sent a copy of any version of its fan club policy to CrowdSurge was in early 2012.

90.     CrowdSurge and its clients believed the fan club policy was inapplicable to their artist presales, but CrowdSurge wished to avoid confrontation with Ticketmaster and instead rely on the merits of the company's offerings to attract clients.  Relying on Ticketmaster's statements in its fan club policy (as well as its verbal assurances) that compliance with the policy meant Ticketmaster would not

-36-

interfere with an artist's presale, CrowdSurge invested months of time and significant resources to develop fan club login technology and other business practices to comply with the fan club policy.  This was no small investment for a company that had approximately 25 employees at the time.  CrowdSurge, in a further but failed effort to coexist with Ticketmaster, similarly made compliance with the fan club policy a keystone of its artist presale business, even though, as noted above, it and its clients believed the policy was inappropriate but something that needed to be tolerated due to Defendants' market power.

91.    Ticketmaster claimed that its "fan club policy" required that the fan club handling an artist presale should: be the artist's *only* "official" fan club maintained for promotional purposes, even if they have numerous promotional arms; provide for some sort of "meaningful interaction" between the artists and fan club members; not advertise presales on "third party marketing vehicles (e.g., Facebook)"; require personal data from fans in order to become members and not offer or market tickets, packages, and prices for specific events to non-members; limit artist presale tickets to four per performance; and issue a unique password and ID to each member.

92.    Ticketmaster's attempt to limit its competitors to a narrowly-defined "fan club" fails to acknowledge that, for many of today's artists, traditional fan clubs have been largely displaced by social media, such as Twitter, Facebook, Instagram, and Songkick.  (For example, according to Nathan Hubbard, Head of Commerce at Twitter and former CEO of Ticketmaster, "Roughly half of the 100 most followed accounts on Twitter are artists, and the technology is now in place for artists to commercialize their follower relationships by selling songs, tickets and t-shirts directly on these platforms.") Twitter, Facebook, Instagram, Songkick, artist websites, and other modern technological options provide the same benefits and serve the same types of purposes today as traditional fan clubs, and due to advances in technology, provide artists with a quickly and easily accessible method of communication for engaging directly with fans. Nevertheless, Ticketmaster's fan club policy stated that an artist must maintain an

-37-

anachronistic and outdated approach for promotional purposes, or else not be able to obtain their artist presale allocation.  There was no legitimate reason or procompetitive justification for this attempted imposition, as demonstrated by (among other things) the fact that none of Ticketmaster's competitors, including AXS and Ticketfly, have imposed any similar requirements on artist presales, and that Defendants themselves have recognized in their public filings that social media and digital platforms much "more effectively reach [one's] fans and drive more ticket sales" than traditional media and marketing methods.

93.    Following its initial receipt of the fan club policy, CrowdSurge performed several artist presales on behalf of its clients through what it understood were the "compliant" fan clubs demanded by Ticketmaster, its competitor in artist presales.  It did so regardless of whether such fan clubs were a valid requirement for the artist to obtain its artist presale allocations from Ticketmaster or Live Nation venues.  This compliance with the monopolist's demands led CrowdSurge to reasonably rely on Ticketmaster's promises and believe that it was now free to continue developing its business without harassment from Defendants.  But the quiet was short-lived.

94.    Beginning in mid-2012, Ticketmaster began a scheme of prolonged interference and harassment by contacting CrowdSurge (and, later, Songkick) and/or its clients and informing them that Songkick's artist presales were not "compliant" with the fan club policy.  This was not limited to an artist presale here or there; and over time it came to occur for virtually every artist presale Songkick helped conduct.  On occasion, Ticketmaster claimed it was at least willing to discuss the issue and granted so-called "one-time exceptions" for various presales.  Such supposed "exceptions" were granted in situations where the supposedly "non-compliant" fan club was clearly anything but, and/or where Ticketmaster was unwilling to risk shutting down the presale because they were trying to pitch the artist's business in other areas.

95.    Ticketmaster and Live Nation executives and employees also told a number of artists and/or their managers that they simply could not work with Songkick

and that they could not use Songkick's services under any circumstances, even at venues that did not have ticketing contracts with Ticketmaster.

**B.**   **2014-2015: Defendants Seek To Fully Exclude Competition in the Artist Presale Ticketing Service Market**

96.     Despite Ticketmaster's efforts, Songkick continued to compete on the merits and continued to succeed.  The recipe for its success was simple: Defendants are just not as good at providing artist presale ticketing services as Songkick.  Among other issues, Defendants: charge much higher service fees for artist presales than Songkick; do not provide bespoke, artist-centric marketing campaigns on the artist's own website and online properties; drive negligible demand for artist upsell opportunities; feed traffic to their secondary ticketing platforms; and do not freely share the consumer data that an artist presale yields.  Thus, in spite of the pushback and threats from Defendants' employees and executives; in spite of the fear, uncertainty, and doubt Defendants spread regarding Songkick; and in spite of the "one time exceptions" and various considerations Defendants offered to artists (discussed below) if and only if they would agree to either forego an artist presale altogether or choose Defendants' artist presale ticketing services instead, artists continued (and continue) to prefer Songkick because of its demonstrated track record, creativity, and level of service.

97.     Faced with this reality and the increasing demand for bona fide artist presale ticketing services, Defendants decided they would try to destroy competition in artist presale ticketing services in favor of their own artist presale ticketing service business.  To this end, Defendants engaged in a wide variety of anticompetitive activity and predatory acts in recent years that have left Songkick no choice but to sue to prevent further harm to competition than what Defendants have already caused.

98.     For example, for **_any_** artist presale Songkick handled at a Ticketmaster or Live Nation venue, Ticketmaster claimed the artist and Songkick needed to comply with an artificial fan club policy with constantly shifting rules.  Ticketmaster had no right to make this demand, based on the artists' rights to the artist presale allocations

1  and the venues' rights to issue such allocations unfettered by Ticketmaster's
2  interference.

3      99.    In furtherance of this unlawful scheme, Ticketmaster falsely claimed that
4  Songkick's clients' fan clubs were not "compliant" even when they were.  No pretense
5  was too absurd.  Ticketmaster was under instructions from Live Nation and its own
6  management to refuse to permit Songkick to handle any artist presales at Ticketmaster
7  and/or Live Nation venues.  This pattern of "refuse first and find reasons why later"
8  became so prevalent that several Songkick clients noted that Defendants seemed to be
9  "at war" with Songkick.

10      100.    One such prospective client was another of the most recognizable artists in
11  today's market.  A representative for the artist told Songkick that it would be
12  completely unable to market the artist's presales for an upcoming tour because of the
13  "war" Defendants were engaged in against Songkick.  The representative noted that the
14  issue stemmed from Live Nation itself and that the artist understood Live Nation would
15  try to block any presale Songkick tried to run.  The representative similarly explained
16  that he had previously seen instances where Songkick put together an artist presale
17  marketing package for Defendants' approval and sign off, which ended up being a
18  waste of time because there was never any chance that Defendants would approve the
19  package simply because it came from Songkick.  In his own words, "If you changed
20  your business model to selling hot dogs in the parking lot, Live Nation won't even let
21  that happen.  They want nothing to move forward with Songkick."  And, because of
22  Ticketmaster's threats, nothing did move forward with that artist.

23      101.    In this vein, Defendants also continued to present an ever-shifting view of
24  what the fan club policy supposedly required, engaging in a figurative game of "whack-
25  a-mole" from late 2014 through the filing of this complaint.  Ticketmaster did so by
26  identifying to artists, their agents, and to Songkick supposed unwritten requirements in
27  the fan club policy.  (These included supposed rules that, *inter alia*, any "Buy Tickets"
28  or similar buttons must be hidden behind the artist's fan club website login; that artist

presale dates and times could only be revealed to existing fan club members; and that a fan club could not be created "shortly before" a tour, even if the artist was a new or emerging act or an act reuniting for a tour, and/or the artist viewed that club as its official club.)   One by one, as Songkick's artist-clients and their booking agents complied with and/or pushed back against Ticketmaster's supposed unwritten rules, Ticketmaster made up new rules and claimed that the next Songkick client's fan club was non-compliant for the newly-identified reason(s).  This pattern repeated itself again and again, and it caused Songkick's artist-clients substantial frustration, which eventually caused several to reluctantly refrain from doing business with Songkick altogether (even though the client conceded that Ticketmaster's positions on fan club compliance were absurd and unsupported).

102.   In demanding supposed strict adherence to their ever-changing arbitrary and unreasonable policy, Defendants pretended to ignore that, today, in the world of competing social media, "traditional" fan clubs are just one promotional tool artists use to connect with and identify their fans.  Although Defendants claim that they have no objection to artists selling artist presale allocations to fan clubs "or similar arrangements," their activities demonstrate that, in their efforts to squash competition, they will only agree to artist presale allocations under an extremely narrow, divorced-from-reality view of what is a "legitimate" fan club (and often not even then).

103.   It did not matter if Defendant employees contradicted their earlier statements or authorizations for similar artist presales, or if they relied on anachronistic definitions of a fan club and its uses.  Songkick pointed out these inconsistencies to Ticketmaster and highlighted examples of fan club presales they had authorized for other, non-Songkick clients.  These statements, however, did not change Defendants' stance.  If Songkick handled the presale, then the artist's presale was not compliant with the fan club policy, period.

104.   In mid-July 2015, Ticketmaster issued a supposed "clarification" to its fan club policy to further restrict artist presales of artist's tickets to their own concerts,

although (despite Songkick's repeated requests) it did not send a copy to Songkick until August 12, 2015.  For this "clarification" of the policy, Ticketmaster added numerous predatory conditions in an attempt to remove competitors that threatened its monopoly on artist presale ticketing services.  For example, Ticketmaster now informed artists that the allegedly necessary fan club must itself be "easily found" via search engines and on the artist's own webpage (as opposed to a social media site, Twitter account, etc.).  Ticketmaster also stated that the fan club must have an online "devoted ongoing community with its own identity and virtual home where members interact with one another in a members-only section" (for which Ticketmaster has cited examples such as "online chats, online message boards and artist journals"), regardless of whether the artist's fan base is most engaged through the artist's social media platforms or its fan club otherwise does not fit these seemingly deliberately antiquated notions and technologies.  Ticketmaster also stated that dates and times of fan club presales could only be accessible by registered fan club members, and that an artist could not even inform potential fan club members of a presale for an upcoming event until they were already a fan club member, severely limiting the reach of the very fan club they impose.

105.   These predatory restrictions, which were aimed at removing Songkick and other smaller competitors from the artist presale ticketing services market and forcing artists to deal instead with Ticketmaster, unreasonably restrain an artist's and Songkick's promotional options in today's world.  For example, in order to be compliant with the letter of Ticketmaster's July 2015 fan club policy, a "legitimate" fan club **must** have a message board (or equivalent feature) on a website.  Message boards were previously popular forms of internet communication, but have largely died out in light of technologies and mobile applications that foster better communities and direct artist-to-fan interaction.  As one artist manager told Ticketmaster in an effort to secure the artist's presale allocation, "If you really want us to have a message board, fine, we will. Our fans won't care but we'll build it if that's what you need."  Moreover, artists often promote their shows and drive demand through instantaneous social media, which

provides far more active engagement with fans than traditional fan clubs given its accessibility and ease of use.  Fans often follow these updates even if they are not in any "official" fan club and will use them as a signal for when and where to purchase tickets to an upcoming show and for the latest news, updates, and content from the relevant artist.  Even though not the same as joining a traditional "fan club," registering for email updates from the artist, as well as following the artist on social media (*e.g.*, "likes" on Facebook or Instagram, "follows" on Twitter, and "tracks" on Songkick), all offer far broader and better reach than fan clubs of the past were ever able to accomplish, and generally provide just as good an indication (if not better) of whether a particular person is an engaged fan.  Nevertheless, Ticketmaster's fan club policy refuses to acknowledge this reality and seeks to impose its terms only on Ticketmaster's artist presale ticketing services competitors, but not Ticketmaster itself.

106.   Such restrictions are more clearly aimed at preventing competition in the artist presale ticketing services market than at achieving the supposed purposes of a fan club requirement.  Notably, Ticketmaster does not require artists using its own artist presale ticketing services to comply with the fan club policy.  In fact, Ticketmaster specifically markets this "no compliance" policy when pitching its own artist presale ticketing services.

107.   The unfair and unreasonable nature of Ticketmaster's campaign in this time period is also evidenced by the fact that it informed Songkick that a particular fan club for an up-and-coming artist was non-compliant, even though the artist in question had not hired (or even had discussions with) Songkick for their United States tour presales.  If there was any suspicion at all that Songkick was working with an artist, Ticketmaster immediately sought ways to shut that process down, regardless of whether Songkick had actually secured any work from the artist.

108.   Ticketmaster also informed Songkick that it needed to comply with artificial, arbitrary, and unreasonable fan club requirements at several venues Songkick was not previously aware exclusively used Ticketmaster's concert venue ticketing

-43-

services.  In response to Songkick's request that it send Songkick a list of all venues within the United States with which it had exclusive ticketing contracts, Ticketmaster refused to do so and stated that Songkick would need to ask the box office at each venue about their concert venue ticketing services contracts.  This tactic was aimed at creating unreasonable transaction costs for Songkick's business, given that Songkick would need to repeatedly inquire of every single concert venue on every single artist's tour whether they had a then-current exclusive ticketing contract with Ticketmaster. Indeed, the main box office contacts at each concert venue often are unaware of the existence or specifics of Ticketmaster's contract with the venue because they are not senior enough at the venue or because the "exclusive" nature of Ticketmaster's contract with the venue may have recently changed or be unclear.

109.  Alternately, in discussions with Songkick, Ticketmaster insisted that Songkick's "presumption" must be that Ticketmaster has an exclusive dealing contract with any venue at which it sells general sale tickets for the artist's show.  In its dealings with Ticketmaster and through publicly available information, Songkick realized that this "presumption" was demonstrably not the case.  Songkick therefore repeatedly requested (over multiple years) that Ticketmaster identify the venues at which Ticketmaster believed Songkick's artist-clients must comply with the then-current Ticketmaster fan club policy (and its then-current interpretation by Ticketmaster). Ticketmaster just as repeatedly refused this request, all in an attempt to unreasonably raise the transactions costs of using Songkick's services to unacceptable levels, create confusion in the market, and create friction between Songkick and its clients and partners.

110.  Defendants also tried to force Songkick and/or its artist-clients to agree to fix service fees for artist presale tickets at the same price Ticketmaster charged or at a fee amount dictated by Ticketmaster.  On multiple occasions, Ticketmaster stated that it would allocate Songkick's artist-clients their artist presale allocations only if Songkick agreed to charge at least Ticketmaster's dictated service fee and pay such fee to

Ticketmaster, thus increasing the all-in price of the artist presale tickets to the same or more than general sale tickets. By demanding that Songkick erase this difference in price between the artist presale and general sale, Defendants tried to increase prices to consumers, to artificially decrease demand for artist presale tickets, and to impose restrictions on Songkick's services that artificially diminished its ability to compete with Ticketmaster's artist presale ticketing services. Notably, prior to its merger with Ticketmaster, Live Nation well understood that lower service fees would increase overall ticket demand, which is why it decided to vertically integrate and take on Ticketmaster's ticketing monopoly. Since the merger, however, with its interests now aligned with Ticketmaster's, Live Nation has behaved very differently.

111. The ploy (one among many) went as follows. First, Ticketmaster asserted that the artist had no "*bona fide*" fan club (as it did with virtually every Songkick client, no matter what). Then, after argument with the artist manager on the issue, Ticketmaster granted a "one-time exception" to the fan club policy so that Songkick could conduct the artist's presale. However, the "one-time exception" was conditioned upon the artist paying Ticketmaster its standard service fee or a fee determined by Ticketmaster (anywhere from 2-5 times the fee that would have been charged in the Ticketmaster-less artist presale hosted by Songkick), even though Ticketmaster was not providing the ticketing service. This then forced the artist to choose one of five unpalatable options: (1) cancel the presales for the Ticketmaster-exclusive venues; (2) concede the presales to Ticketmaster; (3) absorb the higher fees Ticketmaster demanded; (4) raise the service fees on the non-Ticketmaster venue presales to cover the fees Ticketmaster demanded; and/or (5) raise the service fees only on Ticketmaster venue presales to cover both the fees demanded by Ticketmaster and Songkick's cost of doing business (thus making tickets more expensive in the presale than in the general sale).

112. Defendants also colluded with and/or coerced concert venue operators into refusing to allocate artist presale tickets if Songkick was at all involved in an artist's

planned presale.  This was despite Ticketmaster's repeated public admission of the artists' rights to those tickets (described above).  Similarly, Defendants colluded with and/or coerced managers into not using Songkick's services.  Where managers nevertheless wanted to use Songkick's services for their artist-clients, Defendants pressured them to back out of any relationship with Songkick via threats of retaliation at the promotion and ticketing levels (*e.g.*, Ticketmaster would withhold marketing support for the show, including homepage marketing on ticketmaster.com and email blasts to the past and prospective ticket purchasers in Ticketmaster's 130 million+ customer database, thereby jeopardizing the success of Ticketmaster's own general sale for the show), as well as through various other financial repercussions.

113.  In furtherance of their unlawful scheme, Defendants also spread demonstrable falsehoods to artists, managers, and concert venue operators about Songkick, including claims that its systems were unable to handle artist presale ticketing services, that it could never obtain an adequate allocation of tickets (which was Defendants' edict), and other statements intended to spread fear, uncertainty, and doubt regarding Songkick's service and product offerings.  These statements were untrue, and the only one that approached reality—the limited amount of tickets Songkick was allowed to presell for artists—was a discriminatory limitation imposed by Defendants aimed at preventing artists from securing and selling their artist presale allocations through Songkick and other competitors.

114.  Defendants also regularly informed artists that they could not leverage Ticketmaster's broader concert venue ticketing and general marketing services and would not be allowed to sell music, merchandise or VIP experiences with tickets in the general sale if they used Songkick for artist presales.  For example, Defendants threatened multiple artists with an outright refusal to use its marketing resources to support their general sale tickets and overall tour if the artist conducted a Songkick artist presale.  A blatant example involved one of the most iconic and important artists touring today, whose identity will be disclosed once a protective order is in place.  In

early 2014, the artist launched an artist presale for a concert in which Songkick was the artist presale ticketing service provider.  Later that day, the artist's promoter discovered that the show was not being marketed on Ticketmaster's website homepage, and submitted an inquiry to Ticketmaster, the venue ticketing service provider, as to why the marketing had been removed.  Ticketmaster responded, "[A]rtists/tours who keep 100% of their tickets on the TM platform are able to unlock the home page placement marketing asset…we will not be able to offer homepage placement for [the artist's] tour at this time."  This artist had one of the biggest music tours of 2014, grossing over $100 million worldwide (and for which Ticketmaster was the concert venue ticketing service provider for the majority of U.S. shows), yet Ticketmaster refused to market the artist's show on the ticketmaster.com website because the artist used Songkick for artist presale ticketing services.

115.   In another instance, Defendants threatened yet another artist (whose identity will be disclosed once a protective order is in place) that Defendants would not market the artist's tour and would moreover not permit the artist to use Paperless Ticketing (a technology designed to inhibit scalping) on any general sale tickets for the artist's tour if the artist opted to engage Songkick rather than Ticketmaster for artist presale ticketing services.  If carried out, such threats to withhold marketing would clearly damage Defendants, because they would result in overall lower ticket sales for Ticketmaster's concert venue ticketing business, and would result in lower revenues for Live Nation's promotion business and Ticketmaster's venue clients.  In a competitive market, such threats would be economically irrational.  Ticketmaster's aggression therefore demonstrates the lengths to which Defendants were prepared to go in order to protect Ticketmaster's market power, including damaging themselves and their clients in order to preserve that power.  In this specific instance, the threat worked.  As the artist's management explained to Songkick: "[T]he Ticketmaster bullying is out of control and we're not going to be able to do all tour pre-sales off-platform.  They are just sticking it to us too hard."

COMPLAINT

116.   In furtherance of their unlawful scheme within the United States market, Defendants also sought to influence artists' behavior outside of the country with threats of punishment within the United States if they chose Songkick's services abroad; *i.e.*, if they chose Songkick to provide artist presale ticketing services in geographic markets other than the United States.  For example, one artist wanted to use Songkick's artist presale services for the U.K. and European portion of their tour, where Defendants do not have the same dominance over the live music industry that they enjoy in the United States.  Live Nation, on behalf of itself and Ticketmaster, informed that artist—one of the largest touring acts in the world—that using Songkick, even in the U.K. and Europe, was a "complete nonstarter."  If the artist did use Songkick overseas, then Defendants would refuse to provide them several ticketing and marketing services in the United States, including the ability to giveaway a free copy of the artist's album with every ticket sold in the general sale (as was this particular artist's intent).

117.   In yet another example, Ticketmaster informed an artist that they would "permit" the artist to use Songkick's artist presale ticketing services for certain shows on their current tour, but only if the artist committed to using Ticketmaster's equivalent services on all future tours.

118.   Defendants' tying the use of their concert venue ticketing services and/or concert promotion services on the use of Ticketmaster artist presale ticketing services were not limited to just the few examples listed above.  Instead, based on these instances and Songkick's business experiences since, this was a widespread and consistent practice.

119.   As alleged above, another predatory, unfair, and discriminatory practice Ticketmaster uses to preserve its monopoly power is to tell artists they cannot obtain more than 8% of a venue's inventory for a show if the artist uses Songkick.  However, if the artist chooses Ticketmaster's artist presale services instead, they can then obtain allocations for as much of the ticket inventory as they want.  Considering that 80% or more of the shows that Defendants promote do not sell out, and that Defendants do not

sell between 40-50% of their tickets on average, this restraint on trade—which is effectuated through contracts with concert venue operators—is unreasonable and expressly designed to negate competition to the detriment of every market player except Defendants.  Moreover, the restraint only permits artists to obtain what they desire (a higher artist presale allocation) if they agree to use a service they do not desire (Ticketmaster's artist presale ticketing services).  There are no procompetitive benefits to creating a situation in which fewer tickets are sold overall; Defendants have acted to suppress demand solely to hobble Songkick and other competitors.

120.   Live Nation also used its dominance in the concert promotion services market and its control of desirable venues to coerce even Songkick's most ardent artist-clients to choose Ticketmaster over Songkick.  For example, in 2013 and 2014 Songkick assisted a country music superstar to run over 50 artist presales and develop several highly-successful marketing and charity fundraising campaigns.  In 2015, the artist wanted to schedule a second show for a major arena on the artist's upcoming tour and was told by Live Nation (the artist's promoter) that it would only promote a second show if the artist sold over 7,000 tickets for the first show in a presale.  The 8% artist presale allocation imposed by Ticketmaster for this venue was far below this number. Defendants therefore forced the artist to choose between running an artist presale through Songkick *or* scheduling a second show at that major arena, thus tying the artist's second show (and corresponding profits) to the use of Ticketmaster's artist presale ticketing services and its uncapped artist presale allocations.   The artist therefore regretfully declined Songkick's artist presale ticketing services for the tour and instead used Ticketmaster.

121.   As discussed at length above, Live Nation's CEO and Director, Michael Rapino, personally and repeatedly engaged in the anticompetitive acts giving rise to this complaint.  As also discussed above, other Live Nation employees joined Mr. Rapino in these acts and, along with Ticketmaster, have harmed Songkick through their attempts to destroy competition in the artist presale ticketing services market.

**C.     To Enhance Their Monopoly Power, Defendants Place No Similar Restrictions on Their Own Artist Presales**

122.   In stark contrast to all of these restrictions stand the requirements Defendants place on their own artist presale ticketing services (*i.e.*, none).  In advertising its presale options in 2015, Ticketmaster compared its services against "3rd party" options such as Songkick.  It noted that artists have "uncapped" artist presale allocations for Ticketmaster-run artist presales with "unrestricted" seat locations for the presale tickets.  By contrast, Ticketmaster claimed that it could unfairly discriminate and limit third-party-run artist presales to 8% of tickets with only 8% per price level for seat locations.  (Practically speaking, this meant that all of the best seats could be included in a Ticketmaster-run presale, whereas Songkick-run presales could only offer a mix of premium and less desirable seats from throughout the venue.)  Ticketmaster also claimed that artists who boycott Ticketmaster's artist presale ticketing services competitors (such as Songkick) are not required to adhere to Ticketmaster's fan club policy, whereas artists that refuse to boycott such third party artist presale ticketing service providers must do so.  Ticketmaster also assured artists who agreed to boycott Ticketmaster's competitors and utilize Ticketmaster's artist presale services that they would be allowed to market and sell to the general public as part of their artist presales without any restriction to "fan club members."  This was despite representations to Songkick from Defendant executives that they would apply the fan club policy uniformly to both Songkick and Ticketmaster in order to provide a level playing field.

123.   The extent to which Defendants' actions make clear that they want the artist presale ticketing services market to themselves is thus demonstrated by the differences in demands they make regarding Ticketmaster-led versus Songkick-led artist presales.  To preserve their monopoly power, Defendants actively tell artists that they will ***not*** seek to enforce any aspect of Ticketmaster's fan club policy for artist presales handled by Ticketmaster's Artist Services or OnTour division, and they use

this offer as a way to distinguish Ticketmaster's artist presale services from the competition (most notably, Songkick).

124.   Defendants' escalating campaign to remove Songkick and others as a threat to their monopoly power has taken its toll on Songkick's past and present business within the past four years.  Defendants' activities have caused many artists and live music industry participants to forego using Songkick's services, even after they initially indicated they were ready to do business with Songkick for their upcoming tours.  To avoid providing an opportunity for Defendants to further intimidate them, Songkick will identify these artists, managers, and other live music industry participants after a suitable protective order is put in place.  Moreover, numerous other artists and managers have refused to even consider using Songkick's services because of the pushback they will face from Defendants if they even hint at wanting to employ Songkick.

**Defendants' Efforts To Preserve Ticketmaster's Monopoly Power Have Already Had Far-Reaching Anticompetitive Effects, and They Will Continue To Increase if Not Enjoined**

125.   Despite all of Defendants' conscious efforts to undercut Songkick's services, many artists faced with the choice between Songkick and Ticketmaster will typically choose (or attempt to choose) Songkick.  Songkick is simply better at providing artist presale ticketing services than Ticketmaster, and the value it provides to the artists is far beyond what Ticketmaster can offer.  However, if—or, more appropriately for the majority of 2015, when—Defendants engage in anticompetitive and unfair acts to threaten and coerce the artists to not use Songkick (or else suffer punishment from Defendants' organization), more and more artists are compelled not to conduct artist presales at all.  Thus, Defendants have diminished demand in the market overall as the result of their scorched-earth policies.

126.   As a result of Ticketmaster's and Live Nation's anticompetitive conduct, Songkick has lost (and stands to continue to lose) significant business, customers (both artists and consumers), and revenues.  Consumers who formerly were able to obtain

-51-

tickets at lower cost (and with higher quality service) from Songkick are forced to pay supracompetitive prices to obtain tickets from Ticketmaster or are not able to obtain them at all in the primary market, and are forced to turn to the secondary market, particularly including Ticketmaster's own secondary ticketing platforms, where they are charged inflated prices.  Because Songkick is being shut out of the relevant market, some artists that formerly used (or want to use) Songkick to sell tickets, VIP packages, music, merchandise or other offerings to their fans may be forced to turn to OnTour, which is Defendants' captive artist presale ticketing service provider.  The result of Ticketmaster's and Live Nation's efforts, working in concert with venues, is the substantial lessening of competition in the relevant market, injuring both competitors and consumers alike.

### Where the Defendants Do Not Have a Stranglehold, There Exists a Vibrant, Competitive Market for Artist Presale Ticketing Services

127.   At non-Ticketmaster or Live Nation venues such as those run by AEG, concert venue operators often allocate 10% or more of a show's ticket inventory to artists for artist presales without any of the fan club restrictions Defendants seek to unreasonably and wrongfully impose.

128.   Concert venue operators, such as AEG, operate with economic self-interest by seeking to maximize the number of tickets sold for every performance held at the venue.  These operators are happy to have Songkick's help with artist presales, and they do not place any draconian restrictions on Songkick's ticketing services.  Songkick is able to sell more tickets for these venues because it is not restricted as with Ticketmaster and Live Nation venues.  The benefits Songkick creates then filter down to all involved in the shows (making them more profitable overall) and help the artists achieve their business and marketing goals.  This stands in stark contrast to Defendants' conduct, which places unreasonable restrictions on artist presales and is not in their economic self-interest except insofar as it helps them to destroy competition and maintain and/or increase their monopoly power in the market.

129.   This difference can be seen in the fan's purchase experience for artist tours that include both Defendant-controlled and non-Defendant-controlled venues.  With the latter—such as at AEG venues—fan club compliance is not mandated, and as a result, fans may look at an artist's webpage or social media site and click on a "Buy Tickets" button next to the venue of their choice.  They are then immediately directed to a presale page where they may directly purchase tickets from the artist.  In contrast, for the same artist on the same tour, a fan clicking the "Buy Tickets" button for a Defendant-controlled venue is directed to a page asking the fan to join the artist's fan club.  If already a member, the fan must first login with a username and password.  If not already a member, the fan must go through a registration process and join the fan club before being able to even see any details about the presale (*i.e.,* the fan must complete this administrative process before knowing the ticket prices or whether tickets are still available).  This mandatory login process (not applicable to Ticketmaster presales) increases transaction costs, can dissuade fans from purchasing, and, in any event, slows down the ticket purchasing process, thereby disturbing the fan/artist relationship and resulting in fewer tickets sold during the artist presale.

130.   The unreasonable conditions imposed by Ticketmaster in the United States to preserve its monopoly power may be seen by comparing its United States monopoly with the live music industry in the U.K., in which Defendants have much less market power in concert venue ticketing services (because they do not have exclusive dealing contracts) and in concert promotions.  Concert venue ticketing services are not a natural monopoly.  In the U.K., promoters regularly employ several different concert venue ticketing service providers for the same shows, which leads to price competition among and between the service providers (specifically, with respect to service charges, which are dramatically lower than in the United States) and therefore lowers overall ticket prices for consumers.  Where promoters opt for just one concert venue ticketing service instead, the competition between service providers to obtain the contract similarly drives down prices for the promoter and concertgoers.

131.    Artists at U.K. shows also receive artist presale allocations at levels commensurate with what they and the promoter believe the artist can sell during a presale (generally anywhere between 15-50% of the tickets).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)**

**(against All Defendants)**

132.    Songkick repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

133.    Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the relevant markets for artist presale ticketing services and concert venue ticketing services.

134.    Ticketmaster possesses monopoly power in the relevant market for artist presale ticketing services.  Ticketmaster has the power to control prices or exclude competition in the relevant market.

135.    Ticketmaster has market share of approximately 80% of each of the relevant markets for artist presale ticketing services and concert venue ticketing services.

136.    Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the relevant market for artist presale ticketing services, by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to leveraging, coercion of disloyal customers and others, tying arrangements, long-term exclusive dealing arrangements, concerted refusals to deal, boycotts, and mergers and acquisitions, as alleged herein.

Leveraging

137.    Defendants have monopoly power in the relevant market for concert venue ticketing services and in the relevant market for concert promotion services.

138.   Defendants have used their monopoly power in those relevant markets in a predatory, exclusionary, and anticompetitive manner to monopolize the artist presale ticketing services market and exclude Songkick from that market, including but not limited to by means of coercion of disloyal customers and others, tying arrangements, long-term exclusive dealing arrangements, concerted refusals to deal, and group boycotts.

139.   Defendants have used their monopoly power to monopolize or, alternatively, with a dangerous probability of monopolizing for Ticketmaster the relevant market for artist presale ticketing services.

#### Coercion of and threats against disloyal customers and others

140.   Defendants have threatened reprisals against customers and others if they work with Songkick.

141.   Defendants have coerced customers and others not to work with Songkick.

142.   Defendants' threats and coercion have impeded Songkick's ability to provide artist presale ticketing services.

#### Tying arrangements

143.   The provision of artist presale ticketing services, concert venue ticketing services, and concert promotion services are three separate services or products.

144.   Defendants have conditioned the provision of concert venue ticketing services and concert promotion services on the boycotting of Songkick and the use of Ticketmaster's ticketing services for artist presales.

145.   Defendants have sufficient economic power in the relevant market for concert venue ticketing services and the relevant market for concert promotion services to enable them to restrain trade in the relevant market for artist presale ticketing services.

146.   Defendants' conduct has affected a not insubstantial amount of interstate commerce in the provision of artist presale ticketing services.

147.   Defendants' conduct has had an anticompetitive effect in the relevant market for artist presale ticketing services.

### Exclusive dealing arrangements

148.   Defendants have entered into long-term exclusive dealing arrangements with venues with respect to the provision of concert venue ticketing services.

149.   Defendants' arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected and the relevant market for artist presale ticketing services (and, alternatively, from the primary ticketing services market), including but not limited to by excluding Songkick from the provision of artist presale ticketing services.

150.   Defendants' arrangements cannot be circumvented.

151.   Defendants' arrangements with major concert venues are of long duration and not easily terminable as a matter of practical economics.

152.   Defendants have coerced venues to enter into these arrangements.

153.   Defendants' arrangements are not the product of competition.

154.   Defendants' arrangements have had the effect of substantially lessening competition and tending to create a monopoly in the relevant market for artist presale ticketing services and concert venue ticketing services.

### Concerted refusals to deal and group boycotts

155.   Defendants have induced and coerced artists, venues, and promoters to refuse to deal with and to boycott Songkick.

156.   Defendants' conduct has foreclosed access to the relevant market for artist presale ticketing services, which is necessary to enable Songkick to compete.

157.   Ticketmaster possesses a dominant position in the relevant market for artist presale ticketing services and concert venue ticketing services.

158.   Defendants' conduct is not justified, because their conduct is not intended to enhance overall efficiency and to make the relevant market more efficient.

1

<u>Mergers and acquisitions</u>

2      159.   Defendants' mergers and acquisitions, including but not limited to the

3  merger of Ticketmaster and Live Nation, have had the effect of substantially lessening

4  competition and tending to create a monopoly in the relevant markets.

5      160.   Defendants' conduct alleged above has had an anticompetitive effect in the

6  relevant markets.

7      161.   Defendants' conduct alleged above has no legitimate business purpose or

8  procompetitive effect.

9      162.   Defendants' conduct has had a substantial effect on interstate commerce.

10     163.   Live Nation promoted, encouraged, aided, assisted, directed, and/or

11  controlled Ticketmaster's conduct alleged above.

12     164.   Songkick has been and will be injured in its business or property as a result

13  of Defendants' conduct.

14     165.   Songkick has suffered and will suffer injury of the type that the antitrust

15  laws were intended to prevent.  Songkick has been and will be injured by the harm to

16  competition as a result of Defendants' conduct.

17

**SECOND CLAIM FOR RELIEF**

18

**(Attempted Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)**

19

**(against All Defendants)**

20     166.   Songkick repeats and realleges each and every allegation of this Complaint

21  as if fully set forth herein.

22     167.   Defendants have engaged in predatory, exclusionary, and anticompetitive

23  conduct, including but not limited to leveraging, coercion of disloyal customers and

24  others, tying arrangements, long-term exclusive dealing arrangements, concerted

25  refusals to deal, group boycotts, and mergers and acquisitions.

26     168.   Defendants' conduct has had an anticompetitive effect in the relevant

27  market for artist presale ticketing services and concert venue ticketing services.

28

COMPLAINT

169.   Defendants' conduct has no legitimate business purpose or procompetitive effect.

170.   Defendants have engaged in that conduct with the specific intent of monopolizing the relevant market artist presale ticketing services and concert venue ticketing services.

171.   Defendants have engaged in that conduct with a dangerous probability of monopolizing the relevant market for artist presale ticketing services.

172.   Defendants' conduct has had a substantial effect on interstate commerce.

173.   Live Nation promoted, encouraged, aided, assisted, directed, and/or controlled Ticketmaster's conduct alleged above.

174.   Songkick has been and will be injured in its business or property as a result of Defendants' conduct.

175.   Songkick has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Songkick has been and will be injured by the harm to competition as a result of Defendants' conduct.

## THIRD CLAIM FOR RELIEF

### (Sherman Act, Section 1, 15 U.S.C. § 1)

### (against All Defendants)

176.   Songkick repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

177.   As alleged above, Defendants and various venues, promoters, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the relevant market artist presale ticketing services and concert venue ticketing services.

178.   Defendants have induced or coerced various venues, promoters, and others to enter into one or more contracts, combinations, or conspiracies to unreasonable restrain trade, to control prices or exclude competition, and to willfully acquire and

maintain monopoly power for Ticketmaster in the relevant market for artist presale ticketing services and concert venue ticketing services.

179.   As alleged herein, Defendants have conditioned the provision of services and access to venues over which they hold market power on the boycotting of Songkick and the use of Ticketmaster's artist presale ticketing services.

180.   These contracts, combinations, or conspiracies include but are not limited to tying arrangements, long-term exclusive dealing arrangements, concerted refusals to deal, group boycotts, and mergers and acquisitions.

181.   Defendants' conduct has had an anticompetitive effect in the relevant market for artist presale ticketing services and concert venue ticketing services.

182.   Defendants' conduct has no legitimate business purpose or procompetitive effect.

183.   Defendants' conduct has had a substantial effect on interstate commerce.

184.   Live Nation promoted, encouraged, aided, assisted, directed, and/or controlled Ticketmaster's conduct alleged above.

185.   Songkick has been or will be injured in its business or property as a result of Defendants' conduct.

186.   Songkick has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Songkick has been and will be injured by the harm to competition as a result of Defendants' conduct.

## FOURTH CLAIM FOR RELIEF

### (Clayton Act, Section 7, 15 U.S.C. § 18)

### (against All Defendants)

187.   Songkick repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

188.   The merger of Ticketmaster and Live Nation has had the effect of substantially lessening competition and tending to create a monopoly in the relevant market for artist presale ticketing services and concert venue ticketing services.  Within

the last four years, Defendants began to put to use the assets they acquired in their merger to new and anticompetitive purposes as herein alleged.

189.   Defendants' conduct has had a substantial effect on interstate commerce as herein alleged.

190.   Songkick has been and will be injured in its business or property as a result of the merger.

191.   Songkick has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.   Songkick has been and will be injured by the substantial lessening of competition and tendency to create a monopoly as a result of the merger.

## FIFTH CLAIM FOR RELIEF

### (California Business & Professions Code, Section 17200)

### (against All Defendants)

192.   Songkick repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

193.   Defendants have engaged in unfair competition.

194.   Defendants have engaged in unlawful and unfair business acts and practices.

195.   Defendants have engaged in unlawful business acts and practices as herein alleged.

196.   Defendants have engaged in unfair business acts and acts and practices, because their business acts and practices threaten an actual or incipient violation of antitrust laws, including but not limited to Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act, violate the policy or spirit of those laws, or otherwise significantly threaten or harm competition.

197.   Live Nation promoted, encouraged, aided, assisted, directed, and/or controlled Ticketmaster's conduct alleged above.

COMPLAINT

198.   Songkick has suffered and will suffer injury in fact and has lost and will lose money or property as a result of Defendants' unfair competition.

### SIXTH CLAIM FOR RELIEF

**(Intentional Interference with Contractual Relations)**

**(against All Defendants)**

199.   Songkick repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

200.   As herein alleged, within the past two years, Defendants have intentionally interfered with the contracts (oral and written) between Songkick and artists and managers whose identities Songkick will disclose to Defendants' attorneys after a suitable protective order is entered in order to avoid providing Defendants with a further opportunity to intimidate them.

201.   Songkick and the artists mentioned in the previous paragraph have had oral and/or written contracts.

202.   Under those contracts, Songkick was entitled to provide artist presale ticketing and other services for each artist.   In exchange, each artist agreed that Songkick would be paid the service fees it generated on the artist presale tickets it sold for the artist.

203.   Defendants have known of those contracts.

204.   Defendants have intended to disrupt the performance of those contracts.

205.   Defendants' conduct has prevented and will prevent performance or has made and will make performance more expensive or difficult.

206.   Live Nation promoted, encouraged, aided, assisted, directed, and/or controlled Ticketmaster's conduct alleged above.

207.   Songkick has been and will be harmed.

208.   Defendants' conduct has been and will be a substantial factor in causing Songkick's harm.

COMPLAINT

## SEVENTH CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Relations)

### (against All Defendants)

209. Songkick repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

210. As herein alleged, within the past two years, Defendants have intentionally interfered with prospective economic relationships between Songkick and artists and managers whose identities Songkick will disclose to Defendants' attorneys after a suitable protective order is entered in order to avoid providing Defendants with a further opportunity to intimidate them. These prospective economic relationships probably would have resulted in an economic benefit to Songkick.

211. Songkick and the artists and other live music industry participants mentioned in the previous paragraph have had economic relationships that probably would have resulted in an economic benefit to Songkick.

212. Under those relationships, Songkick probably would have been entitled to provide artist presale ticketing and other services for each potential client. In exchange, Songkick would have been paid the service fees it generated on the artist presale tickets it sold for them.

213. Defendants have known of those prospective relationships.

214. Defendants have intended to disrupt those prospective relationships.

215. Defendants have engaged in wrongful conduct, including but not limited to their violation of Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, and Section 17200 of the California Business and Professions Code, as well as their intentional interference with contractual relations.

216. Defendants' conduct has disrupted and will disrupt those relationships.

217. Live Nation promoted, encouraged, aided, assisted, directed, and/or controlled Ticketmaster's conduct alleged above.

218. Songkick has been and will be harmed.

COMPLAINT

219.   Defendants' wrongful conduct has been and will be a substantial factor in causing Songkick's harm.

## EIGHTH CLAIM FOR RELIEF

### (Promissory Estoppel)

### (against All Defendants)

220.   Songkick repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

221.   As noted above, Defendants have repeatedly promised to honor artist presales, if the artist complies with the artificial, arbitrary, and unreasonable "fan club policy."  This is a promise from Defendants upon which Songkick and its artist-clients have relied: "Our contract permits our clients, and with their consent the acts working with them, to hold back tickets for legitimate promotional purposes with the understanding that these tickets will not be sold to the general public by any other ticketing provider."  As herein alleged, Defendants admitted that "under many written agreements between promoters and our clients, the client often allocates certain tickets for artist, promoter, agent and venue use and does not make those tickets available for sale by us."  "During the course of dealings with our clients, we have come to understand that some holdbacks must be tolerated by Ticketmaster so that they may book high caliber acts at the events they promote."

222.   Through these statements and the distribution of their "fan club policy," Defendants thus made a promise to Songkick including not only the public statements quoted above, but also in connection with the "fan club policy" distributed to the industry.  Defendants' promises to allow Songkick to compete, albeit under artificial constraints, were clear and unambiguous in their terms.

223.   Defendants promised that, if Songkick complied with the literal terms of the artificial fan club policy, Songkick would be entitled to provide artist presale ticketing services, with respect to the 8% allotment of tickets that the artists are entitled

to presell and that there would be a "level playing field" between Songkick and Defendant's competing presales service.

224. Defendants' promises were clear and unambiguous in their terms.

225. Songkick relied on those promises.

226. Songkick's reliance was reasonable and foreseeable.

227. Songkick was injured by its reliance.

228. Defendants failed to do something that they promised to do.

229. Live Nation promoted, encouraged, aided, assisted, directed, and/or controlled Ticketmaster's conduct alleged above.

230. Injustice can be avoided only by the enforcement of Defendants' promise.

231. As alleged above, there was no legitimate justification or procompetitive reason for Defendants to impose their artificial, arbitrary, and unreasonable "fan club" requirements on Songkick and other competitors as a condition for being able to provide artist presale ticketing services. As a result of Defendant's predatory acts and anticompetitive conduct described above, Songkick and other competitors were forced to comply with Defendants' "fan club" requirements in order to be able to compete in the market and to provide those services to their customers, the artists. Defendants should not be permitted to continue to enforce their artificial, arbitrary, and unreasonable "fan club" requirements, but at a minimum they should be required to honor the public and direct promises they made to Songkick and other competitors for complying with the "fan club" requirements.

## **PRAYER FOR RELIEF**

232. Wherefore, Songkick requests the following relief:

    (a)    Damages in an amount to be determined;

    (b)    Treble damages;

    (c)    Attorneys' fees;

    (d)    Costs;

COMPLAINT

1   (e) Pre-judgment and post-judgment interest at the maximum rate

2 permitted under the law;

3   (f) Punitive damages;

4   (g) Injunctive relief, including but not limited to an injunction

5 barring Defendants' conduct alleged in the Complaint;

6   (h) Declaratory relief, including but not limited to a declaration and

7 judgment that Defendants' conduct alleged in the complaint violates the laws

8 alleged in the Complaint; and

9   (i) Such other and further relief as the Court deems proper and just.

10       **<u>DEMAND FOR JURY TRIAL</u>**

11   Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Songkick

12 demands a jury trial as to all issues triable by a jury.

13 DATED:  December 22, 2015   QUINN EMANUEL URQUHART &
                SULLIVAN, LLP

14

15

16           By _/s/ Frederick A. Lorig_

17            Frederick A. Lorig

18            Kevin Y. Teruya
             Adam B. Wolfson

19

20            Attorneys for Plaintiff
             Complete Entertainment Resources LLC

21

22

23

24

25

26

27

28

COMPLAINT