QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Frederick A. Lorig (Bar No. 057645)
  fredlorig@quinnemanuel.com
  Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
  Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Complete
Entertainment Resources LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Complete Entertainment Resources LLC d/b/a Songkick, <br><br> Plaintiff, <br><br> v. <br><br> Live Nation Entertainment, Inc.; Ticketmaster LLC, <br><br> Defendants. | CASE NO. 15-cv-9814 DSF (AGRx) <br><br> **PLAINTIFF COMPLETE ENTERTAINMENT RESOURCES LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> [Filed concurrently with Statement of Genuine Disputes and Additional Material Facts, Memorandum in Support of Evidentiary Objections, and Declarations of Adam Wolfson, Josh Block, Jesse Bellin, Josh Baron, and Stephen Glicken] |
| Ticketmaster LLC, <br><br> Counter Claimant, <br><br> v. <br><br> Complete Entertainment Resources LLC d/b/a Songkick, <br><br> Counter Defendant. | Complaint Filed:  December 22, 2015 <br><br> Judge:      Hon. Dale. S. Fischer <br> Date:       August 7, 2016 <br> Time:       1:30 p.m. <br> Crtrm.:     7D <br><br> Motion Hearing Cut-Off:  Aug 7, 2017 <br> Pre-Trial Conference:  October 16, 2017 <br> Trial Date:  November 14, 2017 <br><br> **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |

1

**TABLE OF CONTENTS**

Page

2

3  PRELIMINARY STATEMENT ................................................................. 1

4  STATEMENT OF FACTS ..................................................................... 5

5  I. THE ARTIST PRESALE TICKETING SERVICES MARKET .................... 5

6      A. TM Has the Power to Control Prices and Exclude Competition in the APTS Market ................................................. 6

7

8      B. The Artist Presale is a Decades-Old Feature of the Live Music Industry With Multiple, Well-Accepted Benefits ...................... 6

9      C. The APTS Market Arose From Natural Market Dynamics, Not A Unilateral TM Decision ................................................. 7

10

11     D. APTS Providers Exist to Service Artists, Not Venues, and Therefore Compete for Tickets at the Artist Level .................. 9

12     E. TM, the Only VTS Provider That Also Provides APTS, is the Only VTS Provider That Limits Presales to "Fan Clubs" ........... 10

13

14 II. DEFENDANTS ADMIT THEIR 2012-PRESENT FAN CLUB POLICY IS ████████████ AND HAS BEEN SINCE IT WAS DRAFTED ............................................................................ 11

15

16 III. SONGKICK BECOMES FAN CLUB POLICY-COMPLIANT AND SUBSEQUENTLY THREATENS TM'S MARKET POWER ................... 12

17     A. Songkick's Business Model is to Help Artists Grow and Improve Preexisting Fan Communities for Long-Term Artist Benefits ........... 12

18

19     B. Since 2012, Songkick's Policy Has Been to Help Artists Comply With the TM Fan Club Policy ........................................... 13

20     C. Songkick Succeeded By Offering Better APTS Than TM ............ 16

21 IV. DEFENDANTS RESPONDED TO SONGKICK'S SUCCESS WITH WIDE-RANGING ANTICOMPETITIVE AND ILLEGAL ACTS ............ 17

22 V. DEFENDANTS HAVE ELIMINATED COMPETITION IN THE APTS MARKET AND HARMED VENUES, ARTISTS, AND CONSUMERS ...................................................................... 19

23

24 LEGAL STANDARD FOR SUMMARY JUDGMENT .......................... 20

25 ARGUMENT ...................................................................... 20

26 I. DEFENDANTS ATTEMPT TO FORCE THIS CASE INTO NARROW BOXES DIVORCED FROM THE LAW AND RECORD ......... 20

27

28

Case No. 15-cv-9814-DSF-AGRx

A.   The Law Under Which Defendants' Anticompetitive Conduct is Analyzed ...................................................................... 21

    1.   Sherman Act § 1 – Unreasonable Restraints of Trade .............. 21

    2.   Sherman Act § 2 – Monopolization/Attempted Monopolization .................................................................. 24

    3.   Market / monopoly power ......................................................... 26

B.   Defendants' Anticompetitive Conduct ............................................ 27

C.   Songkick, TM's Competitor, Has Antitrust Standing to Challenge Conduct That Excludes it From the APTS Market ............ 29

D.   Defendants' Arguments That This is a *Trinko* Case Would Eviscerate Decades of Precedent and Invite Error............................... 31

    1.   Defendants' arguments would gut decades of law ................... 32

    2.   *Trinko* does not apply to concerted refusals to deal ................. 33

E.   Defendants' Heavy Reliance on *Tickets.com* is Misplaced ................. 35

    1.   *Tickets.com* did not assess the evidence of harm to artists and fans present in this case ...................................................... 35

    2.   *Tickets.com* says nothing about market power, competitive effects, or substantial foreclosure in the APTS market ............. 36

    3.   The record in this case contradicts *Tickets.com*'s central factual conclusions regarding market power in VTS ................. 37

    4.   Whether or not venues prefer exclusive deals is irrelevant to whether those deals facilitate anticompetitive effects............ 40

        (a)   Defendants' argument is contrary to the facts.................. 40

        (b)   Defendants' argument is contrary to the law ................... 41

        (c)   Defendants' argument is contrary to well-accepted economic principles............................................................ 42

        (d)   Defendants' public policy arguments against judicial antitrust intervention are legally unsupported ...................................................................... 44

II.   DEFENDANTS' SUBSTANTIVE ATTACKS ON SONGKICK'S ANTITRUST CLAIMS FAIL AS A MATTER OF FACT AND LAW........ 45

A.   Defendants' Conduct Has Destroyed Nearly All Competition in the APTS Market ........................................................................... 45

B.   TM's Fan Club Policy, as Constructed and Arbitrarily Enforced, Restrains Competition Far Beyond Any Supposed Justification.......... 46

Case No. 15-cv-9814-DSF-AGRx
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

|   |   | 1. | TM Has Less Restrictive Alternatives Available | 47 |
|   |   | 2. | TM's Fan Club Policy, as Drafted and Applied, is Unreasonably Restrictive and Exclusionary | 49 |
|   | C. | | Defendants Erect a Number of Straw Man Arguments Regarding Their Exclusive Deals | 51 |
|   |   | 1. | No Matter How One Ultimately Interprets TM's Contracts, it is Still Liable for Antitrust Violations | 51 |
|   |   |   | (a) TM does not contract with venues to be the exclusive APTS provider at all of their shows | 52 |
|   |   | 2. | Songkick Competes for Ticketing Rights in a Way the Market Naturally Evolved to Accommodate | 54 |
|   |   | 3. | The Legal Question for Exclusive Dealing is Substantial Foreclosure, Not How the Exclusivity Was Obtained | 56 |
|   |   | 4. | TM Coerced Ties of VTS to APTS in Multiple Ways | 56 |
|   | D. | | Defendants' "Catch-All" Antitrust Arguments Similarly Fail | 57 |
|   |   | 1. | LNE's Conduct Remains Relevant to Songkick's Claims | 57 |
|   |   | 2. | Songkick's Other Allegations Support Multiple Aspects of its Claims | 58 |
|   |   | 3. | The Combined Effect of Defendants' Conduct Has Been to Restrain Competition and Monopolize the APTS Market | 58 |
| III. | | | DEFENDANTS ARTICULATE NO BASIS TO DISMISS SONGKICK'S STATE LAW CLAIMS | 59 |
| IV. | | | AT BEST, DEFENDANTS IDENTIFY GENUINE DISPUTES REGARDING A PORTION OF SONGKICK'S DAMAGES | 61 |
|   | A. | | Defendants' Attacks on Some of Songkick's Lost Profits Reveal Deep Factual Divides | 62 |
|   |   | 1. | The record demonstrates Songkick lost at *least* 139 artists' business due to Defendants' conduct | 62 |
|   |   | 2. | Defendants' factual arguments on lost profits are meritless | 64 |
|   |   | 3. | The Law Specifically Allows Damages for Songkick's Presumptive Lost Sales | 66 |
|   | B. | | Defendants Identify No Basis to Exclude Songkick's Lost Business Value Damages | 67 |
| V. | | | TM'S COUNTERCLAIM ARGUMENTS RAISE A GENUINE DISPUTE OF MATERIAL FACT | 67 |

1

     A.     TM Cannot Sue to Harm Competition.................................................. 67

     B.     TM Fails to Set Forth Sufficient Facts to Support Any of the
             Elements of Contractual Interference ................................................. 68

CONCLUSION........................................................................................ 70

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
 836 F.3d 1171 (9th Cir. 2016)....................................................32, 34, 35

5

*AFMS, LLC v. United Parcel Serv. Co.*,
 2011 WL 13135632 (C.D. Cal. May 27, 2011) ..................................57

6

7

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,
 592 F.3d 991 (9th Cir. 2010)....................................................41, 42

8

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
 92 F.3d 781 (9th Cir. 1996).......................................................20

9

10

*Am. Needle, Inc. v. Nat'l Football League*,
 560 U.S. 183 (2010) ..........................................................21, 24

11

*Amerinet, Inc. v. Xerox Corp.*,
 972 F.2d 1483 (8th Cir. 1992)...................................................66

12

13

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ..............................................................20

14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
 472 U.S. 585 (1985) ..........................................................44, 45

15

16

*Associated Press v. Taft-Ingalls Corp.*,
 340 F.2d 753 (6th Cir. 1965).....................................................67

17

*Associated Press v. U.S.*,
 326 U.S. 1 (1945) .................................................................32

18

19

*Atl. Richfield Co. v. USA Petroleum Co.*,
 495 U.S. 328 (1990) ..............................................................30

20

*Blue Shield of Va. v. McCready*,
 457 U.S. 465 (1982) ..........................................................29, 30

21

22

*Boca Investerings P'ship v. United States*,
 128 F. Supp. 2d 16 (D.D.C. 2000) ...............................................64

23

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
 509 U.S. 209 (1993) ..............................................................45

24

25

*Bushell v. JPMorgan Chase Bank, N.A.*,
 220 Cal. App. 4th 915 (2013)....................................................59

26

*Calculators Haw., Inc. v. Brandt, Inc.*,
 724 F.2d 1332 (9th Cir. 1983)....................................................22

27

28

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008)..................................................23, 24, 26, 56, 57

*Catch Curve, Inc. v. Venali, Inc.*,
  519 F. Supp. 2d 1028 (C.D. Cal. 2007)..........................................................24

*Cavaliers Operating Co. v. Ticketmaster*,
  2008 WL 4449466 (N.D. Ohio Sept. 30, 2008) ...........................................53

*Celebrity Cruises Inc. v. Essef Corp.*,
  478 F. Supp. 2d 440 (S.D.N.Y. 2007) .............................................................63

*Chavez v. Whirlpool*,
  93 Cal. App. 4th 363 (2001)....................................................................60, 61

*City of Anaheim v. S. California Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992)............................................................25, 27, 58

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*,
  710 F.2d 752 (11th Cir. 1983)............................................................22, 33, 34

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001)........................................................................46

*Don Post Studios, Inc. v. Cinema Secrets, Inc.*,
  124 F. Supp. 2d 311 (E.D. Pa. 2000) ............................................................63

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) .......................................................................................37

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) .......................................................................................25

*Forsyth v. Humana, Inc.*,
  114 F.3d 1467 (9th Cir. 1997)..................................................................26, 36

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*,
  582 F.3d 1216 (10th Cir. 2009)..................................................................34, 35

*Givemepower Corp. v. Pace Compumetrics, Inc.*,
  2007 WL 2345027 (S.D. Cal. Aug. 14, 2007) ..............................................61

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
  343 F.3d 1000 (9th Cir. 2003)........................................................................50

*Graphic Prods. Distrib., Inc. v. ITEK Corp.*,
  717 F.2d 1560 (11th Cir. 1983)......................................................................66

*Cal. ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011)............................................................3, 21, 45, 46, 49

*Herron v. State Farm Mut. Ins. Co.*,
  14 Cal. Rptr. 294 (Cal. 1961) ........................................................................60

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997).................................................2, 25, 46, 47

*InfoStream Grp., Inc. v. PayPal, Inc.*,
2012 WL 3731517 (N.D. Cal. Aug. 28, 2012)...............................................58

*Kaiser Steel Corp. v. Mullins*,
455 U.S. 72 (1982) ...................................................................................67

*Kelly v. Kosuga*,
358 U.S. 516 (1959) ................................................................................67

*Koller v. Air & Liquid Sys. Corp.*,
2013 WL 12114668 (C.D. Cal. Feb. 27, 2013).............................................20

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (Cal. 2003) ...................................................................70

*KW Plastics v. U.S. Can Co.*,
130 F. Supp. 2d 1297 (M.D. Ala. 2001) .....................................................63

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ....................................................................21, 33, 41

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003)...............................................................44, 45

*Lorraine v. Markel Am. Ins. Co.*,
241 F.R.D. 534 (D. Md. 2007) .................................................................64

*Los Angeles Land Co. v. Brunswick Corp.*,
6 F.3d 1422 (9th Cir. 1993).....................................................................39

*Martin v. World Savs. & Loan Ass'n.*,
92 Cal. App. 4th 803 (2001) ....................................................................59

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
2004 WL 5907538 (C.D. Cal. June 10, 2004),
*aff'd*, 350 Fed. Appx. 95 (9th Cir. 2009) ...........................................25, 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................30

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004)............................................................24, 26

*U.S. v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .............................................................25, 57

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
806 F.3d 835 (5th Cir. 2015)...................................................................22

*Moore v. James H. Matthews & Co.*,
473 F.2d 328 (9th Cir. 1972)...................................................................33

Case No. 15-cv-9814-DSF-AGRx
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

*Moore v. James H. Matthews & Co.*,
   682 F.2d 830 (9th Cir. 1982) .................................................................. 66

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
   909 F.2d 1245 (9th Cir. 1990) .............................................................. 20

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) .............................................................. 31

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978) ............................................................................ 49

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   37 F. Supp. 3d 1126 (N.D. Cal. Apr. 11, 2014) ......................... 21, 45, 49

*NewCal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .............................................................. 26

*News Theme Promos., Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ...................................................... 22, 30, 55

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
   311 F. Supp. 2d 1048 (D. Colo. 2004) ................................................. 27

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998) ............................................................................ 33

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   802 F.3d 1049 (9th Cir. 2015) .................................................. 2, 21, 47, 48

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014) .............................................................. 62

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
   967 F. Supp. 2d 1347 (N.D. Cal. 2013) ............................................... 32

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990) ........................................................................ 69

*Paladin Assocs., Inc. v. Mont. Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) .............................................................. 23

*Perinatal Med. Grp., Inc. v. Children's Hosp. Cent. Cal.*,
   2010 WL 1525511 (E.D. Cal. Apr. 15, 2010) ..................................... 22

*Poller v. Columbia Broad. Sys., Inc.*,
   368 U.S. 464 (1962) ..................................................................... 20, 65

*Popescu v. Apple Inc.*,
   204 Cal. Rptr. 3d 302 (Ct. App. 2016) ................................................ 61

*Quelimane Co. v. Stewart Title Guar. Co.*,
   960 P.2d 513 (Cal. 1998) .............................................................. 68, 70

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010)..............................................................41, 42

*Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC*,
   2003 WL 22928728 (S.D.N.Y. Dec. 10, 2003)...............................27

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)..............................................26, 36

*Richardson v. La Rancherita of La Jolla, Inc.*,
   159 Cal. Rptr. 285 (Ct. App. 1979)....................................60

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)...............................................................24, 26

*Swinerton & Walberg Co. v. City of Inglewood-L.A. Cnty. Civic Ctr. Auth.*,
   40 Cal. App. 3d 98 (1974).................................................59

*Swipe & Bite, Inc. v. Chow*,
   147 F. Supp. 3d 924 (N.D. Cal. 2015) .............................69

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961)...........................................................23

*Ticketmaster Corp. v. Tickets.com, Inc.*,
   2003 WL 21397701 (C.D. Cal. Mar. 7, 2003) .......4, 20, 35, 36, 37, 39, 41, 56

*Trindade v. Reach Media Grp., LLC*,
   2013 WL 3977034 (N.D. Cal. July 31, 2013) ..............................68

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982)................22, 23, 25, 27, 30, 42, 44, 45, 51, 55

*U.S. v. Terminal R.R. Assn. of St. Louis*,
   224 U.S. 383 (1912) ............................................................32

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981) ...........................................................1

*Universal City Studios, Inc. v. Nintendo Co.*,
   797 F.2d 70 (2d Cir. 1986)................................................60

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ....................................................4, 20, 31-35

*Wilson v. Zapata Off-Shore Co.*,
   939 F.2d 260 (5th Cir. 1991)..............................................64

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ...........................................................66

## **Rules and Regulations**

Fed. R. Civ. P. 56...................................................................20

1  Fed. R. Evid. 803(3) ......................................................................... 63

2  Fed. R. Evid. 803(6) ......................................................................... 63

3
                                    **Treatises**
4
   *Antitrust Law Developments* (Eighth) § 2.C.2.b. ......................... 42
5
   Areeda & Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles
6          and Their Application* ¶ 1800c5 (online ed. 2017) ......................... 43

7  Joseph Farrell, *Deconstructing Chicago on Exclusive
          Dealing*, 50 ANTITRUST BULL. 465 (2005) ...................................... 43
8

9                         **Additional Authorities**

10  Robert H. Bork, *The Antitrust Paradox* (1978) ........................... 44

11  U.S. Dep't of Justice, *Competition and Monopoly:  Single-Firm Conduct
          Under Section 2 of the Sherman Act,* 136-37 (2008) ....................... 40

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRELIMINARY STATEMENT**

This case is about Ticketmaster ("TM") and its parent corporation, Live Nation Entertainment's ("LNE"), campaign to eliminate competition in the artist presale ticketing services ("APTS") market. For the purposes of their motion, Defendants concede that Songkick and TM compete in the APTS market, and that TM has market power in that market (with between █████% market share or more). Defendants also do not contest that TM is by far the most dominant player in the separate venue ticketing services ("VTS") market, with over ███% of major concert venues under exclusive contract in the U.S.

When the parties last appeared before the Court in May 2016, Songkick did not have any discovery from Defendants; nor did it yet have an economic expert to help explain the relevant markets, market power, and anticompetitive effects of the conduct at issue in this case. Defendants argue that the Court decided all relevant factual issues at the preliminary injunction stage, but those arguments fail on both factual and legal grounds.[1] Since April 2016, Songkick has obtained not only lay evidence supporting every one of its factual and legal allegations, but also the expert opinions of (among others) Professor Joseph Farrell, the former Director of Economics for the FTC, Deputy Assistant Attorney General for Economic Analysis in the DOJ's Antitrust Division, and the Chief Economist of the FCC. Professor Farrell concludes, *inter alia*, "In the United States, Ticketmaster has or is on the point of having monopoly power, the power to set prices or exclude competition, in artist presale ticketing services, and has substantial market power and recognized indicia of monopoly power in venue ticketing services." He further concludes that Defendants' exclusive VTS contracts and other conduct have substantially

---

[1] Findings in preliminary injunction orders do not control for the rest of the case exactly because they are entered on an incomplete record. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). As discussed at length below, the full record shows Defendants committed extensive antitrust and other violations, and the effects of that conduct have been devastating.

foreclosed competition, raised prices, and lowered overall ticket sales in the APTS market. Defendants' only response to these conclusions is to seek to discredit this preeminent economist as some sort of fringe thinker when, in fact, the limited opinions of his they do attack—*i.e.*, criticisms of ***their defenses***—are noted by the DOJ (including in connection with the LNE-TM merger itself) and case law as the consensus view.

TM's unchallenged market power in the APTS market is important because it helps frame why its conduct violates federal antitrust and state law. Defendants' highest-level executives claim they are under no obligation to reasonably draft or interpret the "fan club policy" at the center of this case, and claim that TM can arbitrarily interpret the policy to exclude rivals from the APTS market. AMF ¶ 342. The record shows this has been Defendants' practice, as they have specifically "taken a new enforcement approach to the fan club policy" in order to "take over the [APTS] market." Ex. 285, at -756-757. This goes far beyond the supposed procompetitive benefits of the fan club policy, which Defendants claimed in discovery is just to protect their venue-specific VTS investments. Furthermore, the TM executive charged with interpreting the policy is also in charge of competing with Songkick in the APTS market and is compensated, in part, on how many artist presale tickets he keeps "on-platform" and away from competitors. AMF ¶ 466. Thus, TM, a monopolist, has subjectively set the rules for its competition in a policy Defendants admit is economically unreasonable and exclusionary.

Defendants attempt to shift focus from these facts by trying to focus on supposed violations of the fan club policy, but that argument ignores that TM cannot simply set whatever policy it wants to exclude and harm competition; it and LNE must act reasonably for the purpose of market efficiency. Antitrust law holds that if (as here) there are demonstrable anticompetitive effects from a monopolist's conduct, then that conduct is illegal if less restrictive alternatives exist. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015)

1  (less restrictive alternatives analysis applies to Section 1 claims); *Image Technical*
2  *Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1213-14 (9th Cir. 1997) (same,
3  for Section 2). TM's own witnesses admit its pre-merger approach to artist presales
4  did not present any business problems for TM, and that approach was demonstrably
5  less restrictive than either its 2012 or 2015 fan club policies. Similarly, TM's VTS
6  rivals face the same tension between the need for their venue-clients to permit artist
7  presales and preventing unreasonable "cannibalization" of general sales, yet those
8  VTS rivals (who do not offer APTS like TM) apply a straight numerical cap on
9  artist presale tickets without any other restrictions than that the presale conclude
10 before the general sale. The law is clear that the existence of such alternatives
11 precludes summary judgment. Furthermore, even if alternatives did not exist, TM
12 goes far beyond the supposed procompetitive justifications for its fan club policy,
13 which requires a jury to balance the (virtually uncontested) anticompetitive effects
14 the record establishes against those supposed benefits. This balancing is necessarily
15 a factual issue for the jury, particularly because Defendants used the fan club policy
16 to "take over" the APTS market. *See*, *e.g.*, *Cal. ex rel. Harris v. Safeway, Inc.*, 651
17 F.3d 1118, 1138-39 (9th Cir. 2011) (en banc).
18      The fan club policy's overly restrictive nature comes further into focus with
19 evidence showing that, contrary to Defendants' mischaracterizations, Songkick's
20 central goal was to help its clients modify preexisting fan communities to comply
21 with TM's more technical fan club guidelines. To do so, Songkick suspended
22 operations for half a year in 2012 to develop a fan club policy-compliant system, a
23 model that Defendants accepted as compliant at the time. But, Defendants began
24 changing the rules from 2014 on (including an official "clarification" in 2015) to
25 make compliance infeasible and at TM's discretion, because they feared the broader
26 "existential" threat Songkick and other modern APTS providers posed to TM's
27 market power. As part of this broad-based attack, Defendants repeatedly hacked
28 Songkick's computer systems and misappropriated its trade secrets in order to

1  conduct a successful campaign of interfering with SK's clients using the

2  confidential information they misappropriated. But, although the trade secret and

3  hacking claims are incorporated into Songkick's antitrust, tortious interference, and

4  unfair competition claims, Defendants' motion does not discuss much less

5  distinguish those allegations nor the standalone misappropriation and hacking

6  claims which also incorporate those allegations.

7        Faced with these factual issues (including, *inter alia*, Defendants' written

8  admission that it is up to venues to decide when to provide artist presale tickets),

9  Defendants seek to recharacterize this case as a unilateral refusal to deal, *i.e.*,

10  "*Trinko,*" case. But Songkick's allegations, discovery pleadings, and evidence have

11  always been that TM engaged in and/or coerced multi-party concerted action with,

12  *inter alia*, venues and artists (*e.g.*, convincing or forcing those entities to boycott

13  Songkick), not unilateral action as in *Trinko*. Such concerted action invokes a wide

14  variety of different antitrust doctrines, including exclusive dealing, unreasonable

15  restraints of trade, exclusionary monopolistic conduct, vertically-arranged boycotts,

16  tying, and others. Thus, *Trinko* is inapposite, which *Trinko* itself and Defendants'

17  other case citations recognize. *See* Argument Section I.D, *infra*.[2] In short, while

18  Defendants would desperately like to make this a *Trinko* case, it is not.

19        In the alternative, Defendants argue for dismissal based on the unpublished,

20  pre-LNE merger opinion, *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL

21  21397701 (C.D. Cal. Mar. 7, 2003). That opinion predated TM's creation of its fan

22  club policy and the imposition of even more restrictive changes after TM merged

23  with LNE in 2010. But, more importantly, *Tickets.com* does not inform the current

24

25     [2]  Similarly, Defendants' *Trinko* arguments completely rely on rejecting the

26  Court's 2016 finding that TM's venue contracts carve out some artist presale seats
   from TM's exclusivity. *See* Dkt. 63 at 3. Defendants' economist, Janusz Ordover,

27  Ph.D., assumed there was no such carve out and testified he would have to

28  reexamine all of his opinions if there were. Ex. 73 Ordover Dep. 23:4-14.

Case No. 15-cv-9814-DSF-AGRx

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   analysis because, *inter alia*, Judge Hupp did not analyze the APTS market or

2   competitive effects in that market, and specifically found that "[Tickets.com's

3   evidence] shows prices to the consumer are not affected." Here Professor Farrell's

4   report shows the exact opposite:  prices for APTS and to consumers went up due to

5   Defendants' conduct. Put simply, Judge Hupp analyzed a different dispute (*i.e.*,

6   between VTS providers) in a different marketplace (*i.e.*, pre-merger) and with an

7   entirely different record in material respects.

8         For the remainder of Songkick's state claims and TM's counterclaim,

9   Defendants submit "manager declarations," which merely contradict those

10  managers' own contemporaneous documents, statements, and previous experience

11  with Songkick. These declarations and the evidence Songkick submits in response

12  merely create additional issues of fact and do not support summary judgment. In

13  addition, Songkick's intentional interference and unfair competition claims

14  incorporate its trade secret misappropriation allegations, which Defendants do not

15  challenge in their motion. In short, Defendants identify no basis to award them

16  partial summary judgment on any of the claims.

17        **STATEMENT OF FACTS[3]**

18  **I.   THE ARTIST PRESALE TICKETING SERVICES MARKET**

19        Defendants do not contest that APTS is a separate well-defined relevant

20  product market from VTS. Br. at 30 n.9. In order to fully explain this case, however,

21  Songkick provides the following explanation of the market's features.

22

23

24  [3]  Songkick supports its factual assertions in this brief with references to its
    contemporaneously-filed Response to the Defendants' Proposed Statement of
    Uncontroverted Facts and Conclusions of Law and Plaintiff's Statement of

25  Additional Genuine Disputes of Fact and Law. "RSUF" citations are to Songkick's
    responses to Defendants' "uncontroverted" facts. "AMF" citations are to Songkick's

26  additional facts. "Ex." citations are to exhibits to the Declaration of Adam B.
    Wolfson, and "[Name] Decl." or "[Name] Ex." citations are to declarations filed

27  concurrently with this brief. "O'Mara Ex." and "Schmitt Ex." citations are to
    exhibits respectively appended to Dkt. 222 and Dkt. 220-141.

28

### A.  TM Has the Power to Control Prices and Exclude Competition in the APTS Market

Artist presales are instances in which an artist directly sells tickets to its fans before a show's "general sale," usually with lower service fees than the general sale. AMF ¶ 288. APTS are a type of primary ticketing service in the U.S. specifically aimed at servicing artist presales.[4] They are in contrast to VTS, which, as the name implies, are ticketing services provided to venues instead of artists. AMF ¶ 289.

TM competes in both relevant markets while Songkick competes only in APTS. AMF ¶ 291. It is uncontested that TM holds dominant market shares in both markets, providing over ██% of VTS at major concert venues and the same or more of APTS in the United States. AMF ¶ 292. TM's market share in VTS has gone up every year since it merged with LNE, and its market share stands to go to almost 100% of APTS with the elimination of Songkick. AMF ¶ 293.

Due to these facts and others, TM has market power in APTS, which Defendants do not contest in this motion. That market power is derived from, *inter alia*, TM's web of long-term VTS contracts throughout the U.S. Farrell Ex. 1 at 56-69. Due to TM's ubiquity, it is inevitable that today's artists must play in at least one TM venue on a U.S. tour, and typically far more than that. AMF ¶ 294. This also magnifies TM's market power in APTS. Farrell Ex. 1 at 86-90; *id.* Ex. 2 at 30-37.

### B.  The Artist Presale is a Decades-Old Feature of the Live Music Industry With Multiple, Well-Accepted Benefits

Artist presales have been a feature of the live music industry for decades. AMF ¶ 295. Artists benefit from artist presales because they:  create buzz for a show in order to drive overall ticket sales; "reward" dedicated fans with lower-priced tickets; and facilitate a long-term marketing channel between artists and their fans by providing artists with their fans' personal consumer information. AMF ¶ 296

---

[4]  Primary ticketing services are services to facilitate the first sale of a ticket to a live event. This typically involves a bundle of different, but related, services and products that are provided to a party selling tickets in the first instance.

(collecting documents and third party manager declarations).

For the venues and their VTS provider, the first benefit of artist presales is that permitting them allows the venue to attract high-quality acts (who, based on industry practice, expect at least the option to run artist presales). AMF ¶ 297. Furthermore, a well-run presale helps spur demand for the show and lead to higher overall ticket sales. AMF ¶ 298. Thus, as the result of third party artist presales, a venue generally enjoys higher general ticket sales and higher overall revenues from concession, parking, and other venue-controlled services. *Id.*; AMF ¶ 299. TM's own venue manager declarants make this clear, as the venues continue to permit third party presales despite ████████████████████████████████████ ████. AMF ¶ 300. And even those statements appear overblown, as Songkick's own venue declarants demonstrate. *See*, *e.g.*, Mickelson Decl.

Fans in particular benefit from third party artist presales. Due to the TM-created "service fee" model, fans—not venues or artists—actually pay for ticketing services through service and other fees levied on top of a ticket's face value. AMF ¶ 301, 302. In artist presales, however, fans typically pay lower service fees than the general sale. AMF ¶ 303. Artists also use artist presales to maximize the chance that their most dedicated fans are "rewarded" by having early access to tickets in front of other, less engaged fans. AMF ¶ 304.

### C.   The APTS Market Arose From Natural Market Dynamics, Not A Unilateral TM Decision

Contrary to Defendants' description (at 8), artist presales and the fan club policy are not some generous gift TM gave to artists. As third party artist manager deponents (and other sources) explained in discovery, with the advent of the internet, artist presales became more and more popular—with some artists insisting on selling up to 50% of tickets themselves. AMF ¶ 329. Because venues compete with each other to attract artists, they invariably accommodated artists' ticket allocation requests or else be at a competitive disadvantage vis-à-vis other venues.

RSUF ¶ 41, 85. TM generally agreed with its venue-clients to accommodate these requests, *despite* its broader exclusive contracts, so that the venues could attract high-quality acts. RSUF ¶ 41.[5] TM's own industry expert (a former TM senior executive) admitted this practice created no business issues for TM, even in the days of 50% artist presale allocations, and that TM simply worked with venues to provide artist presale allocations to artists. AMF ¶ 327.

Before 2002, there was no such thing as a fan club policy, even though TM employed the same exclusivity model it does today. AMF ¶ 326. However, in early 2002, TM issued a series of letters to venues seeking to implement a new "legitimate fan club" requirement on artist presales. AMF ¶ 330. An APTS provider affected by these new rules, String Cheese Incident Ticketing ("SCIT"), met with TM's then-CEO to contest this restrictive new policy. TM's CEO admitted that, although it was the *venues'* choice whether to allocate artist presale tickets, TM could impose this policy on the venues because TM was like "heroin" to the venues and they would do what TM said. AMF ¶ 332. TM refused to budge and, in 2003, SCIT was forced to sue for antitrust violations. *Id.*; AMF ¶ 333.

Subsequently, the parties resolved their dispute with a 2004 agreement that became the model for TM's fan club policy, as well as its overall approach to artist presales for the next almost decade. ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
*Id.*; AMF ¶ 334. ████████████████████████████████

---

[5] Notably, with the exception of LNE-controlled venues (discussed further below) or instances where TM forced venues to refuse to allocate tickets to Songkick, the record is bereft of instances where venues objected to allocating tickets for artist presales. The opposite is true: when TM exercised its market power to prevent Songkick from running presales in the U.S., venues—*including LNE-controlled venues*—routinely expressed their disappointment and apologies for the refusal TM forced on them. RSUF ¶ 85.

1 ████████████████████████████████████████████████████

2 █████████████ AMF ¶ 335. Following this agreement, for many years TM left it for

3 venues to decide when and how they applied the policy, if at all. AMF ¶ 334. ██████

4 ████████████████████████████████████████████████████

5 ██████████████████████ Ex. 162, SK00932679 at -680.

**D.  APTS Providers Exist to Service Artists, Not Venues, and Therefore Compete for Tickets at the Artist Level**

As noted above, the separation between the VTS and APTS markets is uncontested on this motion (Br. at 30 n.9). In the VTS market, major concert venues contract with VTS providers to service the majority of their tickets. In the APTS market, *artists* contract with APTS providers to service the artist presale tickets they receive from venues. The simple market reality is that, because APTS providers compete for ticketing rights from artists, there is no reason to also seek contracts with venues. AMF ¶ 305-307. In exchange, APTS providers deliver substantial value to artists, the venues at which they play, and ticket-buying fans. Farrell Ex. 1 at 80-84, 122-135; *id.* Ex. 2 at 13-15.

The nature of VTS and APTS are also fundamentally different and therefore require different approaches to obtaining ticketing rights. A VTS provider must focus on facilitating a large volume of ticket sales for a large number of show dates for a wide variety of artists (who rent the venue for their shows). AMF ¶ 308. This business model permits a hypothetical VTS provider to focus on a single venue and seek to service tickets across all of that venue's various shows.

In contrast, APTS providers must focus on servicing a single artist's *tour*, because they are helping represent an artist's brand across the tour. AMF ¶ 309. This means that, if an APTS provider is unable to run presales at specific venues on a tour, they will typically lose the artist's business. AMF ¶ 310. Thus, when Songkick is prevented from running presales at TM venues, its artist-clients do not typically use it for presales at non-TM venues on that same tour. AMF ¶ 311. That is

why, as Defendants note (at 17), Songkick was "at least equally successful in getting presales at TM and non-TM venues." When TM refused to permit Songkick to service artist presales at TM venues, Songkick also lost its clients' business at non-TM venues. AMF ¶ 312.[6]

One argument Defendants make is that Songkick should have tried to contract with venues (rather than artists) to provide APTS. As an initial matter, upfront contracts may make sense for VTS (where the provider always knows which venue it is servicing). But they make little sense for APTS (where artists' tour itineraries are unpredictable and change tour-to-tour). Given artists' preference for a single APTS provider for their tour, and the unpredictable nature of artists' tour itineraries, Songkick would need to follow TM around for at least ▇▇▇▇▇—because only ▇ ▇% of TM's contracts come up for renewal each year—and sign all major concert venues to a contract before Songkick could run a single artist presale. Jones Decl. ¶ 41. That makes no sense, and it is telling Defendants claim it is the only way Songkick or other rivals should compete in the APTS market.

### E.   TM, the Only VTS Provider That Also Provides APTS, is the Only VTS Provider That Limits Presales to "Fan Clubs"

The parties agree TM utilizes its "fan club policy" for artist presales at venues where it has an exclusive VTS contract. Defendants admit that no other VTS provider requires artists to use a "fan club" for their artist presales. AMF ¶ 321. Instead, TM's VTS rivals, like AXS, simply set a numerical cap for the number of presale tickets they are willing to allocate—typically 10-30%, *id.*—and require that the presale conclude before the general sale. *Id.* Any unsold presale tickets must go back into the general sale pool, but that is it. AMF ¶ 322.[7] Notably, unlike TM, none

---

[6] In most of the instances when Songkick still conducted presales for clients where it had been foreclosed from TM venues, that was because the artist was too far down the road with their presales and could not afford to pull them so late in the process.

[7] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ O'Mara Ex. 45 ¶ 2(c)(v).

of its VTS rivals compete in the APTS market and therefore do not have incentives to artificially restrict competition in that market. AMF ¶ 323. Songkick and other APTS providers cannot focus their business solely on TM's less restrictive VTS rivals because, as noted above, APTS providers service ***tours***, and all major tours today inevitably pass through TM venues. AMF ¶ 324.

## II.   DEFENDANTS ADMIT THEIR 2012-PRESENT FAN CLUB POLICY IS ███████████ AND HAS BEEN SINCE IT WAS DRAFTED

Originally, artists used mail-in fan clubs to identify the fans most likely to engage with them long-term and help generate direct-to-fan commerce opportunities and buzz for their shows through artist presales. AMF ¶ 328. With the advent of the internet, artists shifted to marketing themselves to fans through websites. AMF ¶ 329. This was the state of technology in 2004 when TM entered into the settlement agreement with SCIT, establishing the model for the first version of the fan club policy. *See* Fact Section II, *supra*.

Today, artists primarily communicate with their fan communities via personal websites and social media (*e.g.*, Facebook, Twitter, etc.). AMF ¶ 336. Consumers primarily go to these sites because they are already fans of the artist. As they have always done, fans look for artist presale tickets as one of the main perks for rewarding artists with their loyalty and devotion, and artists continue to insist on the opportunity to provide them in order to obtain those fans' consumer data for subsequent targeted marketing. AMF ¶ 337.

It was in this context that Songkick entered the APTS market in 2010. The fan club policy then in existence tracked the version set forth in the SCIT agreement. AMF ¶ 338-39. In response to both Songkick and other APTS providers' rise, TM revised the fan club policy in 2012 in part to limit the channels through which artists could sell artist presale tickets (*e.g.*, prohibiting Facebook marketing) unless TM handled the presale, and then again in even more restrictive fashion in 2015. AMF ¶ 340. One of the authors of the 2012 fan club policy, however, admitted ███████████

1 ███████████████████████████████████████████████

2 ██ AMF ¶ 341.

3      Defendants' top executives also have claimed that they do not have to

4 reasonably draft or enforce the policy's terms. AMF ¶ 342. Defendants have also

5 explicitly admitted that ████████████████████████████████████

6 █████████████████████████████████████████████████████

7 █████████████████████████████████ AMF ¶ 343.; *see*

8 *also* AMF ¶ 344 (providing the same perspective from artists). And Defendants have

9 noted that ████████████████████████████████████████████

10 █████████████████████████████████████████████████████

11 ██████████████████ Ex. 351.

12 **III.   SONGKICK BECOMES FAN CLUB POLICY-COMPLIANT AND SUBSEQUENTLY THREATENS TM'S MARKET POWER**

13      **A.   Songkick's Business Model is to Help Artists Grow and Improve**

14           **Preexisting Fan Communities for Long-Term Artist Benefits**

15      Artist presales are not a short-term profit grab for artists. AMF ¶ 346-349.

16 Indeed, the vast majority of Songkick's artist-clients make no additional revenue

17 from artist presale tickets themselves. Instead, they are a way to help build and

18 strengthen a community of fans by rewarding those fans with advance access to

19 tickets and lower overall ticket prices. AMF ¶ 350. Because artists run a presale

20 themselves, they can obtain artist presale purchasers' consumer data, which

21 facilitates a marketing channel for long-term interaction directly between the artist

22 and its fans. AMF ¶ 351. Historically, TM and other VTS providers refused to

23 provide this data to artists (although, after misappropriating Songkick's trade

24 secrets, TM began promoting an offer of some of this data on a limited basis). AMF

25 ¶ 352. Defendants imply that Songkick's artist-clients create "fig-leaf" fan clubs to

26 get some undefined short-term benefit at the venue's expense, but that ignores that,

27 if the artist does not get tickets into true fans' hands, it does not receive the primary

28

1  benefits of artist presales:  a stronger relationship with, and data on, the fans most

2  likely to follow and support the artist's career. AMF ¶ 351.

3       When artists come to Songkick, they have preexisting fan communities,

4  which are typically run through a combination of an artist-branded website and

5  social media (*e.g.*, Facebook, Instagram, etc.). AMF ¶ 353. The artists' websites

6  typically include news about the artist, tour dates, special merchandise, contests, and

7  artist-specific offers. AMF ¶ 354. Their social media channels also by definition

8  provide for direct interaction with the artist and between fans. AMF ¶ 355. Songkick

9  does not run the artists' websites or social media, because those are the artists'

10  properties. AMF ¶ 356.[8]

11       Songkick fits into artists' ecosystems by facilitating a critical aspect of any

12  fan community:  presale tickets. Songkick embeds its technology into artists'

13  websites so the artists can run presales alongside the rest of the artist-fan

14  interactions they offer. AMF ¶ 360. As Defendants' own example of a "legitimate

15  fan club" demonstrates, "early access to tickets" is the first benefit most fans want

16  from artists. AMF ¶ 361. This is an unsurprising revelation; primary tickets are often

17  hard to come by and fans want to pay lower fees.

18     **B.**   **Since 2012, Songkick's Policy Has Been to Help Artists Comply With the TM Fan Club Policy**

19

20       In their attempt to paint Songkick as a rule-breaker, Defendants ignore that

21  Songkick made it its policy to comply with TM's 2012 policy (once it learned of the

22  policy's alleged scope), and that Defendants accepted Songkick's compliance model

23  for the next year, until it became what Defendants called an "███████" threat.

24  _____

25  [8]  As noted above, the primary way artists communicated with fans before the

26  internet was through mail-in fan clubs. Once the internet came around, many artists put these types of offers behind paid memberships in order to generate extra income

27  while off tour. AMF ¶ 358. However, due to the shifts in online culture presaged by Facebook, Twitter, Instagram, Google, and other free web services, most artists

28  today do not charge for membership and instead manage their brand through open communication and special offers. AMF ¶ 359.

When Songkick first entered the APTS market in early 2010, it did not know about the fan club policy. AMF ¶ 363. It first heard of the policy in September 2011 from a CAA agent, but believed at that time that the policy was limited to LNE-owned venues, because those were the only venues for which TM insisted on compliance. AMF ¶ 364. After Songkick learned in early 2012 that TM believed the policy applied to *all* TM venues, Songkick developed a plan to ensure it could meet both the letter and spirit of the policy. AMF ¶ 365.

However, Songkick could not immediately meet the policy's technical requirements because it did not then have the ability to put presales and other exclusive content behind a login. AMF ¶ 366. Songkick therefore stopped conducting artist presales at TM venues, unless it had a waiver from TM for that specific presale or integrated into a fan club run by a third party provider with the necessary technology, and spent the next seven months (from February-September 2012) creating that technology to become fan club policy-compliant. AMF ¶ 367.

From September 2012 on, Songkick tried to ensure that its artist-clients were fan club policy-compliant in whatever venues Songkick knew were TM venues. AMF ¶ 368.[9] Songkick ensured that artists understood and complied with the policy's requirements, including providing a members-only area with special content and features beyond just presale tickets. AMF ¶ 372. There was a wide variety of such content, largely depending on the artist, and it complemented other content Songkick helped the artists create for their broader tour (some of which

---

[9] On repeated occasions, Songkick requested a full list of TM venues from Defendants, but they refused to provide one. AMF ¶ 369. Instead, Defendants stated that it was Songkick's burden to identify TM's venues, even though the venue representatives with whom Songkick corresponded often did not know whether they had an exclusive relationship with TM, and Defendants in this litigation claimed they were unable to provide a full list of TM venues because it was supposedly too burdensome to do so. AMF ¶ 370. Nevertheless, Songkick created and maintained a massive database of TM venues from its best understanding of the market so it could ensure fan club policy compliance. AMF ¶ 371.

1   appeared behind the fan club wall, some of which did not). A comprehensive

2   description of the types of special content Songkick helped its artists create—which

3   was often quite extensive—is described in, *inter alia*, the Bellin Decl.

4          Given how outdated the fan club policy is, some artists pushed back regarding

5   its archaic requirements. However, Songkick always ensured that even those artists

6   complied in TM venues requiring such compliance, or else they could not work with

7   Songkick. AMF ¶ 372, 374; Bellin Decl. ¶¶ 14-18.[10] Indeed, Songkick's clients

8   provided the  same type of content to their fans as ███████████████████

9   Defendants now claim is an example of a "qualifying" fan club. AMF ¶ 373.

10  Defendants have also explicitly admitted that multiple Songkick client fan clubs

11  with select pieces of special content clearly complied with the fan club policy. AMF

12  ¶ 378.

13         To the extent Defendants criticize Songkick (at 16) for helping artists create

14  fan club policy-compliant fan clubs, they again ignore the realities of the live music

15  industry. Tours are often the ***best*** time to start or refresh a fan club, because they

16  represent a moment in an artist's career when they are most visible to the public eye

17  (and therefore most likely to generate interest to join their fan communities). AMF ¶

18  380. Also, as noted above, Songkick's clients all had preexisting fan communities,

19  the vast majority of which provided the same features as "legitimate fan clubs," just

20  in the open rather than behind a login. AMF ¶ 381. Songkick helped those artists put

21  

22  [10] The ████████████████ example on which Defendants primarily rely to "prove" Songkick's supposed "catch me if you can" approach (Br. at 14-16, discussing that artist's ████████████████ special fan club content) underscores this point. That was an instance in which the artist revolted at the idea of not providing complete access to themselves for all of their fans. Songkick nevertheless explained the fan club policy's requirements and got the artist to comply. AMF ¶ 375. The ██████ photographs Defendants latch onto were ones that Songkick's employees did not find particularly flattering, but they were what the artist felt comfortable providing to their fans, so Songkick acceded to its clients' wishes. AMF ¶ 376. Songkick then proceeded with the limited artist presales it conducted for this artist—two shows—once it felt comfortable about fan club policy compliance. *Id.* Notably, Defendants do not identify a single other instance where there was "fig-leaf" special content. *See generally* RSUF ¶¶ 118-141.

Case No. 15-cv-9814-DSF-AGRx
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   some of the features they offered for free behind a login along with all artist presale

2   information. AMF ¶ 382. Songkick thus helped its clients step backward in time to

3   comply with the fan club policy, because TM demanded it.

4        In the Bellin Decl., Songkick further breaks down Defendants' criticisms of

5   its artist-clients' fan clubs and shows how they complied with both the letter and

6   spirit of the fan club policy.  Bellin Decl. ¶¶ 27, 30-82.

7        Defendants misrepresent the record by claiming that Songkick thinks a "fan

8   club-style wall" is itself enough to comply with the fan club policy. *See*, *e.g.*, Br. at

9   13-14. That is false. A login mechanic to put content in an "exclusive" area was the

10  one technology missing from Songkick's platform in early 2012. AMF ¶ 366, 384.

11  The ████ analogy Defendants cite (at 13)—presumably because of its evocative

12  imagery—drives home this point. As the full document and the author's testimony

13  make clear, Songkick did ***not*** believe its technology was enough for compliance.

14  AMF ¶ 386. Instead, the ***artists*** also needed to comply with the policy by, for

15  example, not advertising presale ticket specifics outside of the fan club's walls (*e.g.*,

16  on Facebook, etc.). *Id.* Thus, just as a ████████████ can do its best to comply

17  with all applicable laws and regulations in creating ██████, its consumers can still

18  violate the law by using ██████ in a proscribed way. *Id.*

19        **C.   Songkick Succeeded By Offering Better APTS Than TM**

20        CrowdSurge (one of the companies that merged to form today's Songkick)

21  originally formed in the U.K. That market is important to this case because it

22  demonstrates that, contrary to Defendants' claims in their motion, the exclusivity

23  model TM built and maintains in the U.S. is not needed to incentivize VTS

24  providers to provide services to venues. The U.K. employs an "allocation" model,

25  where venues allocate a portion of their tickets to VTS providers on an exclusive

26  basis (after the VTS providers, including TM, compete with one another for those

27  contracts) and then cede control over the rest of the tickets to the promoter of each

28  show at the venues. AMF ¶ 387. Thus, on a show-by-show basis, there are often

multiple ticketing service providers simultaneously selling tickets. AMF ¶ 388. This has resulted in lower service fees and overall ticket prices to fans, Farrell Ex. 1 at figs. 35 & 36; *id.* Ex. 2 at 60-61, and is a model employed by many of the world's top concert venues (including *the* top venue in the world). AMF ¶ 389.

Armed as it was with its experience in the allocation model, Songkick saw an opportunity in the U.S. to present a new, better form of ticketing services, albeit within the constraints of the TM U.S. exclusivity model. AMF ¶ 390. Certainly this represented a procompetitive disruptive intent, but not, as Defendants imply, by causing venues to break their contracts.

Defendants themselves recognized the threat Songkick's better ticketing services represented. They called it an "███████" threat to their broader VTS business and noted that, if they could eliminate Songkick and other "artist ticket[ers]" in order to "████████████████" they could obtain ███████ of extra tickets. AMF ¶ 391.[11]

## IV.  DEFENDANTS RESPONDED TO SONGKICK'S SUCCESS WITH WIDE-RANGING ANTICOMPETITIVE AND ILLEGAL ACTS

From the point they first became aware of Songkick and the "new wave" of APTS providers, Defendants attempted to constrain that competition through their exclusive VTS contracts and the 2012 revision to the fan club policy, which barred Songkick and other APTS rivals from utilizing the most up-to-date distribution channels for artist presales while not placing similar constraints on TM. AMF ¶ 340. Later sections of this brief explain why the exclusive deals and fan club policy

---

[11]  In their motion, Defendants claim (at 65) that Songkick never would have been profitable, even in the but-for world. This is entirely incorrect. Songkick was on pace to become profitable by 2016. AMF ¶ 392. As Songkick's damages analysis indicates, Defendants deprived it of *millions* of tickets (not 61,000). AMF ¶ 394. Furthermore, Defendants themselves recognized the ever-growing threat Songkick represented after it started to achieve scale in the market. AMF ¶ 391, 540.

1  overall are unreasonably restrictive and exclusionary. Notably for this statement of

2  the facts, the record shows Songkick adapted to the 2012 policy and for the next

3  year Defendants did not contest that Songkick's updated platform enabled

4  compliance, despite what their counsel now claim.

5      As Songkick's market share continued to grow, however, Defendants realized

6  they stood to lose substantial business in the APTS market from increased

7  competition. Defendants therefore initiated a campaign to restrain Songkick's and

8  other APTS providers' continued growth by (a) serially identifying new, previously

9  unstated "requirements" in the fan club policy to disallow previously-compliant

10  artist presales, AMF ¶ 402; (b) substantially revising the policy to be even more

11  restrictive with a 2015 "clarification" that supposedly gave TM the right to

12  arbitrarily reject presales on whatever basis it wanted and was designed to "█████

13  ████████████████████" AMF ¶ 403; (c) inducing venues to boycott Songkick by

14  refusing to allocate presale tickets to Songkick's clients, even where the venue was

15  willing to do so and Songkick's client complied with the policy, AMF ¶ 404; and (d)

16  using a variety of tactics to bully and coerce artists into not using Songkick, else

17  lose broader economic benefits on their general ticket sales, AMF ¶ 405. One

18  particularly notable recent example is ████████████, whose website is

19  unquestionably one of the most robust out there in terms of artist-fan engagement.

20  AMF ¶ 406. TM nevertheless claimed it was not a "qualifying" fan club, and Mr.

21  Rapino took it upon himself to convey that assessment to ████████████

22  management in order to pressure them not to use Songkick for artist presales. AMF

23  ¶ 407, 407A. This pressure worked, and led ████████ to drop Songkick for all

24  future shows at TM venues. *Id.* Another example is ████████████, which

25  Defendants admitted for years had a "real fan club" until it switched to Songkick in

26  early 2017, when Defendants suddenly claimed the opposite. AMF ¶ 408, 409.

27  Numerous other examples are detailed in Songkick's supporting documents and

28  declarations. AMF ¶ 402-405; Jones, Glicken, Smith, Third Party Decls. (defined in

n.12 below)

In order to put Songkick out of business, Defendants also hacked its systems and misappropriated Songkick's trade secrets and other confidential information through ex-Songkick employee, Stephen Mead. AMF ¶ 410. Defendants used these trade secrets to preemptively interfere with artists. AMF ¶ 411. Defendants also used the secrets to "█████" in areas where Defendants had fallen substantially behind Songkick. AMF ¶ 412. Mr. Rapino himself pressured his employees for this information. AMF ¶ 413. Defendants do not mention these facts nor contest them anywhere in the motion. But this corporate espionage was a critical part of their broader scheme to eliminate Songkick and rival APTS providers.

## V. DEFENDANTS HAVE ELIMINATED COMPETITION IN THE APTS MARKET AND HARMED VENUES, ARTISTS, AND CONSUMERS

The effect of Defendants' conduct has been to exclude all real competition in the APTS market, AMF ¶ 414, which has resulted in higher prices to fans; less competitive, lower-quality choices for artists seeking APTS providers; and lower overall ticket sales. AMF ¶ 415. Songkick has suffered substantial individual harm from Defendants' conduct, stemming from both the broader harms to competition Defendants inflicted and the Songkick-specific acts they took. AMF ¶ 416. █████ ████████████████ ████████████████ █████████.

On this motion, Defendants have convinced a few artist managers to offer testimony to the contrary (although Defendants did not disclose those managers as potential witnesses during fact discovery). *See* Br. at 59-61. As discussed in Argument Section IV, however, those declarations simply identify genuine disputes of material fact, because the managers contradict themselves and their historical statements/documents, and are clouded by substantial indicia of a current desire to please LNE, which shows they at most highlight genuine disputes of material fact.

1   Furthermore, Songkick submits 18 of its own manager and other third party

2   declarations, which show that Songkick lost substantial amounts of business to

3   Defendants' conduct.[12]

4               **LEGAL STANDARD FOR SUMMARY JUDGMENT**

5           Summary judgment is only appropriate if, when viewing the evidence in the

6   light most favorable to the non-movant, there is no genuine issue as to any material

7   fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56;

8   *see Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 787 (9th Cir. 1996); *Movie 1 &*

9   *2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1248 (9th Cir. 1990).  Summary

10  judgment is particularly "disfavored in complex antitrust litigation" where motive

11  and intent are important and where relevant information is controlled by hostile

12  witnesses. *Movie 1 & 2*, 909 F.2d at 1248 (citing *Poller v. Columbia Broad. Sys.,*

13  *Inc.,* 368 U.S. 464, 473 (1962)). "Summary judgment is appropriate only in the clear

14  absence of any significant probative evidence tending to support the complaint." *Id.*

15  at 1249; *see also Koller v. Air & Liquid Sys. Corp.*, 2013 WL 12114668, at *1 (C.D.

16  Cal. Feb. 27, 2013) ("In ruling on a summary judgment motion, 'the judge's function

17  is not himself to weigh the evidence and determine the truth of the matter but to

18  determine whether there is a genuine issue for trial.'") (quoting *Anderson v. Liberty*

19  *Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

20                        **ARGUMENT**

21  **I.    DEFENDANTS ATTEMPT TO FORCE THIS CASE INTO NARROW
        BOXES DIVORCED FROM THE LAW AND RECORD**

22          Although Songkick's allegations are clear that Defendants engaged in

23  widespread anticompetitive conduct involving multiple different types of antitrust

24  violations, Defendants erect a rhetorical strawman by claiming this case is

25

26  _____

27  [12]  *See* Berger, Blasko, Colton, Corcoran, C. Miller, Foster, Furhmann,
    Guggenheim, Holden, Kane, Mickelson, Moses, Paluska, Pardo, Pawson, Ramseur,
28  Sulmer, Thomas Decls. (collectively, "Third Party Decls.").

supposedly about a unilateral refusal to deal analyzed under the Supreme Court's *Trinko* decision and, if it is not a unilateral refusal to deal case, then Judge Hupp's unpublished 2003 *Tickets.com* decision controls. Br. at 2-3, 31-37, 46-53.

These arguments are simply incorrect as a matter of law and the record. In order to contextualize why, however, it is first necessary to summarize the law applicable to Defendants' conduct, as well as Songkick's theories of harm.

### A.   The Law Under Which Defendants' Anticompetitive Conduct is Analyzed

#### 1.   Sherman Act § 1 – Unreasonable Restraints of Trade

Section 1 of the Sherman Act prohibits any "contract, combination, … or conspiracy" that unreasonably restrains competition. *Safeway, Inc.*, 651 F.3d at 1132. The touchstone is "concerted action" between two or more entities. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). For vertical restraints such as the ones at issue in this case—*e.g.*, agreements (whether formal or informal) between sellers and consumers of ticketing services—courts typically apply the "rule of reason." *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-88 (2007). The jury analyzing a restraint under the rule of reason "review[s] all of the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and [] determine[s] whether the anticompetitive aspects of the challenged practice outweighs its pro-competitive effects." *Safeway*, 651 F.3d at 1133 n.10.

This process proceeds through a burden-shifting approach. The plaintiff first must show the concerted action had anticompetitive effects. *O'Bannon*, 802 F.3d at 1070. The burden then shifts to the defendant to show the conduct had non-pretextual, procompetitive benefits. *Id.* "Procompetitive effects include efficiency gains, the development or improvement of products, and other benefits to consumers and society." *Safeway*, 651 F.3d at 1160. Assuming the defendant can establish such non-pretextual procompetitive benefits, the plaintiff may then demonstrate there are

1   substantially less restrictive alternatives available to achieve the same goals.

2   *O'Bannon*, 802 F.3d at 1070. If they do, that is the end of the inquiry; but, if they

3   cannot, the jury then weighs the anticompetitive effects against the procompetitive

4   benefits. *Id.* at 1074. Although these inquiries may sometimes be appropriate for

5   summary judgment, they almost always are not. *See*, *e.g.*, *In re NCAA Student-*

6   *Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1146-48 (N.D. Cal.

7   Apr. 11, 2014) (denying summary judgment given conflicting evidence on

8   anticompetitive effects and procompetitive benefits); *see also Perinatal Med. Grp.,*

9   *Inc. v. Children's Hosp. Cent. Cal.*, 2010 WL 1525511, at *8 (E.D. Cal. Apr. 15,

10  2010) ("[E]ach element of each Sherman Act claim presents a question of fact.").

11          **In general (including boycott).** For the purposes of Section 1, all of the

12  instances in which Defendants worked with other entities—including by contract,

13  agreement, or coercion—to prevent Songkick from conducting artist presales are

14  analyzed under the rule of reason. In particular, Defendants' successful efforts to

15  convince venues to boycott Songkick by refusing to allocate it artist presale tickets

16  are offenses governed by the rule of reason. *Constr. Aggregate Transp., Inc. v. Fla.*

17  *Rock Indus., Inc.*, 710 F.2d 752, 777-79 (11th Cir. 1983) ("*CAT*") (cited in Br. at

18  35); *see also MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 840 (5th Cir.

19  2015); *Calculators Haw., Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1337 n.2 (9th Cir.

20  1983). So, too, are Defendants' successes in convincing artists not to work with

21  Songkick, even if those artists did not willingly do so. *CAT*, 710 F.2d at 777-81.

22  The only theories of anticompetitive conduct that go beyond this general analytical

23  framework are the harms to APTS caused by Defendants' exclusive dealing itself

24  and their tying.

25          **Exclusive dealing.** Exclusive dealing contracts are analyzed under Section 1

26  pursuant to the rule of reason. *Theme Promos., Inc. v. News Am. Mktg. FSI*, 546

27  F.3d 991, 1001 (9th Cir. 2008). They are not presumed legal, as Defendants argue

28  (at 27), but are analyzed for whether they unreasonably restrain competition. *Id.*

In addition to the rule of reason requirements, a plaintiff asserting anticompetitive exclusive deals under Section 1 must show that the contracts (a) are exclusive, and (b) substantially foreclosed competition in a well-defined relevant market. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1301-02 (9th Cir. 1982). In analyzing substantial foreclosure, the fact finder:

> weigh[s] the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Id.* (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961).

Defendants concede—indeed, trumpet—that they have exclusive deals. The only exclusive dealing-specific question for Section 1 is thus whether the deals substantially foreclosed competition in the APTS market.

**Tying.** Unlike other vertical restraints, tying is afforded *per se* illegal treatment in certain situations. Under Section 1, "[a] tying arrangement will constitute a per se violation of the Sherman Act if the plaintiff proves '(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market.'" *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (internal quotation marks omitted). Tying violations also occur where the defendant coerces a counterparty into agreeing they "will not purchase the tied product from any other supplier." *Paladin*, 328 F.3d at 1159.

Defendants concede there are two separate services at issue:  VTS and APTS. Br. at 30 n.9. Separate products are therefore not contested on this motion.

In the venue context, Defendants also concede there is a tie; they simply

dispute whether there was sufficient "coercion" to demonstrate that TM unlawfully tied VTS and APTS. Br. at 28-29. Coercion may be express or implied, but it requires a substantial factual analysis. For example, if the evidence shows that a tie was an implied or understood condition of dealing with the defendant, coercion exists. *Cascade Health*, 515 F.3d at 914. Similarly, if the economic evidence shows that rational purchasers would not purchase the second product/service absent a tie, that also suffices to establish implicit evidence of coercion. *Id.* at 915.

In the artist context, Defendants claim not to understand (at 54) that Songkick similarly alleges a tie between VTS and APTS. Songkick discusses the evidence of tying and coercion at both the venue and artist levels in Argument Section II.C.

## 2.   Sherman Act § 2 – Monopolization/Attempted Monopolization

Section 2 of the Sherman Act "covers both concerted and independent action" that "monopolizes" or "threatens actual monopolization." *Am. Needle*, 560 U.S. at 190. The former is when the defendant willfully obtains or maintains "monopoly power" (*see* Argument Section I.A.3, *infra*) through exclusionary/anticompetitive acts. *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). The latter makes illegal acts intended and, if successful, dangerously likely to confer such power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 453 (1993).

Like Section 1, Section 2 applies an intentionally flexible analysis intended to address the endless variety of exclusionary acts monopolists/attempted monopolists can concoct. Specifically, "anticompetitive conduct" under Section 2 "is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health*, 515 F.3d at 894. Thus, "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory…. [The word] 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not

-24-

further competition on the merits or does so in an unnecessarily restrictive way." *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007).

As noted above, Section 2 covers both concerted and unilateral action; therefore, activities like arranging vertical boycotts with venues or convincing artists not to work with Songkick incur liability if done to willfully obtain or maintain monopoly power. *Am. Needle,* 560 U.S. at 190. As with Section 1, Section 2 also applies specific additional criteria for exclusive dealing and tying, although exclusive dealing under Section 2 does not apply the rule of reason. Instead, the jury must simply analyze whether the exclusive deals "reasonably appear capable of making a significant contribution to … maintaining monopoly power," and whether competing firms that wanted to use the distribution channels subject to the exclusivity arrangement "constituted nascent threats" to defendant's monopoly power. *U.S. v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc).

In conducting both a Section 1 and 2 analysis, it is improper "to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *Masimo Corp. v. Tyco Health Care Grp., L.P.*, 2004 WL 5907538, at *5-*6 (C.D. Cal. June 10, 2004) (quoting *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1378 (9th Cir. 1992)). Indeed, the jury must look to the "aggregate pattern of conduct in the relevant market." *Twin City*, 676 F.2d at 1302. To be sure, a series of "perfectly legal acts" makes it "more difficult to find overall wrongdoing." *City of Anaheim*, 955 F.2d at 1376. However, "[b]ehavior that might otherwise not be of concern to the antitrust laws ... can take on exclusionary connotations when practiced by a monopolist." *Image Tech. Servs.*, 125 F.3d at 1217 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992). Therefore, similar to Section 1, a fact finder assessing a Section 2 claim must balance anticompetitive effects and procompetitive benefits from alleged exclusionary conduct. *Image Tech. Servs.*, 125 F.3d at 1213-14.

### 3.    Market / monopoly power

A final concept common to Songkick's various antitrust claims is "market power." "Market power" is the ability of a single seller to raise price and restrict output. *Eastman Kodak*, 504 U.S. at 464. Such power may be demonstrated with: (1) direct evidence of the injurious exercise of market power, *i.e.*, evidence of restricted output and supracompetitive prices; or (2) circumstantial evidence pertaining to the structure of the market. *Image Tech. Servs.*, 125 F.3d at 1202. Evidence of restricted output and supracompetitive prices is direct evidence of market power. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997). "To demonstrate market power circumstantially, a plaintiff must:  (1) define the relevant market [which is uncontested on this motion], (2) show that the defendant owns a dominant share of that market [which is uncontested on this motion], and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Because Songkick competes in the APTS market, it must show that TM possesses or is dangerously likely to possess substantial market power in APTS. *See NewCal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (Section 1 rule of reason); *MetroNet*, 383 F.3d at 1130 (Section 2 monopolization); *Spectrum Sports*, 506 U.S. at 456 (Section 2 attempted monopolization). Defendants explicitly disclaim any challenges to TM's market power in the APTS market. Br. at 30 ("[T]here are both 'power' and 'conduct' elements of a Section 2 violation. … We focus on whether TM has engaged in any exclusionary conduct."). Thus, for the purposes of Songkick's antitrust claims, market power in that market is presumed.

The only other area where the question of market power arises is for Songkick's tying theories. Songkick must show that TM possesses enough market power in VTS to coerce purchasers to also buy APTS (or refrain from purchasing APTS from TM's rivals). *See Cascade Health*, 515 F.3d at 913. This is the only

market power Defendants challenge in their brief. Br. at 46-49. Songkick's response to those arguments may be found in Argument Section I.E below. In short, the record establishes that Defendants indeed have market power in VTS.

### B.    Defendants' Anticompetitive Conduct

Although Defendants seek to complicate and obscure the issue, Songkick's allegations of anticompetitive conduct are straightforward. There are two relevant markets at issue in this case, the definition of which Defendants do not challenge: VTS and APTS. Farrell Ex. 1 at 48-55, 75-85. TM competes in both markets; Songkick, in the latter. AMF ¶ 291. TM has market power in both markets by virtue of a web of exclusive deals with over ██% of major concert venues across the nation. Farrell Ex. 1 at 56-74, 86-91. Defendants do not contest TM's market power in APTS on this motion.

Since 2012, Defendants[13] have acted anticompetitively through a variety of independent and overlapping methods. The first is their overarching and pervasive efforts to regulate and exclude competition in the APTS market due to their exclusive dealing contracts. Although there is a dispute about the exact scope of those contracts, the power they confer and the foreclosure they have caused constitute exclusive dealing violations under both Sections 1 and 2.

Next, Defendants have acted anticompetitively through their imposition of an unreasonably restrictive and exclusionary competitive restraint:  the fan club policy. As discussed in Argument Section II.B, TM's fan club policy, as implemented since

---

[13]  As TM's sole parent corporation, Live Nation is liable for TM's acts because it actively directed, controlled, and encouraged TM's scheme, *see Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1069-70 (D. Colo. 2004), and directly participated in the scheme. *Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC*, 2003 WL 22928728 (S.D.N.Y. Dec. 10, 2003). LNE's involvement is therefore relevant to proving anticompetitive effects and Songkick's damages, because that conduct was part of the overall anticompetitive scheme. *See City of Anaheim*, 955 F.2d at 1378; *Twin City*, 676 F.2d at 1302; *Masimo*, 2004 WL 5907538, at *5-*6. Defendants do not challenge this conclusion in their motion, likely because LNE's participation is clear in the record.

1  2012 and particularly since 2015, goes far beyond the procompetitive benefits it

2  ostensibly seeks to achieve. Defendants revised the policy in 2012 knowing it did

3  not reflect today's market realities, and they impose it on third party APTS

4  providers even though Defendants believe the policy is "███████" and out of touch

5  with how today's artists market themselves.

6       Furthermore, the evidence shows that Defendants specifically applied the fan

7  club policy with the intent and effect of destroying APTS competition. AMF ¶ 421.

8  Defendants did so by convincing venues to boycott Songkick by refusing to allocate

9  tickets to Songkick's artist-clients; by coercing artists into dropping Songkick as an

10 APTS provider because the transaction costs of using Songkick (due to the policy)

11 were too high; and through a variety of other means based on the fan club policy's

12 unavoidability for all major tours throughout the nation. These acts constitute

13 Section 1 violations (because they rely on concerted action) and Section 2 violations

14 (because they represent willful efforts to obtain and maintain monopoly power).

15       Surrounding both TM's exclusive deals and fan club policy are a number of

16 other acts excluding competition and controlling prices in the APTS market by

17 forcing artists to either use TM for APTS or not run an artist presale at all, else lose

18 the ability to maximize sales during the general sale. AMF ¶ 419. This constitutes

19 both Section 1 and Section 2 violations for the same reasons as articulated above.

20       Finally, it is uncontested on this motion that Defendants' actions have had

21 substantial anticompetitive effects in the APTS market. Today's APTS market has

22 just two legitimate participants left:  TM and Songkick. AMF ¶ 459.  Artists (the

23 consumers of APTS) have been deprived of choice for APTS providers, fans (who

24 actually pay for VTS and APTS) are paying higher service fees than ever before,

25 and venues are selling less tickets overall. Farrell Ex. 1 at 122-151. Songkick and

26 other APTS rivals contribute to the exact opposite results when they provide APTS

27 instead of TM. *Id.* And the effects here represent ***millions*** of tickets per year—not

28

1    61,000 tickets, as Defendants falsely misrepresent.[14] Thus, millions of fans have

2    already suffered anticompetitive overcharges due to Defendants' conduct, and

3    millions more will suffer the same for the foreseeable future. In short, the record is

4    replete with evidence of anticompetitive effects in the APTS market.

5         Defendants justify this result by the claimed need to protect Ticketmaster's

6    "venue-specific investments." AMF ¶ 430. Although that might ostensibly be a valid

7    business justification in the abstract, the record indicates it is pretextual here and,

8    furthermore, Defendants go about achieving that goal in an unreasonable way not

9    based on market efficiencies. *See* Argument Section II.B, *infra*. No other VTS

10   provider in the U.S. employs anything like TM's fan club requirements. Instead,

11   they set a numerical cap on the number of tickets artists may sell through presales.

12   This naturally-developed less restrictive alternative efficiently balances venues',

13   artists', promoters', and VTS providers' needs, particularly because third party artist

14   presales lead to more ticket sales overall. Similarly, TM's pre-2012 approach to

15   artist presales (even with fan club requirements) permitted APTS competition while

16   limiting general sale "cannibalization." But Defendants do not employ these less

17   restrictive alternatives, because they view modern APTS providers as an "████████

18   " threat to TM's broader market power. AMF ¶ 391. Thus, Defendants'

19   justifications for their conduct do not allow them to escape antitrust liability.

20      **C.**     **Songkick, TM's Competitor, Has Antitrust Standing to Challenge**

21

22

---

23   [14] In his damages report, Songkick's expert, David Yurkerwich, separated
Songkick's lost profits into six, overlapping categories of wrongdoing, all of which

24   fundamentally incorporate the fan club policy and its application throughout the
industry. Yurkerwich Decl. Ex. 1 42-59, Ex. 8.4. These categories collectively

25   represent millions of lost ticket sales per year. *Id.* One of the categories—
representing approximately 61,000 tickets—involved instances where alleged non-

26   compliance with the fan club policy was likely the primary reason for the losses. *Id.*
The other categories—which led to the millions of lost ticket sales—reflect losses

27   due to the fan club policy's specific limitations (two categories), as well as threats
and relationship harms Defendants caused through their invocation and application

28   of the policy (three separate categories). *Id.*

Case No. 15-cv-9814-DSF-AGRx

**Conduct That Excludes it From the APTS Market**

Before moving to Defendants' substantive arguments, Songkick first addresses their claims that Songkick lacks antitrust standing to bring this case. Br.at 44-46. As a competitor in the APTS market TM sought to anticompetitively restrain, Songkick is a quintessential antitrust plaintiff and unquestionably has antitrust standing. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982) (observing that default plaintiffs in case aimed at eliminating competitors from the market are those competitors). To the extent TM utilizes the contracts and market power it obtained in the VTS market to substantially foreclose competition in the APTS market, Songkick has standing to challenge that conduct, although of course just to the extent of Songkick's claims, which are confined to the APTS market. *See News Theme Proms., Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003-04 (9th Cir. 2008) (plaintiff had antitrust standing to challenge defendant's exclusive deals with plaintiff's end customers, because, even though plaintiff did not participate in the market in which defendant secured its exclusive deals, the deals substantially foreclosed plaintiff's access to an important input to its business). Defendants seem to acknowledge this point (at 44-45), which renders their first antitrust standing argument (*id.*) confusing at best, and misleading at worst.

Defendants' second antitrust standing argument (at 46) is far more cynical, and frankly frivolous. In the context of price-fixing conspiracies—where the anticompetitive conduct is horizontal collusion between competitors to collectively raise prices—a competitor not part of the conspiracy lacks antitrust standing because they could only have gained from the conspiracy. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337 (1990) (cited in Br. at 46); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986). In contrast, where (like here) the anticompetitive conduct is a scheme to exclude all rivals in a market, it is crystal clear that the competitor(s) whom the monopolist seeks to eliminate have

1  antitrust standing. *See McCready*, 457 U.S. at 479.[15]

2  A final point is that Defendants assert it is "new and legally unprecedented"

3  to claim a defendant's widespread exclusive deals may foreclose competition and

4  incentivize potential clients to enter agreements with it to reduce competition

5  amongst themselves. Br. at 46. The former is a straightforward, historical example

6  of anticompetitive exclusive dealing. *See, e.g., Twin City*, 676 F.2d 1291 (finding

7  Section 1 violation due to the defendants' market share, web of long-term contracts,

8  and exclusionary clauses and conduct related to those contracts). The latter just

9  explains why clients would be willing to sign up with a monopolist for their own

10  gain, and is akin to a hub-and-spoke conspiracy (although does not rely on the

11  existence of any horizontal agreements between the venues). *See, e.g., In re Musical*

12  *Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015)

13  (discussing the elements of "traditional hub-and-spoke conspirac[ies]"). Neither of

14  these concepts is new, and Defendants' claims to the contrary continue a telling

15  theme of studied confusion when it comes to the economics of this case.

16  **D.    Defendants' Arguments That This is a *Trinko* Case Would Eviscerate Decades of Precedent and Invite Error**

17  As the above indicates, Songkick's antitrust claims proceed on the premise

18  that Defendants committed several different anticompetitive acts, many of which

19  overlap in terms of theories of liability. Nevertheless, Defendants assert that the ***only***

20  theory Songkick may assert is a unilateral refusal to deal theory, because much of

21  Defendants' conduct boils down to preventing Songkick from obtaining access to

22  tickets Defendants claim they previously contracted to sell. Br. at 31.[16]

23  There are at least three fundamental problems with Defendants' arguments,

24

25

---

26  [15]  What makes this argument particularly cynical is that Songkick competes with TM in APTS by offering lower service fees, so does not benefit from being forced to charge higher ticketing service fees. AMF ¶ 432.

27  [16]  The Supreme Court most recently articulated the bounds of unilateral refusal to deal jurisprudence in its *Trinko* decision: *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

28

each of which independently demonstrates why this portion of their motion fails.

### 1.   Defendants' arguments would gut decades of law

The first problem with Defendants' *Trinko* argument is that Defendants seek to separate the exclusive deals at issue in this case with the ***results*** of those deals. According to Defendants, the Court should only look at their conduct after they have secured long-term exclusive dealing agreements from venues. *Id.* Framed this way, Defendants argue, the only "real" complaint is about their refusal to permit a third party to sell those tickets instead of Defendants. *Id.* at 31-37.

Explicit in all of Songkick's antitrust theories, though, is that the original anticompetitive conduct—securing exclusive contracts or other promises from providers of a key input—permitted the defendants to lock up or otherwise harm competition in the market in which it competed with the plaintiff. *See* Argument Section I.B, *supra*. If Defendants were right with their "two-step" approach (wherein they only focus on whether the second supposed step—refusal to deal—is illegal), ***every*** exclusive dealing contract could be recharacterized this way and none of the above legal frameworks would ever arise in a case with exclusive deals.

Defendants thus urge the Court to ignore a century of antitrust law and instead analyze this case solely under the narrow doctrine articulated in *Trinko*. That would be error, as Defendants' own citations demonstrate. *See*, *e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) (analyzing the same core set of facts under theories of exclusive dealing, bundled discounts, price discrimination, and unilateral refusal to deal).

Defendants' factual contentions further underscore this point. Assuming they were entirely correct in their statement of the case, they have obtained full exclusivity of all tickets at ██% of major concert venues, and have regulated and limited the APTS market by virtue of those fully exclusive venue contracts. That is quintessential exclusive dealing. *See*, *e.g.*, *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1358-60 (N.D. Cal. 2013) (holding that, if

alleged facts were proven, exclusive dealing agreements locking up supply to, and foreclosing competition in, downstream market violated the antitrust laws).

## 2. *Trinko* does not apply to concerted refusals to deal

The next problem with Defendants' argument is that *Trinko* and its progeny only apply to ***unilateral*** refusals to deal. *See Trinko*, 540 U.S. at 410.[17] ***Concerted*** refusals to deal—*i.e.*, refusals to deal that involve the joint actions of two or more parties, such as vertically-arranged boycotts—are analyzed under Section 1's *per se* and rule of reason approaches (depending on the conduct at issue) and Section 2's broader exclusionary practices standard for monopolization and attempted monopolization. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134-36 (1998) (*per se* liability for group boycott agreed between horizontal competitors); *CAT*, 710 F.2d 752 (rule of reason liability for defendant where it arranged for its purchaser to boycott plaintiff's business); *Moore v. James H. Matthews & Co.*, 473 F.2d 328, 332 (9th Cir. 1972) (group boycott evidence sustained both Section 1 and 2 claims).

Defendants themselves note that venues, not TM, have the ultimate right to determine who may service their tickets. Br. at 5. Furthermore, it is indisputable that, on behalf of its artist-clients, Songkick reached out to venues, not TM, for artist presale ticket allocations. AMF ¶ 433. The only instances in which the venues did not allocate those artist presale tickets was when TM injected itself into the process. *Id.* This is the definition of concerted refusals to deal. *See, e.g.*, *CAT*, 710 F.2d 752; *Moore*, 473 F.2d at 332; *cf. also, e.g.*, *Leegin*, 551 U.S. at 893 (vertical agreements with horizontal competitors to aid a competition-reducing cartel "would need to be held unlawful under the rule of reason").

Defendants attempt (at 34-35) to argue otherwise, but their own cases belie

---

[17] "Respondent also relies upon *U.S. v. Terminal R.R. Assn. of St. Louis,* 224 U.S. 383 (1912), and *Associated Press v. U.S.,* 326 U.S. 1 (1945). These cases involved *concerted* action, which presents greater anticompetitive concerns and is amenable to a remedy that does not require judicial estimation of free-market forces: simply requiring that the outsider be granted nondiscriminatory admission to the club."

Case No. 15-cv-9814-DSF-AGRx

1    the argument. First, *CAT*, 710 F.2d 752 (11th Cir. 1983), strongly supports

2    Songkick, whether *Trinko*-related or not. In *CAT*, the defendant (an "aggregate"—

3    *i.e.*, sand, gravel, and other rock material—producer) convinced an asphalt company

4    to refuse to receive a competitor's aggregate from the plaintiff hauling company.

5    The goal of this agreement was (1) to restrict importation of the competitor's

6    aggregate, and (2) to restrict competition in the aggregate hauling industry, which

7    benefited the defendant's hauling subsidiary. *Id.* at 779-780. Given the boycott

8    aspect, the Court noted that the claims were "closer to a unilateral refusal to deal"

9    than a *per se* illegal horizontal conspiracy. *Id.* at 773-74. But, because there was a

10   vertical agreement, the conduct was analyzed under the ***rule of reason***, ***not*** the

11   unilateral refusal to deal doctrine. *Id.* Furthermore, the conduct (forcing a purchaser

12   to not deal with the defendant's competitor) made it "quite similar to a tying

13   arrangement" and subject to analysis under that doctrine, too. *Id.* at 780-81.

14        Here, the facts show that TM contracted with venues (a vertical arrangement)

15   and then convinced those venues to boycott Songkick (TM's horizontal competitor).

16   *CAT* and the analytical framework it identifies is on all fours with these facts.

17        Next, in *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of

18   Durango*, 582 F.3d 1216 (10th Cir. 2009), the plaintiff (a nephrology medical

19   practice) alleged that the defendant hospital entered the nephrology field in

20   competition with the plaintiff, invested substantial amounts to create facilities for

21   nephrology services, and then acted anticompetitively by refusing the plaintiff

22   access to those "essential facilities." *Id.* at 1223-24. There was no third party

23   involved.[18] The facilities that the defendant refused to the plaintiff were its own and

24   the Tenth Circuit therefore unsurprisingly noted that the appropriate way to analyze

25   such a scenario was *Trinko*'s unilateral refusal to deal test. *Id.*

---

27   [18]  Defendants claim otherwise in their motion, *see* Br. at 35, but that is wrong. The
28   defendant hospital hired a nephrologist to build out its practice, but that doctor was a
     salaried employee of the hospital and therefore not a third party. *See id.* at 1218.

Similarly, in *Aerotec*, the defendant manufactured certain replacement parts the plaintiff needed in order to conduct its repair business (which competed with the defendant). *See* 836 F.3d at 1176-77. When the plaintiff complained about the prices and terms on which the defendant offered to sell those parts, the Ninth Circuit unsurprisingly applied the *Trinko* framework given that the defendant was the only party allegedly refusing to deal with the plaintiff. *Id.* at 1183-84. (There were no exclusive deals in the record. *Id.* at 1181.) Also, as previously noted, the Circuit analyzed the concerted action elements of the plaintiff's claims under a variety of other theories as well. *Id.* at 1178-83, 1185-89.

The common thread between *Four Corners* and *Aerotec*—which is absent here—is (a) no concerted action (as exists in this case), and (b) that the defendant was the original and sole owner of the facilities or products at issue. In contrast, TM contracts to service ***third parties'*** tickets and asserts the right to tell those third parties to boycott Songkick. None of Defendants' cases indicates those facts could—let alone should—be analyzed under *Trinko* or as a unilateral refusal to deal.

### E.    Defendants' Heavy Reliance on *Tickets.com* is Misplaced

Defendants attempt to negate the fact of TM's market power in VTS by relying on an unpublished 2003 opinion from Judge Hupp:  *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003).[19] There are many reasons why that unpublished opinion, based as it was on a 14-year-old record, has no bearing on this dispute.[20]

#### 1.    *Tickets.com* did not assess the evidence of harm to artists and fans present in this case

Defendants neglect to mention Judge Hupp did not have before him evidence of any harm to artists or fans when assessing TM's power and the anticompetitive

---

[19]   Defendants also improperly cite a subsequent unpublished Ninth Circuit opinion in direct violation of Circuit Rule 36-3(c).

[20]   For the purposes of the ensuing discussion, Songkick notes that Defendants do not contest TM has a more than ▮% share of the VTS and APTS markets.

effects of its exclusive deals. Indeed, the Court noted his record indicated there was ***no*** difference in the prices consumers paid based on which VTS provider won a venue's contract. *Id.* at *5 ("[Tickets.com's evidence shows] prices to the consumer are not affected by competition between the ticket service providers for the venues' business, which is the subject of this suit."). Here, the evidence is the exact opposite and strongly demonstrates TM's market power, because it shows TM's ability to control prices and exclude competition in VTS ***and*** APTS. *See*, *e.g.*, Farrell Ex. 1 at 122-151; *id.* Ex. 2 at 30-44.

First, TM's exclusive deals and conduct have limited artists' ability to select APTS providers, and Defendants have excluded all major rival providers. AMF ¶ 436. This has led to less ticket sales overall, as well as higher overall prices for APTS. Farrell Ex. 1 at 132-139. Both of these results harm artists. *Id.* at 122-132.

Next, and related, fans pay higher prices when TM (as opposed to another VTS provider) has an exclusive deal with a venue. *Id.* at 132-151. Given that fans, not venues or artists, are who actually pay for ticketing services, these facts demonstrate the competitive harm from TM's exercise of its market power. *See Rebel Oil*, 51 F.3d at 1434 (restricted output and supracompetitive prices is direct proof of exercise of market power).

Judge Hupp based his opinion on the absence of any such evidence before him. 2003 WL 21397701, at *4-*5. That immediately distinguishes *Tickets.com* from this case. *Compare id.*; *with Rebel Oil*, 51 F.3d at 1434.

### 2. *Tickets.com* says nothing about market power, competitive effects, or substantial foreclosure in the APTS market

Next, *Tickets.com* focused only on power in "the market for full service ticket distribution services purchased by major venues"; *i.e.*, the VTS market. *Tickets.com*, 2003 WL 21397701, at *2. However, the market central to Songkick's claims is the separate ***APTS market***, which Defendants do not challenge in terms of market definition or market power. Br. at 30, 30 n.9. Indeed, Defendants admit their ability

to control prices and exclude competition in APTS, and the evidence is that they have largely succeeded in excluding all major APTS rivals, which has led to higher prices and lower overall ticket sales. AMF ¶ 436. Those are the hallmarks of market power (as *Tickets.com* notes, 2003 WL 21397701, at *4; *see also Forsyth*, 114 F.3d at 1475) and none of Judge Hupp's discussion in 2003 contradicts those facts.

Similarly, Defendants do not anywhere in their brief contest that their various alleged actions and deals substantially foreclose competition in the APTS market. *See generally* Br. at 18-58. Thus, it is undisputed on this motion there is a genuine issue of material fact regarding (at least) Songkick's exclusive dealing theories, and that *Tickets.com* says nothing about those claims.

### 3. The record in this case contradicts *Tickets.com*'s central factual conclusions regarding market power in VTS

Defendants ignore the above and instead focus on three factual findings from *Tickets.com* that supposedly negate TM's market power: (a) other VTS providers may bid for venue contracts; (b) venues may possess bargaining power for their deals; and (c) in 2003, there were no meaningful barriers to entry in VTS. Br. at 47. Notably, Defendants do not even acknowledge the LNE-TM merger in 2010 or how the market has changed since then (despite the DOJ's unsuccessful efforts to constrain TM's market power through a consent decree).

*"Bidding market."* The fact that TM bids for venue contracts and occasionally loses does not speak to a lack of market power, nor does it speak to a lack of substantial foreclosure. Regarding the former, as Professor Farrell notes, such a conclusion runs afoul of the Supreme Court's "Cellophane Fallacy." *See* Farrell Ex. 1 ¶ 174; *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). In short, even a monopolist will occasionally lose customers when it raises prices above the monopolist level. *du Pont*, 351 U.S. at 395. But this marginal loss of customers is not evidence of a lack of market power; it is the consequence of the *exercise* of such power. To hold otherwise (*i.e.*, by granting

1  summary judgment) despite facts indicating market power is error. *Id.* Here, there is

2  substantial evidence hitting every indicia of market power and showing that TM's

3  current "competitive constraints" are in a world where it has already achieved

4  monopolist status. Farrell Ex. 1 at 56-74, 86-91. Songkick therefore urges the Court

5  to avoid Defendants' request for it to commit the Cellophane Fallacy.

6      Moving to substantial foreclosure, Defendants claim that rival VTS providers,

7  including new entrants, can bid for up to ██% of TM's contracts each year, and that

8  this somehow prevents foreclosure. Br. at 48. This argument, too, ignores the 2017

9  record and commits a fundamental economic error.

10     First, contrary to Defendants' incredibly misleading claims (*e.g.*, at 48-49),

11  TM only loses competitive renewal bids ██% of the time. Farrell Ex. 2 at 41 Fig.

12  8.[21] This means, at most, TM loses ██*%* of tickets it controls each year. Wolfson

13  Decl. ¶ 2. But every loss TM suffers is offset by more gains in new business,

14  meaning that TM's share of the VTS market has consistently grown every year since

15  the LNE merger, despite what Defendants call a robust bidding market. AMF ¶ 438.

16     The evidence also shows that no competitors constrain TM's power. AXS, for

17  example, is the largest of the competitors Defendants identify and has a DOJ-

18  imposed stronghold of venues at which TM is not allowed to compete for VTS.

19  AMF ¶ 440. Nevertheless, in the venues where TM and AXS do compete, the latter

20  is wholly unable to prevent TM from obtaining ever-increasing numbers of venue

21  contracts. Farrell Ex. 2 at 38-41. The same fact holds true for each of the other

22  competitors Defendants identify. *Id.*; *see also* AMF ¶ 441, 442.

23     The reason for this ever-growing share is both that TM already has market

24  power, but also that its power has created a network effect whereby venues are

25  _____

26  [21] The "██% loss" number Defendants cite (at 7, 48) is only in "formal" Requests
    for Proposal, *see* Dkt. 220-2 ¶ 33, which the record of actual annual ticket losses
27  indicates is a tiny fraction of overall bids. Furthermore, the sole source for this
    information is former TM employee Cole Gahagan's say so, and is not substantiated
28  by any documentary evidence or personal knowledge. RSUF ¶ 33.

incentivized to enter long-term contracts with TM in order to avoid competing with each other on service fees. Farrell Ex. 1 ¶ 128; *id.* Ex. 2 ¶¶ 44-45, 47-53. Thus, the record demonstrates that the fact of bidding in the VTS market does not actually call into question TM's market power. Farrell Ex. 1 at 155-59; *id.* Ex. 2 at 17-19, 38-41.

*Venues' bargaining power.* Defendants next claim that venues have bargaining power when contracting with TM. But that is entirely irrelevant to the relevant question. First, the economic literature is clear that even sophisticated buyers (such as many venues here) are not immune to market power. Farrell Ex. 2 ¶ 92. Second, the evidence is that, in recent years—after the LNE merger and long after *Tickets.com*—TM has co-opted the venues into perpetuating its market power by allowing them to help set services fees and share in higher amounts of those fees. AMF ¶ 447. Thus, not only does TM make ever higher amounts of money on a per-ticket basis, but now *so do the venues* at the expense of fans. Farrell Ex. 1 at Fig. 12; *id.* Ex. 2 at 43. As discussed in further detail below (Argument Section I.E.4, *infra*), this creates a situation where the venues are willing to perpetuate—and have perpetuated—TM's market power, because they get to share in its monopoly profits.

*Barriers to entry in VTS.* Defendants do not actually offer any evidence that the VTS market lacks barriers to entry. Br. at 47-49.[22] Moreover, the evidence is to the contrary; there are substantial barriers to entry, including (among other things): the need to create a complex ticketing platform; the length of preexisting exclusive contracts (typically, ███ years); the substantial upfront payments often necessary to secure VTS contracts; and TM's integrated relationship with LNE, which gives it unique leverage. Farrell Ex. 1 at 67-73; Wolfson Decl. ¶ 3. And, indeed, Defendants admit TM does not see much, if any, threat from potential new market entrants, *see*,

---

[22] "Barriers to entry" are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993).

1    *e.g.*, *id.* at 72-73 (citing Rapino admissions), which is consistent with the DOJ's

2    findings in its 2010 Competitive Impact Statement that substantial barriers to entry

3    exist in the VTS market. AMF ¶ 449.

4            **4.      Whether or not venues prefer exclusive deals is irrelevant to whether those deals facilitate anticompetitive effects**

5    Defendants argue that, because TM's exclusive dealing agreements with

6    venues are voluntary (as opposed to coerced), the agreements are necessarily pro-

7    competitive and therefore legal. Br. at 27-28, 49-51. Under Defendants' argument,

8    absent a finding of coercion, an exclusive dealing agreement is *per se* legal. This

9    argument is contrary to the facts, the law, and well-accepted economic principles.

10           (a)      Defendants' argument is contrary to the facts

11   Defendants' argument depends on the assumption that the parties to each

12   agreement take into account all of the effects, both beneficial and harmful, of the

13   agreements on both themselves and others not party to the agreement, and that the

14   parties therefore would not have voluntarily contracted unless the agreements were

15   in the aggregate more beneficial than harmful. *See, e.g.*, U.S. Dep't of Justice,

16   *Competition and Monopoly:  Single-Firm Conduct Under Section 2 of the Sherman*

17   *Act* 136-37 (2008) (the "Section 2 Report")[23] ("Some have argued that exclusive

18   dealing can never have anticompetitive effects because it is against buyers' interests

19   to help a seller acquire or maintain monopoly power. Implicit in this argument is the

20   presumption that, if buyers enter into exclusivity arrangements, it must be because

21   the arrangements create efficiencies. … But it is now generally accepted that the

22   assumptions necessary to support this argument do not always apply.") (cited in Br.

23

24   _____

25   [23]  *Available at https://www.justice.gov/sites/default/files/atr/legacy/2009/05/ 11/236681.pdf.* The Section 2 Report was withdrawn by the Department of Justice,

26   because the report reflected an "overly cautious" approach to certain conduct within the reach of Section 2. U.S. Dep't of Justice, *Justice Department Withdraws Report*

27   *on Antitrust Monopoly Law* (May 11, 2009), https://www.justice.gov/opa/pr/justice-department-withdraws-report-antitrust-monopoly-law. (In other words, some felt it

28   was too conservative in its analysis.) This is telling, given that even this "overly cautious" report squarely rejects Defendants' primary economic defense.

1   at 27). This assumption is contrary to the facts where, as here, the parties to the

2   agreements do not take into account all of the effects of the agreements, because

3   some of the anticompetitive effects of the agreements are suffered by entities (like

4   artists and fans) which are not parties to the agreements but are impacted by the

5   agreements. *See, e.g.*, Farrell Ex. 1 at 122-50 (showing, *inter alia*, higher prices for

6   APTS and lower number of ticket sales); Farrell Ex. 2 at 59-61.

7                    (b)    Defendants' argument is contrary to the law

8          Defendants' argument regarding the legal significance of coercion is not

9   supported by and is contrary to the decisions cited in their brief (at 27-28, 49-51).

10  First, Defendants cite *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d

11  57, 78 (3d Cir. 2010). But in *Race Tires*, the court expressly rejected this argument.

12  *See id.* ("[W]e do not hold that coercion is an essential element of every successful

13  antitrust claim," and "Hoosier and DMS [the defendants] are *not* entitled to

14  summary judgment merely because there is an absence of coercion or interference

15  on the part of Hoosier.").

16         Second, Defendants cite *Tickets.com*. But as noted above, the analysis in that

17  case was limited to the effects of the agreements on venues, because the lawsuit was

18  limited to those effects. *See Tickets.com*, 2003 WL 21397701, at *5 (the evidence

19  presented failed to show that prices to the consumer were "affected by competition

20  between the ticket service providers for the venues' business, which is the subject of

21  this suit"). Where, as here, the relevant question is whether the agreements were

22  more beneficial than harmful to artists and fans, that question is not answered by the

23  voluntary acceptance of the agreements by venues.

24         Third, Defendants cite *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,

25  551 U.S. 877, 882 (2007). But in *Leegin*, the Court did not hold that voluntary

26  agreements are not "lightly condemned," as Defendants argue. The Court held that a

27  vertical price agreement is evaluated under the rule of reason (not per se legal). *See*

28  *Leegin Creative Leather Prods.*, 551 U.S. at 882.

Fourth, Defendants cite *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 996 (9th Cir. 2010). But in *Allied Orthopedic*, the court did not hold that exclusive dealing is "frequently" procompetitive, as Defendants argue. The court held that an exclusive dealing agreement is evaluated under the rule of reason (not per se legal). *See Allied Orthopedic*, 592 F.3d at 996.

Fifth, Defendants cite the Section 2 Report. But with respect to the argument that exclusive dealing can never have anticompetitive effects, the report states "it is now generally accepted that the assumptions necessary to support this argument do not always apply." Section 2 Report at 136-37. As explained above, the assumptions necessary for Defendants' argument are contrary to the facts.

Last, Defendants cite I ABA Section of Antitrust Law, *Antitrust Law Developments (Eighth)* § 2.C.2.b (2017). But the treatise cites and discusses only a single authority – *Race Tires Am.* – on this issue. *See Antitrust Law Developments (Eighth)* § 2.C.2.b. As explained above, *Race Tires Am.* expressly rejects Defendants' argument. *See Race Tires Am.*, 614 F.3d at 78

As these cases make clear, Defendants' argument for necessarily procompetitive and therefore per se legal voluntary contracts is contrary to the well-accepted standard (the rule of reason) applied by the courts in evaluating an exclusive dealing agreement, even absent a finding that the agreement was coerced. *See, e.g.*, *Allied Orthopedic*, 592 F.3d at 996-98 (applying rule of reason to exclusive dealing agreement with no finding or discussion of coercion re agreement); *Twin City*, 676 F.2d at 1303-05 (same).

(c)   Defendants' argument is contrary to well-accepted economic principles

Defendants misconstrue Professor Farrell's opinions regarding "negative contracting externalities" and lack of internalization. Br. at 49-52. A "negative contracting externality" is a negative effect of a contract that is suffered by an entity that is not a party to the contract. *See, e.g.*, Farrell Ex. 1 at 43 & n.139; Ex. 388

-42-

1   Farrell Dep. Tr. 221:20 – 226:8. That negative effect is not "internalized" by the

2   parties to the contract. *See, e.g.*, Farrell Ex. 1 at 37 & n.128; Farrell Ex. 2 at 16-19.

3          Professor Farrell concludes, *inter alia*, that TM's contracts with venues

4   foreclose competition by other artist presale ticketing service companies, and that

5   the contracts have anticompetitive effects because the contracts raise the prices for

6   artist presale ticketing services, lower the number of ticket sales, and cause harm to

7   artists and fans. *See, e.g.*, Farrell Ex. 1 at 122-50; Farrell Ex. 2 at 59-61. This is a

8   straightforward analysis consistent with the law. *See, e.g.*, *Twin City,* 676 F.2d at

9   1303-05 (affirming finding of antitrust violation based on substantial foreclosure of

10  competition and anticompetitive effect). Contrary to Defendants' suggestion (at 49-

11  52), Professor Farrell does not conclude that the contracts have anticompetitive

12  effects simply because there are externalities and lack of internalization.

13         Defendants and their expert, Dr. Ordover, argue Professor Farrell is mistaken

14  because voluntary contracts supposedly can never have anticompetitive effects. Br.

15  at 27-28, 50-51. But, as explained above, that argument is contrary to the facts and

16  the law. This, as Professor Farrell explains, is because negative contracting

17  externalities and lack of internalization demonstrate that the necessary assumptions

18  for Defendants' and Dr. Ordover's argument do not hold under the facts of this case.

19  (*See, e.g.*, Farrell Ex. 1 at 36-44; Farrell Ex. 2 at 16-19; Ex. 388 Farrell Dep. Tr.

20  221:20 – 226:8.) Put differently, Professor Farrell discusses these concepts to

21  explain the flaws in Defendants' and their economist's arguments.

22         Contrary to Defendants' assertion (at 52) that Professor Farrell's opinion is

23  "absurd" and unprecedented, his critique is well-accepted, including by Defendants'

24  own authorities. *See, e.g.*, Areeda & Hovenkamp, *Antitrust Law:  An Analysis of

25  Antitrust Principles and Their Application* ¶ 1800c5 (online ed. 2017) ("[I]t matters

26  little whether one views exclusive dealing as 'imposed' by the dominant firm or

27  'agreed upon' by the dominant firm and its dealers.") (cited in Br. at 38, 41); Section

28  2 Report ("Some have argued that exclusive dealing can never have anticompetitive

-43-

Case No. 15-cv-9814-DSF-AGRx

1  effects…. But it is now generally accepted that the assumptions necessary to support

2  this argument do not always apply.") (citing, *inter alia*, Joseph Farrell,

3  *Deconstructing Chicago on Exclusive Dealing*, 50 ANTITRUST BULL. 465, 476

4  (2005)) (cited in Br. at 27).  While Defendants assert (at 49) that Professor Farrell

5  "swings for the fences," they are the ones who swing for the fences with an

6  argument that is contrary to law, fact, and well-accepted economic principles.

7       Defendants also misconstrue Professor Farrell's deposition testimony. For

8  example, they quote his testimony that there is no "off-the-shelf model" that can be

9  applied to this case. But Professor Farrell explained that he "extract[ed] from a

10 pretty technical literature what [he] view[s] as the broad and relatively robust

11 principles and applied those," and he cited a number of articles supporting his

12 opinions. Ex. 388 Farrell Dep. Tr. 234:17-235:2; *see also id.* at 230:17-233:11;

13 Farrell Ex. 1 at 36-44; Farrell Ex. 2 at 16-19. In addition, Professor Farrell explained

14 that his approach is consistent with the generally accepted policies applied in the

15 evaluation of mergers. Ex. 388 Farrell Dep. Tr. 242:20-243:13; 244:5-246:17.

16 Professor Farrell was the chief economist at the Department of Justice and the

17 Federal Trade Commission (Farrell Ex. 1 at 1).

18      Defendants also quote Professor Farrell's testimony that he, an economist,

19 could not identify at the deposition specific cases applying those principles—in

20 those specific terms. But Professor Farrell explained that while he could not identify

21 at the deposition any decisions or actions applying those specific terms ("negative

22 contracting externalities" or "internalization"), a number of decisions apply those

23 principles, even if not in those specific terms. Ex. 388 Farrell Dep. Tr. 225:11-

24 226:8. Consistent with his testimony, courts have found antitrust violations despite

25 the absence of any finding of coercion. *See, e.g.*, *Twin City,* 676 F.2d at 1303-05;

26 *LePage's Inc. v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003).

27          (d)   <u>Defendants' public policy arguments against judicial
                  antitrust intervention are legally unsupported</u>

28

Defendants argue that markets are robust, naturally self-correcting, and do not require judicial intervention through the antitrust laws. Br. at 49-50. In support of that argument, Defendants oddly cite *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604 n.31 (1985), quoting Robert H. Bork, *The Antitrust Paradox* 156 (1978). But neither the decision nor the quote support Defendants' argument. In an omitted part of the quote, Judge Bork states that a monopolist can act contrary to market patterns:  "By disturbing optimal distribution patterns one rival can impose costs upon another, that is, force the other to accept higher costs." *Aspen Skiing*, 472 U.S. at 604 n.31. In the decision, the Court affirmed a finding of monopolization where the monopolist was acting contrary to market patterns, and judicial antitrust intervention was required to correct the market. *See id.* at 604-609.

Defendants also argue that judicial antitrust intervention in markets has the potential to make things worse, not better. Br. at 49-50. In support of that argument, Defendants cite *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993). But in *Brooke Group*, the Court discussed a concern over judicial antitrust intervention with respect to ***low*** prices. *See id.* at 223. Low prices are afforded special deference, because they benefit consumers regardless of how those prices are set. *See id.* In contrast, exclusive dealing does not benefit consumers in all cases. *See, e.g.*, *Twin City,* 676 F.2d at 1303-05; *LePage's*, 324 F.3d at 157-58. Most importantly, as discussed above, the conduct challenged in this case causes high, not low, prices.

## II.  DEFENDANTS' SUBSTANTIVE ATTACKS ON SONGKICK'S ANTITRUST CLAIMS FAIL AS A MATTER OF FACT AND LAW

### A.  Defendants' Conduct Has Destroyed Nearly All Competition in the APTS Market

Below, Songkick addresses the various arguments Defendants construct to justify their behavior. Each of those arguments, however, must be viewed in light of the substantial (and almost entirely unchallenged) evidence of anticompetitive

effects in the APTS market, *see* Argument Section I.A.1 & 2, *supra*, because those effects are often the answer to why, at most, Defendants have simply identified genuine disputes of material fact. *See NCAA*, 37 F. Supp. 3d at 1146-48; *Safeway*, 651 F.3d at 1138-39 (denying summary judgment in light of conflicting evidence of anticompetitive and procompetitive effects of at-issue restraints).

### B. TM's Fan Club Policy, as Constructed and Arbitrarily Enforced, Restrains Competition Far Beyond Any Supposed Justification

As noted above, *see* Argument Section I.A.1 & 2, *supra*, once a plaintiff establishes anticompetitive effects in the relevant market, antitrust law permits the defendant to justify their behavior by proving it had non-pretextual procompetitive benefits/legitimate business justifications. If the defendant can do so, the next step is for the plaintiff to identify less restrictive alternatives to the complained-of actions. If the plaintiff does, that is the end of the inquiry. But, if the plaintiff cannot identify a less restrictive alternative, the jury then weighs the anticompetitive effects against the procompetitive benefits and determines if the former outweighs the latter. *See Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159-60 (9th Cir. 2001); *Image Tech. Servs.*, 125 F.3d at 1213-14. Each of these steps is inherently factual. *Safeway*, 651 F.3d at 1138-39. Thus, because there is substantial evidence of anticompetitive effects in the APTS market, Defendants are permitted to offer proposed justifications for the fan club policy at trial. But they identify no legal or factual reason the Court may grant summary judgment on that issue now under either Section 1 or 2. *See generally* Br. at 37-41.

Nevertheless, addressing Defendants' attempts to justify the drafting and application of the fan club policy—a process which, the Court noted, must have been competitively reasonable, Dkt. 63 at 4—it is clear they go far beyond any professed procompetitive benefit and instead use the fan club policy as an unreasonable restraint of trade and monopolistic exclusionary practice.

In discovery, Songkick asked Defendants for the fan club policy's alleged

procompetitive benefits/justifications. Defendants claimed the policy is justified because it limits "free-riding" on TM's venue-specific investments and ensures that TM is able to recoup its investment in ticketing infrastructure and upfront fees paid to venues (therefore incentivizing TM to continue making those investments). AMF ¶ 463. Defendants never claimed there is some sort of procompetitive benefit from TM regulating how artists market themselves (*i.e.*, through fan clubs or other means), *id.*, and the record shows that Defendants were only concerned with keeping tickets "on-platform" by limiting the category of individuals to whom artists could sell tickets. AMF ¶ 464.

As an initial matter, Defendants make no showing that these supposed procompetitive benefits are anything but pretextual, which immediately stands as a basis to deny summary judgment. TM makes the same sort of upfront payments to venues in the U.K., where it does not have exclusivity, and provides the same scope of VTS services. AMF ¶ 465. Similarly, in the U.S., TM agreed to artist presales for years without any negative effects on VTS. AMF ¶ 467. TM's VTS underwriting models exclude tickets TM historically did not sell for the venue (*e.g.*, artist presale tickets). AMF ¶ 493. And, perhaps most importantly, Defendants took a "new enforcement approach to the fan club policy" in order to "take over the [APTS] market." AMF ¶ 421. These facts show that there is an inherent dispute regarding whether TM actually identified a non-pretextual procompetitive benefit.

However, even assuming Defendants are not just offering a pretext for limiting artist presales, the factual question is whether the means TM chose to accomplish its goals were unreasonably restrictive and/or exclusionary in the APTS market. *O'Bannon*, 802 F.3d at 1070; *Image Tech. Servs.*, 125 F.3d at 1213-14.

### 1.    TM Has Less Restrictive Alternatives Available

If substantially less restrictive alternatives to the complained-of conduct exist that are (a) virtually as effective in accomplishing the same supposed procompetitive goals, without (b) adding significant cost to the defendant, then the

current restrictive conduct violates Sections 1 and 2. *See O'Bannon*, 802 F.3d at 1070; *Image Tech. Servs.*, 125 F.3d at 1213-14. Oddly, Defendants claim (at 39) that Songkick does not proffer such an alternative. That is incorrect. Songkick advocates (and the record clearly shows) that a simple numerical cap on artist presale tickets is exactly such a less restrictive alternative and is used in the APTS market without significant costs by TM's VTS rivals. Similarly, TM's own pre-2012 approach to artist presales is similarly less restrictive.

As noted above, TM's VTS rivals face the same competing incentives with respect to artist presales:  they must permit artist presales for their venue-clients' sake, but they also want to limit too much general sale cannibalization. In order to balance these competing incentives, TM's VTS rivals employ the straight numerical cap discussed at length above. ███████████████████████████████████

████████████████████████████ *See*, *e.g.*, O'Mara Ex. 45 ¶ 2(c)(v). This actual market practice is strong evidence of a less restrictive alternative, particularly because Defendants' costs would ***decrease*** if they employed it due to lower fan club policy enforcement efforts. AMF ¶ 486. Defendants' own industry expert (a former senior TM executive) admitted artist presales did not present any business problems for TM in the days before the fan club policy. AMF ¶ 327. Defendants have never offered any explanation why additional ***fan club*** requirements—particularly those unilaterally interpreted by TM—are necessary to achieve their alleged benefits. *See O'Bannon*, 802 F.3d at 1075 (restraint that is "*patently and inexplicably stricter* than necessary to accomplish all of its procompetitive objectives" is illegal).

As Professor Farrell explained, TM's current fan club policy is unreasonable because of its ***comprehensive*** restrictiveness, which is plainly shown by the less restrictive ways TM's VTS rivals address the market need for artist presales. TM's application of its requirements similarly presents an antitrust problem because TM—the dominant competitor in the APTS market—claims sole discretion to determine its competitors' compliance, regardless of whether that determination is

reasonable or not. AMF ¶ 342. Furthermore, the TM employees tasked with determining compliance receive less pay if they keep less tickets "on-platform." AMF ¶ 466. This is an inherently abusive scenario, run by a monopolist.

To the extent Defendants argue (at 39-41) that a straight numerical cap or the pre-2012 version of the fan club policy are not less restrictive alternatives because TM might lose sales in the APTS market due to heightened competition, that is not a defense. There are less restrictive alternatives that prevent unreasonable general sale cannibalization while preserving APTS competition. If, after the less restrictive alternative is put in place, a monopolist's rivals gain market share from being the better competitive option, that is the encouraged result. *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 696 (1978) ("[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.")

Given these facts, there is a genuine issue of material fact on less restrictive alternatives that should proceed to trial. *See NCAA*, 37 F. Supp. 3d at 1146-48.

### 2. TM's Fan Club Policy, as Drafted and Applied, is Unreasonably Restrictive and Exclusionary

What the record shows is that the fan club policy goes far beyond Defendants' justifications for its existence. As an initial matter, Songkick and other APTS providers do not "free-ride" on TM's investments; they provide substantial benefits to the venues, artists, and TM itself in terms of, *inter alia*, greater overall ticket sales. Farrell Ex. 1 at 80-84, 137 Fig. 30; *id.* Ex. 2 at 13-15. Next, the option for third party artist presales benefits the venues and TM by ensuring that artists will actually consider those venues for their tour. AMF ¶ 466. And, the amount of investment TM puts into its ticketing infrastructure has nothing to do with whether venues permit third party presales, given that the practice is decades old and existed as TM was building out that ticketing infrastructure. AMF ¶ 474.

The issue largely comes down to whether the "fan club" requirement is reasonable. The market shows it is not. Defendants claim (*e.g.*, at 5) that most major

concert venues in the U.S. utilize the exclusivity model. That means those VTS rivals have the same general motivations as TM to protect their investments. Farrell Ex. 1 at 151-54; *id.* Ex. 2 at 55-56. If one believes Defendants, TM's VTS rivals are strong competitors in the VTS market. Nevertheless, ***none*** of those rivals employs a fan club requirement; instead, they only impose numerical limits (typically 10%-30% of sellable capacity) for artist presale allocations. AMF ¶ 321. If the fan club policy is as procompetitive as Defendants claim, it is telling—and dispositive of this motion—that no other VTS provider utilizes anything like the "legitimate fan club" requirement. *See Safeway*, 651 F.3d at 1138-39; *NCAA*, 37 F. Supp. 3d at 1146-48.

Looking to the fan club policy's drafting history and application, its anticompetitive nature becomes even clearer. As one of the 2012 version's authors admits, that version was not drafted with today's market realities in mind. AMF ¶ 341. Today's artists market themselves differently than in previous decades, where fan clubs were necessary to identify and communicate with true fans. AMF ¶ 477. As TM's 30(b)(6) witness admitted, modern technology has "██████" the artist marketing experience so they can directly reach multiples more fans, and presales limited to fan clubs are a thing of the past. AMF ¶ 478. The fan club policy thus stands as an anachronism that does not benefit artists, venues, or fans in any meaningful way, a fact that Mr. Rapino admitted. AMF ¶ 479.

In practice, Defendants' application of the fan club requirement also was not motivated by protecting TM's venue-specific investments. The requirement was ***explicitly*** wielded and changed in order to capture the APTS market for TM and prevent an "██████" threat to TM's stranglehold on the market—because modern APTS providers exemplify a future in which venues, promoters, and artists can utilize different ticketing service providers on a show-by-show or tour-by-tour basis. AMF ¶ 480, 481. Indeed, Defendants admitted their latest enforcement of the policy was meant to "████████████████" AMF ¶ 391.

Defendants try to skirt past these facts by claiming (at 42) that Songkick was

too small to represent a loss of competition in the APTS market. The arrogance of that argument demonstrates the problem:  the antitrust laws are concerned with permitting all competitors—particularly nascent startups with such disruptive potential—a fair shake at achieving scale through true competition in the relevant market. *See Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1010 (9th Cir. 2003) ("[T]he central purpose of the antitrust laws, state and federal, is to preserve competition."). However, on a factual level, Defendants also completely misrepresent the record. Songkick sold millions of tickets in its lifetime, lost millions more ticket sales to Defendants' conduct, and is the only APTS provider of any meaningful scale left besides TM. AMF ¶ 482.[24]

Until about 2014, Defendants themselves estimated their APTS competitors (including Songkick) had between ██████% of the APTS market. AMF ¶ 484. Defendants also estimated at that time there were ██████ more artist presale tickets to service annually. *Id.* Since then, Defendants went on their campaign to "██████ ██████" the APTS market—starting in 2012 and magnifying in 2015. AMF ¶ 402-407. With Songkick's demise, TM will have foreclosed 100% of the market. That is certainly an antitrust problem, and it is cynical for Defendants to claim otherwise based on intentionally misleading math (at 43). *See*, *e.g.*, *Twin City*, 676 F.2d 1291 (foreclosure of just 24% of market enough to incur antitrust liability).

### C.   Defendants Erect a Number of Straw Man Arguments Regarding Their Exclusive Deals

#### 1.   No Matter How One Ultimately Interprets TM's Contracts, it is Still Liable for Antitrust Violations

Defendants spend a significant amount of time arguing that their venue contracts give them the right to provide APTS for all shows at that venue. *See* Br. at 20-24. This, however, misses a critical point:  even if TM obtained the right to be

---

[24]  Songkick explains above at 27 n.13 that Defendants attempt to substantially mislead in claiming Songkick only asserts it lost 61,000 ticket sales due to Defendants' fan club policy-related misconduct.

the exclusive APTS provider for venues under its contracts, those agreements are anticompetitive and unlawful for the reasons explained above in Argument Section I. Contract interpretation is therefore largely irrelevant to the jury's ultimate decisions. In any event, Defendants overstep as a factual matter in arguing their contracts give them full exclusivity over APTS in addition to VTS.

> (a)   TM does not contract with venues to be the exclusive APTS provider at all of their shows

First, to the extent Defendants argue that "TM owns the exclusive rights to conduct artist presales at TM venues," Br. at 20-24, that argument contradicts the text of the contracts and the admissions of Defendants' employees.

Defendants admit that TM's contract with the City of Rochester, Minnesota, is representative of its broader set of venue contracts. Br. at 21. Under the terms of the contract (cited in Br. at 21-22), the venue grants to TM the right to be the exclusive seller of tickets. AMF ¶ 488; O'Mara Ex. 43 ¶ 2(a). In addition, the venue agrees to certain restrictions on its conduct:

> Principal shall not directly or indirectly use, sponsor, promote, advertise, authorize or permit the use of any third party that promotes, engages in or facilitates the sale, resale or issuance of tickets.

*Id.* ¶ 2(c). But the venue retains the right to sell and to provide certain categories of tickets, including tickets for distribution through legitimate fan clubs in accordance with current guidelines:

> Subject to the terms of this Section 2, Principal retains the right to:  (i) sell single Tickets from the Facility Box Office to persons physically present at the Facility Box Office; (ii) sell Season/Contract Tickets; (iii) conduct Group Sales of Tickets; and (iv) provide a reasonable number of House Seats for any Attraction.
>
> *               *               *
>
> "House Seats" means Tickets provided by Principal … (ii) for distribution through legitimate fan clubs in accordance with current guidelines (i.e., fan club holds) … provided that House Seats Tickets shall not be distributed to the general public.

*Id.* ¶¶ 2(b), 14. Because the venue retains these rights, TM does not own the rights

Case No. 15-cv-9814-DSF-AGRx

1  under the express terms of the contract.

2        This interpretation is not only supported by the express terms, but also

3  Defendants' admissions. For example, Defendants explicitly admit on this motion

4  that a fan club carve out placed directly in Para. 2(c) and "Subject to the terms of

5  this Section 2" permits third party presales. RSUF ¶ 82 (citing O'Mara Ex. 45).

6  Similarly, Defendants' historical documents noted that third party APTS providers

7  could sell tickets if they complied with the fan club policy. AMF ¶ 469. Defendants

8  argue (at 23) that Songkick did not obtain any evidence from parties to the contracts

9  regarding their interpretation, but Songkick has long had Defendants' historical

10  admissions and, now, recent ones from this motion.

11        This interpretation is also consistent with historical practice in the live music

12  industry, AMF ¶ 492, and with the evidence that TM does not pay for the right

13  retained by the venue. The amount of TM's upfront payments and its estimates of

14  overall profits from a venue deal are based on the number of tickets TM has

15  historically sold at the venue, which does not include tickets third parties sold. AMF

16  ¶ 493. TM does not own a right for which it does not pay.

17        Further, this interpretation is consistent with the Court's conclusions in its

18  order on Songkick's preliminary injunction motion, Dkt. 63 at 2:

19        The exclusive contracts generally include a carveout for the venue to
          sell "house seats" outside of the Ticketmaster system. The parties
20        agree that "house seats" are generally defined to include tickets
          provided to a performing artist "for distribution through legitimate fan
21        clubs in accordance with current guidelines (i.e., fan club holds)."

22        Defendants assert that Songkick will argue that House Seats "categorically"

23  fall outside TM's rights under the contract. Br. at 22-23. But that is not Songkick's

24  argument. Songkick argues that House Seats fall outside TM's contractual rights to

25  the extent House Seats fall within the rights the venue retains, as established above.

26        Defendants also argue (at 23) that the venue's agreement not to use or to

27  authorize the use of a third party precludes the use by an artist or its representatives

28  of a third party with respect to the sale of House Seats under the carve-out for House

Seats. But that agreement is a restriction on the venue, not a restriction on the artist or its representatives (who receive tickets from the venue and, Defendants admit, may use third party providers to service those tickets). AMF ¶¶ 181, 227; RSUF ¶ 81. In support of this argument, Defendants cite *Cavaliers Operating Co. v. Ticketmaster*, 2008 WL 4449466, at *7 (N.D. Ohio Sept. 30, 2008). However, in that case, the ***venue*** used a third party. *See Cavaliers*, 2008 WL 4449466, at *1-*2, *6-*7. The case also did not involve the carve out for House Seats. *See id.*

Defendants further argue that TM's contracts do not confer any rights on artists. But that is a red herring. The venue retains the right to provide House Seats to artists or their representatives. This is about venues' rights to decide.

### 2. Songkick Competes for Ticketing Rights in a Way the Market Naturally Evolved to Accommodate

Defendants' next straw man is the claim (at 25-26) that Songkick does not compete for ticketing rights in the same way as TM's VTS business, so therefore allegedly cannot complain of antitrust violations in the APTS market. This argument fails because it ignores how the markets structured themselves—which Defendants claim elsewhere should control the analysis, *see* Br. at 50 ("the vast majority of contemporary antitrust case law gives substantial deference to how markets organize themselves")—as well as demands that Songkick pursue an infeasible business model divorced from the realities of the APTS market.

With respect to natural market structure, Defendants concede on this motion that VTS and APTS are separate markets. The record (including Defendants' admissions) demonstrates that these two markets developed to accommodate artists' desire and need to sell some tickets directly to their fans rather than through venues. AMF ¶ 494. Although venues potentially gave up some service fee rebates by allocating artist presale tickets, they nevertheless engaged in the practice for decades because it was necessary to attract the highest-profile acts. AMF ¶ 297. TM also acknowledged and accommodated the practice for its venue-clients' benefit, Ex.

162, SK00932679 at -680, and it was at least historically the venues' decision whether or not to allocate tickets to artists for presales. AMF ¶ 495. Indeed, as Defendants' venue managers' declarations demonstrate, venues still accommodate third party artist presales even though they can sometimes create logistical issues. AMF ¶ 496.

Importantly, the natural dynamic in the APTS market is for providers (including TM) to compete for ticketing rights *from the artists*. AMF ¶ 497. Although this competition differs from how VTS providers compete for venue business, that observation misses the point. APTS exist as a separate market because artists regularly secure a portion of tickets to their shows for direct sales and need a ticketing service to run those sales. AMF ¶ 498. In exchange, APTS providers provide value to the artist, venue, and VTS provider for the reasons discussed at length above. *See* Fact Section I.B, *supra*. By foreclosing rival APTS providers from competing for those ticketing rights, Defendants committed textbook antitrust violations. *See Twin City*, 767 F.2d 1291; *News Theme*, 546 F.3d at 1003-04.

To the extent Defendants argue that Songkick needed to contract with venues rather than artists for APTS rights, that ignores the realities of the market, which Songkick explained above. Briefly:  (1) *artists* are the ones that award ticketing rights in the APTS market; (2) artists strongly prefer a single APTS provider for the entire tour; (3) the single source preference means that Songkick would need to secure separate APTS rights from nearly every major concert venue in the U.S. to have enough coverage to accommodate artists' tours; and (4) Songkick would need to pursue these venue contracts for ███████ (as Ticketmaster's contracts came up for renewal), just so it could run its first artist presale. *See* Fact Section I.C, *supra*. As Professor Farrell noted—and as common sense indicates—this is completely unrealistic, Ex. 388 Farrell Dep. Tr. 85:2-86:5, 90:25-93:13; Farrell Ex. 2 at 20-21, and it is telling that Defendants claim it is the only way a rival APTS provider could conceivably gain share in the APTS market.

### 3.   The Legal Question for Exclusive Dealing is Substantial Foreclosure, Not How the Exclusivity Was Obtained

Defendants argue (at 26-28) that Songkick needs to establish TM coerced venues into entering exclusive deals in order for those deals to be anticompetitive. As discussed above, this is legally incorrect. The pertinent question for exclusive dealing is whether the deals substantially foreclose competition in the relevant market, and whether they do so in a way that either violates the rule of reason (Section 1) or monopolizes (Section 2). *See* Argument Section I.A.1 & 2, *supra*. Although the defendant's counterparties' willingness to enter the contracts may weigh into the analysis where the alleged anticompetitive harm is *to* those counterparties, the weight and relevance of such evidence is limited to that specific question. *See*, *e.g.*, *Tickets.com*, 2003 WL 21397701, at *4-*5. Defendants' arguments to the contrary—which amount to the invocation of a legal requirement that does not exist—are errors of law. *See* Argument Section I.E.4, *supra*.

### 4.   TM Coerced Ties of VTS to APTS in Multiple Ways

Nevertheless, to the extent coercion is an actual element of Songkick's liability theories—*e.g.*, in connection with the tying portion of its claims—there is ample evidence of such conduct here. *See* Br. at 28-29, 54 (arguing otherwise).

First, with respect to TM's venue clients, there is substantial economic evidence of coercion to purchase more ticketing services than the venue wanted. *See Cascade Health*, 515 F.3d at 914 (denying summary judgment where economic evidence established basis to infer coercion in tying claim). The record establishes that there are substantial benefits to venues from permitting third party artist presales, not the least of which is higher overall ticket sales. Farrell Ex. 1 at 137, Fig. 30. Similarly, there is substantial lay evidence that venues believe the ability to offer the option for third party artist presales is highly desirable, and that this is because artists demand the right. AMF ¶ 288, 297-300. Given that (a) it is evidently in venues' best economic interests to permit third party artist presales, and (b) TM

has substantial market power in the VTS market (over ▮▮% share, with substantial pricing/exclusion power), that venues nevertheless cede TM the right in any way to control APTS there shows that a reasonable jury may find coercion and, thus, tying of VTS and APTS at the venue level. *Cascade Health*, 515 F.3d at 914.

Tying also exists at the artist level. When an artist selects a venue for a stop on their tour, one of the services the venue provides is general sale ticketing. AMF ¶ 504. Defendants admit TM conducts the general sale as venues' agent. AMF ¶ 505. Although artists cannot select a different VTS provider nor set the service fees at the venue-level, TM nevertheless offers certain VTS to artists, including tour marketing and incremental sale options (like album, fan club, and VIP bundles). AMF ¶ 506. These portions of TM's broader VTS are extremely valuable to artists. AMF ¶ 507. However, if an artist selects a third party APTS provider instead of TM, Defendants refuse to permit the artist to utilize the VTS they want in the general sale, or (in the case of tour marketing) offer a much more limited version to the artist. AMF ¶ 508. Faced with the choice of conducting a third party artist presale versus losing additional revenues on 92% of tickets and full tour marketing (which affects overall tour sales), most artists are forced to forego using Songkick or other third party APTS providers. AMF ¶ 509. This represents both direct evidence of coercion, *see Microsoft*, 253 F.3d at 65-66, and economic evidence of coercion, because the artists' clear economic preference is to use a third party APTS provider due to the benefits it confers. *Cascade Health*, 515 F.3d at 914.

### D.   Defendants' "Catch-All" Antitrust Arguments Similarly Fail

#### 1.   LNE's Conduct Remains Relevant to Songkick's Claims

Although Defendants are correct (at 53) that Songkick no longer pursues a claim based on LNE tying its concert promotion service to APTS, LNE's conduct remains relevant for a number of reasons, not the least of which is because LNE's CEO personally instructed TM to destroy APTS competition. *See supra* at 27 n.13.

## 2.    Songkick's Other Allegations Support Multiple Aspects of its Claims

Defendants next argue (at 53-55) that Songkick's "remaining allegations" do not support any of its antitrust claims. As an initial matter, to the extent Defendants argue in this section of their motion that Songkick cannot establish unreasonably restrictive or exclusionary conduct based on the record, this brief already addresses those arguments at length above in Argument Sections I & II.A-C.

With respect to monopoly leveraging, the initial problem with Defendants' argument is that, contrary to their statements, the Ninth Circuit ***does*** recognize such a claim. *AFMS, LLC v. United Parcel Serv. Co.*, 2011 WL 13135632, at *15 (C.D. Cal. May 27, 2011). The key in the Ninth Circuit is that the defendant must use its monopoly power in one market to gain or attempt to gain monopoly power in another market; other Circuits hold that it is enough to just obtain a "competitive advantage" in the second market. *Id.*; *InfoStream Grp., Inc. v. PayPal, Inc.*, 2012 WL 3731517, at *4–5 (N.D. Cal. Aug. 28, 2012).

Here, the record demonstrates that TM has monopoly power in the VTS market. Farrell Ex. 1 at 56-74; Farrell Ex. 2 at 30-44. Through a wide variety of acts detailed at length above, TM utilized that power to obtain monopoly power in the separate APTS market. *See* Fact Section V, *supra*. Defendants do not challenge that TM has obtained monopoly power in the APTS market. Br. at 30. Thus, at the very least, there is a genuine dispute of material fact regarding monopoly leveraging, and Defendants offer no evidence or legal argument to the contrary.

## 3.    The Combined Effect of Defendants' Conduct Has Been to Restrain Competition and Monopolize the APTS Market

A final point regarding Songkick's antitrust claims is that Defendants pay lip service to the requirement to view their conduct as a whole, *see* Br. at 55, but then commit the very error the Ninth Circuit warns against by breaking apart that conduct and claiming it is not individually anticompetitive. In response to that error, Songkick respectfully refers the Court to the above Sections explaining why

-58-

1   Defendants' acts constitute multiple, overlapping antitrust violations.

2          However, in this portion of Defendants' argument, they ignore the import of

3   the "viewed as a whole" law. Defendants argue that, even if they committed some

4   anticompetitive acts, the individual quantum of harm from those acts is not enough

5   to constitute an antitrust violation. *See*, *e.g.*, Br. at 41-43. That is legally wrong.

6   Where a defendant commits multiple anticompetitive acts that ***collectively*** lead to

7   competitive harm, that is an antitrust violation. *See City of Anaheim*, 955 F.2d at

8   1378 (the focus is on anticompetitive acts' "synergistic effect"). Here, the record

9   shows that Defendants' acts, individually but especially in the aggregate, destroyed

10  competition in the APTS market. *See* Fact Sections v. & VI, *supra*.

11  **III.   DEFENDANTS ARTICULATE NO BASIS TO DISMISS SONGKICK'S
         STATE LAW CLAIMS**

12         Defendants' arguments regarding Songkick's state-law claims are similarly

13  flawed and lacking in merit. Summary judgment on these claims should be denied.

14         First, with regard to Songkick's promissory estoppel claim, Defendants ignore

15  that Songkick is not, as Defendants claim, relying on TM's fan club policy itself, but

16  rather on express promises TM made to Songkick that Defendants would not

17  interfere with Songkick-run artist presales if they complied with the policy. For

18  example, TM's main liaison with Songkick specifically promised that TM:

19         agreed to allow up to 8% of sellable seats for an event (with concurrent
           venue approval) to be sold directly to registered members of an artist's
20         official fan community, as long as that community is about the artist
           and has more to offer than just access to tickets.
21

22  AMF ¶ 511; *see also* AMF ¶ 512. TM's promises, which Songkick reasonably and

23  foreseeably relied upon, remained in effect regardless of whether TM revised its Fan

24  Club Policy. In other words, so long as Songkick complied with that policy (no

25  matter how many times TM might change the policy in an apparent attempt to

26  strong-arm artists into running presales on TM's platform) TM promised to allow

27  Songkick to sell artist presale tickets. Where California courts have considered such

28

conditional promises, they have held them to be clear and unambiguous. *See, e.g., Martin v. World Savs. & Loan Ass'n.* 92 Cal. App. 4th 803, 809 (2001); *Bushell v. JPMorgan Chase Bank, N.A.*, 220 Cal. App. 4th 915, 929-30 (2013). Nor does a reservation of rights in a separate document negate a promise or make reliance on the promise unreasonable. *Swinerton & Walberg Co. v. City of Inglewood-L.A. Cnty. Civic Ctr. Auth.*, 40 Cal. App. 3d 98, 103-05 (1974) (reasonable to rely upon promise where notice contained reservation of rights). Defendants later reneged on their promises, damaging Songkick.

Second, as to Songkick's intentional interference with contractual relations claim, Defendants (at 57) mischaracterize their conduct as simply enforcing existing rights under contracts between the venues and TM. Defendants conveniently overlook that their conduct far exceeded what could legitimately be seen as enforcing their contracts—including repeated hacking into Songkick's computer system and theft of Songkick's trade secrets that Songkick understands the FBI and the U.S. Attorney's Office for the Eastern District of New York are currently investigating in addition to Songkick's civil claims. FAC ¶ 133-202, 282-306; Wolfson Decl. ¶ 4. To the extent Defendants are arguing that stealing trade secrets and hacking is necessary in order to enforce their own interpretation of their venue contracts, that bizarre argument necessarily fails. *See Richardson v. La Rancherita of La Jolla, Inc.*, 159 Cal. Rptr. 285, 289 (Ct. App. 1979) (party seeking to protect a right must have a "*reasonable basis*" for belief it had the right and may only threaten to protect using "*appropriate means.*") (emphasis added).

Defendants also fail to cite a single fact to support their argument that any of their actions—even setting aside the hacking and trade secret theft—were actually necessary to protect the real scope of their contract rights. *See* Br. 55-58. Instead, the facts show that Defendants were aware that their contracts contain a carve out for artist presale tickets, and yet they failed to even check the contracts with specific venues before interfering with Songkick's presales. AMF ¶ 514. Given that

Defendants did not even know what contractual rights they had at each of these venues, they could not have had a reasonable, good faith basis to interfere with Songkick. *See Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir. 1986); *Herron v. State Farm Mut. Ins. Co.*, 14 Cal. Rptr. 294, 296 (Cal. 1961) (setting forth various criteria a jury considers when determining "[w]hether an intentional interference by a third party is justifiable").

Third, regarding Songkick's unfair competition claim, Defendants (at 57) misrepresent their own authority. In *Chavez v. Whirlpool*, the Court of Appeals explicitly noted "incipient" violations of antitrust law—*i.e.*, an act "that violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition"—constitutes unfair competition in California. 93 Cal. App. 4th 363, 375 (2001). *Chavez* also noted its holding did not apply more broadly than to conduct that was expressly "deemed reasonable and condoned" under antitrust law. *Id.* at 375.

Finally, regarding Songkick's intentional interference with prospective economic relations claim, Defendants seek to gloss over that this is a separate claim under California law and that Defendants' wrongful acts include, among many others, Defendants' trade secret theft and hacking, in addition to intentional interference with contractual relations, unfair competition, and antitrust violations. Any of these acts more than satisfy the wrongful act element of intentional interference with prospective economic relations. *See, e.g., Popescu v. Apple Inc.*, 204 Cal. Rptr. 3d 302, 324 (Ct. App. 2016) (trade secret theft, among others, satisfies wrongful act element); *Givemepower Corp. v. Pace Compumetrics, Inc.*, 2007 WL 2345027, at *8 (S.D. Cal. Aug. 14, 2007) (same for unfair competition).

**IV.   AT BEST, DEFENDANTS IDENTIFY GENUINE DISPUTES REGARDING A PORTION OF SONGKICK'S DAMAGES**

In their haste to rebut a portion of Songkick's damages, Defendants have

submitted declarations from a handful of artist managers representing approximately

40 of 139 artists Songkick's damages expert identified as part of his lost profits

analysis. Nearly all, if not all, of those declarants have deep ties with Defendants.

Using similar language apparently drafted by Defendants' attorneys, the manager

declarants claim they never would have done business with Songkick. Their

contemporaneous documents and statements, however, tell a much different story,

and it is clear these declarants are now engaging in revisionist history. Furthermore,

their ties and relationships with Defendants—including being owned by, affiliated

with, or otherwise beholden to LNE and/or needing to curry its favor for deals that

are currently on the table but not yet consummated—clearly establish the basis for

reasonable jurors to question each of the declarant's credibility and bias. AMF ¶

526-35. The declarations raise, at best, genuine disputes of material fact. So, too, do

Defendants' attempts to characterize various documents establishing Songkick's

losses of still other artists' business.

### A. Defendants' Attacks on Some of Songkick's Lost Profits Reveal Deep Factual Divides

#### 1. The record demonstrates Songkick lost at *least* 139 artists' business due to Defendants' conduct

Defendants argue (at 58-59) that Mr. Yurkewich essentially plucked the 139

artists cited in the lost profits portion of his report from thin air.[25] This

characterization bears no resemblance to Mr. Yurkewich's actual analysis and

opinions, nor to the substantial evidence in the record.

---

[25] Defendants also attempt (at 58) to cast aspersions on Mr. Yurkewich by citing a
12-year-old case excluding his opinions. Defendants' citation has nothing to do with
Mr. Yurkewich's report, which cites hundreds of pieces of evidence demonstrating a
basis to believe there was a causal connection that can be proven at trial between
Songkick's damages and Defendants' conduct. AMF ¶ 536. Defendants' own
damages expert, Paul Meyer, recently had part of his own opinion limited by the Ninth
Circuit on grounds that he was "unduly speculative" and failed to provide sufficient
objective evidence for certain of his damages calculations. *Oracle Corp. v. SAP AG*,
765 F.3d 1081, 1093-94 (9th Cir. 2014).

The analysis Mr. Yurkerwich actually performed involved speaking with Songkick about the artist business it lost and then reviewing hundreds of documents and data collections as part of a confirmatory analysis based on those conversations.[26] Based on a plethora of evidence, which is cited in his report and reliance materials, Mr. Yurkerwich categorized 139 artists into different, but overlapping, categories of losses due to Defendants' conduct.[27] Yurkerwich Ex. 1 at 43-59, Ex. 3.0-3.2. This group of lost artists includes several of the world's most well-known musicians, a caliber of act Songkick regularly services. Indeed, Songkick's success with this type of high-level artist is exactly what led Defendants to worry so much about the threat it presented. AMF ¶ 539-40.

Because of length and scope, Songkick cannot set forth here all of the facts demonstrating it lost business from the artists Defendants highlight in their motion. Songkick therefore respectfully directs the Court to the Jones, Glicken, Smith, and Third Party Decls., as well as AMF ¶ 541, 543-580. Those discuss, at length, substantial evidence supporting the bases on which reasonable jurors could easily conclude that Defendants' illegal conduct caused Songkick to lose this business.

To the extent Defendants claim (at 61, 64) that the evidence referenced in the preceding paragraph is inadmissible, they are simply incorrect. First, to the extent Songkick's potential clients made statements to it explaining why they chose not to do business with it and/or chose do business with Defendants instead, that is admissible evidence under the state of mind exception to the rule against hearsay. *See Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 447 (S.D.N.Y. 2007) ("[T]estimony concerning the motivation of customers for ceasing to deal with a

---

[26]   Yurkerwich Ex. 1 at Ex. 2.0 -2.1; Yurkerwich Ex. 3 at Ex. 1.0.
[27]   For each category, Mr. Yurkerwich took a conservative approach by applying a further discount to those artist-by-artist lost profit calculations based on a broader likelihood of success analysis he applied across the overlapping loss categories. RSUF ¶ 182-184.

business is admissible under the state of mind exception to the hearsay rule" where "there is otherwise admissible proof that business was lost."); Fed. R. Evid. 803(3).[28] Second, to the extent Defendants claim (at 64) Songkick's Salesforce database is "triple hearsay," this similarly misunderstands the Federal Rules of Evidence. The Salesforce database is unquestionably a business record admissible under Fed. R. Evid. 803(6), *see* Glicken Decl. ¶¶ 7-13, and the fact that a scrivener transcribed statements made to other Songkick employees in order to put those statements into the database does not somehow create another level of hearsay Songkick must overcome.[29]

## 2.   Defendants' factual arguments on lost profits are meritless

Defendants claim (at 59) that Songkick provided no deposition testimony that it lost these artists' business. That is disingenuous. Songkick did not provide testimony about these artists because Defendants did not ask. AMF ¶ 542. If they had, Defendants would have learned all the information recounted in the Jones, Glicken, and Smith Decls., each of whom was deposed or could have been deposed (given that they were disclosed as potential witnesses at the beginning of the case).

Defendants next heavily—indeed, almost exclusively—rely on declarations

---

[28]  *KW Plastics v. U.S. Can Co.,* 130 F. Supp. 2d 1297, 1299 (M.D. Ala. 2001) (customer's statements about initial desire to work with company were admissible under Rule 803(3) to prove that initial intent); *Don Post Studios, Inc. v. Cinema Secrets, Inc.,* 124 F. Supp. 2d 311, 320, fn. 15 (E.D. Pa. 2000) ("Out of court statements of consumers describing their motivation for purchasing a particular product are admissible")

[29]  "If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6) . . .  [I]f the source of the information is an outsider . . . [t]he outsider's statement must fall within another hearsay exception to be admissible." *Wilson v. Zapata Off-Shore Co.,* 939 F.2d 260, 271–72 (5th Cir. 1991); *Boca Investerings P'ship v. United States*, 128 F. Supp. 2d 16, 20–21 (D.D.C. 2000) ("when a business record is prepared by one employee from information supplied by another employee . . . multiple hearsay is excused."); *Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534, 573 (D. Md. 2007) (same).

from artist managers for the proposition that Songkick never would have obtained 40 of the 139 identified artists' business. Br. at 59-61.[30] As set forth in the Jones, Glicken, Smith, and Miller Decls. and in Songkick's AMF, the contemporaneous evidence directly rebuts each of these revisionist declarations. It is also notable that the 11 declarants suffer from serious credibility issues, including:

- One declarant, Irving Azoff (formerly the CEO of TM when it merged with LNE), claims he is ███████████████████████████████████. Azoff Decl, ¶5, ██████████████████████████████████. AMF ¶ 527-29. ██████ Mr. Azoff is personal friends with LNE CEO Michael Rapino (showing up in critical emails in this case), and recently started a consulting firm that relies in large part on LNE. AMF ¶ 527.

- A second declarant, Adam Flick, was most recently employed by Azoff MSG Entertainment (whose CEO is Irving Azoff), worked at Live Nation and Ticketmaster until 2013, and is similarly impacted by the apparent control LNE exerts over him. AMF ¶ 530. But there is more. ████████████████████████████████████ AMF ¶ 531. Mr. Flick's declaration tries to walk away from his clear contemporaneous statement, Flick Decl. ¶ 10, but this only further harms his credibility, ██████████████. *See* AMF ¶ 531.

- Another declarant, Desiree Perez, conveniently omits that her company is a subsidiary of Defendant Live Nation. AMF ¶ 532. ████████████████████████████████████ AMF ¶ 533.

These types of bias issues impact the weight of the manager declarants' testimony, particularly where they speculate what they would have done in an alternate world. *See Poller*, 368 U.S. at 473 ("credibility and the weight" of witnesses' testimony can only "be appraised" when witnesses are "present and subject to cross-examination," and "[t]rial by affidavit is no substitute for trial by jury"). Additional facts regarding the manager declarants' bias and credibility are

---

[30] Songkick was unable to depose these declarants or take third-party discovery on the substance of their statements because Defendants only submitted the declarations for the first time with their Motion. Defendants similarly did not identify these managers as potential witnesses during fact discovery.

discussed at AMF ¶ 526, 534-35. These issues, central as they are to this aspect of Defendants' motion, require its denial.

Moving past the declarations, Defendants (at 61) cite a single example of Songkick's evidence regarding 25 other artists not represented by the declarants and then claim, in sweeping fashion, that there is no other evidence regarding these artists in the record.  This is fundamentally incorrect, as the broader record reflects a number of ways Defendants interfered not just with these specific artists, but with artists generally. *See, e.g.,* AMF ¶ 544-80; Jones, Glicken, Smith, Third Party Decls.

### 3. The Law Specifically Allows Damages for Songkick's Presumptive Lost Sales

Defendants also apply the wrong standard regarding causation and antitrust damages. "[T]he Supreme Court has … established a relaxed standard for proving the amount of damages in an antitrust case once the fact of damage has been shown … It will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982). "[I]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9 (1969). Under this standard, a jury may conclude and infer "from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Graphic Prods. Distrib., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1579 (11th Cir. 1983) ("*GPD*"). Thus, with such evidence in hand, "an antitrust plaintiff need not show evidence of specific lost sales in order to prove damages." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir. 1992).

Finally, contrary to Defendants' implication, an antitrust plaintiff "need not

1  have been operating at a profit in order to recover lost future profits," because "to

2  deny recovery to a businessman who has struggled to establish a business in the face

3  of wrongful conduct by a competitor simply because he never managed to escape

4  from the quicksand of red ink to the dry land of profitable enterprise would make a

5  mockery of the private antitrust remedy." *GPD*, 717 F.2d at 1582.

6    **B.    Defendants Identify No Basis to Exclude Songkick's Lost Business Value Damages**

7    Defendants argue (at 65) that the Court should reject Mr. Yurkerwich's lost

8  business value damages calculations because his calculations rely in part on the

9  losses Songkick suffered from the 139 artists he identified in his report. As noted

10  above, there is no basis for summary judgment on Mr. Yurkerwich's lost profits

11  calculations. At most there is a factual question—one that falls in Songkick's

12  favor—and therefore Defendants' motion for summary judgment as to lost business

13  value damages also fails.[31]

14  **V.    TM'S COUNTERCLAIM ARGUMENTS RAISE A GENUINE DISPUTE OF MATERIAL FACT**

15

16    TM's counterclaim arguments bear very little relationship to any actual facts.

17  They also entirely rely on the fan club policy, which, if proven anticompetitive,

18  cannot be enforced. The motion fails for both these reasons.

19    **A.    TM Cannot Sue to Harm Competition**

20    In the first instance, TM cannot prevail on its counterclaim for contractual

21  interference because it is well-established that a party to an illegal bargain cannot

22  recover damages for breach of that agreement. *Kaiser Steel Corp. v. Mullins*, 455

23  U.S. 72, 82 (1982) (if agreement is "illegal" under the Sherman Act it "is subject to

24  the defense of illegality"); *Kelly v. Kosuga*, 358 U.S. 516, 520 (1959); *Associated*

25

26  _____

27  [31]  To the extent Defendants claim that Songkick could not have lost business value because it did not turn a net profit, as explained in a learned treatise Defendants'

28  own damages expert, Paul Meyer, cites, the typical trajectory is for startups to lose money for their first few years. *See* Ex. 386 at 4 Fig. 1.

*Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 759 (6th Cir. 1965). If Songkick prevails on its antitrust claims, Defendants have no basis to assert their counterclaim.

Viewed in this context, TM's counterclaim only serves to underscore how Defendants have repeatedly sought to exclude competitors from the artist presale ticketing market. As one TM employee put it, TM's approach has been: ███████ ███████████████████████████████████████████ AMF ¶ 436.

## B. TM Fails to Set Forth Sufficient Facts to Support Any of the Elements of Contractual Interference

In any event, TM fails to meet its burden on any of the five elements of contractual interference. TM must show (1) a valid contract between TM and each venue; (2) Songkick's knowledge of each of these contracts; (3) Songkick's intentional acts designed to induce a breach or disruption of each contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *See Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 530 (Cal. 1998). TM fails to allege facts supporting these required elements.

As to the knowledge element, TM has "failed to allege … that [Songkick] had knowledge of any *specific* contracts or details about the contracts." *See Trindade v. Reach Media Grp., LLC*, 2013 WL 3977034, at *15-16 (N.D. Cal. July 31, 2013) (granting motion to dismiss claim for intentional interference) (emphasis added). Instead, TM presents just two emails containing vague references to "contractual rights … in the venues in which we operate" that do not name any venues, and a similarly vague reference in a book one Songkick employee wrote mentioning TM has many "exclusive" contracts. Br. at 68. These offhand references do not show that Songkick had knowledge of *specific* terms regarding any of the 40 assorted venue contracts, and TM does not even attempt to argue that Songkick had knowledge of the specific terms of TM's venue contracts—despite the fact Defendants claim their contracts are highly negotiated. *See* RSUF ¶ 68. Moreover, Songkick did not even know that most of these 40 venues even contracted with TM

-68-

1   in the first place. *See Swipe & Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 934-35 (N.D.

2   Cal. 2015) (plaintiff fails to sufficiently allege knowledge element if it merely

3   alleges defendant knew generally that it had agreements with customers, e.g., but

4   failed to "allege any facts showing . . . knowledge of the agreements with these

5   specific customers"); *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118,

6   1126 (1990) (plaintiff must establish existence of contract and "defendant's

7   knowledge of *this* contract") (emphasis added). The specific terms of TM's

8   contracts are highly confidential, and were not known to Songkick other than a few

9   it was able to locate online for public venues after it filed this case. AMF ¶ 517. As

10   to even the simple fact of whether a venue had a contract with TM at all, the facts

11   show that Songkick repeatedly asked for a list from TM, but was repeatedly

12   rebuffed, so had to make a best guess. AMF ¶ 369-71. Songkick therefore clearly

13   could not have had the requisite knowledge about the terms of each contract.

14       As to the intent element, the record is clear for each of these artists that

15   Songkick took great pains to try to satisfy TM so that it could run their artist

16   presales. AMF ¶ 520. Each of these six artists, and Songkick, believed that the fan

17   club sites satisfied TM's fan club policy, or—to the extent they learned for the first

18   time that the venue contracted with TM after being contacted by TM about the

19   presales—Songkick and the artist sought to ensure in good faith that the presales

20   subsequently complied with the policy. AMF ¶ 521.

21       Specifically with respect to ████████ the facts also show that ████████

22   booking agent, not Songkick, reached out to Defendants and venues seeking to

23   obtain more than 8% of sellable capacity for ████████ presales. AMF ¶ 522.

24   Songkick, by contrast, requested only 8% of sellable seats for known TM venues.

25   AMF ¶ 523. This is hardly an example of Songkick interfering with TM; rather, it is

26   an example of a highly successful artist exercising ████ rights to make a request of

27   Defendants. TM's attempt to hold Songkick accountable for any ticket fees lost due

28   to venues accommodating ████████ requests necessarily fails.

1    As to breach, TM provides no evidence that any of the 40 contracts for which

2  it seeks compensation actually incorporate the fan club policy. None of the contracts

3  attach the policy, and the vast majority plainly state that the terms contained within

4  are the "entire agreement." AMF ¶ 524. To the extent TM seems to claim that

5  Songkick breached the contracts by violating the fan club policy, the 2015

6  "Clarification" states that the policy itself is *not* a contract, indicating that it also is

7  not part of any venue contracts. O'Mara Ex. 61 ("█████████████████████████

8  ███████████████████████████████████████████████████████████████████

9  ████"). TM cannot therefore argue now with a straight face that its fan club policy

10  constitutes a contract for purposes of its contractual interference claim. *See Korea*

11  *Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1157 (Cal. 2003) (plaintiff

12  who did not claim to have enforceable contract could at most could assert claim for

13  interference with prospective economic advantage, not interference with

14  contract). Because Defendants disclaimed that their fan club policy was a contract,

15  Songkick also could not have had the requisite intent. *See Quelimane*, 960 P.2d at

16  530 (valid contract required for contractual interference).

17    As to the remaining elements of intentional interference, what the facts show

18  is that Songkick attempted to compete in good faith with TM, but that TM used its

19  market power in combination with its arbitrary, unreasonable policy to tell Songkick

20  and its artist-clients that TM could, and would, exclude others from the APTS

21  market. The facts show that TM viewed its role as telling artists when, and how,

22  they could sell their artists presale tickets, and whether they could use Songkick.

23  The facts show, in essence, that TM viewed its role to tell anyone else in the

24  industry who sought to challenge their interpretation of the fan club policy to "████

25  ███████████████████████" AMF ¶ 436.

26                              **CONCLUSION**

27    For the foregoing reasons, Songkick respectfully requests that the Court deny

28  Defendants' motion in full.

1    Dated:  June 26, 2017          **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

2

3                        By:   */s/ Frederick A. Lorig*
                            Frederick A. Lorig

4                             Kevin Y. Teruya
                            Adam B. Wolfson

5                             Attorneys for Plaintiff
                            COMPLETE ENTERTAINMENT

6                             RESOURCES LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 15-cv-9814-DSF-AGRx
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT