1  QUINN EMANUEL URQUHART &
2  SULLIVAN, LLP
      Frederick A. Lorig (Bar No. 057645)
3      fredlorig@quinnemanuel.com
      Kevin Y. Teruya (Bar No. 235916)
4      kevinteruya@quinnemanuel.com
      Adam B. Wolfson (Bar No. 262125)
5      adamwolfson@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  *Attorneys for Plaintiff and Counter Defendant*
   *Complete Entertainment Resources LLC*

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12            WESTERN DIVISION JUDICIAL DISTRICT

13

14  Complete Entertainment Resources          CASE NO. 2:15-CV-09814 DSF
    LLC d/b/a Songkick,                       (AGRx)
15
                    Songkick,                 **PLAINTIFF'S SUBMISSION OF**
16                                            **ITS PROPOSED JURY**
              v.                              **INSTRUCTIONS THAT ARE**
17                                            **DISPUTED BY DEFENDANTS**
    Live Nation Entertainment, Inc.;
18  Ticketmaster LLC,                         The Honorable Dale S. Fischer

19                  Defendants.               Trial Date: November 14, 2017

20

21  Ticketmaster LLC,

22           Counter-Claimant,

23           v.

24  Complete   Entertainment   Resources
    LLC d/b/a Songkick,
25
             Counter-Defendant.
26

27

28

Complete Entertainment Resources LLC d/b/a Songkick submits the following proposed jury instructions to which Defendants Live Nation Entertainment, Inc. and Ticketmaster LLC, have indicated they object.  Songkick reserves the right to amend, supplement, or otherwise revise the following submission, including but not limited to: (1) any changes to the model instructions not reflected in Defendants' redlines; (2) in response to any new arguments, testimony or evidence offered by Defendants; (3) on the basis of any information or documents obtained from discovery which has not yet been provided; and (4) in response to Defendants' revised verdict form, which Songkick is still reviewing.

**INDEX OF PLAINTIFF'S PROPOSED JURY INSTRUCTIONS**

| NO. | TITLE | SOURCE | PAGE |
|-----|-------|--------|------|
| 76 | Sherman Act, Section 1 | ABA Model Jury Instructions in Civil Antitrust Cases at 2, Ch. 1 § B (Instruction 2) | 2 |
| 77 | Sherman Act, Section 1—Rule of Reason | ABA Model Antitrust Instructions at 3, Ch. 1 § C.1 (Instruction 3A) | 5 |
| 78 | Sherman Act, Section 1—Rule of Reason—Evidence of Competitive Benefits | ABA Model Jury Instructions in Civil Antitrust Cases 8 (2016) (citing authorities) | 8 |
| 79 | Sherman Act, Section 1—Rule of Reason—Balancing the Competitive Effects | ABA Model Antitrust Instructions at 9, Ch. 1 § C.4 (Instruction 3D) | 11 |
| 80 | Sherman Act, Sections 1 and 2—Elements of Exclusive Dealing | ABA Model Antitrust Instructions at 71, Ch. 2 § D.5 (Instruction 5); 1st Am. Compl. ¶¶ 219-20 | 13 |
| 81 | Sherman Act, Sections 1 and 2—Exclusive Dealing—Additional Considerations | ABA Model Antitrust Instructions at 73-74, Ch. 2 § D.6 (Instruction 6) | 18 |
| 82 | Sherman Act, Sections 1 and 2—Tying Arrangements | ABA Model Antitrust Instructions at 84, Ch. 2 § E.1 (Instruction 1) | 22 |

| NO. | TITLE | SOURCE | PAGE |
|---|---|---|---|
| 83 | Sherman Act, Sections 1 and 2—Tying—Elements—Per Se Unlawful Tying | ABA Model Jury Instructions in Civil Antitrust Cases 86-87 (2016) (citing authorities) | 26 |
| 84 | Sherman Act, Sections 1 and 2—Tying—Presence of Two Products | ABA Model Antitrust Instructions at 90, Ch. 2 § E.5 (Instruction 5) | 30 |
| 85 | Sherman Act, Sections 1 and 2—Tying—Proof of Conditioning | ABA Model Antitrust Instructions at 93 Ch. 2 § E.7 (Instruction 7) | 32 |
| 86 | Antitrust Damages—Causation and Disaggregation | ABA Model Antitrust Instructions at 310–311, Ch. 6 § B.4 (Instruction 4); LePage's, Inc. v. 3M, 324 F.3d 141, 166 (3d Cir.2003); Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 812 (3d Cir.1984); Dial Corp. v. News Corp., 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016); Univac Dental Co. v. Dentsply Int'l, Inc., No. CIV. A. 1:07-CV-493, 2010 WL 844507, at *4–*5 (M.D. Pa. Jan. 20, 2010), report and recommendation adopted, No. CIV. A.107-CV-0493, 2010 WL 1816745 (M.D. Pa. Apr. 27, 2010) | 35 |
| 87 | Antitrust Damages—Lost Profits | ABA Model Antitrust Instructions at 315, Ch. 6 § B.8 (Instruction 8) | 39 |
| 88 | Antitrust Damages—Future Lost Profits | ABA Model Antitrust Instructions at 317–318, Ch. 6 § B.9 (Instruction 9) | 41 |
| 89 | Antitrust Damages—Going Concern or Goodwill | ABA Model Antitrust Instructions at 319–320, Ch. 6 § B.10 (Instruction 10) | 44 |

| NO. | TITLE | SOURCE | PAGE |
|---|---|---|---|
| 90 | Antitrust—Sherman Act—Nature of the Claim | Kevin F. O'Malley, Jay E. Grenig & Hon. William C. Lee, 3A Federal Jury Practice and Instructions § 150:1 (6th ed. Aug. 2017 Update). | 50 |
| 91 | Sherman Act Sections 1 and 2—Boycott | | 54 |
| 92 | Sherman Act Sections 1 and 2—Antitrust Damages—Uncertainty as to Amount of Damages | Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264–65 (1946). | 58 |
| 100. | Federal Computer Fraud and Abuse Act—Damages | | 63 |
| 101. | Misappropriation of Trade Secrets (California)—Introduction | | 69 |
| 102. | Misappropriation of Trade Secrets (California)—Essential Factual Elements | | 73 |
| 103. | Duty To Employer | *Blackbird Techs., Inc. v. Joshi*, No. 5:15-CV-04272-EJD, 2015 WL 5818067, at *4 (N.D. Cal. Oct. 6, 2015), *appeal dismissed* (Nov. 23, 2015). | 76 |
| 104. | Misappropriation of Trade Secrets (California)—Misappropriation By Acquisition | | 78 |
| 105. | Misappropriation of Trade Secrets (California)—Misappropriation By Disclosure | | 80 |
| 106. | Misappropriation of Trade Secrets (California)—Misappropriation By Use | | 82 |
| 107. | Misappropriation of Trade Secrets (California)—Damages | | 86 |

| NO. | TITLE | SOURCE | PAGE |
|---|---|---|---|
| 108. | Misappropriation of Trade Secrets (California)—Lost Profits | | 87 |
| 109. | Intentional Interference With Contractual Relations and Intentional Interference With Prospective Economic Relations - Damages | | 89 |
| 110. | Re:  Promissory Estoppel | | 92 |
| 111. | Re:  Promissory Estoppel - Clear And Unambiguous Promise Defined | | 94 |
| 112. | Re:  Promissory Estoppel - Reasonable Reliance Defined | | 95 |
| 113. | Re:  Promissory Estoppel - Damages | | 96 |
| 114. | Re:  Unfair Competition (Cal. Bus. & Prof. Code § 17200 Et Seq.) | | 98 |
| 115. | Re:  Unfair Competition - Unlawful Practices (Cal. Bus. & Prof. Code § 17200 Et Seq.) | | 100 |
| 116. | Re:  Unfair Competition - Unlawful Practices (Cal. Bus. & Prof. Code § 17200 Et Seq.) | | 102 |
| 117. | Conversion—Essential Factual Elements | CACI 2100 | 104 |
| 118 | Presumed Measure of Damages for Conversion (Civ. Code, § 3336) | CACI 2102 | 107 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# PLAINTIFF'S COMPETING PROPOSED FEDERAL ANTITRUST INSTRUCTIONS

## SHERMAN ACT, SECTION 1 AND VARIOUS
## CONDUCT SPECIFIC INSTRUCTIONS

### Plaintiff's Proposed Instruction No. 76:
### Sherman Act, Section 1

Plaintiff challenges Defendants' conduct under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, Plaintiff must prove the following:

    (1)    the existence of a contract, combination, or conspiracy between or among at least two separate entities;

    (2)    that the contract, combination, or conspiracy unreasonably restrains trade;

    (3)    that the restraint affects interstate or foreign commerce; and

    (4)    that the restraint caused plaintiff to suffer an injury to its business or property.

*Authority*: American Bar Association Antitrust Section, Model Jury Instructions in Civil Antitrust Cases at 2, Ch. 1 § B (Instruction 2) (2016 ed.) ("ABA Model Antitrust Instructions").

***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed instruction closely hews to the ABA Model Instruction on the elements of a claim under Section 1 of the Sherman Act. Defendants object to Songkick's proposed instruction principally on the basis that it does not include Defendants' proposed modifications (additions and deletions) as set forth in *their* proposed competing version of the instruction. Specifically, Defendants would have the Court *add* language for the sole purpose of limiting what Songkick will be able to prove at trial

1  to only conduct-specific Section 1 violations.  *See* Defendants' Competing

2  Instruction No. 76 ("To prove a violation of Section 1 of the Sherman Act, Plaintiff

3  must establish each of these elements with respect to the specific conduct alleged in

4  this case that it claims violated Section 1.").

5      There is no basis to modify the form to limit Songkick's claims to "conduct-

6  specific" theories under the exclusive dealing and tying doctrines.  The form

7  instruction does not contemplate limiting the instruction to particular theories of

8  liability.  For the purposes of Section 1, and by way of example only, Ticketmaster's

9  construction and application of the fan club policy is analyzed under the general

10  Rule of Reason, because it is the basis of vertically-arranged boycotts and/or a

11  regulation Ticketmaster imposes on competitors via agreements with venues – but

12  isn't limited only to the conduct-specific tying or exclusive dealing claims, as

13  Defendants would have it.  *See Constr. Aggregate Transp., Inc. v. Fla. Rock Indus.,*

14  *Inc.*, 710 F.2d 752, 777-79 (11th Cir. 1983) ("CAT") (cited in Br. at 35); *see also*

15  *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 840 (5th Cir. 2015);

16  *Calculators Haw., Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1337 n.2 (9th Cir. 1983).

17  Songkick's First Amended Complaint likewise confirms that the anticompetitive

18  conduct "include[es] but [is] not limited to" the conduct-specific theories

19  enumerated.  *See, e.g.*, Dkt. 158 at 207.  As master of its complaint, Plaintiff cannot

20  be artificially limited in its antitrust theories by Defendants' misleading jury

21  instruction.

22  ***Defendants' Objections***:  Plaintiff's instructions in general, and specifically

23  Proposed Instruction No. 90 invite error by creating the inaccurate impression that

24  Plaintiff has cognizable claims for "a contract, combination, or conspiracy" that

25  "unreasonably restrains trade," separate and apart from the alleged anticompetitive

26  conduct that Plaintiff challenges as unlawful exclusive dealing, tying, and/or boycott

27  claims.  Defendants respectfully ask the Court to give the more specific instructions

28  pertaining to and developed for the kinds of concerted action at issue here.  *See Pac.*

1  *Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (rejecting

2  plaintiff's attempt to "join [two] claim[s] that cannot succeed, and alchemize them

3  into a new form of antitrust liability never before recognized by this Court"); *see*

4  *also generally* Defs. and Counter-Claimant's Reply in Supp. of Mot. for Partial

5  Summ. J. at 1–7, 10, ECF No. 249-1 ("Defs.' MSJ Reply").

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S SUBMISSION OF DISPUTED JURY
INSTRUCTIONS
CASE NO. 2:15-CV-09814 DSF (AGRx)

**Plaintiff's Proposed Instruction No. 77:**

**Sherman Act, Section 1—Rule of Reason**

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it found to be unreasonable.  You must determine, therefore, whether the restraints challenged here —Defendants' agreements with concert venues and artists, and their fan club policy[*describe it*]   is are unreasonable.

In making this determination, you must first determine whether Plaintiff has proven that the challenged restraint has resulted in a substantial harm to competition in a relevant product and geographic market.  If you find that Plaintiff has proven that the challenged restraint results in a substantial harm to competition in a relevant market, then you must consider whether Defendant has proven that the restraint produces countervailing competitive benefits.  If you find that it does, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

*Authority*: ABA Model Antitrust Instructions at 3, Ch. 1 § C.1 (Instruction 3A).

***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed instruction closely hews to the ABA Model Instruction explaining the rule of reason. Defendants object to Songkick's proposed instruction principally on the basis that it does not include Defendants' proposed modifications (additions and deletions) as set forth in *their* proposed competing version of the instruction.  Defendants request *a five paragraph* description of the Rule of Reason analysis Defendants crafted and are attempting to justify under *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015).  However, *O'Bannon* clearly states the three primary steps in succinct, non-argumentative fashion:  "[1] The plaintiff bears the initial burden of

showing that the restraint produces significant anticompetitive effects within a relevant market. [2] If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects. [3] The plaintiff must then 'try' to show that any legitimate objectives can be achieved in a substantially less restrictive manner." *Id.* at 1070 (quoting *Tanaka v. Univ. of S. Cal.,* 252 F.3d 1059, 1063 (9th Cir. 2001). Furthermore, as *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404 (9th Cir. 1991) made clear, the step following the above is to "weigh the harms and benefits to determine if the behavior is reasonable on balance." *Id.* at 1413 (citing *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 2018–19, 90 L.Ed.2d 445 (1986); 7 P. Areeda, *Antitrust Law* ¶ 1502, at 371-72).   Even if *O'Bannon* were to justify some modifications to the model instruction (it does not), the additions Defendants propose are too argumentative and would result in a confusing and misleading instruction.

Moreover, beyond the general burden-shifting process for the Rule of Reason, Defendants seek to add language not found in the case law (*e.g.*, portions of their final added paragraph on competitive harm), or selectively quoted for specific elements of the analysis (*e.g.*, their paragraph on less restrictive alternatives).  There are form instructions for each such element that both parties include, and selectively adding language to this instruction on those elements is unnecessarily argumentative, because this instruction simply lays out the general framework for the Rule of Reason analysis.  The instruction should therefore remain exactly that: a high-level explanation of the Rule of Reason that is fleshed out in subsequent instructions. Songkick's competing Proposed Instruction No. 76 should be given instead.

***Defendants' Objections:***   Plaintiff's Proposed Instruction No. 77 should not be given because by merely stating the model instruction and refusing to conform it to the applicable Rule of Reason framework provided by the Ninth Circuit, or the incorporate the change to the Ninth Circuit's Rule of Reason analysis provided in

1  *O'Bannon*, Plaintiff's instruction fails to provide the jury with an accurate or clear

2  understanding of controlling law, and invites reversible error.  *O'Bannon v. NCAA,*

3  802 F.3d 1049 (9th Cir. 2015).  The Ninth Circuit does not permit "balancing" unless

4  and until the plaintiff establishes a less restrictive alternative under the exacting

5  *O'Bannon* standards.

PLAINTIFF'S SUBMISSION OF DISPUTED JURY
INSTRUCTIONS
CASE NO. 2:15-CV-09814 DSF (AGRx)

**Plaintiff's Proposed Instruction No. 78:**

**Sherman Act, Section 1—Rule of Reason—Evidence of Competitive Benefits**

If you find that Plaintiff has proven that the challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways.  If you find that the challenged restraint does result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits.  If plaintiff proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

*Authority*: American Bar Association Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases 8 (2016) (citing authorities).

**<u>*Plaintiff's Statement of Law In Support of Its Instruction*</u>**:  Songkick's proposed instruction closely hews to the ABA Model Instruction regarding the Rule of Reason—Evidence of Competitive Benefits. Defendants object to Songkick's proposed instruction principally on the basis that it does not include Defendants' proposed modifications (additions and deletions) as set forth in *their* proposed competing version of the instruction.  Defendants' proposed modifications are both argumentative and also contrary to the law and should be rejected.

First, Defendants argue that the instruction should include language paraphrasing this Court's holding at the preliminary injunction phase. (i.e., "The Court has already determined that there is at least once competitive benefit from Defendants' policy of restricting Fan Club tickets to preexisting, *bona fide* artist fan clubs—it protects Defendants' exclusive rights for ticket sale servicing from being eviscerated by phony direct 'fan club' sales."). That holding was, of course, based on an incomplete record and therefore is not binding at trial.  *See Univ. of Texas v.*

1     *Camenisch*, 451 U.S. 390, 395 (1981).  Defendants therefore invite the Court to err

2 by instructing the jury on that preliminary finding, in contravention of Supreme

3 Court precedent.

4         Second, what is and is not a procompetitive benefit is a fact question for the

5 fact finder to decide based on the evidence at trial.  *See O'Bannon*, 802 F.3d at 1082

6 (noting the fact finder—in that case, the district court—made "findings of fact" as

7 to what were procompetitive benefits).  To the extent Defendants try to take that

8 determination from the jury via the final paragraph of their additions to the form

9 instruction, that is an error of law.

10         Third, Defendant' objection that Songkick's instruction does not identify

11 supposed ways competitive restraints may benefit competition is unsupported.

12 Given the highly factual nature of the procompetitive benefit question, *see id.*, it is

13 improper for Defendants to make a generalized fact statement of this type in the

14 instruction.  They should instead elicit evidence at trial regarding the specific

15 procompetitive benefits they allege, and make argument on that evidence at the

16 appropriate time.

17         Finally, Defendants' proposed deletion of the form instruction on less

18 restrictive alternatives is improper and unsupported, because the Ninth Circuit is

19 clear that less restrictive alternative(s) undercut a showing of supposed

20 procompetitive benefits.  *Id.* at 1070, 1075-76.  As the form instruction indicates, the

21 interrelation between these two concepts and showings requires that they be

22 presented to the jury together.  Furthermore, the Ninth Circuit is similarly clear (as

23 the form instruction states) that it is the plaintiff's burden to 'try' to prove such less

24 restrictive alternatives, *Bhan*, 929 F.2d at 1413, which the form instruction states.

25 Given that Defendants identify no reason why this law should be excluded from the

26 form instruction, their attempt to delete the language and create an entirely separate

27 instruction on the topic should be rejected.  Songkick's Proposed Instruction hews

28 exactly to the form and is therefore the proper choice for the jury.

***Defendants' Objections:***   Plaintiff's Proposed Instruction No. 78 should not be given because it ignores the determination about the effect of Defendants' policy regarding Fan Club tickets that this Court already made.  Further, their instruction deletes Defendants' proposal for clarifying how a restraint may benefit competition, which serves only to assist the jury in understanding the law.  Lastly, with respect to the last paragraph, by merely stating the model instruction and failing to conform it to the applicable Rule of Reason framework provided by the Ninth Circuit, or incorporate the change to the Ninth Circuit's Rule of Reason analysis provided in *O'Bannon*, Plaintiff's instruction fails to provide the jury with an accurate or clear understanding of controlling law, and invites error.    In contrast, Defendants' Proposed Instruction No. 95 provides an accurate statement of controlling law with respect to how a jury must analyze a plaintiffs' proposed alternative restraint.

**Plaintiff's Proposed Instruction No. 79:**

**Sherman Act, Section 1—Rule of Reason—**

**Balancing the Competitive Effects**

If you find that the challenged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable.  If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable.  In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors.  Plaintiff bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

*Authority*: ABA Model Antitrust Instructions at 9, Ch. 1 § C.4 (Instruction 3D).

***Plaintiff's Statement of Law In Support of Its Instruction*:**

Songkick's proposed instruction closely hews to the ABA Model Instruction on the Rule of Reason - Balancing the Competitive Effects.  Defendants object to Songkick's proposed instruction principally on the basis that it does not include Defendants' proposed addition to the form as set forth in *their* proposed version of the instruction, i.e., the underlined language below:

> If you find that the challenged restraint was reasonably necessary to achieve competitive benefits <u>but that there was a less restrictive alternative that would have been virtually as effective in achieving legitimate objectives without significantly increased cost, then as the final step in your analysis</u> . . .

Songkick's version should be provided to the jury because Defendants' proposed modifications are both argumentative and it contradicts decades of law on

Rule of Reason analyses.  As the Ninth Circuit stated in *Bhan*, after the burden-shifting between anticompetitive effects, procompetitive benefits, and less restrictive alternatives, the final step following is to "weigh the harms and benefits to determine if the behavior is reasonable on balance."  *Bhan*, 929 F.2d at 1413. There is no need to yet again reiterate in this form instruction the less restrictive alternative step, as Defendants attempt to do in order to attempt to argumentatively remind the jury. Songkick's proposed jury instruction should therefore be given.

**_Defendants' Objections to SK Version:_**  Plaintiff's Proposed Instruction No. 79 should not be given because by merely restating the model instruction, it fails to account for the standard established by the Ninth Circuit in *O'Bannon* and thus does not accurately reflect controlling law and invites error.

**Plaintiff's Proposed Instruction No. 80:**

**Sherman Act, Sections 1 and 2—Elements of Exclusive Dealing**

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. Plaintiff contends that a venue is a buyer of "concert venue ticketing services," and an artist is a buyer of "artist presale ticketing services."

Exclusive dealing arrangements and partial exclusive dealing arrangements, whatever form they may take, are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market.  From the standpoint of either ~~the~~a buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to ~~the~~a buyer and the buyer's access to competing suppliers' products and services.

~~There are several forms of exclusive dealing arrangements. The arrangement may take the form of [an agreement forbidding the buyer from purchasing the product or service from the supplier's competitors, a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier, or a pricing policy that creates a substantial disincentive to purchase from competitors]. Some practices [minimum purchase requirements, inventory requirements, or sales quotas] may operate as partial exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers.~~

To establish that an exclusive dealing [or partial exclusive dealing] arrangement violates the Sherman Act, Plaintiff must establish each of the following elements by a preponderance of the evidence:

    1. an agreement between the ~~buyer~~venue(s) and ~~the supplier~~Defendant(s) that totally [or in substantial part] forecloses the ~~buyer~~artist(s) from

1    purchasing ~~the product [or service]~~ "artist presale ticketing services"

2    from competing suppliers;

3    2.  the agreement was an unreasonable restraint of trade that resulted in a

4        substantial adverse effect on competition in a relevant market;

5    3.  Defendants have substantial market power in the market for "artist

6        presale ticketing services";

7    4.  the agreement occurred in or affected interstate commerce or foreign

8        commerce; and

9    5.  Plaintiff was injured in its business or property because of the

10       agreement.

11   If you find that the evidence is insufficient to prove any one or more of these

12   elements, then you must find for Defendants and against Plaintiff on Plaintiff's

13   exclusive dealing claim.  If you find that the evidence is sufficient to prove all five

14   elements as to ~~a particular~~ Defendants, then you must find for Plaintiff and against

15   Defendants on Plaintiff's exclusive dealing claim.

16

17   **Authority**: ABA Model Antitrust Instructions at 71, Ch. 2 § D.5 (Instruction 5); 1st

18   Am. Compl. ¶¶ 219-20.

19

20   ***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed

21   instruction faithfully follows the ABA Model Instruction on the elements of

22   exclusive dealing, only adding or substituting to clarify its exclusive dealing claims.

23   Defendants object to Songkick's proposed instruction on the basis that it does not

24   include Defendants' proposed modifications to the form.   Those modifications

25   should be rejected for multiple reasons.

26   First, Defendants would like to preface the form instruction with a sentence

27   asserting that Songkick claims "Defendants' venue contracts are unlawful exclusive

28   dealing arrangements."  This addition is not only unnecessary – it wrongly limits

1    Songkick's actual claim that it was Defendants' venue contracts *and other*
2    *agreements with the venues or artists* that constituted the wrongful exclusive dealing
3    arrangements.

4         Second, Defendants object to Songkick's instruction that for the exclusive
5    dealing claim, a jury must find Defendants had substantial market power in the artist
6    presale ticketing services ("APTS") market.  Defendants argue that, because the
7    exclusive contracts were with the venues, the question of substantial market power
8    must also focus on the venue ticketing services ("VTS") market.  That is wrong.  The
9    key question is whether a defendant had substantial market power in the relevant,
10   ***impacted*** market, and whether exclusive dealing contracts substantially foreclosed
11   competition in that relevant market.  This is so regardless of whether the exclusive
12   deals were themselves entered in that relevant market.  *See Oltz v. St. Peter's Cmty.*
13   *Hosp.*, 861 F.2d 1440, 1446–47 (9th Cir. 1988) (exclusive dealing claim could lie
14   where "the exclusive arrangement potentially affected [two] markets" because "both
15   were relevant to the search for competitive harm") (*citing to Jefferson Parish Hosp.*
16   *Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (acknowledging
17   that "[t]he exclusive contract had an impact on two different segments of the
18   economy: consumers of medical services, and providers of anesthesiological
19   service.")); *News Theme Proms., Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003-
20   04 (9th Cir. 2008) (plaintiff had antitrust standing to challenge defendant's exclusive
21   deals with plaintiff's end customers, because, even though plaintiff did not
22   participate in the market in which defendant secured its exclusive deals, the deals
23   substantially foreclosed plaintiff's access to an important input to its business).
24   Songkick alleges that the relevant market Defendants substantially foreclosed was
25   the APTS market.  Moreover, Live Nation's agreements with artists to only use
26   Ticketmaster for artist presale ticketing services–whether as part of a "360 deal" or
27   some other arrangement—similarly contribute to substantially foreclose competition
28   in the APTS market. (As a side note, if Defendants are correct in their contract

1   interpretation arguments, then their venue contracts specifically cover APTS and

2   therefore are themselves agreements within the APTS market.)

3        Defendants' deletion of the form language on "partial exclusive dealing" is

4   improper, particularly in this case.  Ticketmaster's venue contracts and/or other

5   agreements with venues and artists either granted it the right to sell all or

6   (importantly for this instruction) the majority—but not all—of venues' tickets.  The

7   contracts also, according to Defendants, impose the "fan club" requirement on all

8   third party artist presale ticketing service providers conducting artist presales at the

9   venues.  Songkick alleges that, no matter the correct contract interpretation,

10  Defendants' contracts substantially foreclose competition in the artist presale

11  ticketing services market.  Where exclusivity is less than full, but has the practical

12  effect of substantially foreclosing competition in the market, that is a partial

13  exclusive dealing-based claim.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254,

14  270 (3d Cir. 2012); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 834 (11th Cir. 2015).  For

15  that reason, the language on partial exclusive dealing should be included in the

16  instruction.

17  ***Defendants' Objections***: The parties' disagreement over the Section 1 exclusive

18  dealing instruction has two parts:  (1) whether the instruction needs to identify the

19  challenged conduct, and (2) whether Plaintiff can alter the elements set out in the

20  model instruction such that it can challenge ***venue ticketing contracts*** by pointing to

21  alleged foreclosure in what Plaintiff claims is a separate market for ***artist presale***

22  ***ticketing services***.  As to the latter, the first element of exclusive dealing that Plaintiff

23  must prove (per the ABA Model instruction) is: "an agreement between the buyer(s)

24  and the supplier that totally [or in substantial part] forecloses the buyer(s) from

25  purchasing the product [or service] from competing suppliers."   Plaintiff's

26  drastically alter the model instruction, proposing: "an agreement between the

27  venue(s) and Defendant(s) that totally or in substantial part forecloses *the artist(s)*

28  from purchasing "artist presale ticketing services' from competing suppliers."  There

1   is no legal basis for changing the focus away from foreclosure of rivals who are

2   trying to compete in the market allegedly tied-up with exclusive deals.  *See*, *e.g.*,

3   *Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F. 2d 976, 983 (9th Cir.

4   1988); Defs.' MSJ Reply at 12-13.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S SUBMISSION OF DISPUTED JURY
INSTRUCTIONS
CASE NO. 2:15-CV-09814 DSF (AGRx)

**Plaintiff's Proposed Instruction No. 81:**

**Sherman Act, Sections 1 and 2—Exclusive Dealing—Additional Considerations**

In determining whether Defendants exclusive dealing contracts had a substantially harmful effect on competition in the relevant market, you should consider the nature and history of the use of exclusive dealing contracts in the ticketing services industry, whether buyers [of the relevant product or service] have independent reasons for entering into exclusive dealing contracts or were coerced into entering into them, whether other competing suppliers also offer exclusive dealing contracts, the extent of competition among competing suppliers for exclusive dealing contracts with buyers, Defendants' position in the marketplace, the competitive alternatives to Defendants' products or services, the reasons Defendants and buyers entered into the exclusive dealing contracts at issue, and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the market and on price and other competition in the market.

You also should consider whether the buyer is the final end user of the product. If the buyer is the final end user, the exclusive dealing contract forecloses competitors from that portion of the market represented by the buyer's purchases and makes it more likely that competition may be harmed if the buyer represents a substantial portion of the market. On the other hand, if the buyer is a distributor or reseller, and there are other alternatives for competing sellers to market their products to end users, then an exclusive dealing agreement may not foreclose competitors' access to the market and, thus, not substantially harm competition.

In determining the extent to which Defendants' exclusive dealing contracts foreclose competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing contracts foreclose less than 20 percent of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives

available.  Similarly, the shorter the duration of the contract, the less likely it is to harm competition.  The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty.  In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

In determining if Defendants' exclusive dealing contracts substantially harmed competition, you also should consider defendant's market power.  If Defendants do not possess market power, then there cannot be substantial harm to competition from an exclusive dealing contract, and you must find for Defendants on this claim.  If you decide that the buyers are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power Defendants might otherwise have.  If Plaintiff cannot show that Defendants had the power to force buyers to enter into exclusive contracts they did not want, this would be an indication that Defendants lack market power.

Finally, you should consider whether the process in which Defendants secured exclusive contracts itself involved competition.  If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the exclusive contracts against Defendants, this is also evidence that Defendants do not have market power.

By considering all of these factors, you should determine whether the exclusive dealing contracts adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market. Where a restraint does not adversely affect price, output, or product quality, it is unlikely to substantially harm competition.

*Authority*: ABA Model Antitrust Instructions at 73-74, Ch. 2 § D.6 (Instruction 6).

1

2   ***Plaintiff's Statement of Law In Support of Its Instruction***:   Songkick's proposed

3   instruction closely hews to the ABA Model Instruction on Exclusive Dealing—

4   Additional Considerations.   Songkick proposes to delete the language "of the

5   relevant product or service" (which is optional and bracketed in the form) because

6   the parties have already agreed to insert a description of the services subject to

7   exclusive dealing contracts, i.e., "ticketing services."   Defendants also object to

8   Songkick's instruction because they believe that the middle paragraph beginning

9   with "[y]ou should also consider" should be deleted, but that would be in error

10  because the instruction would then omit a point that is highly relevant to the facts in

11  this case.  Songkick alleges that venues are buyers of venue ticketing services, and

12  artists are buyers of artist presale ticketing services.  Given that fact, those buyers

13  are, in many (although not all) circumstances, the "end user" of the product in

14  question (ticketing services).  The instruction on the considerations the jury should

15  give to such users is therefore relevant and proper to include.

16  Finally, Defendants object to Songkick's form on the basis that it does not add

17  language to the form instruction characterizing the buyers as just the "venues."  For

18  the reasons explained in support of Songkick's Proposed Instruction No. 80, limiting

19  the concept of the "buyer" to venues is improper here because Songkick alleges that

20  Defendants' exclusive dealing agreements impacted the markets for both VTS and

21  APTS, and in the latter market, the "buyers" of those services are typically artists

22  and artist managers.

23  ***Defendants' Objections:***   Plaintiff's Proposed Instruction No. 81 should not be

24  given because it includes language from the model instruction that does not apply to

25  the facts of the case and removes Defendants' minor edits to conform this instruction

26  to the facts of this case.  Instead, Defendants' Proposed Instruction No. 81 should be

27  given.

28

**Plaintiff's Proposed Instruction No. 82:**

**Sherman Act, Sections 1 and 2—Tying Arrangements**

Plaintiff claims that Defendants engaged in an unlawful tying arrangement. A tying arrangement is one in which the seller will ~~sell~~provide one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product), or at least agrees that he will not purchase the tied product from any other supplier.  A service may be a tying "product" and/or a tied "product."  Those terms are used with respect to services, as well as products. In this case, Plaintiff claims that "concert venue ticketing services" ~~[product A]~~ is the tying product and "artist presale ticketing services" ~~[product B]~~ is the tied product.


*Authority*: ABA Model Antitrust Instructions at 84, Ch. 2 § E.1 (Instruction 1).


***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed instruction closely hews to the ABA Model Instruction regarding tying arrangements.  Based on the context in this case, it is necessary to substitute the word "sell" with "provide," because the law is clear that a tying claim can exist where the "tying product" is provided to a customer for free, as is true in this case. *See Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.,* 772 F.2d 467, 473–75 (8th Cir. 1985) (even where "there is no 'sale' of the tying product (club memberships) to allegedly coerced buyers [of the tied product, real estate]," plaintiff had a viable tying claim because "the evil . . . is the same as that generated by traditional unlawful tying arrangements-competition in the market for one product is restrained due to the seller's exploitation of its control over another product."); *Lucas Indus., Inc. v. Kendiesel, Inc*., No. CIV. A. 93-4480, 1995 WL 350050, at *7 (D.N.J. June 9, 1995) (plaintiff had a viable tying claim where defendant "gives away the alleged tying product (technical literature) and then charges for the tied product (pumps and

parts),” Defendant is “exploiting the demand for the free tying product in order to force buyers into the purchase of the tied product.”); *BookLocker.com, Inc. v. Amazon.com, Inc.,* 650 F. Supp. 2d 89, 97–103 (D. Me. 2009) (plaintiff had a viable tying claim where Amazon “foreclosed competition on the merits in the market for [publishing-on-demand] printing [tied product] by its conditioning of access to the Direct Amazon Sales Channel [for sales of such publications] [tying product].”). The issue is “the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product,” *see id., citing to Jefferson Parish Hosp. Dist. No. 2. v. Hyde,* 466 U.S. 2, 12-13, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), and not whether the tied product was purchased, sold, or provided.

Specifically, Songkick intends to prove that Ticketmaster provides certain venue ticketing services to artists *on venues’ behalf*, including tour marketing and incremental sale options (like album, fan club, and VIP bundles).  These portions of Ticketmaster’s broader venue ticketing services are extremely valuable to artists, but, if an artist selects a third party artist presale ticketing service provider instead of Ticketmaster, Defendants refuse to permit the artist to utilize the VTS they want in the general sale, or (in the case of tour marketing) offer a much more limited version to the artist.  This coerces the artist into selecting Ticketmaster for artist presale ticketing services, because the choice of conducting a third party artist presale versus losing additional revenues on 92% of tickets and full tour marketing (which affects overall tour sales) causes most artists to forego using Songkick or other third party providers. This is a textbook tying claim.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913-915 (9th Cir. 2008) (finding that plaintiff established tying claim where evidence was that monopolist would not provide tying services without consumers also purchasing tied service); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) (“[T]he essential characteristic of an invalid tying arrangement lies in the ***seller’s exploitation of its control over the tying product to force the buyer into the***

1   ***purchase of a tied product*** that the buyer either did not want at all, or might have
2   preferred to purchase elsewhere on different terms.") (emphasis added).

3      If the jury finds that venues have agreed to utilize Ticketmaster for all artist
4   presale ticketing services at the venue, then that also presents a tying claim.
5   Songkick alleges that, to the extent this is the jury's finding, the evidence shows
6   venues were coerced into giving Ticketmaster control over artist presales at the
7   venues, because the inability to allow artists to sell artist presale tickets using third
8   party providers leads to lower ticket sales and diminishes the venues' ability to
9   attract artists to play there in the first place.  The question in a Section 1 tying
10  claim—which in this case should be analyzed under the *per se* standard—is whether
11  "the tying arrangement affects a not insubstantial volume of commerce in the tied
12  product market" (*i.e.*, artist presale ticketing services), which Songkick will show at
13  trial it did.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir.
14  2008) (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th
15  Cir. 2003) (internal quotation marks omitted).   Under Section 2, the question is
16  whether this tying conduct "reasonably appear[s] capable of making a significant
17  contribution to … maintaining monopoly power" in artist presale ticketing services,
18  particularly if Songkick "constituted nascent threats" to Defendants' monopoly
19  power. *U.S. v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc). Again,
20  this is evidence Songkick will present at trial.  Defendants cite no case for the
21  proposition that, in the face of evidence showing anticompetitive effects in the
22  relevant market stemming from tying, the consumers forced into a tie have to be the
23  plaintiff's own consumers or even in the same market as the plaintiff.

24  ***Defendants' Objection:***  Defendants object to Plaintiff's Proposed Instruction on
25  grounds that it is incorrect, misleading, and invites legal error because it
26  fundamentally modifies the meaning of the model instruction (and in fact
27  fundamentally alters the necessary showing Plaintiff must make to prevail on its
28  tying claim) by arbitrarily replacing the word "sell" with the word "provide" in the

first sentence of the instruction.  It is well-established that "[e]ssential to the second element of a tying claim is proof that *the seller* coerced a buyer *to purchase* the tied product." *See Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003) (emphasis added).  In other words, there must be a sale and there must be a purchase. Plaintiff should not be permitted to rewrite the terms of the model instruction simply to reduce or alter the burden placed on it by the ABA Model Antitrust Instructions and controlling law.

**Plaintiff's Proposed Instruction No. 83:**

**Sherman Act, Sections 1 and 2—Tying—Elements—**

**Per Se Unlawful Tying**

To prevail on its tying claim, Plaintiff must prove each of the following elements by a preponderance of the evidence:

1. "Concert venue ticketing services" and "artist presale ticketing services" are separate and distinct products;

2. Defendants will ~~sell~~provide "concert venue ticketing services" only on the condition that the buyer also purchase "artist presale ticketing services", or that the buyer not purchase "artist presale ticketing services" from any other supplier;

3. Defendants have sufficient market power with respect to "concert venue ticketing services" to enable it to restrain competition as to "artist presale ticketing services";

4. the alleged tying arrangement has foreclosed a substantial volume of commerce as to "artist presale ticketing services";

5. ~~Defendants have a financial interest as to "artist presale ticketing services";~~

6. Defendants' conduct occurred in or affected interstate commerce or foreign commerce; and

7. Plaintiff was injured in its business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all ~~seven~~ six of these elements, then you must find for Plaintiff and against Defendants on Plaintiff's tying claim. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Defendants and against Plaintiff on Plaintiff's tying claim.

*Authority*: American Bar Association Section of Antitrust Law, Model Jury

1   Instructions in Civil Antitrust Cases 86-87 (2016) (citing authorities).

2

3   ***Plaintiff's Statement of Law In Support of Its Instruction***:   Songkick's proposed

4   instruction closely hews to the ABA Model Instruction –Tying—Elements—

5   Unlawful Tying Under the Rule of Reason.   Defendants complain that Songkick's

6   instruction does not specify who are the "buyers" and who are the "sellers" – but

7   ignore that Songkick is merely following the form instructions that the Court

8   directed the parties to use.   Given multiple previous filings and discussion, there is

9   nothing mysterious about who is a provider and who is a consumer:  the providers

10  of the VTS services are Defendants (on venues' behalf), and the consumers are the

11  artists.   Defendants have also objected that Songkick's tying claim does not warrant

12  a *per se* tying instruction.   That is incorrect for the reasons discussed below, but also

13  for the simple reason that Songkick alleged a *per se* tying claim in its complaint,

14  reiterated that is was seeking such relief in its opposition to Defendants' motion for

15  partial summary judgment, and has never faced any arguments to the contrary from

16  Defendants.   (Defendants only argued at summary judgment that Songkick was

17  unable to factually prove coercion, which is an element of both *per se* and Rule of

18  Reason tying claims.)   A tying arrangement based on a contractual tie is subject to

19  *per se* treatment, *see Datagate, Inc. v. Hewlett-Packard Co.,* 60 F.3d 1421 (9th Cir.

20  1995), while a tying arrangement based on a technological tie may be subject to the

21  Rule of Reason in certain circumstances, *United States v. Microsoft Corp.*, 253 F.3d

22  34, 96 (D.C. Cir. 2001), but this case involves the former, not the latter.   Songkick

23  is entitled to have the jury decide whatever claims it alleged and are in the case.   If

24  Songkick is unable to prove a *per se* tying claim at trial, so be it.   But the jury must

25  decide that factual question.

26        Under Section 1, "[a] tying arrangement will constitute a per se violation of

27  the Sherman Act if the plaintiff proves '(1) that the defendant tied together the sale

28  of two distinct products or services; (2) that the defendant possesses enough

1  economic power in the tying product market to coerce its customers into

2  purchasing the tied product; and (3) that the tying arrangement affects a not

3  insubstantial volume of commerce in the tied product market.'" *Cascade Health*

4  *Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (quoting *Paladin Assocs.,*

5  *Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (internal quotation

6  marks omitted).  Defendants' *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551

7  U.S. 877, 886 (2007), has no substance.  *Leegin* merely reiterated that "the *per se*

8  rule is appropriate only after courts have had considerable experience with the type

9  of restraint at issue."  Courts clearly have had such experience with tying claims,

10  which is why the Ninth Circuit articulated the elements of a *per se* tying claim in

11  *Cascade Health* and other precedent (such as the Supreme Court's opinion in

12  *Jefferson Parish*).  Furthermore, Songkick is simply applying the ABA form

13  instruction on *per se* tying claims; this is clearly a well-accepted, long-existent

14  body of law.

15  ***Defendants' Objections:***  Plaintiff's Proposed Instruction No. 83 presumes that

16  Plaintiff's tying claim is so straightforward as to warrant a *per se* analysis, with no

17  consideration given to whether the alleged tying arrangement has unreasonably

18  restrained trade or had a substantial adverse effect on competition, or, if so, how

19  any procompetitive benefits of the arrangement may weigh against it.  A per se

20  instruction is inappropriate here, given that transacting for comprehensive ticketing

21  rights, including presale rights, is not inherently and inevitable anticompetitive.

22  *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)

23  ("Resort to per se rules is confined to restraints, like those mentioned, 'that would

24  always or almost always tend to restrict competition and decrease output.'").

25  Plaintiff's tying claims should be evaluated under the rule of reason, as provided in

26  Defendants' Instruction No. 83, not under a per se standard.

27       Defendants further object to Plaintiff's Proposed Instruction 38 by

28  incorporating by reference Defendants' Objections to Plaintiff's Proposed

Instruction 82.  Plaintiff's modification of the model instruction by replacing the word "sell" with the word "provide" in the second element Plaintiff has to prove is incorrect, misleading, and invites reversible error.

1

**Plaintiff's Proposed Instruction No. 84:**

2

**Sherman Act, Sections 1 and 2—Tying—Presence of Two Products**

3    To determine whether "concert venue ticketing services" and "artist

4  presale ticketing services" are separate and distinct products, you should consider

5  whether there would be demand for each of them if they were offered separately.  If

6  enough customers would want to ~~purchase~~obtain "concert venue ticketing services"

7  alone and "artist presale ticketing services" alone to induce sellers generally to

8  provide "concert venue ticketing services" alone and "artist presale ticketing

9  services" alone, then "concert venue ticketing services" and "artist presale ticketing

10 services" are separate products.  On the other hand, if there is very little demand for

11 one of the products by itself, that is, without the other product, then "concert venue

12 ticketing services" and "artist presale ticketing services" are not two separate

13 products for the purposes of the tying claim, even if they are sometimes ~~sold~~provided

14 separately.

15    Products may be separate products even if one of them is useless without the

16 other.  The relevant issue is whether there is sufficient demand from customers to

17 induce sellers to provide them separately, even if the customer needs to obtain both

18 products from one or more supplies.

19

20 *Authority*:  ABA Model Antitrust Instructions at 90, Ch. 2 § E.5 (Instruction 5).

21

22 *__Plaintiff's Statement of Law In Support of Its Instruction__*:  Songkick's proposed

23 instruction closely hews to the ABA Model Jury Instructions in Civil Antitrust Cases

24 – 90 (2016), but based on the facts of the case, and consistent with the law, Songkick

25 proposes two small modifications: (i) that the word "purchase" be replaced with

26 "obtain" and (ii) that the word "sold" be replaced with "provided."  For the reasons

27 explained in support of Songkick's Proposed Instruction No. 81, a tying claim is

28

viable even where, as here, the tying product (VTS-related services like artist marketing, for example) is provided to artists for free.

***Defendants' Objections:***   Defendants further object to Plaintiff's Proposed Instruction 84 by incorporating by reference Defendants Objections to Plaintiff's Proposed Instruction Nos. 82 and 83.   Plaintiff's modification of the model instruction by replacing the word "sold" with the word "provided" in the first paragraph alters the meaning of the model instructions, and inappropriately changes the burden Plaintiff must show by a preponderance of the evidence.   For the same reasons, Defendants object to Plaintiffs replacement of the word "purchase" with the word "obtain."   It is well-established that "[e]ssential to the second element of a tying claim is proof that *the seller* coerced a buyer *to purchase* the tied product." *See Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003) (emphasis added).   In other words, there must be a sale and there must be a purchase.   Plaintiff should not be permitted to rewrite the terms of the model instruction simply to reduce or alter the burden placed on it by the ABA Model Antitrust Instructions and controlling law.

1     **Plaintiff's Proposed Instruction No. 85:**

2     **Sherman Act, Sections 1 and 2—Tying—Proof of Conditioning**

3          You may find that a tying arrangement exists between "concert venue

4     ticketing services" and "artist presale ticketing services" if Defendants either refused

5     to ~~sell~~provide "concert venue ticketing services" unless purchasers also agreed to

6     buy "artist presale ticketing services" (or not to buy "artist presale ticketing services"

7     from another supplier), or effectively coerced purchasers into buying "artist presale

8     ticketing services" in addition to "concert venue ticketing services."

9          To prove coercion, Plaintiff must prove by a preponderance of the evidence

10    that Defendants exploited its control over "concert venue ticketing services" to force

11    the buyer into the purchase of "artist presale ticketing services", which the buyer

12    either did not want at all, or might have preferred to purchase elsewhere on different

13    terms, and that any appearance of choice was illusory.  Mere sales pressure or

14    persuasion is not coercion.

15         If Defendants have made the ~~purchase~~obtaining of "concert venue ticketing

16    services" and "artist presale ticketing services" together the only viable economic

17    option, you may find that Defendants have effectively tied "concert venue ticketing

18    services" to "artist presale ticketing services."  However, there is no coercion if

19    "concert venue ticketing services" and "artist presale ticketing services" are offered

20    separately ~~for sale~~ and separately ~~purchase~~obtaining is economically feasible and if

21    those products are not bundled together illegally.

22

23    *Authority*: ABA Model Antitrust Instructions at 93 Ch. 2 § E.7 (Instruction 7).

24

25    ***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed

26    instruction closely hews to the ABA Model Jury Instructions in Civil Antitrust Cases

27    – 93 (2016), but based on the facts of the case, and consistent with the law, Songkick

28    proposes four small modifications: (i) that the word "sell" be replaced with

1   "provide;" (ii) that the word "purchase" be replaced with "obtain" (in two places);

2   and (iii) deletion of "for sale."  For the reasons explained in support of Songkick's

3   Proposed Instruction No. 82, a tying claim is viable even where, as here, the tying

4   product (VTS-related services like artist marketing, for example) is provided to

5   artists for free.

6   ***Defendants' Objections:***  Defendants further object to Plaintiff's Proposed

7   Instruction 85 by incorporating by reference Defendants Objections to Plaintiff's

8   Proposed Instruction 82, 83, and 84.  Plaintiff's modifications of the model

9   instruction by replacing the word "sell" with "provide," "purchase" with

10  "obtaining" and deletion of the words "for sale" are incorrect, misleading, and

11  invites reversible error.  It is well-established that "[e]ssential to the second

12  element of a tying claim is proof that *the seller* coerced a buyer *to purchase* the

13  tied product."  *See Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir.

14  2003) (emphasis added).  In other words, there must be a sale and there must be a

15  purchase.  Plaintiff should not be permitted to rewrite the terms of the model

16  instruction simply to reduce or alter the burden placed on it by the ABA Model

17  Antitrust Instructions and controlling law.

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S SUBMISSION OF DISPUTED JURY INSTRUCTIONS
CASE NO. 2:15-CV-09814 DSF (AGRx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ANTITRUST DAMAGES INSTRUCTIONS

**Plaintiff's Proposed Instruction No. 86:**

**Antitrust Damages—Causation and Disaggregation**

If you find that Defendants violated the antitrust laws and that Plaintiff was injured by that violation, Plaintiff is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts of Defendants. Plaintiff bears the burden of showing that its injuries were caused by Defendants' antitrust violation, as opposed to any other factors. If you find that Plaintiff's alleged injuries were caused in part by Defendant's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of Plaintiff's alleged injuries that was caused by Defendants' alleged antitrust violation.

~~[Where Plaintiff is a purchaser claiming injury from an alleged overcharge:'] Plaintiff claims that it suffered injury because it paid higher prices for [product A] than it would have paid if the [alleged antitrust violation] had not occurred. Defendant claims that these higher prices occurred as a result of other factors that have nothing to do with the alleged antitrust violation. These include [list, as appropriate, defendant's examples of ways prices could increase in the normal course of business activity]. Plaintiff is not entitled to recover for changes in price that resulted solely from these or other causes arising from the normal course of business activity. The presence of these factors does not mean Plaintiff did not suffer antitrust injury, but Plaintiff is not entitled to recover for damages caused by them. Plaintiff only may recover for damages caused by the alleged antitrust violation.~~

Plaintiff claims that it suffered injury because it lost sales and profits as a result of Defendants' alleged antitrust violation. Defendant claims that any profits or sales lost by Plaintiff occurred as a result of other factors that have nothing to do with the alleged antitrust violation. Defendants claim that T~~t~~hese include: Plaintiff's inability to control its costs, and Plaintiff's flawed business model, which Defendants contend depended on acquiring ticketing inventory for free. Plaintiff is not entitled to recover for lost profits that resulted solely from these or other causes

1    arising from the normal course of business activity.  The presence of these factors

2    does not mean Plaintiff did not suffer antitrust injury, but Plaintiff is not entitled to

3    recovery for damages caused by them.  Plaintiff only may recover for damages

4    caused by the alleged antitrust violation.

5        Plaintiff bears the burden of proving damages by a preponderance of the

6    evidence, including apportioning damages between lawful and unlawful causes.  If

7    you find that Plaintiff was injured by Defendants' alleged antitrust violation, and

8    there is a reasonable basis to apportion Plaintiff's alleged injury between lawful and

9    unlawful causes, then you may award damages.

10       If you find that Plaintiff's alleged injuries were caused by factors other than

11   Defendants' alleged antitrust violation, then you must return a verdict for

12   Defendants. If you find that there is no reasonable basis to apportion Plaintiff's

13   alleged injury between lawful and unlawful causes, or that apportionment can only

14   be accomplished through speculation or guesswork, then you may not award any

15   damages at all.  However, apportionment is not required if you find that it is

16   extremely difficult, if not impossible, to apportion an amount of damages to any one

17   act where Defendants' acts, whether lawful or unlawful, taken together violate the

18   antitrust laws.

19

20   *Authority*: ABA Model Antitrust Instructions at 310–311, Ch. 6 § B.4 (Instruction

21   4); *LePage's, Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir.2003); *Bonjorno v. Kaiser

22   Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir.1984); *Dial Corp. v. News

23   Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016); *Univac Dental Co. v. Dentsply Int'l,

24   Inc.*, No. CIV. A. 1:07-CV-493, 2010 WL 844507, at *4–*5 (M.D. Pa. Jan. 20,

25   2010), report and recommendation adopted, No. CIV. A.107-CV-0493, 2010 WL

26   1816745 (M.D. Pa. Apr. 27, 2010).

27

28

1   ***Plaintiff's Statement of Law In Support of Its Instruction***:   Defendants object to

2   Songkick's inclusion of the correct statement of the law that apportionment is

3   unnecessary if the jury finds that it is extremely difficult, if not impossible, to

4   apportion damages to any one of Defendants' acts where, taken together, they violate

5   the antitrust laws.  That objection is not meritorious.  Circuit Courts have routinely

6   noted that "it would be extremely difficult, if not impossible, to segregate and

7   attribute a fixed amount of damages to any one act [when] the theory [is] not that

8   any one act in itself was unlawful, but that all the acts taken together showed a § 2

9   violation." *LePage's, Inc. v. 3M,* 324 F.3d 141, 166 (3d Cir. 2003) (citing *Bonjorno*

10   *v. Kaiser Aluminum & Chem. Corp.,* 752 F.2d 802, 812 (3d Cir. 1984)).  Here too,

11   Songkick alleges that all Defendants' acts, taken together, constituted a Section 2

12   violation.  *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1378 (9th Cir.

13   1992) (it is improper "to focus on specific individual acts of an accused monopolist

14   while refusing to consider their overall combined effect"); *see also Twin City*

15   *Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291 1302 (9th Cir. 1982)

16   (the jury must look to the "aggregate pattern of conduct in the relevant market.");

17   *Masimo Corp. v. Tyco Health Care Grp., L.P.*, 2004 WL 5907538, at *5-*6 (C.D.

18   Cal. June 10, 2004) (quoting *City of Anaheim*).  If the jury were to find Defendants'

19   "actions taken as a whole to be a violation of Section Two of the Sherman Act,

20   disaggregating the monopolist's lawful actions from its unlawful actions for the

21   purpose of calculating damages may be 'unnecessary, if not impossible.'" *Dial*

22   *Corp. v. News Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016); *see also Univac*

23   *Dental Co. v. Dentsply Int'l, Inc.*, No. CIV. A. 1:07-CV-493, 2010 WL 844507, at

24   *4–*5 (M.D. Pa. Jan. 20, 2010), report and recommendation adopted, No. CIV.

25   A.107-CV-0493, 2010 WL 1816745 (M.D. Pa. Apr. 27, 2010).  For these reasons,

26   Songkick's Proposed Instruction should be given.

27   ***Defendants' Objections to SK's Instruction:***   Defendants object to Plaintiff's

28   inclusion of the phrase: "However, apportionment is not required if you find that it

is extremely difficult, if not impossible, to apportion an amount of damages to any one act where Defendants' acts, whether lawful or unlawful, taken together violate the antitrust laws" in its jury instruction. *First*, the proposed language departs from the Model in a way that is both transparently favorable to Plaintiff, and unequivocally contradicts the actual language and intent of this model instruction. The cases Plaintiff cites in alleged support of this deviation from the model instruction all predate the Model Instruction. *Second*, lawful acts cannot be aggregated together to create an antitrust violation. *See, e.g.*, *Masimo Corp. v. Tyco Health Care Group, L.P.*, 2004 WL 5907538 at *5-6 (C.D. Cal. June 10, 2004). Moreover, a plaintiff cannot recover damages for injuries caused by factors other than the alleged unlawful conduct of defendant. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) (An antitrust plaintiff must "segregate the losses, if any, caused by acts which were not antitrust violations from those that were."); *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159-60 (9th Cir. 2015) ("Because Schulze similarly did not make an effort to separate the losses suffered as a result of Intamin's conduct from the total losses suffered by Magnetar, it would have been impossible for a jury to estimate the lost profits attributable to Intamin's conduct"); *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) (reversing damage award in favor of one plaintiff where evidence showed that plaintiff's exit from market was caused by factors other than defendant's conduct). *Third*, the Ninth Circuit does not recognize an "extreme[] difficult[y]" exception to the rule that antitrust damages awards cannot be the product of speculation of guesswork.

**Plaintiff's Proposed Instruction No. 87:**

**Antitrust Damages—Lost Profits**

Plaintiff claims that it was harmed because it lost profits as a result of Defendants' alleged antitrust violation.  If you find that Defendant committed an antitrust violation and that this violation caused injury to Plaintiff, you now must calculate the profits, if any, that Plaintiff lost as a result of Defendants' antitrust violation.  To calculate lost profits, you must calculate net profit: the amount by which Plaintiff's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues. ~~You may calculate the net profit by the following measure: [The court should incorporate case-specific instructions addressing legitimate means of measuring lost profit, as appropriate based on the evidence, such as the before-after, yardstick, or market share measures].~~

*Authority*: ABA Model Antitrust Instructions at 315, Ch. 6 § B.8 (Instruction 8).

***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed instruction closely hews to the ABA Model Jury Instructions in Civil Antitrust Cases – 315-16 (2016), but object to Songkick's proposed instruction on the grounds that it does not include the line:

> You may calculate the net profit by the following measure: [The court should incorporate case-specific instructions addressing legitimate means of measuring lost profit, as appropriate based on the evidence, such as the before-after, yardstick, or market share measures].

This portion is unnecessary because the parties' respective experts on damages will be testifying at length as to the measure of damages.  Attempting to summarize or do justice to the parties' experts' respective positions will result in a cumbersome instruction that would only confuse the jury.  Further, the jury should be free to draw any conclusions regarding credibility and weigh the expert testimony it will hear

1   without interference.  There is no place here for the parties or the Court to instruct
2   the jury to which theory to give credence.  Songkick's competing Proposed
3   Instruction No. 87, which is identical except for removing the unnecessary language,
4   should be read to the jury instead.

5   ***Defendants' Objection:***  Plaintiff's Instruction No. 87 should not be given because
6   Plaintiff proposes entirely deleting language required by the model instruction,
7   which contemplates the Court filling in "case-specific instructions" regarding lost
8   profit damages—specifically, the means of measuring net profit.  There is no
9   justification for removing entirely any place for instruction regarding the legitimate
10  means by which net profits can be calculated if lost profits are appropriate.  To the
11  contrary, lost profit damages rely on these exact calculations.  Rather, as
12  contemplated by the Model Instructions, such language should be left to be filled in
13  by the Court when appropriate.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| 1 | **Plaintiff's Proposed Instruction No. 88:** |
| 2 | **Antitrust Damages—Future Lost Profits** |
| 3 | Plaintiff claims that it was harmed because, had it not been for Defendants' |
| 4 | alleged antitrust violation, Plaintiff would have earned profits for ~~four~~five years into |
| 5 | the future (until 2021). If you find that Defendants committed an antitrust violation |
| 6 | and that this violation caused injury to Plaintiff, you now must calculate the future |
| 7 | profits, if any, that Plaintiff lost as a result of Defendants' antitrust violation. |
| 8 | To calculate future lost profits, you must make a reasonable estimate of (1) the |
| 9 | amount of profits, if any, that Plaintiff would have earned in future years, and (2) the |
| 10 | length of time for which it would have earned those profits.  In making this |
| 11 | calculation, you are not required to calculate future lost profits with absolute |
| 12 | mathematical certainty or precision, but you must not engage in guesswork or |
| 13 | speculation.  In making this determination, you must consider the various factors |
| 14 | that could affect the future success of Plaintiff's business, such as general market or |
| 15 | economic conditions, lawful competition Plaintiff would face in the future, |
| 16 | Plaintiff's management of business, changes in technology or other business |
| 17 | conditions, and other factors affecting plaintiff's future performance ~~[expand or~~ |
| 18 | ~~contract as appropriate]~~. |
| 19 | Your determination of future lost profits must have a reasonable basis in the |
| 20 | evidence and cannot be speculative.  If there is no evidence from which you can |
| 21 | make a reasonable estimate of lost future profits, you may not award damages for |
| 22 | future lost profits. |
| 23 | In calculating future lost profits, you must calculate net profit.  In simple |
| 24 | terms, net profit is gross revenues minus all of the costs and expenses that would be |
| 25 | necessary to produce those revenues.  ~~You may calculate net profit by using the~~ |
| 26 | ~~following measures: [The court should incorporate case-specific instructions~~ |
| 27 | ~~addressing legitimate means of measuring future lost profit, as appropriate based on~~ |
| 28 | ~~the evidence, such as the before-after, yardstick, or market share measures]~~. |

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable. This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money. For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year— you would then have something more than $1,000 in a year from now. Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year. This lower amount is known as an amount discounted to present value.

*Authority*: ABA Model Antitrust Instructions at 317–318, Ch. 6 § B.9 (Instruction 9).

***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed instruction closely hews to the ABA Model Jury Instructions in Civil Antitrust Cases on future lost profits – 317–318 (2016), but Defendants object that Songkick's version omits the following language:

> You may calculate the net profit by the following measure: [The court
> should incorporate case-specific instructions addressing legitimate
> means of measuring lost profit, as appropriate based on the evidence,
>    such as the before-after, yardstick, or market share measures].

This portion is unnecessary because the parties' respective experts on damages will be testifying at length as to the measure of damages. Attempting to summarize or do justice to the parties' experts' respective positions will result in a cumbersome instruction that would only confuse the jury. Further, the jury should be free to draw any conclusions regarding credibility and weigh the expert testimony it will hear without interference. There is no place here for the parties or the Court to instruct

the jury to which theory to give credence. Songkick's competing Proposed Instruction No. 88, which is identical except for removing the unnecessary language, should be read to the jury instead.

***Defendants Objections:*** Plaintiff's Instruction should not be given because Plaintiff proposes deleting entirely deleting where the Court would fill in, if it lost profit damages are appropriate, the means of measuring net profit that it deems legitimate based on the evidence. There is no justification for removing entirely any place for instruction regarding the legitimate means by which net profits can be calculated. If lost profit damages are warranted, such damages necessarily require a net profit calculation. Rather, as contemplated by the Model Instructions, such language should be left to be filled in by the Court when appropriate.

**Plaintiff's Proposed Instruction No. 89:**

**Antitrust Damages—Going Concern or Goodwill**

Plaintiff claims that it was harmed because, had it not been or Defendants' alleged antitrust violation, the "going concern" or "goodwill" value of its business would have been higher than it actually was.  If Plaintiff was forced to sell, shut down, or otherwise terminate its business because of Defendants' alleged antitrust violation, Plaintiff is entitled to damages for any resulting loss to its business's going concern value.  Going concern value is the value of a company as an operating venture to a prospective buyer.  Going concern damages are designed to compensate Plaintiff for the value that Plaintiff's business would have had at the point Plaintiff went out of business, but for Defendants' alleged antitrust violation.

Going concern damages are measured by determining the loss of goodwill suffered by Plaintiff's business as a result of Defendants' alleged antitrust violation.  Goodwill consists of the intangible assets of a business, including customer relationships, an established location, employees and their skill sets, and other elements that lead to profits over and above an amount fairly attributable to the return on capital investment and the labor of the owner.  Goodwill also includes the reasonable prospect of continued additional profit in the future.

If you find that Defendants committed an antitrust violation and that this violation caused damage to the amount for which Plaintiff was able to sell its business, you may award damages for loss of goodwill.  You may include both lost past profits and the loss of goodwill in calculating a total damages award.  You may not, however, award damages for both loss of goodwill and future lost profits, so in considering future damages in this case you should not add or combine these figures together.  But you may consider the anticipated future profits of a business as a factor in determining the goodwill of that business.

The most important element of goodwill is the expectation of future profitable operations.  Calculate (1) the reasonable expectation of future profits minus (2) an

1   ~~amount attributable to a reasonable return on the capital investment [plus a return~~
2   ~~attributable to the labor of the owner of the business]. If that number is positive, that~~
3   ~~is the goodwill value; otherwise there is no goodwill value. In determining whether~~
4   ~~goodwill exists, and how much it is if it exists, you should consider how far into the~~
5   ~~future the profitable operations of the business might have been expected to~~
6   ~~continue, considering all of the circumstances existing at the time, had it not been~~
7   ~~for Defendants'~~ alleged antitrust violation.

8   ~~If Plaintiff sold its business for more than the value of its tangible assets,~~
9   ~~Plaintiff likely received some compensation for goodwill, and you should take this~~
10  ~~amount into account in determining Plaintiff~~'s lost goodwill..

12  ***Authority***: ABA Model Antitrust Instructions at 319–320, Ch. 6 § B.10 (Instruction
13  10).

14  ***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed
15  instruction closely hews to the ABA Model Jury Instructions in Civil Antitrust Cases
16  on going concern – 319-20 (2016), and Defendants agree in principal that an
17  instruction should be given on the subject of loss of going concern/goodwill
18  damages.  *See* Defendants' Proposed Instruction No. 90.    Defendants object to
19  Songkick's proposed instruction principally on the basis of two deletions.

20          First, Defendants object to Songkick's deletion of the paragraph beginning
21  with "[t]he most important element of goodwill is the expectation of future profitable
22  operations," and which then provides a method for calculating goodwill.  This part
23  of the instruction does not accurately reflect that there are several accepted bases for
24  valuating goodwill.  The statement that one method is "the most important element
25  of goodwill" is prejudicial and legally misleading.  As other model instructions and
26  case law indicate, the appropriate method for assessing and calculating goodwill for
27  a startup company like Songkick must be flexible enough to allow the jury to take
28  into account additional elements that may contribute to the intangible business value

1   that is reflected in the concept of "goodwill."   These methods do not prioritize the

2   "expectation of future profitable operations," i.e., the "income approach" for every

3   type of business, and it is an inappropriate method for a startup company (like

4   Songkick) whose income was depressed as the result of anticompetitive conduct.

5   *See, e.g.*, 4-79 Modern Federal Jury Instructions-Civil P 79.02 (2017) (jury

6   instruction for loss of goodwill, citing to cases); 3 Fed. Jury Prac. & Instr. § 129:32

7   (6th ed.) (same).

8         Furthermore, for purposes of going concern valuations, it is well-accepted that

9   the fair market value of a privately held business is estimated to be the largest of the

10   income approach, asset approach, or market approach.   *See* George P. Roach,

11   Correcting Uncertain Prophecies: An Analysis of Business Consequential Damages,

12   22 Rev. Litig. 1, 11 (2003) ("It is well accepted that the fair market value of a

13   privately held business is estimated to be the largest of the values determined by the

14   following three methods . . . (1) Income Approach . . . . . (2) Asset Approach . . . or

15   (3) Market Approach"); *id.* at 21 ("Unless the company has significant asset

16   holdings such as real estate, securities, or natural resources, the first or third method

17   usually generates the largest value."); *id.* ("the majority rule is that lost profits is to

18   be used only in cases of partial destruction, and going concern value is to be used

19   only in cases of total destruction of a business."); *Okerlund v. United States*, 53 Fed.

20   Cl. 341, 347 (2002), *aff'd*, 365 F.3d 1044 (Fed. Cir. 2004) ("market approach" is a

21   reliable business valuation method accepted by courts and "within  the valuation

22   community."); *Alberts v. HCA, Inc.*, 496 B.R. 1, 6 (D.D.C. 2013) ("There are three

23   primary methods for determining 'fair market value': (1) the 'market' approach; (2)

24   the 'net asset' or 'cost' approach; and (3) the "income" approach.")*; Crimi v. C.I.R.*,

25   105 T.C.M. (CCH) 1330 (T.C. 2013) (same); *Skydive Arizona, Inc. v. Quattrocchi*,

26   673 F.3d 1105, 1112 (9th Cir. 2012) ("In measuring harm to goodwill, a jury may

27   consider a plaintiff's expenditures in building its reputation in order to estimate the

28   harm to its reputation after a defendant's bad acts."); *Mem'l, Inc. v. Harris*, 655 F.2d

1   905, 908 (9th Cir. 1980) ("the District Court should not have required a specific

2   formula for the calculation of goodwill"); Banc *One Corp. v. Comm'r of Internal*

3   *Revenue*, 84 T.C. 476, 507 (1985), aff'd sub nom, *Banc One Corp. v. C.I.R.*, 815

4   F.2d 75 (6th Cir. 1987) ("certainly goodwill may arise from something other than

5   excess earnings."). The jury must not be artificially constrained in evaluating the

6   merits of these approaches in valuing Songkick's business.

7   Second, deleting the last sentence of the form – "If plaintiff sold its business

8   for more than the value of its tangible assets, plaintiff likely received some

9   compensation for goodwill, and you should take this amount into account in

10  determining plaintiff's lost goodwill" – is also proper because Songkick has not sold

11  its artist presale ticketing service business unit.  That part of the form instruction is

12  optional, and should not be given here because it does not apply to the facts in this

13  case.

14  ***Defendants' Objections***:   Plaintiff's Proposed Instruction should not be given

15  because Plaintiff deleted the last two paragraphs from the ABA Model Antitrust

16  Instruction. These two paragraphs are not optional; rather, they are critical to the

17  jury's understanding of a proper damages award based on going concern value.

18  Specifically, the first deleted paragraph instructs the jury on how to calculate

19  goodwill.  The first deleted paragraph also states that: "In determining whether

20  goodwill exists, and how much it is if it exists, you should consider how far into the

21  future the profitable operations of the business might have been expected to

22  continue, considering all of the circumstances existing at the time, had it not been

23  for defendant[s]'s alleged antitrust violation."  ABA Model Antitrust Instructions at

24  319–320, Ch. 6 § B.10 (Instruction 10). This portion of the model instruction, which

25  Plaintiff has deleted, is particularly important because Plaintiff never earned a profit.

26  Indeed, even if Plaintiff were awarded the alleged lost profits it claims were caused

27  by Defendants conduct, Plaintiff's own expert's analysis shows that it would still

28  have lost millions of dollars.  Per the model instruction, the jury should be instructed

1   that this is a factor it should consider in determining lost goodwill damages, if any.

2   There is no justification for removing this consideration from the jury, one that the

3   drafters of the model instructions explicitly included.

4        The second paragraph Plaintiff deleted from the model instruction is equally

5   important. That paragraph states: "[i]f plaintiff sold its business for more than the

6   value of its tangible assets, plaintiff likely received some compensation for goodwill,

7   and you should take this amount into account in determining plaintiff's lost

8   goodwill."  Here, if Plaintiff wants to pursue a damages claim based on the loss of

9   its entire business, the jury must be informed that it should deduct from that amount

10  any compensation Plaintiff has already received. To hold otherwise would allow for

11  Plaintiff to inflate its damages claim by seeking from Defendants the residual value

12  of its business it was already able to sell to someone else.

13       Lastly, Plaintiff's Proposed Instruction is also confusing because it gives the

14  goodwill instruction before the lost profits instructions that it references.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# PLAINTIFF'S STAND-ALONE PROPOSED FEDERAL ANTITRUST INSTRUCTIONS

# Plaintiff's Proposed Instruction No. 90

## ANTITRUST—SHERMAN ACT—NATURE OF THE CLAIM

Plaintiff ~~claims defendants have violated the Sherman Act by [describe]~~[asserts antitrust claims for monopolization and attempted monopolization of artist presale ticketing services in violation of Section 2 of the Sherman Act, unreasonable restraint of trade in violation of Section 1 of the Sherman Act, and exclusive dealing, tying, and boycott in violation of Sections 1 and 2 of the Sherman Act].  [Defendants deny those claims.]

The purpose of the Sherman Act is:

(1) to preserve and advance our system of free, competitive enterprise;

(2) to encourage, to the fullest extent practicable, free and open competition in the marketplace; and

(3) to prevent the accomplishment of a monopoly in any business or industry

all to the end that the consuming public may receive better goods and services at a lower cost.

~~Any unreasonable interference, by contract, or combination, or conspiracy, with the ordinary, usual, and freely-competitive pricing or distribution system of the open market in interstate trade and commerce, constitutes an unreasonable restraint of interstate trade, and is a violation of the federal antitrust laws.~~

Authority:

Kevin F. O'Malley, Jay E. Grenig & Hon. William C. Lee, 3A Federal Jury Practice and Instructions § 150:1 (6th ed. Aug. 2017 Update).

***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed instruction on the Sherman Act – nature of the claim – reflects the law as accurately restated in the *O'Malley* antitrust jury instructions referenced by the 9th Circuit

Manual of Model Civil Jury Instructions.  Defendants object that the proposed instruction supposedly fails to "describe" how Defendants have violated the Sherman Act or "misstates" the law.  Neither objection has merit.  Songkick's proposed instruction describes in detail that its claims are based upon "monopolization and attempted monopolization of artist presale ticketing services in violation of Section 2 of the Sherman Act, unreasonable restraint of trade in violation of Section 1 of the Sherman Act, and exclusive dealing, tying, and boycott in violation of Sections 1 and 2 of the Sherman Act."  Despite this clear explanation, Defendants are trying (as demonstrated by their Proposed Instruction No. 76) to include additional language designed to improperly restrict Songkick's varied allegations of Defendants' anticompetitive behavior to a few examples of specific conduct.  As Songkick already briefed in opposing Defendants' motion for partial summary judgement, the anticompetitive scheme Songkick alleges includes anticompetitive acts that have "conduct-specific" tests, but ***also*** acts that are analyzed under the more general Section 1 Rule of Reason and Section 2 predatory/anticompetitive conduct standards.  Despite Defendants' repeated attempts to confuse this issue, Section 1's Rule of Reason framework looks at the anticompetitive effects concerted action has in the relevant market, and whether those effects are outweighed by any procompetitive benefits.  *See Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).  Section 2's general standard defines "anticompetitive conduct" broadly to include "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).  Similarly, Section 2 also imparts liability if the jury finds that the fan club policy was simply a condition Ticketmaster unilaterally placed on the market due to its monopolist status.  *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) (Section 2 applies to both unilateral and

1   concerted conduct).  Thus, Defendants' objections are merely an effort to artificially

2   limit the true scope of Songkick's allegations.

3        Next, Defendants claim that this Form Instruction's entirely unedited

4   description of the purpose of the Sherman Act is "one-sided and unbalanced."  As a

5   preliminary matter, Songkick notes that Defendants themselves draw heavily from

6   this same source (O'Malley, Federal Jury Practice and Instructions) throughout their

7   Proposed Instructions.  The form instruction Songkick utilizes explicitly informs the

8   jury that the Sherman Act's purpose lies in preserving "free, competitive enterprise,"

9   and "free and open competition in the marketplace."  The form instruction makes

10  zero reference to protections for specific competitors that were not harmed through

11  broader harm to competition.  Thus, this objection is also baseless.  Songkick's

12  proposed instruction should therefore be provided to the jury.

13  ***Defendants' Objections***:  Defendants have no objection to an instruction describing

14  the purpose of the Sherman Act, but of the available alternatives Plaintiff has chosen

15  one that lacks reasonable balance.  The parties Stipulated Instruction No. 33 and

16  Defendants' Proposed Instructions No. 93 should be given instead.

17       Furthermore, Plaintiff's Proposed Instruction No. 90 suggests that it has some

18  undefined, generalized claim for antitrust liability under Section 1 of the Sherman

19  Act, separate and apart from Plaintiff's exclusive dealing, tying, and boycott claims.

20  That violates the letter and spirit of the model rule on which this instruction is based.

21  The model instruction at issue specifically states that the instruction should

22  "describe" the alleged anticompetitive conduct that Plaintiff claims violates the

23  Sherman Act.  Plaintiff circumvents this requirement by asserting a completely

24  undefined claim for an "unreasonable restraint of trade in violation of Section 1,"

25  without providing any requisite factual detail of the challenged conduct (including

26  what restraint or agreements are at issue, and who the parties to those agreements

27  allegedly are).  In Plaintiff's proposed instruction, exclusive dealing, tying, and

28  boycott are additional claims under Section 1 (and Section 2)—not the factual basis

1   for this freestanding "unreasonable restraint of trade" claim.   Consequently,

2   Plaintiff's proposed approach invites error.   Defendants respectfully ask the Court

3   to give the more specific instructions pertaining to and developed for the kinds of

4   concerted action at issue here.   See Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.,

5   555 U.S. 438, 457 (2009) (rejecting plaintiff's attempt to "join [two] claim[s] that

6   cannot succeed, and alchemize them into a new form of antitrust liability never

7   before recognized by this Court"); see also generally Defs. and Counter-Claimant's

8   Reply in Supp. of Mot. for Partial Summ. J. at 1–7, 10, ECF No. 249-1 ("Defs.' MSJ

9   Reply").

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S SUBMISSION OF DISPUTED JURY
INSTRUCTIONS
CASE NO. 2:15-CV-09814 DSF (AGRx)

# Plaintiff's Proposed Instruction No. 91

## SHERMAN ACT SECTIONS 1 AND 2—BOYCOTT

Plaintiff has alleged that defendants [and other persons or businesses] have violated the Sherman Act by agreeing not to deal with plaintiff.

A person or business has the right to deal, or refuse to deal, with whomever it likes, as long as it makes that decision on its own.  The Sherman Act, however, prohibits two or more persons or businesses from agreeing with one another not to [deal with plaintiff by preventing the purchase of artist presale ticketing services from plaintiff][*state nature of alleged refusal to deal*] where certain circumstances are shown to exist, a situation sometimes referred to as a "group boycott."

To prevail on this claim against a defendant, plaintiff must prove, as to that defendant, each of the following elements by a preponderance of the evidence:

(1)defendant and one or more other persons or businesses refused to deal with plaintiff by [by preventing the purchase of artist presale ticketing services from plaintiff][*state nature of alleged refusal to deal, e.g., not selling to plaintiff*];

(2)the refusal to deal was pursuant to an agreement between that defendant and one  or more other persons or businesses;

(3)at least two of the parties to the agreement are direct competitors;

(4[3])the refusal to deal [unreasonably restrains trade]disadvantaged plaintiff by denying plaintiff access to a supply of product, a facility, a market, or a service necessary for plaintiff to compete effectively;

(5[4])the refusal to deal occurred in or affected interstate [or foreign] commerce; and

(6[5])plaintiff was injured in its business or property because of the refusal to deal.

1      If you find that the evidence is insufficient to prove any one or more of these

2  elements as to a defendant, then you must find for that defendant and against

3  plaintiff on plaintiff's concerted refusal to deal claim.  If you find that the evidence

4  is sufficient to prove all ~~six~~[five] elements as to a defendant, then you must find for

5  plaintiff and against that defendant on plaintiff's concerted refusal to deal claim.

6  Authority: American Bar Association Section of Antitrust Law, Model Jury

7  Instructions in Civil Antitrust Cases 44-46 (2016) (citing authorities).

8

9  ***Plaintiff's Statement of Law In Support of Its Instruction***:  Songkick's proposed

10  instruction closely hews to the ABA Model Jury Instructions in Civil Antitrust Cases

11  on boycott – 44-46 (2016), except modified to reflect the Rule of Reason (which is

12  applied to vertically-arranged boycotts).  Defendants agree in principal that an

13  instruction should be given on the boycott aspects of Songkick's claims.  *See*

14  Defendants' Proposed Instruction Nos. 49-52.  However, Defendants object that the

15  form on which Songkick bases this instruction is inappropriate because the unaltered

16  form instruction was intended for use in the context of a horizontal boycott

17  predicated on the per se rule, and not the vertically-organized boycotts Songkick

18  alleges.  However the instructions to the form confirm that "[i]n other cases in which

19  an alleged group boycott should be evaluated under the rule of reason," i.e., in the

20  context of a vertical boycott, "the court should instruct the jury on the elements of

21  the rule of reason inquiry as appropriate."  Songkick's boycott theories hinge on the

22  Rule of Reason and it has requested an instruction on the rule of reason.  *See*

23  Songkick's Proposed Instruction Nos. 77-79.  To the extent the jury finds there was

24  a vertically-arranged boycott under Songkick's proposed instruction, the jury will

25  still have to analyze whether it violated the Sherman Act pursuant to the rule of

26  reason analysis.  *See Constr. Aggregate Transp., Inc. v. Fla. Rock Indus.*, Inc., 710

27  F.2d 752, 777-79 (11th Cir. 1983) ("CAT") (applying rule of reason to vertically-

28  arranged boycott); *KASP, Inc. v. Adesa Lexington, LLC*, No. CIV.A. 6:05-394-DCR,

1   2006 WL 385310, at *7 (E.D. Ky. Feb. 17, 2006) ("Having determined that both the

2   auto dealers' . . . attempted vertical group boycott should be examined under a rule

3   of reason analysis, the examination of [plaintiff's] claims must return to the fourth

4   and fifth elements of a Sherman Act claim . . . that the Defendants restrained trade

5   "in the relevant market" and that "an anti-trust injury" has resulted.").

6           Songkick deleted the only element that applies specifically to horizontal

7   boycotts – that "at least two of the parties to the agreement are direct competitors."

8   Because Songkick is not alleging a horizontal boycott, this element is unnecessary,

9   and should not be surprising to Defendants, given that Songkick made its position

10  clear in opposing Defendants' motion for partial summary judgment. *See* Dkt. No.

11  232-1 at 4, 25, 33. Defendants' objection to the form instruction on the basis that

12  Songkick's claim should instead be instructed to the jury under a hub-and-spoke

13  conspiracy theory is a red herring. For the reasons explained above, Songkick has a

14  claim predicated, in part, on vertically-arranged boycotts, and it is entitled to instruct

15  the jury on that basis. The Court should not instruct the jury on a liability theory

16  Songkick does not assert; *i.e.*, hub-and-spoke conspiracy, and should provide the

17  jury with Songkick's proposed instruction.

18  ***Defendants' Objections***:  Defendants object that Plaintiff's Proposed Instruction

19  No. 91 makes no sense because Plaintiff fails to describe the nature of the boycott—

20  or even identify the supposed members of this alleged boycott—as required by the

21  ABA Model Antitrust Instructions (and as a matter of common sense). The ABA

22  Model Antitrust Instructions cited by Plaintiff specifically require Plaintiff to explain

23  that "Plaintiff has alleged that defendants [*and other persons or businesses*] have

24  violated the Sherman Act by agreeing not to deal with Plaintiff." Rather than fill in

25  the bracketed language, and thereby identify who the other members of the alleged

26  boycott are, Plaintiff simply deletes the brackets—leaving the jury to guess who

27  Defendants allegedly agreed with to boycott Plaintiff's business. Per this proposed

28

1   instruction, therefore, the jury would be given no description of what Plaintiff's

2   boycott claim actually is—including critically who it involves.

3       Moreover, Plaintiff's Proposed Instruction No. 91 is not proper for the

4   additional reason that Plaintiff does not actually allege a group boycott among

5   Defendants and venues.  Rather, the type of arrangement that Plaintiff alleges with

6   respect to the venues is, at best, a hub-and-spoke conspiracy, with Defendants at the

7   hub uniting thousands of concert venues to reduce competition among themselves.

8   *See* Defs.' Mot. for Partial Summ J. at 16, ECF No. 249.  Thus, the jury should be

9   instructed to decide this claim based on the elements required to prove a hub-and-

10  spoke conspiracy, rather than generic group boycott, as provided in Defendants'

11  Proposed Instruction No. 95.

12      Defendants further object that, Plaintiff's Proposed Instruction No. 91 is

13  inaccurate because it does not require the jury to find that all parties to the alleged

14  conspiracy—whatever that may be, since Plaintiff's instruction fails to define it—

15  had the requisite specific intent to conspire to achieve an unlawful objective.  The

16  Supreme Court has made clear that, to prove a boycott claim, all parties to the

17  arrangement must have "a conscious commitment to a common scheme designed to

18  achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S.

19  752, 764 (1984).  Yet Plaintiff's Proposed Instruction No. 62—its sole boycott

20  instruction—contains nothing that would instruct the jury that it must find that

21  Plaintiff has proven this element of its claim.  Plaintiff's Proposed Instruction No.

22  62 therefore constitutes legal error for this reason as well.

23      Finally, Plaintiff's proposed edit to the Model Instruction's element number

24  3, per the red line shown here, removes an important and specific element of the

25  group boycott claim, and attempts to replace it with a vague, undefined concept.

26  This edit is indefensible.

27

28

PLAINTIFF'S SUBMISSION OF DISPUTED JURY
INSTRUCTIONS
CASE NO. 2:15-CV-09814 DSF (AGRx)

**Plaintiff's Proposed Instruction No. 92**
**SHERMAN ACT SECTIONS 1 AND 2—ANTITRUST DAMAGES—**
**UNCERTAINTY AS TO AMOUNT OF DAMAGES**

If you find for plaintiff, in calculating damages, you may not calculate damages based on speculation or guesswork, but any uncertainty as to the specific amount of damages must be resolved against defendants because it was their wrongdoing which created an uncertainty as to the amount of damages.

Authority: *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65 (1946).

***Plaintiff's Statement of Law In Support of Its Instruction:***

Defendants entirely misapprehend (or intentionally try to mischaracterize) this instruction. There is no dispute that this is a correct statement of the law. Courts within the Ninth Circuit have applied *Bigelow* and its progeny to this day. *See Greyhound Computer Corp. v. Int'l Bus. Machines Corp.*, 559 F.2d 488, 506 (9th Cir. 1977) (citing to *Bigelow* and holding that "[t]he risk that error will occur in resolving this kind of uncertainty [over damages] must be borne by the antitrust violator where wrongdoing intervenes before the process is complete."); *Jensen v. United States*, 326 F.2d 891, 894 n.5 (9th Cir. 1964) (citing to *Bigelow* and holding that "[i]f there should be any uncertainty regarding the amount[] [of damages], that question must be resolved against [wrongdoer]."); *Fontana Pipe & Fabrication v. Ameron, Inc.*, 993 F.2d 882 (9th Cir. 1993) (citing to *Bigelow* and holding that "[w]hatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced.") *citing to Story Parchment Co. v. Paterson Co.,* 282 U.S. 555 (1931) ("Whatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus

1   produced.").  It is well recognized that an antitrust plaintiff has a lessened standard

2   to prove the ***amount*** of damages once they have proven the ***fact*** of damage.  *See*

3   *Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1221 (9th Cir. 1997)

4   ("In the context of antitrust violations that standard is relaxed once liability is shown

5   because market uncertainties often preclude a precise showing of 'where' the

6   plaintiff would have been absent the proven antitrust violation…We allow juries to

7   rely on probable and inferential proof, and to approximate damages."); *Moore v.*

8   *James H. Matthews & Co.,* 682 F.2d 830, 836 (9th Cir. 1982) ("[T]he Supreme Court

9   has … established a relaxed standard for proving the amount of damages in an

10  antitrust case once the fact of damage has been shown … It will be enough if the

11  evidence shows the extent of the damages as a matter of just and reasonable

12  inference, although the result be only approximate."); *Zenith Radio Corp. v.*

13  *Hazeltine Research, Inc*., 395 U.S. 100, 114 n.9 (1969) ("[I]t is enough that the

14  illegality is shown to be a material cause of the injury; a plaintiff need not exhaust

15  all possible alternative sources of injury in fulfilling his burden of proving

16  compensable injury."); *Graphic Prods. Distrib., Inc. v. ITEK Corp*., 717 F.2d 1560,

17  1579 (11th Cir. 1983) ("GPD") (Under this standard, a jury may conclude and infer

18  "from the proof of defendants' wrongful acts and their tendency to injure plaintiffs'

19  business, and from the evidence of the decline in prices, profits and values, not

20  shown to be attributable to other causes, that defendants' wrongful acts had caused

21  damage to the plaintiffs.").  Songkick does not purport to contest the disaggregation

22  requirement for antitrust damages; this instruction simply explains that, once it has

23  provided evidence of loss attributable to Defendants' antitrust violations, the amount

24  of such loss is subject to the *Bigelow* standard.

25  ***Defendants' Objections***:  Plaintiff's Proposed Instruction No. 92 should not be given

26  because it is not based on any model instruction, and is a completely inaccurate

27  statement of the law.  Moreover, it stands in contrast to the ABA Model Antitrust

28  Instruction regarding "Causation and Disaggregation," which Plaintiff similarly tries

1   to dramatically alter.   *See* Defendants' Statement of Law In Support of Their
2   Instruction No. 86 and Defendants' Objections to Plaintiff's Instruction No. 86.

3       Under the law, Plaintiff may recover damages only if it provides the jury with
4   a "reasonable basis upon which to estimate the amount of its losses" caused by
5   Defendants' alleged anticompetitive conduct.   *See U.S. Football League v. Nat'l*
6   *Football League*, 842 F.2d 1334, 1378–79 (2d Cir. 1988). This is Plaintiff's burden
7   to prove.  Plaintiff's Proposed Instruction, however, effectively flips this burden by
8   instructing the jury that Plaintiff is entitled to whatever damages it wants because it
9   was Defendants' alleged "wrongdoing which created an uncertainty as to the amount
10  of damages." That is not the law.

11      Indeed, Plaintiff's sole cited authority does not support its proposed
12  instruction.  To the contrary, in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251
13  (1946), the Supreme Court upheld a damages award that was based on the plaintiff's
14  reduced profits, even though the amount of damages could not be measured with
15  absolute mathematical precision, because "the jury may make a just and reasonable
16  estimate of the damages based on relevant data."  *Id.* 265.  In finding that the
17  damages award was supported by sufficient evidence despite the lack of
18  mathematical "exactness," the Court noted, in *dicta*, that "[a]ny other rule would
19  enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Id.*
20  *Bigelow*, therefore, stands only for the unremarkable proposition—already agreed to
21  in   the   parties   Stipulated   Instruction   No.   37   regarding   the
22  "Basis for Calculating Damages"—that the jury is "permitted to make just and
23  reasonable estimates in calculating plaintiff's damages," and is "not required to
24  calculate damages with mathematical certainty or precision." *See also* ABA Model
25  Antitrust Instructions at 307, Ch. 6 § B.3 (Instruction 3). Nothing in *Bigelow*,
26  however, states or even suggests that there is a separate rule requiring that any
27  uncertainty in the amount of those damages to be "resolved against defendants."

28

1    Plaintiff's Proposed Instruction No. 92 is thus a clear misstatement of the law that

2    invites reversible error.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# PLAINTIFF'S COMPETING PROPOSED FEDERAL COMPUTER FRAUD AND ABUSE ACT ("CFAA") CLAIMS INSTRUCTION

1
2
3

**PLAINTIFF'S PROPOSED INSTRUCTION NO. 100
FEDERAL COMPUTER FRAUD AND ABUSE ACT—DAMAGES**

4   If you find that Defendants violated Section 1030(a)(2)(c), you may award

5   Plaintiff damages under the CFAA.  These damages may include:

6   Costs of identifying the violation;

7   Costs of investigating the violation;

8   Costs of responding to the violation;

9   Costs of conducting a damage assessment;

10   Costs of restoring the data, program, system, or information to its condition

11   prior to the violation;

12   Lost revenues or costs incurred due to interruption of service; and

13   The value of any business Plaintiff lost as a result of the violation of the

14   CFAA.

15   It is Plaintiff's burden to prove its damages by a preponderance of the

16   evidence.

17

18   ***Plaintiff's Statement of Law In Support of Its Instruction*:**  Plaintiff's proposed

19   instruction tracks the Computer Fraud and Abuse Act's definitions of "loss" and

20   "damages," as well as the case law interpreting those definitions.  *See* 18 U.SC §

21   1030(g) ("Any person who suffers damage or loss by reason of a violation of this

22   section may maintain a civil action against the violator to obtain compensatory

23   damages…";) *id.* §  1030(e)(8) (defining "damage" as "any impairment to the

24   integrity or availability of data, a program, a system, or information"); *id.* §

25   1030(e)(11) (defining "loss" as "any reasonable cost to any victim, including the

26   cost of responding to an offense, conducting a damage assessment, and restoring

27   the data, program, system, or information to its condition prior to the offense, and

28

1   any revenue lost, cost incurred, or other consequential damages incurred because

2   of interruption of service.").[1]

3       In the Ninth Circuit, "damages for loss of business and business goodwill,"

4   as well as the costs of investigating and responding to CFAA violations, are

5   recoverable under the CFAA.  *See Creative Computing v. Getloaded.com LLC*, 386

6   F.3d 930, 935 n.19 (9th Cir. 2004) (describing defendant's argument to the

7   contrary as "without force because [loss of business and business goodwill] are

8   economic damages," and also noting that "consequential economic loss" includes

9   "lost profits and loss of good will or business reputation."); *U.S. v. Larsen,* 190

10  Fed. Appx. 552, 553 (9th Cir. 2006) ("the time that the victim's salaried employees

11  spend responding to the unauthorized intrusion" is recoverable under the CFAA);

12  *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 980–81 (N.D. Cal.

13  2008) (allowing recovery of costs incurred analyzing computer logs to determine

14  the IP addresses that accessed plaintiff's computers).  Plaintiff adequately

15  disclosed such damages for the reasons set forth in its Opposition to Defendants'

16  Motion *in Limine* to Exclude Evidence Relating to Certain Alleged Trade Secret

17  and CFAA Damages (ECF No. 347), which Plaintiff incorporates herein by

18  reference.[2]  In addition, the Supplemental Expert Report of David Yurkerwich—

19  prompted by Defendants' production of nearly 4,000 documents on September 11,

20  2017—calculates Plaintiff's lost profits in relation to Defendants' CFAA

21  violations, among other violations.

22  ***Defendants' Objections***:  Defendants object to Plaintiff's Proposed Instruction No.

23  100 because (i) Plaintiff did not disclose during discovery any damages that are

24  _____

    [1]   Plaintiff is unaware of any model instruction regarding CFAA damages.

25  [2]   *See also United States v. Pierre-Louis*, No. 00-434, 2002 WL 1268396, at *4
26  (S.D. Fla. Mar.22, 2002) (recognizing "[t]he fact that Congress has amended the
    CFAA to now include consequential damages (including 'lost profits')").  .
27  *Paradigm All., Inc. v. Celeritas Techs.*, LLC, 722 F. Supp. 2d 1250, 1269–70 (D.
    Kan. 2010) (cost of hiring expert to "investigate a possible hacking," "review[]
28  server logs, "identif[y] suspicious IP addresses," and "trace[] those IP addresses . .
    . to [defendant]" are recoverable under CFAA).

PLAINTIFF'S SUBMISSION OF DISPUTED JURY
INSTRUCTIONS
CASE NO. 2:15-CV-09814 DSF (AGRx)

1   within the scope of this instruction (as set forth more fully in Defs.' Mot. *In Limine*

2   to exclude evidence of certain alleged trade secret and CFAA damages, ECF No.

3   293), and (ii) the instruction includes damages that are not available to Plaintiff.

4   *First*, the only losses that Plaintiff has identified with respect to Defendants'

5   alleged breach of the CFAA are unjust enrichment damages.  *See* Decl. of D.

6   Yurkerwich in Supp. of Pl.'s Opp'n to Defs.' Mot. For Partial Summ. J., ECF No.

7   239-27, Ex. 1 ("Yurkerwich Opening Report") ¶ 7.  Plaintiff's proposed

8   instruction, however, does not state that it is entitled to recover damages for unjust

9   enrichment because unjust enrichment damages are <u>not</u> recoverable under the

10   CFAA.  *See, e.g.*, *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 478

11   (S.D.N.Y. 2004).  *Second*, Plaintiff's Proposed Instruction No. 99 is misleading,

12   because the list of damages following the phrase "damages may include"

13   improperly suggests that the jury can award any of the forms of damage listed

14   upon finding a violation of 18 U.S.C. § 1030(a)(2)(C).  This is not the law.

15   Damages under the CFAA are <u>not</u> available until Plaintiff makes a preliminary

16   showing of $5,000 of "loss" as defined in the CFAA.  "Loss" is limited to the "cost

17   of responding to the incursion, conducting a damage assessment, and restoring the

18   system or information to its condition prior to the incursion, and any revenue lost,

19   cost incurred, or consequential damages incurred because of interruption of

20   services," section 1030(e)(11).  As discussed above, Plaintiff has never disclosed

21   $5,000 of "loss" resulting from Defendants' alleged CFAA violations.  *See, e.g.*,

22   *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 949 (N.D. Cal. 2014)

23   (no CFAA claim where plaintiff failed to allege it suffered $5,000 of "loss").

24   During discovery, Plaintiff only disclosed a computation of unjust enrichment for

25   its CFAA claims.  Yurkerwich Opening Report ¶ 7.  Accordingly, Plaintiff's

26   proposed instruction regarding CFAA damages should be rejected.

27         Defendants further object to Plaintiff's Proposed Instruction No. 100

28   because it is confusing and potentially misleading to ask the jury to determine

1   damages separately for each Defendant.  Plaintiff itself has never sought distinct

2   damages from each Defendant.  And, it is misleading because it asks the jury to

3   find damages separately against each Defendant without ensuring that no double

4   counting occurs.  For these reasons, Plaintiff's Proposed Instruction No. 100

5   should be rejected.  Defendants request that their Proposed Instruction No. 100 be

6   given instead.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PLAINTIFF'S STAND-ALONE PROPOSED NON-ANTITRUST INSTRUCTIONS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A.    TRADE SECRET MISAPPROPRIATION INSTRUCTIONS

# PLAINTIFF'S PROPOSED INSTRUCTION NO. 101
## MISAPPROPRIATION OF TRADE SECRETS (CALIFORNIA)— INTRODUCTION

[Name of plaintiff] Plaintiff claims that [he/she/it] [is/was] the [owner/licensee] of [insert general description of alleged trade secret[s]]the following trade secrets, including compilations of data, which I refer to as Plaintiff's "Claimed Trade Secrets":

1.  Artist toolboxes;

2.  Online stores;

3.  Artist pipelines;

4.  Financial information;

5.  Customer data;

6.  Weekly head of department reports;

7.  Client lists;

8.  Board of directors presentations, business plans, internal strategies; and

9.  Contracts with third parties

[Name of plaintiff] Plaintiff claims that [this/these] [select short term to describe, e.g., information] [is/are] [a] each of these pieces of information are trade secret[s] and that [name of defendant]Defendants misappropriated [it/them]. "Misappropriation" means the improper [acquisition, /use,/ [or] disclosure] of the trade secret[s]. [Name of plaintiff]Plaintiff also claims that Defendants' [name of defendant]'s misappropriation caused [[him/her/it]it harm and/ [or] [name of defendant] Defendants to be unjustly enriched].

[Name of defendant] Defendants deny denies [insert denial of any of the above claims].

[[Name of defendant]Defendants also claims [insert affirmative defenses].

Trade secrets frequently contain elements that by themselves may be in the

1  public domain but together qualify as trade secrets.  A trade secret can exist in a

2  combination of characteristics and components, each of which by itself is in the

3  public domain, but the unique combination of which is a protectable trade secret.

4  It is the secrecy of the claimed trade secret as a whole that is determinative.  The

5  fact that some or all of the components of the trade secret are well-known does not

6  preclude protection for a secret combination, compilation, or integration of the

7  individual elements.

8

9  ***Plaintiff's Statement of Law In Support of Its Instruction:***  With the exception of

10  its final paragraph, Plaintiff's proposed instruction tracks CACI 4400, verbatim.

11  The proposed instruction's lone deviation from CACI 4400 (i.e., the final

12  paragraph in Plaintiff's proposed instruction) is justified because Defendants have

13  represented that they intend to (erroneously) argue at trial that one or more of

14  Plaintiff's claimed trade secrets is generally known and/or in the public domain.

15  Accordingly, it is important for the Court to instruct the jury that even if individual

16  features of a particular trade secret are in fact the public domain, the unique

17  combination thereof may still qualify as a protectable trade secret.  *See, e.g.*,

18  *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) ("The fact that some

19  or all of the components of the trade secret are well-known does not preclude

20  protection for a secret combination, compilation, or integration of the individual

21  elements. . . .") (internal citations omitted).[3]  Defendants' objection that Plaintiff

22  never disclosed a compilation trade secret ignores the fact that of some of

23  Songkick's trade secrets are, inherently, compilations.  Songkick not only

24  _____

25  [3]  *See also id.* . ("A trade secret can exist in a combination of characteristics and
   components, each of which, by itself, is in the public domain, but the unified

26  process design and operation of which in unique combination affords a competitive
   advantage and is a protectable trade secret") (citing *Computer Care v. Serv. Sys.*

27  *Enters., Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992)); *Leatt Corp. v. Innovative
   *Safety Tech., LLC*, 2010 WL 1526382 at *6 (S.D. Cal. Apr. 15, 2010) ("In

28  determining whether the information is generally known, the focus is on the
   information or product as a whole, not its individual components.").

1   identified these trade secrets during discovery, but provided a Rule 30(b)(6)

2   witness to testify about them and sit for any questions Defendants posed.

3          Defendants argue that Plaintiff's inclusion of the form instruction's language

4   "Defendants' misappropriation caused [Plaintiff] ***harm***" (emphasis added) is

5   inappropriate because Plaintiff, in their view, failed to disclose any "harm"

6   resulting from Defendants' misappropriation.  For the reasons set forth in its

7   Opposition to Defendants' Motion *in Limine* to Exclude Evidence Relating to

8   Certain Alleged Trade Secret and CFAA Damages (ECF No. 347), which Plaintiff

9   incorporates herein by reference, Plaintiff adequately disclosed such harm.  In

10  addition, the Supplemental Expert Report of David Yurkerwich—prompted by

11  Defendants' production of nearly 4,000 documents on September 11, 2017—

12  calculates Plaintiff's specific lost profits in relation to Defendants'

13  misappropriation of Plaintiff's trade secrets, among other misconduct.  The

14  September 11, 2017 production provided the first direct evidence from fact

15  discovery allowing Songkick to draw these conclusions.

16  ***Defendants' Objections:***  Defendants incorporate by reference their objections to

17  Plaintiff's Proposed Instruction No. 100.  Specifically, Defendants object to

18  Plaintiff's Proposed Instruction No. 101 on grounds that Plaintiff has not disclosed

19  that it has suffered any damages that could constitute "harm" as a result of

20  Defendants' alleged trade secret misappropriation.  As discussed in Defs.' Mot. *In*

21  *Limine* to exclude evidence of certain alleged trade secret and CFAA damages,

22  ECF No. 293, the only damages that Mr. Yurkerwich (and therefore Plaintiff)

23  identified with respect to Defendants' alleged trade secret misappropriation are

24  damages for unjust enrichment.  Because Plaintiff did not offer during discovery a

25  computation of damages for any loss or harm allegedly caused by Defendants'

26  alleged trade secret misappropriation *other* than Defendants' unjust enrichment,

27  Plaintiff is not entitled to seek damages for any such harm or loss.  Accordingly,

28  Plaintiff's Proposed Instruction No. 101 is misleading and improper to the extent

1   that it suggests that Plaintiff is entitled to, and that the jury can award, such

2   damages.

3          Defendants further object to Plaintiff's Proposed Instruction No. 100 on

4   grounds that Plaintiff failed to disclose "compilation data" or any compilation trade

5   secret during discovery and so is barred from recovering for such a trade secret.

6   When bringing a CUTSA claim, a "plaintiff bears the burden in the first instance of

7   identifying the trade secrets and showing that they exist." *Mad Dogg Athletics,*

8   *Inc. v. Hart Wood, Inc.*, 2010 WL 11506882 at *9 (C.D.Cal. Oct. 4, 2010) (citing

9   *Imax Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998).  In this

10  action, Plaintiff was ordered by Magistrate Judge Rosenberg to provide a 30(b)(6)

11  witness to testify as to "the identity of each trade secret(s) with reasonable

12  particularity, ***including compilations***."  *See* ECF No. 173 at 5 (emphasis added).

13  Not once during the March 8, 2017 deposition of Plaintiff's 30(b)(6) witness, Mr.

14  Block, did he identify "compilation data" or a compilation of any sort as one of

15  Plaintiff's alleged trade secrets.  Plaintiff even produced at Mr. Block's deposition

16  a list of nine alleged trade secrets.  *See* Declaration of Andrew M. Gass in Support

17  of Defs. and Counterclaimant's Mots. *in Limine* and Mem. of Contentions of Fact

18  and Law, ECF No. 303, Ex. 10.  The word "compilation" does not exist on that

19  document.  *Id*.  Nor did Plaintiff disclose a compilation trade secret in its initial

20  Proposed Jury Instructions, which the parties exchanged on August 23, 2017, and

21  met and conferred about on September 17, 2017.  Plaintiff's belated "disclosure"

22  of a compilation trade secret, just weeks before trial, is impermissible, as is

23  Plaintiff's inclusion of the paragraph beginning with "[t]rade secrets frequently

24  contain," which deviates from CACI and is irrelevant where, as here, a plaintiff has

25  not disclosed a compilation trade secret.

26

27

28

1

2   **PLAINTIFF'S PROPOSED INSTRUCTION NO. 102**
**MISAPPROPRIATION OF TRADE SECRETS (CALIFORNIA)—**
3   **ESSENTIAL FACTUAL ELEMENTS**

4   [Name of plaintiff] Plaintiff claims that [name of defendant] Defendants

5   have has misappropriated a Plaintiff's trade secrets.  To succeed on this claim,

6   Plaintiff [name of plaintiff] must prove all of the following for one or more of the

7   Claimed Trade Secrets:

8   That [name of plaintiff] Plaintiff [owned/was a licensee of] owned [the

9   following:][describe each item claimed to be a trade secret that is subject to the

10   misappropriation claim]:

11   1.   Artist toolboxes;

12   2.   Online stores;

13   3.   Artist pipelines;

14   4.   Financial information;

15   5.   Customer data;

16   6.   Weekly head of department reports;

17   7.   Client lists;

18   8.   Board of directors presentations, business plans, internal strategies;

19   and

20   9. Contracts with third parties

21   That [this/these]one or more Claimed Trade Secret [select short term to

22   describe, e.g., information] [was a /were ] [a] trade secret[s] at the time of the

23   misappropriation;

24   That [name of defendant] Defendants improperly [acquired, /used,/ or

25   disclosed] the one or more Claimed Trade Secrettrade secret[s];

26   That [[name of plaintiff] Plaintiff was harmed / [or] [name of defendant]

27   Defendants werewas unjustly enriched]; and

28

That ~~[name of defendant]'s~~ <u>Defendants'</u> ~~[acquisition, /use, / [or] disclosure]~~ was a substantial factor in causing ~~[[name of plaintiff]~~Plaintiff's harm ~~/ [or] [name of defendant]~~ <u>Defendants</u> to be unjustly enriched.

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction tracks CACI 4401, verbatim.  To the extent Defendants object to Plaintiff's inclusion of the form instruction's language that "Plaintiff was harmed," Plaintiff respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Misappropriation of Trade Secrets (California)—Introduction," *supra* at 101, which Plaintiff incorporates herein by reference.

***Defendants' Objections:***  Defendants incorporate by reference their objections to Plaintiff's Proposed Instruction Nos. 100 and 101.  Specifically, Defendants object to Plaintiff's Proposed Instruction No. 102 on grounds that (i) Plaintiff has not disclosed that it has suffered any damages that could constitute "harm" as a result of Defendants' alleged trade secret misappropriation; and (ii) Plaintiff has not disclosed "compilation data" or a compilation trade secret.

Defendants also raise for the Court's consideration that Plaintiff's Proposed Instruction Nos. 101 and 102 added additional trade secrets that were not included in its initial Proposed Jury Instructions as exchanged on August 23, 2017.  Plaintiff's initial Proposed Jury Instruction Nos. 101 and 102 listed the following as Plaintiff's alleged trade secrets: (1) "client-facing artist toolboxes"; (2) "test sites"; and (3) "Plaintiff's internal strategy documents and non-public financial information, such as Plaintiff's client lists and related data, 'Weekly Head of Department reports,' and actual and forecasted revenues and profits."  Plaintiff's revised Proposed Instruction Nos. 101 and 102 expand that list to include "artist pipelines," "customer data," "board of director presentations," "business plans," and "contracts with third parties."  Plaintiff is not entitled to disclose an ever-changing list of alleged trade

1 | secrets.  The Court should reject this belated attempt to add alleged trade secrets to
2 | its jury instructions.

# PLAINTIFF'S PROPOSED INSTRUCTION NO. 103
## DUTY TO EMPLOYER

Under California law, an employee has a duty not to use or disclose trade secrets that the employee acquired during the course of his or her employment. This duty survives the termination of the employment relationship.

Authority:

*Blackbird Techs., Inc. v. Joshi*, No. 5:15-CV-04272-EJD, 2015 WL 5818067, at *4 (N.D. Cal. Oct. 6, 2015), *appeal dismissed* (Nov. 23, 2015).

***Plaintiff's Statement of Law In Support of Its Instruction:*** Plaintiff's proposed instruction is based on California law obligating former employees to maintain the confidentiality of their former employer's trade secrets, even after the employment relationship ends. *See, e.g.*, *Bank of Am. v. Immel*, 2010 WL 2380877, at * 2-3, (N.D. Cal. June 11, 201); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1526 (1997). The language used in the draft instruction is drawn directly from the cited authority. In addition to the general obligation placed on former employees under California law, the former Songkick employee at issue for its trade secret claims, Stephen Mead, was contractually obligated to maintain the confidentiality of Songkick's trade secrets after leaving the company. *See* Exhibit 22 at SK00616593. Mr. Mead's breach of this legal duty and his contractual obligations are important, because they underscore the improper means through which Defendants misappropriated Songkick's trade secrets.

***Defendants' Objections:*** Defendants object to Songkick's Proposed Instruction No. 103 on grounds that it is irrelevant, misplaced, and will confuse the jury. Mr. Mead's "duty" to his employers is irrelevant to whether he misappropriated Songkick's trade secrets and the case on which Songkick relies is thus inapposite. *See, e.g.*, *Blackbird Techs., Inc. v. Joshi*, No. 5:15-CV-04272-EJD, 2015 WL 5818067, at *4 (N.D. Cal.

Oct. 6, 2015), *appeal dismissed* (Nov. 23, 2015) (defendant-former employee owed duty to former employer).

1

2

**PLAINTIFF'S PROPOSED INSTRUCTION NO. 104
MISAPPROPRIATION OF TRADE SECRETS (CALIFORNIA)—
MISAPPROPRIATION BY ACQUISITION**

3

4

5

6

7

[Name of defendant]Defendants appropriated [name of plaintiff]Plaintiff's trade secret[s] by acquisition if [name of defendant] Defendants acquired the trade secret[s] and knew or had reason to know that [he/she/it/[name of third party]] they and/or Stephen Mead used improper means to acquire [it/them].

8

9

10

Improper means of acquiring a trade secret or knowledge of a trade secret include, but are not limited to, theft, bribery, misrepresentation, or breach or inducing a breach of a duty to maintain secrecy., wiretapping, electronic eavesdropping, [or] [insert other means of espionage].

11

12

However, it is not improper to acquire a trade secret or knowledge of the trade secret by:

13

14

Independent efforts to invent or discover the information; or

15

Reverse engineering; that is, examining or testing a product to determine how it works, by a person who has a right to possess the product; or

16

17

Obtaining the information as a result of a license agreement with the owner of the information

18

19

Observing the information in public use or on public display; or

20

Obtaining the information from published literature, such as trade journals, reference books, the Internet, or other publicly available sources.

21

22

23

Plaintiff may prove that Defendants misappropriated one or more Claimed Trade Secrets through circumstantial or direct evidence.

24

25

26

27

***Plaintiff's Statement of Law In Support of Its Instruction:***  With the exception of the addition of its final sentence, Plaintiff's proposed instruction tracks CACI 4405, verbatim.  This single deviation from the model instruction is justified because Plaintiff's direct evidence of Defendants' misappropriation is less voluminous than

28

1  Plaintiff's circumstantial evidence of the same. It is therefore important for the

2  Court to instruct the jury that the law does not distinguish between direct and

3  circumstantial evidence, and that Defendants' misappropriation may be proven

4  through the latter. *See, e.g.*, *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,

5  873 F. Supp. 2d 1192, 1215–16 (N.D. Cal. 2012) ("Plaintiffs alleging trade secret

6  misappropriation may prove such misappropriation by circumstantial as well as

7  direct evidence."); *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F.

8  Supp. 2d 938, 944 (N.D. Cal. 2007) (same). Defendants did produce some direct

9  evidence of their misappropriation of Songkick's trade secrets in their September

10  11, 2017 production; however, the late nature of that production prevented Songkick

11  from following up for additional direct discovery—including deposition

12  testimony—and is currently subject to its pending motion for sanction (Dkt. 313).

13  ***Defendants' Objections:*** Defendants object to Plaintiff's Proposed Instruction

14  No. 104 because the sentence "Plaintiff may prove that Defendants misappropriated

15  one or more Claimed Trade Secrets through circumstantial or direct evidence"

16  deviates from CACI 4405 without justification (and without citing any authority in

17  support of that deviation). Additionally, this deviation creates a proposed instruction

18  that is duplicative of Plaintiff's Proposed Instruction No. 6, and therefore is

19  redundant, unnecessary, and contrary to the Court's order on jury instructions. *See*

20  Order re: Jury Trial at 7, ECF No. 66.

21

22

23

24

25

26

27

28

**PLAINTIFF'S PROPOSED INSTRUCTION NO. 105
MISAPPROPRIATION OF TRADE SECRETS (CALIFORNIA)—
MISAPPROPRIATION BY DISCLOSURE**

[Name of defendant] Defendants misappropriated [name of plaintiff]Plaintiff's trade secret[s] by disclosure if [name of defendant] Defendants:

Disclosed any of [it/them] without [name of plaintiff]Plaintiff's consent; and

[Did any of the following:]

[insert one or more of the following:]

[Acquired knowledge of the trade secret[(s)] by improper means][./; or]2.

[At the time of disclosure, knew or had reason to know that [his/ her/its]their knowledge of [name of plaintiff]Plaintiff's trade secret[s]Claimed Trade Secret(s) came from or through [name of third party]Stephen Mead ("Mr. Mead"), and that [name of third party] Mr. Mead had previously acquired the trade secret([s]) by improper means][./; or]

At the time of disclosure, knew or had reason to know that [his/ her/its]their knowledge of [name of plaintiff]Plaintiff's Claimed Trade Secret(s) trade secret[s] was acquired [insert circumstances giving rise to duty to maintain secrecy]through Stephen Mead's employment at CrowdSurge, which created a duty to keep the [select short term to describe, e.g., information] Claimed Trade Secret(s) secret]; or]

At the time of disclosure, knew or had reason to know that [his/ her/its]their knowledge of [name of plaintiff]Plaintiff's Claimed Trade Secret(s) trade secret[s] came from or through [name of third party]Mr. Mead, and that Mr. Mead [name of third party] had a duty to [name of plaintiffPlaintiff] to keep the [e.g., information] Claimed Trade Secret(s) secret;] or

[Before a material change of [his/her/its]their position, knew or had reason to know that the Claimed Trade Secret(s)[it was/they] were] [a] trade secret[s] and that knowledge of [it/them] had been acquired by accident or mistake.]

<u>Plaintiff may prove that Defendants misappropriated one or more Claimed Trade Secrets through circumstantial or direct evidence.</u>

***Plaintiff's Statement of Law In Support of Its Instruction:***  With the exception of the addition of its final sentence, Plaintiff's proposed instruction tracks CACI 4406, verbatim.  This single deviation from the model instruction is justified for the reasons set forth in the Supporting Points and Authorities in Plaintiff's instruction titled, "Misappropriation of Trade Secrets (California)—Misappropriation by Acquisition," *supra* at 104, which Plaintiff incorporates herein by reference.

***Defendants' Objections:***  Defendants object to Plaintiff's Proposed Instruction No. 105 because the sentence "Plaintiff may prove that Defendants misappropriated one or more Claimed Trade Secrets through circumstantial or direct evidence" deviates from CACI 4406 without justification, and without citing any authority in support of that deviation.  Additionally, this deviation creates a proposed instruction that is duplicative of Plaintiff's Proposed Instruction No. 6, and therefore is redundant, unnecessary, and contrary to the Court's order on jury instructions.  *See* Order re: Jury Trial at 7, ECF No. 66.

1

2

**PLAINTIFF'S PROPOSED INSTRUCTION NO. 106
MISAPPROPRIATION OF TRADE SECRETS (CALIFORNIA)—
MISAPPROPRIATION BY USE**

3

4

[Name of defendant] Defendants misappropriated [name of plaintiff]Plaintiff's trade secret([s]) by use if [name of defendant] Defendants:

5

6

Used [it/them] without [name of plaintiff]Plaintiff's consent; and

[Did any of the following:].

7

[insert one or more of the following:]

8

9

[Acquired knowledge of the trade secret[s] by improper means]; or]

At the time of use, knew or had reason to know that [his/her/its]their

10

knowledge of [name of plaintiff]Plaintiff's trade secret([s]) came from or through

11

[name of third partyMr. Mead], and that [name of third partyMr. Mead] had

12

previously acquired the trade secret([s]) by improper means]; or]

13

14

[At the time of use, knew or had reason to know that [his/her/its]their

knowledge of Plaintiff's[name of plaintiff]'s trade secret[s] was acquired under

15

circumstances creating a legal obligation to limit use of the [select short term to

16

describe, e.g., information]Claimed Trade Secret(s)]; or]

17

18

[At the time of use, knew or had reason to know that [his/her/its] their

knowledge of [name of plaintiff]Plaintiff's trade secret([s]) came from or through

19

Mr. [name of third party]Mead, and that [name of third party] Mr. Mead had a

20

duty to [name of plaintiff] Plaintiff to limit use of the [e.g., information]Claimed

21

Trade Secret(s)]; or]

22

23

[Before a material change of [his/her/its] their position, knew or had reason

to know that the Claimed Trade Secret(s) [it was/they were] [a] trade secret[s] and

24

that knowledge of [it/them ]had been acquired by accident or mistake.]

25

26

If you find that any Claimed Trade Secret was disclosed to Defendants, and

that Defendants then produced one or more similar products or services, the

27

28

1  burden shifts to Defendants to prove that they did not use the Claimed Trade

2  Secret.

3        Plaintiff may prove that Defendants misappropriated one or more Claimed

4  Trade Secrets through circumstantial or direct evidence.

5

6  ***Plaintiff's Statement of Law In Support of Its Instruction:***  With the exception of

7  the addition of its final two sentences, Plaintiff's proposed instruction tracks CACI

8  4407, verbatim.  The second of the two added sentences (regarding circumstantial

9  evidence) is justified for the reasons set forth in the Supporting Points and

10  Authorities in Plaintiff's proposed instruction titled, "Misappropriation of Trade

11  Secrets (California)—Misappropriation by Acquisition," *supra* at 104, which

12  Plaintiff incorporates herein by reference.

13        Plaintiff's inclusion of the second sentence—"If you find that any Claimed

14  Trade Secret was disclosed to Defendants, and that Defendants then produced one

15  or more similar products or services, the burden shifts to Defendants to prove that

16  they did not use the Claimed Trade Secret"—is also justified because it is

17  consistent with decades of precedent in both California and other states that

18  adopted the Uniform Trade Secret Act ("UTSA").  *See, e.g.*, *Garter-Bare Co. v.

19  Munsingwear Inc.*, 723 F.2d 707, 715 (9th Cir. 1984) (after finding evidence of

20  misappropriation and similarity of products, "the burden shifted to [defendant] to

21  show that…at the time, it could have arrived at the process by independent

22  invention, inspection, or reverse engineering."); *Integral Sys., Inc. v. Peoplesoft,

23  Inc.*, No. C-90-2598-DLJ, 1991 WL 498874, at *13 (N.D. Cal. July 19, 1991)

24  (once plaintiff establishes that Defendants product bears a "substantial identity"

25  with plaintiff's trade secrets, "the burden shifts to the defendants to prove that they

26  independently developed those trade secrets") (internal citations omitted);

27  *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) (applying Tennessee

28  Uniform Trade Secret Act and collecting cases from the Second, Fourth, Seventh,

Eighth, Ninth, and Federal Circuits that together "support the proposition that, once evidence of access and similarity is proffered, it is entirely reasonable for [the jury] to infer that [defendant] used [plaintiff's] trade secret.") (internal citations omitted).[4]

Against the weight of this authority, Defendants rely on a single case decided by the California Court of Appeal, *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1668-74 (2003), in arguing that Plaintiff's proposed instruction is improper. *Sargent Fletcher* holds that a trade secret owner must effectively disprove (without evidence from the defendant) that the defendant independently created the trade secret. That decision is at odds with the above-cited decades of precedent—both in California and other UTSA jurisdictions—and its reasoning has since been called into question by a leading trade secret treatise. *See Milgrim on Trade Secrets* § 15.01 ("***the appellate court's decision [in Sargent Fletcher] to not place the burden of proof of independent development on the disclosee which then makes a very similar product, seems to be a major deviation from established law and an inherent contradiction with the commercial ethics underpinning of trade secret law***") (emphasis added). Moreover, this Court is not obligated to follow the Court of Appeal's decision in *Sargent Fletcher*, given that the California Supreme Court has not yet weighed in on the issue and *Sargent Fletcher* so clearly violates fundamental precepts of trade secret law, by effectively

---

[4]   *See also Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir. 1976) ("As a number of cases have pointed out, disclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention."); *Amvac Chem. Corp. v. Termilind, Ltd.*, No. CIV. 96-1580-HA, 1999 WL 1279664, at *8 (D. Or. Aug. 3, 1999) (applying Oregon's Trade Secret Act and holding that "evidence that defendants acquired the information in violation of the secrecy agreements, together with the substantial similarity of the process descriptions, leads to an inference of misappropriation"); *Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 230 (S.D. Cal. 1986) (after plaintiff provided evidence of defendants' misappropriation, and that defendant's "processes bear a substantial identity" with plaintiff's trade secrets, "the burden shifts to the defendants to prove that they independently developed those trade secrets.").

1  requiring a plaintiff to disprove a defendant's affirmative defense (independent

2  creation) without the defendant providing evidence in support of that defense.  *See*

3  *Golden v. California Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1089 (9th

4  Cir. 2015) ("When the highest court of a state has not yet decided an issue of state

5  law, a federal court must "apply what [it] find[s] to be the state law after giving

6  proper regard to relevant rulings of other courts of the State.") (citing *C.I.R. v.*

7  *Bosch's Estate,* 387 U.S. 456, 465 (1967)).

8  ***Defendants' Objections:*** Defendants object to Plaintiff's Proposed Instruction

9  No. 106 because the sentence "[i]f you find that any Claimed Trade Secret was

10  disclosed to Defendants, and that Defendants then produced one or more similar

11  products or services, the burden shifts to Defendants to prove that they did not use

12  the Claimed Trade Secret" attempts to alleviate Plaintiff's burden of proof as to

13  "use," misstates the law, and deviates from CACI 4407 without justification.

14  Under California Civil Code section 3426, Plaintiff bears the burden of proof to

15  show that the defendant "used" its trade secrets, both at the outset and during trial.

16  *See Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1668-74 (2003)

17  (affirming decision to refuse proposed instruction shifting burden of proof to

18  defendant to show independent development upon showing of substantial

19  similarity between plaintiff's and defendant's products, on grounds CUTSA rejects

20  burden shifting framework).  As the Northern District of California held: "It is the

21  plaintiff's burden to show improper use as part of its prima facie case.  Proof that

22  defendant's use resulted from independent derivation or reverse engineering is

23  evidence that there was no improper use on its part."  *Brocade Commc'ns Sys., Inc.*

24  *v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1215 (N.D. Cal. 2012).

25

26

27

28

**PLAINTIFF'S PROPOSED INSTRUCTION NO. 107
MISAPPROPRIATION OF TRADE SECRETS (CALIFORNIA)—
DAMAGES**

If ~~[name of plaintiff]~~ [Plaintiff] proves that ~~[name of defendant]~~ [Defendants] misappropriated ~~[his/her/its]~~ one or more of its ~~trade secret[s]~~ [Claimed Trade Secrets], then ~~[name of plaintiff]~~ [Plaintiff] is entitled to recover damages if the misappropriation caused ~~[name of plaintiff]~~ [Plaintiff] to suffer an actual loss~~/ [or] [name of defendant]~~ [Defendants] to be unjustly enriched.

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction tracks CACI 4409, verbatim.  To the extent Defendants object to Plaintiff's inclusion of the form instruction's language regarding Plaintiff's "actual loss," Plaintiff respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Misappropriation of Trade Secrets (California)—Introduction," *supra* at 101, which Plaintiff incorporates herein by reference.

***Defendants' Objections:***  Defendants incorporate by reference their objections to Plaintiff's Proposed Instructions No. 100.  Specifically, Defendants object to Plaintiff's Proposed Instruction No. 107 on grounds that Plaintiff has not disclosed or identified any damages that could constitute "actual loss" as a result of Ticketmaster's alleged trade secret misappropriation.

# PLAINTIFF'S PROPOSED INSTRUCTION NO. 108
## MISAPPROPRIATION OF TRADE SECRETS (CALIFORNIA)—LOST PROFITS

~~[Insert number, e.g., "13."] Lost profits~~

To recover damages for lost profits ~~[name of plaintiff]~~ Plaintiff must prove it is reasonably certain ~~[he/she/it]~~ would have earned <u>additional</u> profits but for ~~[name of defendant]'s~~ Defendants' conduct. To decide the amount of damages for lost profits you must determine the gross amount ~~[name of plaintiff]~~ Plaintiff would have received but for <u>Defendants'</u> ~~[name of defendant]'s~~ conduct and then subtract from that amount the expenses ~~[including the value of the [specify categories of evidence, such as labor/ materials/rents/~~ all expenses ~~interest of the capital employed]]~~ ~~[name of plaintiff]~~ Plaintiff would have had if ~~[name of defendant]'s~~ Defendants' conduct had not occurred.

The amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction tracks CACI 3903N, verbatim, with the exception of a single inclusion of the word "additional" before "profits."  To the extent Defendants object to Plaintiff's inclusion of the form instruction's language regarding Plaintiff's "lost profits," Plaintiff respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Misappropriation of Trade Secrets (California)—Introduction," *supra* at 101, which Plaintiff incorporates herein by reference.

***Defendants' Objections:***  Defendants incorporate by reference their objections to Plaintiff's Proposed Instructions No. 100.  Specifically, Defendants object to Plaintiff's Proposed Instruction No. 108 on grounds that Plaintiff has not disclosed

1   or identified any damages that could constitute "lost profits" as a result of

2   Ticketmaster's alleged trade secret misappropriation.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2     B.     INTENTIONAL INTERFERENCE INSTRUCTION

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S PROPOSED INSTRUCTION NO. 109
INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE
ECONOMIC RELATIONS - DAMAGES**

If you find that ~~plaintiff~~ Plaintiff is entitled to a verdict against ~~defendant~~ either Defendant based upon the claim of [inducing breach of contract] [or] [interference with contractual relations] [or] [interference with prospective economic advantage] [or ], you should then award ~~plaintiff~~ Plaintiff damages in an amount that will reasonably compensate plaintiff for all loss or harm, providing that you find it was [or will be] suffered by ~~plaintiff~~ Plaintiff and caused by ~~the defendant's~~ Defendants' conduct. The amount of your award should include:

1. The financial loss of the benefits of the [contract(s)] [or] [the prospective economic relationship]; [and]

[[2.] [Emotional distress] [or] [aActual harm to reputation] if it was reasonably to be expected to result from the interference[.][;]] [and] [32.] Consequential losses caused by the interference for lost business value.]

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction tracks BAJI 7.89, verbatim, with the exception of Plaintiff's inclusion of  the words "lost business value."  Defendants objected to the inclusion of this phrase on the grounds that it "suggests Plaintiff will have presented evidence of such loss to the jury at the time the instruction is given of this phrase at the end of the proposed instruction."  Defendants' objection ignores that Plaintiff's damages expert, David Yurkerwich, calculated Plaintiff's "lost business value," and will present evidence of that calculation to the jury.

***Defendants' Objections:*** Defendants object to Plaintiff's Proposed Instruction No. 109 because the words "for lost business value" in the final sentence are an unjustified deviation from BAJI 7.89, as this deviation suggests that Plaintiff will have presented evidence of such loss to the jury at the time the instruction is given.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

C.      PROMISSORY ESTOPPEL INSTRUCTIONS

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PLAINTIFF'S PROPOSED INSTRUCTION NO. 110
## RE:  PROMISSORY ESTOPPEL

Plaintiff claims that Defendants made and broke a promise to Plaintiff that Defendants would not object to Plaintiff running artist presales at venues that contracted with Ticketmaster if Plaintiff's artist-clients complied with Ticketmaster's "fan club policy."  Plaintiff therefore claims that Defendants are liable to it for damages it suffered in relying on that promise.  This is known as a claim for "promissory estoppel."  To establish this claim, Plaintiff must prove all of the following:

1. Defendants made a clear and unambiguous promise to Plaintiff that if its artist-clients complied with Ticketmaster's "fan club policy," the artist could conduct an artist presale using Plaintiff's services;

2. Plaintiff relied on Defendants' promise;

3. Plaintiff's reliance on Defendants' promise was both reasonable and foreseeable; and

4. Plaintiff was injured by its reliance.

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction is derived from *Laks v. Coast Federal Savings & Loan Association*, 60 Cal.App.3d 885, 890 (1976).  Although promissory estoppel is equitable in nature, it is (a) a wrongful act underlying Plaintiff's intentional interference with prospective economic advantage claim (and must therefore be considered by the jury), and (b) Plaintiff respectfully requests that the Court try Plaintiff's claim with an advisory verdict by the jury.  *See* Fed. R. Civ. P. 39(c) ("In all actions not triable of right by jury the court upon motion or of its own initiative may try any issue with an advisory jury."); *see also W. Oilfields Supply Co. v. Goodwin*, 461 F. App'x 624, 625–26 (9th Cir. 2011) ("The district court properly instructed the jury

1  on the four prima facie elements of promissory estoppel, based on California

2  law…").  In addition, the use directives for CACI 2202 state that where the

3  wrongful conduct element of a claim for intentional interference with prospective

4  economic advantage is tortious, "the judge should instruct" the jury "on the

5  elements of" the wrongful conduct tort in addition to instructing the jury regarding

6  the intentional interference with prospective economic advantage elements.

7  Directions for Use, CACI 2202; *see also Dent Mart Int'l, Inc. v. iDen Dental*

8  *Supply, Inc.*, 2015 WL 2439301, at *9 (Cal. Ct. App., May 20, 2015) (noting that

9  the use directives for CACI 2202 suggest the trial court should instruct on the

10 elements of the underlying tortious wrongful conduct).  Plaintiff also respectfully

11 requests that any overlapping issues common to Plaintiff's legal claims and

12 Plaintiff's claim for promissory estoppel be tried first to the jury.  *See Beacon*

13 *Theatres, Inc. v. Westover*, 359 U.S. 500, 508-511 (1959); *Shum v. Intel Corp.*, 499

14 F.3d 1272, 1276-1729 (Fed. Cir. 2007).

15 ***Defendants' Objections***: Defendants generally object to all of Plaintiff's proposed

16 instructions regarding its promissory estoppel claim (i.e., Plaintiff's Proposed

17 Instructions Nos. 110-113) because this claim is equitable in nature and thus

18 carries no right to a jury trial.  *See, e.g.*, *C & K Eng'g Contractors v. Amber Steel*

19 *Co.*, 23 Cal. 3d 1, 10 (1978) (no right to a jury trial for a promissory estoppel

20 claim); *A-C Co. v. Security Pacific Nat. Bank*, 173 Cal. App. 3d 462 (1985) (same).

21 No instructions regarding promissory estoppel should be given to the jury.

22 However, Defendants do not object to Plaintiff presenting evidence to the jury that

23 relates to its promissory estoppel claims, as long as such evidence also relates to

24 one of Plaintiff's jury-triable claims.  Defendants reserve all rights to make specific

25 objections to such evidence during trial.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PROPOSED] STIPULATED INSTRUCTION NO. 111
RE:  PROMISSORY ESTOPPEL - CLEAR AND UNAMBIGUOUS
PROMISE DEFINED

A clear and unambiguous promise is a promise that is definite enough such that it can be determined what the scope of the parties' duties are under the promise, and that the limits of the parties' performance are sufficiently defined to provide a rational basis for assessing damages for the breach of that promise.

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Promissory Estoppel," *supra* at 110, which Plaintiff incorporates herein by reference.

***Defendants' Objections:*** Defendants incorporate by reference their general objections to Plaintiff's Proposed Instruction No. 110.  Specifically, Defendants object to Plaintiff's Proposed Instruction No. 111 on grounds that promissory estoppel is an equitable claim which carries no right to a jury trial.

# PLAINTIFF'S PROPOSED INSTRUCTION NO. 112
## RE: PROMISSORY ESTOPPEL - REASONABLE RELIANCE DEFINED

In determining whether [~~name of plaintiff~~]Plaintiff's reliance on the [~~misrepresentation/concealment/false~~ promise] was reasonable, [~~he/she/~~it] must first prove that the matter was material. A matter is material if a reasonable person would find it important in determining his or her choice of action.

If you decide that the matter is material, you must then decide whether it was reasonable for [~~name of plaintiff~~]Plaintiff to rely on the [~~misrepresentation/concealment/false~~ promise]. In making this decision, take into consideration Plaintiff's employees' [~~name of plaintiff~~]'s intelligence, knowledge, education, and experience.

~~However, it is not reasonable for anyone to rely on a [misrepresentation/concealment/false promise] that is preposterous. It also is not reasonable for anyone to rely on a [misrepresentation/concealment/false promise] if facts that are within [his/her] observation show that it is obviously false.~~

***Plaintiff's Statement of Law In Support of Its Instruction:*** Plaintiff's proposed instruction tracks CACI 1908, verbatim. Plaintiff also respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Promissory Estoppel," *supra* at 110, which Plaintiff incorporates herein by reference.

***Defendants' Objections:*** Defendants incorporate by reference their general objections to Plaintiff's Proposed Instruction No. 110. Specifically, Defendants object to Plaintiff's Proposed Instruction No. 112 on grounds that promissory estoppel is an equitable claim which carries no right to a jury trial.

# PLAINTIFF'S PROPOSED INSTRUCTION NO. 113
# RE:  PROMISSORY ESTOPPEL - DAMAGES

To recover damages for lost profits, [*name of plaintiff*]Plaintiff must prove that it is reasonably certain [he/she/it]it would have earned profits but for [*name of defendant*]'sDefendants' breach of the contractbroken promises.

To decide the amount of damages for lost profits, you must determine the gross, or total, amount [*name of plaintiff*]Plaintiff would have received if the contract promise had been performedkept and then subtract from that amount the costs [including the value of the [labor/materials/rents/expenses/interest on loans invested in the business]] [*name of plaintiff*] would have had if the contract had been performed.

You do not have to calculate the amount of the lost profits with mathematical precision, but there must be a reasonable basis for computing the loss.

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction tracks CACI 352, verbatim, with the exception of Plaintiff's substitution of the words "breach of the contract" for "broken promises".  In addition, Plaintiff respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Promissory Estoppel," *supra* at 110, which Plaintiff incorporates herein by reference.

***Defendants' Objections:*** Defendants incorporate by reference their objections to Plaintiff's Proposed Instructions Nos. 100 and 110.  Specifically, Defendants object to Plaintiff's Proposed Instruction No. 113 on grounds that: (i) Plaintiff has not disclosed that it has suffered any damages that could constitute "lost profits" as a result of Defendants' alleged broken promises, and (iii) promissory estoppel is an equitable claim which carries no right to a jury trial.

D.     SECTION 17200 CLAIM INSTRUCTIONS

# PLAINTIFF'S PROPOSED INSTRUCTION NO. 114
## RE:  UNFAIR COMPETITION (Cal. Bus. & Prof. Code § 17200 et seq.)

Plaintiff claims that one or more of the Defendants violated California's Unfair Competition Law, which prohibits business practices that are unlawful or unfair. A practice may be considered "unfair" even if it is not "unlawful" and vice versa. Therefore, you should find that a Defendant violated the Unfair Competition Law if Plaintiff proves by a preponderance of the evidence that Defendants committed business practices that are unlawful <u>or</u> unfair.

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction is derived from Cal. Bus. & Prof. Code § 17200, *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999), William L. Stern, Bus. & Prof. C. § 17200 Practice, §§ 3:12-3:15 (2017).  Although a claim brought under Cal. Bus. & Prof. Code § 17200 is equitable in nature, it is (a) a wrongful act underlying Plaintiff's intentional interference with prospective economic advantage claim (and must therefore be considered by the jury), and (b) Plaintiff respectfully requests that the Court try Plaintiff's claim with an advisory verdict from the jury.  *See* Fed. R. Civ. P. 39(c) ("In all actions not triable of right by jury the court upon motion or of its own initiative may try any issue with an advisory jury.");  *see also Tanedo v. E. Baton Rouge Par. Sch. Bd.,* No. SACV1001172JAKMLGX, 2014 WL 12642003, at *1 (C.D. Cal. Apr. 1, 2014) ("The jury's verdict as to Cal. Bus. & Prof. Code §§ 17200, *et seq.* was an advisory verdict, subsequently adopted by the Court.").   Plaintiff respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Promissory Estoppel," *supra* at 110, which Plaintiff incorporates herein by reference.  Plaintiff also respectfully requests that any overlapping issues common to Plaintiff's legal claims and Plaintiff's § 17200 claim be tried first to the jury.

1  *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508-511 (1959); *Shum v.*

2  *Intel Corp.*, 499 F.3d 1272, 1276-1729 (Fed. Cir. 2007).

3  ***Defendants' Objections***: Defendants generally object to all of Plaintiff's proposed

4  instructions regarding its unfair competition under California Business and

5  Professions Code section 17200 claim (i.e., Plaintiff's Proposed Instruction Nos.

6  114-116), because this claim is equitable in nature and carries no right to a jury

7  trial.  *See, e.g.*, *Hodge v. Superior Court*, 145 Cal. App. 4th 278, 285 (2006)

8  (holding that "there is no right to a jury trial in a section 17200 lawsuit," and also

9  noting that "there is no right to a jury trial in an action for damages for breach of

10  contract where the sole basis for the action is the equitable theory of promissory

11  estoppel").  No instructions regarding unfair competition under California law

12  should be given to the jury.  However, Defendants do not object to Plaintiff

13  presenting evidence to the jury that relates to its Section 17200 claim, as long as

14  such evidence also relates to one of Plaintiff's jury-triable claims.  Defendants

15  reserve all rights to make specific objections to such evidence during trial.

16

17

18

19

20

21

22

23

24

25

26

27

28

# PLAINTIFF'S PROPOSED INSTRUCTION NO. 115
## RE: UNFAIR COMPETITION - UNLAWFUL PRACTICES (Cal. Bus. & Prof. Code § 17200 et seq.)

For the purposes of the Unfair Competition Law, an "unlawful business act or practice" may include any business practice that violates state or federal law. Therefore, you should find that Defendants have violated the Unfair Competition Law by engaging in unlawful business practices if you determine that they have done any one of the following pursuant to my previous instructions:

1) violated the Computer Fraud and Abuse Act;

2) intentionally interfered with Plaintiff's prospective economic advantage; or

3) intentionally interfered with Plaintiff's contractual relations;

4) violated Section 1 and/or 2 of the Sherman Act; or

5) misappropriated Plaintiff's trade secrets.

***Plaintiff's Statement of Law In Support of Its Instruction:*** Plaintiff's proposed instruction is derived from Cal. Bus. & Prof. Code § 17200, *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999), *Saunders v. Super. Ct.*, 27 Cal. App. 4th 832, 838-39 (1994), and William L. Stern, Bus. & Prof. C. §17200 Practice, § 3:56 (2017). Plaintiff respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Promissory Estoppel," *supra* at 110, which Plaintiff incorporates herein by reference. Plaintiff also respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.)," *supra* at 114, which Plaintiff incorporates herein by reference.

***Defendants' Objections:*** Defendants incorporate by reference their general objection to Plaintiff's Proposed Instruction No. 114. Specifically, Defendants

1  object to Plaintiff's Proposed Instruction No. 115 on grounds that Plaintiff's

2  Section 17200 claim is an equitable claim which carries no right to a jury trial.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S PROPOSED INSTRUCTION NO. 116
RE:  UNFAIR COMPETITION - UNLAWFUL PRACTICES (Cal. Bus. & Prof. Code § 17200 et seq.)**

For the purposes of the Unfair Competition Law, an "unfair business act or practice" means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction is derived from *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) and William L. Stern, Bus. & Prof. C. §17200 Practice, § 3:56 (2017).  Plaintiff respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Promissory Estoppel," *supra* at 110, which Plaintiff incorporates herein by reference.  Plaintiff also respectfully refers the Court to the Supporting Points and Authorities in Plaintiff's instruction titled "Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.)," *supra* at 114, which Plaintiff incorporates herein by reference.

***Defendants' Objections****:* Defendants incorporate by reference their general objection to Plaintiff's Proposed Instructions No. 114.  Specifically, Defendants object to Plaintiff's Proposed Instruction No. 116 on grounds that Plaintiff's Section 17200 claim is an equitable claim which carries no right to a jury trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# PROPOSED INSTRUCTIONS FOR DEFENDANTS' CLAIMS

## PLAINTIFF'S PROPOSED INSTRUCTION NO. 117
### Conversion—Essential Factual Elements

[*Name of plaintiff*]Ticketmaster claims that [*name of defendant*]Plaintiff wrongfully exercised control over [his/her/its] personal property. To establish this claim, [*name of plaintiff*]Ticketmaster must prove all of the following:

1.That [*name of plaintiff*]Ticketmaster [owned/possessed/had a right to possess] [a/an] [*insert item of personal property*];

2.That [*name of defendant*]Plaintiff intentionally and substantially interfered with [*name of plaintiff*]Ticketmaster's property by [*insert one or more of the following:*]

[taking possession of the [*insert item of personal property*];] [or]

[preventing [*name of plaintiff*] from having access to the [*insert item of personal property*];] [or]

[destroying the [*insert item of personal property*];] [or] [refusing to return the [*insert item of personal property*] after [*name of plaintiff*] demanded its return.]

3.That [*name of plaintiff*]Ticketmaster did not consent;

4.That [*name of plaintiff*]Ticketmaster was harmed; and

5.That [*name of defendant*]Plaintiff's conduct was a substantial factor in causing [*name of plaintiff*]Ticketmaster's harm.


Authority:
CACI 2100

***Plaintiff's Statement of Law In Support of Its Instruction:***  Plaintiff's proposed instruction tracks CACI 2100 verbatim other than the insertion of the words Ticketmaster or Plaintiff as appropriate in the blanks for name of plaintiff and name of defendant.  Plaintiff is not attempting to fill in the blanks in the model instruction for "*insert item of personal property*" because, as reflected in the

1   version of this instruction Defendants originally proposed to Songkick,

2   Defendants' statements to Songkick regarding what property they allege was

3   converted are internally conflicting and contrary to law.  Conversion generally

4   involves tangible personal property, and does not apply to a license to do business,

5   for example, or contract rights.  An intangible contract right cannot be the basis for

6   a conversion claim under California law.  *See* Witkin §§ 701, 702; *Olschewski v.*

7   *Hudson,* 87 Cal. App. 282, 286-889 (1927) ("conversion lies only for the wrongful

8   appropriation of goods, chattels or personal property which is specific enough to be

9   identified, and not to such indefinite, intangible and uncertain property rights as the

10  mere goodwill of a business, or trade secrets, . . . or a licensed market stall for

11  transacting trade"); *Boehm v. Spreckels*, 183 Cal. 239 (1920) (contract for the

12  exclusive control of a newspaper route created a mere agency, and conveyed no

13  interest in property).  Nor can a license for the use of real property (i.e., a ticket) be

14  the basis for a conversion claim.  *Stith v. Colella*, 2012 WL 1899178, *5 (Cal. App.

15  May 25, 2012) ("license for the use of realty … is not personal property subject to

16  a conversion").  The sole case Defendants have cited in discussions with Songkick,

17  *Fremont Indem. Co. v. Fremont General Corp.*, 148 Cal. App. 4th 97, 125 (2007),

18  does not assist Defendants because it only addresses misappropriation of a net

19  operating loss, which the court found under the specific circumstances of that case

20  to be "comparable to the misappropriation of tangible personal property or shares

21  of stock." *Id.*  Defendants have not alleged conversion of net operating loss, and

22  *Fremont* specifically notes it is not altering the traditional elements of the tort of

23  conversion.  *Id.*

24  **<u>Defendants' Objections:</u>**  Defendants object to Plaintiff's Proposed Instruction No.

25  117 on grounds that Plaintiff fails to describe the property that Defendants allege

26  was converted by Plaintiff.  Defendants request that that the "item of personal

27  property" required by the CACI instruction be described as the "right to distribute

28  tickets to events at the venues with which it contracted."  California "courts have

recognized that property is a broad concept that includes every intangible benefit and prerogative susceptible of possession or disposition." *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 211 (2014) (Mosk, J.) (*citing Fremont Indemnity Co. v. Fremont General Corp.*, 148 Cal. App 4th 97, 124-25 (2007)) (holding that intangible property can form the basis of a conversion claim).  Defendants' proffered description of their allegedly converted property as the "right to distribute tickets to events at the venues with which it contracted" is thus proper under California law and should be inserted into Plaintiff's Proposed Instruction No. 117.

## PLAINTIFF'S PROPOSED INSTRUCTION NO. 118
### Presumed Measure of Damages for Conversion (Civ. Code, § 3336)

If you decide that [*name of plaintiff*]Ticketmaster has proved [his/her/its] claim against [*name of defendant*]Plaintiff, you also must decide how much money will reasonably compensate [*name of plaintiff*]Ticketmaster for the harm. This compensation is called "damages."

[*Name of plaintiff*]Ticketmaster must prove the amount of [his/her/its] damages. However, [*name of plaintiff*]Ticketmaster does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by [*name of plaintiff*]Ticketmaster:

1. [The fair market value of the [*insert item of personal property*] at the time [*name of defendant*]Plaintiff wrongfully exercised control over it;].

[*or*]

[Special damages resulting from [*name of defendant*]'s conduct;] [and]

2. Reasonable compensation for the time and money spent by [*name of plaintiff*] in attempting to recover the [*insert item of personal property*]; [and]

3. [Emotional distress suffered by [*name of plaintiff*] as a result of [*name of defendant*]'s conduct.]

[In order to recover special damages, [*name of plaintiff*] must prove:

1. That [*describe special circumstances that require a measure of damages other than value*];

2. That it was reasonably foreseeable that special injury or harm would result from the conversion; and

3. That reasonable care on [*name of plaintiff*]'s part would not have prevented the loss.]

1   ["Fair market value" is the highest price that a willing buyer would have

2   paid to a willing seller, assuming:

3       1. That there is no pressure on either one to buy or sell; and

4       2. That the buyer and seller know all the uses and purposes for which the

5   [*insert item*] is reasonably capable of being used.]

6

7   Authority:
    CACI 2102
8

9   ***Plaintiff's Statement of Law In Support of Its Instruction:***  With the exception of

10  excluding the bracketed language regarding "special damages" (which Defendants

11  are not seeking in this case), Plaintiff's proposed instruction tracks CACI 2102,

12  verbatim.  Plaintiff is not attempting to fill in the blank in the model instruction for

13  "*insert item of personal property*" for the reasons set forth in the Supporting Points

14  and Authorities in Plaintiff's instruction titled, "Conversion (California)—Essential

15  Factual Elements," *supra* at 117, which Plaintiff incorporates herein by reference.

16  ***Defendants' Objections:***  Defendants incorporate by reference their objection to

17  Plaintiff's Proposed Instruction No. 117.  Specifically, Defendants object to

18  Plaintiff's Proposed Instruction No. 118 on grounds that Plaintiff fails to describe

19  the property that Defendants allege was converted by Plaintiff.  Defendants request

20  that that the "item of personal property" required by the CACI instruction be

21  described as the "right to distribute tickets to events at the venues with which it

22  contracted."  California "courts have recognized that property is a broad concept

23  that includes every intangible benefit and prerogative susceptible of possession or

24  disposition."  *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 211 (2014)

25  (Mosk, J.) (*citing Fremont Indemnity Co. v. Fremont General Corp.*, 148 Cal. App

26  4th 97, 124-25 (2007)) (holding that intangible property can form the basis of a

27  conversion claim).  Defendants' proffered description of their allegedly converted

28  property as the "right to distribute tickets to events at the venues with which it

contracted" is thus proper under California law and should be inserted into Plaintiff's Proposed Instruction No. 118.

Dated: October 12, 2017                    QUINN   EMANUEL   URQUHART   &

                                          SULLIVAN, LLP

                          By:  */s/ Fred Lorig*
                               _____

                               Fred A. Lorig

                               *Attorneys    for    Plaintiff    Complete Entertainment Resources LLC*