# EXHIBIT 5

**Complete Entertainment Resources LLC**

**d/b/a Songkick**

**v.**

**Live Nation Entertainment, Inc.;**

**Ticketmaster LLC**

**Case No. 15-cv-9814**

**Expert Rebuttal Report of Paul K. Meyer**

**TM Financial Forensics, LLC**

**April 24, 2017**

Paul K. Meyer

*Highly Confidential – Outside Counsel Only*

# TABLE OF CONTENTS

**Page**

I.     Assignment .......................................................................................................1

II.    Information Considered .................................................................................2

III.   Summary of Overall Opinions ......................................................................3

IV.   Summary of Opinions of David Yurkerwich ...............................................4

    A.    Mr. Yurkerwich's Calculation of Songkick's Lost Profits ...................4

    B.    Mr. Yurkerwich's Calculation of Ticketmaster's Alleged Unjust Enrichment.....................................................................................................12

    C.    Mr. Yurkerwich's Calculation of Songkick's Alleged Lost Business Value ........15

V.     Analysis of Mr. Yurkerwich's Lost Profits Opinions ........................................17

    A.    Mr. Yurkerwich Fails to Provide Any Legitimate Justification for Including 10% or 20% Presale Allocation Scenarios............................................................18

    B.    Mr. Yurkerwich Fails to Demonstrate that the 139 "At-Issue" Artists Would Have Used Songkick to Conduct Artist Presales "But For" Ticketmaster's Actions ...........................................................................................................19

    C.    As a Result of Numerous Methodological Flaws and Errors, Mr. Yurkerwich's Calculation of the Number of Songkick's Alleged Lost Presale Tickets for U.S. Events is Unreliable ..............................................47

    D.    Mr. Yurkerwich's Calculation of Alleged Future Lost Profits Is Improper and Speculative ............................................................................................54

    E.    Mr. Yurkerwich's Application of a "Global Adjustment" Is Overstated and Contrary to Documents and Information Produced by the Parties .......................56

    F.    Mr. Yurkerwich Significantly Overstates the Incremental Profit per Ticket that Songkick Would Have Achieved if it Had Sold the Alleged Lost Presale Tickets.............................................................................................................61

    G.    Mr. Yurkerwich's Lost Profits Analysis – Conclusion...........................................63

VI.   Analysis of Mr. Yurkerwich's Unjust Enrichment Opinions ...............................63

    A.    Mr. Yurkerwich Fails to Analyze and Identify Any Specific Alleged Economic Benefit that Ticketmaster May Have Received from Having Seen or Had Access to the Specific Songkick Documents and Information.................65

*Highly Confidential – Outside Counsel Only*

B.      Mr. Yurkerwich's "New Business Model Approach" Is Improper and Speculative .................................................................................70

C.      Mr. Yurkerwich's "New Artist-Clients Approach" Is Improper and Speculative .................................................................................72

D.      Mr. Yurkerwich's Adjustment for "Global Unjust Enrichment" is Speculative and Inappropriate ..................................................74

VII.    Analysis of Mr. Yurkerwich's Determination of Songkick's Alleged Lost Business Value ....................................................................74

A.      Mr. Yurkerwich's Assumption That Songkick's Current Business Value is Zero is Unsupported ..................................................75

B.      Mr. Yurkerwich's Analysis is Incomplete and Fails to Follow Applicable Valuation Standards ..................................................77

C.      Mr. Yurkerwich Provides No Support That Valuing a Company Based on a "GTV Multiple" Is an Accepted Methodology .........82

D.      Mr. Yurkerwich's Calculation of Songkick's "Lost Business Value" Suffers from the Flaws of His Lost Profits Analysis .........83

E.      Even Assuming that Mr. Yurkerwich's Methodology Was Correct, Mr. Yurkerwich Overstates Songkick's "Lost Business Value" by At Least $100 Million ..................................................................83

VIII.   Summary – Analysis of Mr. Yurkerwich's Opinions .........................84

ii

## INTRODUCTION

1.     On March 13, 2017, I issued an Expert Report in this matter quantifying the harm to Live Nation and Ticketmaster, and addressing other issues related to damages, arising from their claims against Songkick (the "Meyer Initial Report").[1]  In this expert rebuttal report (the "Rebuttal Report"), I am responding and providing rebuttal opinions to Songkick's damages claims against Live Nation and Ticketmaster, as set forth by Songkick's damages expert, Mr. David Yurkerwich.

2.     This Rebuttal Report should be read in conjunction with the Meyer Initial Report. Throughout this Rebuttal Report, I refer to the Meyer Initial Report, including defined terms set forth therein.

3.     This Rebuttal Report proceeds in eight parts.  Part I describes my assignment.  Part II describes information I considered in the course of preparing this Rebuttal Report.  Part III contains a summary of my overall opinions.  Part IV provides a summary of the opinions and calculations of Mr. Yurkerwich.  Part V provides my analysis of Mr. Yurkerwich's opinions related to Songkick's alleged lost profits.  Part VI provides my analysis of Mr. Yurkerwich's opinions related to Ticketmaster's alleged unjust enrichment.  Part VII contains my analysis of Mr. Yurkerwich's opinions related to Songkick's alleged lost business value.  Part VIII provides a summary of my analysis presented in Parts V through VII.

## I.     ASSIGNMENT

4.     Counsel for Live Nation and Ticketmaster retained TMF to address damages and other financial and economic issues related to allegations brought against Defendants Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster LLC ("Ticketmaster") by Songkick, and related to Ticketmaster's counterclaims against Songkick.[2]  In this Rebuttal Report, I address issues related to Songkick's damages claims against Live Nation and

---

[1]     Expert Report of Paul K. Meyer, March 13, 2017 (the "Meyer Initial Report").

[2]     *Complete Entertainment Resources d/b/a Songkick v. Live Nation Entertainment, Inc.; Ticketmaster LLC,* First Amended Complaint, February 16, 2017 ("First Amended Complaint"); *Ticketmaster LLC v. Complete Entertainment Resources d/b/a Songkick,* Defendants' First Amended Answer, Affirmative Defenses, and Counter Complaint, June 3, 2016 ("Amended Answer and Counter Complaint").

1

*Highly Confidential – Outside Counsel Only*

Ticketmaster for alleged monopolization, attempt to monopolize, restraint of trade, unfair competition, trade secret misappropriation, violation of the Computer Fraud and Abuse Act, and interference.[3]  Specifically, I am responding to the March 13, 2017 Expert Report of Songkick's damages expert, Mr. David Yurkerwich (the "Yurkerwich Report").[4]

5.  My curriculum vitae, as well as a listing of cases in which I have submitted an expert report or have testified as an expert witness at trial, arbitration, and/or deposition in the last 4 years, were included as **Attachments 1** and **2** to the Meyer Initial Report.  My hourly billing rate on this matter is $650.  I have no publications during the last ten years.  TMF's compensation is not dependent on the outcome of this matter.  TMF's work on this matter was performed by me or under my supervision.

## II.  **INFORMATION CONSIDERED**

6.  **Attachment 3** to the Meyer Initial Report contains a listing of various documents and information that I considered as of the filing of the Meyer Initial Report, and **Attachment 3.1** attached hereto contains a listing of additional documents and information that I considered in the preparation of this Rebuttal Report.  Selected pages of the documents and information listed on **Attachments 3** and **3.1** may be used as exhibits.  Additionally, I may prepare graphical or illustrative exhibits to use at trial and/or in other phases of the litigation, based on the documents and information relied upon, and my analysis of those documents and information.

7.  Since the filing of the Meyer Initial Report, TMF has interviewed the following Ticketmaster personnel:

- Jared Smith (President);
- David Marcus (Executive Vice President and Head of Music);
- Geoff Carns (Senior Vice President of Venues and Promoters);
- Zeeshan Zaidi (Senior Vice President and General Manager of Ticketmaster Artist Services); and
- Michael Schmitt (Senior Director of Tour Execution).

---

[3]   First Amended Complaint, ¶¶ 203-269 and 282-327.

[4]   Expert Report of David Yurkerwich, March 13, 2017 (the "Yurkerwich Report").

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 434**

8.      Since the filing of the Meyer Initial Report, TMF has interviewed the following artist managers or agents:

- Bernie Cahill and Matt Maher (ROAR LLC – for Zac Brown Band)
- Jordan Feldstein (Career Artist Management ("CAM") – for Maroon 5, Breaking Benjamin, Lana Del Rey, and A$AP Rocky);
- Adam Flick (Azoff Management – for: Journey; Fleetwood Mac; The Eagles; Van Halen; Bon Jovi; Steely Dan; The Dead & Company; Earth, Wind & Fire; The Doobie Brothers; Gwen Stefani; Don Henley; and Joe Walsh);
- Fernando Lebeis (Team Brazil – for Guns N' Roses);
- Guy Oseary (Maverick – for Madonna and U2);
- Christian Suarez (RocNation – for Jay-Z and Rihanna); and
- Johnny Wright and Brad Margolis (Wright Entertainment Group and Tennman Digital – for Justin Timberlake)

9.      The conclusions and analyses in this Rebuttal Report are based on currently available documents and information.  If additional information becomes available, I may supplement and amend my opinions.  Similarly, the Meyer Initial Report and this Rebuttal Report may be supplemented by testimony, and I may also be asked to address issues raised by Songkick's witnesses and/or expert reports.  In addition, I may file a subsequent report replying to Songkick experts' analysis of my opinions and/or related matters.

10.     TMF received and executed a copy of the protective order in this matter.  Some of the documents considered have been designated as "Highly Confidential – Attorneys' Eyes Only" or "Highly Confidential – Outside Counsel Only."  Accordingly, I understand that this Report and the Attachments hereto, in whole or in part, may be designated as "Highly Confidential – Attorneys' Eyes Only" or "Highly Confidential – Outside Counsel Only."

## III.  <u>SUMMARY OF OVERALL OPINIONS</u>

11.     Mr. Yurkerwich's damages opinions are unsupported, unreliable, overstated, and speculative.

12.     As it relates to Mr. Yurkerwich's opinions on Songkick's alleged lost profits, Mr. Yurkerwich fails to demonstrate that the 139 "at issue" artists would have used Songkick to conduct artist presales "but for" the alleged actions of the Defendants.  Mr. Yurkerwich's lost profit damages are directly contradicted by Songkick's financial data, documents, and the representations of managers and agents for artists included in his lost profits

3

*Highly Confidential – Outside Counsel Only*

calculation.  In addition, Mr. Yurkerwich's lost profits analysis contains methodological flaws and errors.  As a result, his opinions related to Songkick's alleged lost profits are unreliable and speculative.

13.     In his determination of Ticketmaster's unjust enrichment related to its alleged use of Songkick's purported confidential information, Mr. Yurkerwich fails to analyze and identify any specific alleged economic benefit that Ticketmaster may have received from having seen, or had access to, the specific Songkick documents and information. Furthermore, Mr. Yurkerwich's "New Business Model Approach" and "New Artist-Clients Approach" to calculating Ticketmaster's alleged unjust enrichment are improper, overstated, and speculative.

14.     Finally, Mr. Yurkerwich's opinions as to Songkick's alleged "Lost Business Value" are unsupported, unreliable, and speculative.  Mr. Yurkerwich's analysis of Songkick's alleged "Lost Business Value" is incomplete, and Mr. Yurkerwich fails to follow applicable valuation standards set forth by the AICPA.

## IV.     <u>SUMMARY OF OPINIONS OF DAVID YURKERWICH</u>

15.     Mr. Yurkerwich states that he was "asked by counsel for Songkick to estimate the damages caused by the Defendants' actions in this matter."[5]  Mr. Yurkerwich presents his damages calculations, "including their global impact," for Songkick's federal antitrust, state unfair competition, intentional interference with contractual relations, intentional interference with economic relations, trade secret misappropriation, and fraud and abuse claims.[6]

16.     Mr. Yurkerwich's damage calculations are overlapping and are not additive across all claims.

### A.     Mr. Yurkerwich's Calculation of Songkick's Lost Profits

17.     For Songkick's federal antitrust, state unfair competition, and intentional interference claims, Mr. Yurkerwich has calculated Songkick's damages on the basis of Songkick's alleged past and future lost profits.  Mr. Yurkerwich's lost profits analysis has three major

---

[5]     Yurkerwich Report, ¶ 4.

[6]     Yurkerwich Report, ¶¶ 5-7.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 436**

parts. Mr. Yurkerwich first purports to identify and categorize 139 "at-issue" artists that Mr. Yurkerwich has determined "Songkick would have done business with 'but-for' Ticketmaster's alleged actions in this matter."[7] Having identified the 139 "at-issue" artists and divided them into different interference categories, Mr. Yurkerwich then undertakes a series of steps whereby he purports to quantify the number of at-issue tickets encompassed by the allegedly lost presales for these artists. Finally, he calculates a purported incremental profit per ticket that Songkick would have allegedly earned on these same tickets. I explain each of these steps in greater detail below.

18. As explained in the following paragraphs, Mr. Yurkerwich has not separately calculated Songkick's lost profits for each of these 139 "at-issue" artists, but rather has calculated Songkick's lost profits for all of these artists, in the aggregate, through the application of various factors and overall average statistics related to Ticketmaster and Songkick ticket sales and profits.

### 1. Identification and Categorization of "At-Issue" Artists

19. Mr. Yurkerwich claims in his report that he "performed a detailed analysis of Songkick's artist, manager, and agency relationships during the time of interference," and "identified artists and business relationships that Songkick alleges it lost due to Ticketmaster's behavior."[8] In other words, the first step in Mr. Yurkerwich's analysis of lost profits is a causation determination that he makes based on his personal review and opinion of the factual record in this case.

20. Mr. Yurkerwich next comes to conclusions as to the nature of the alleged interference for each of the 139 "at-issue" artists, and groups them into the following six categories:

---

[7]    Yurkerwich Report, ¶ 80; *see also* ¶ 8.

[8]    Yurkerwich Report, ¶¶ 42-43.

*Highly Confidential – Outside Counsel Only*

**Table 1:  Mr. Yurkerwich's "At-Issue" Artists
By Alleged "Type of Interference"[9]**

| Mr. Yurkerwich's "Type of Interference" | Number of "At-Issue" Artists |
|---|---|
| LN/TM Pressure/Threats/Leverage | 30 |
| LN/TM Relationship Restrictions | 35 |
| Harmed Manager or Agency Relationship | 39 |
| Fan Club Policy (Allocation Cap) | 9 |
| Fan Club Policy (Alleged Non-Compliance) | 21 |
| Fan Club Policy (Bundling or Merchandise) | 5 |
| **Total** | **139** |

21.   I address issues related to Mr. Yurkerwich's identification and categorization of his 139 "at-issue" artists in **Section V.B** of this Rebuttal Report.

### 2.   *Songkick's Alleged Lost Presale Tickets for U.S. Events (2012-2016)*

22.   As an initial step in his calculation of the number of at-issue tickets, Mr. Yurkerwich "reviewed the available evidence relating to each of these at-issue artists and identified the beginning year of Ticketmaster's alleged interference."[10]  Mr. Yurkerwich then, for each artist, identified the number of tickets that Ticketmaster sold for that artist (whether through presales and/or ticket sales during the general on sale) for events occurring in, and subsequent to, what he identifies as the "beginning year of Ticketmaster's alleged interference."[11]  In purporting to identify the "beginning year of Ticketmaster's alleged interference," Mr. Yurkerwich once again offers a causation opinion based on his review of the factual record.   **Schedule 8** to this Rebuttal Report provides a list of Mr. Yurkerwich's 139 "at-issue" artists and the corresponding number of Ticketmaster U.S.

---

[9]   Yurkerwich Report, ¶ 81 & Exhibit 9.5.  Mr. Yurkerwich states in his report that his Exhibit 9.5 provides "a complete analysis of information for the artists with alleged interference." [Yurkerwich Report, ¶ 43].

[10]   Yurkerwich Report, ¶ 82.

[11]   Yurkerwich Report, ¶ 82 & Exhibit 9.1.

*Highly Confidential – Outside Counsel Only*

6

ticket sales included in Mr. Yurkerwich's analysis, sorted by alleged "type of interference" category.

23.    Having identified the number of at-issue tickets actually sold by Ticketmaster for the 139 "at-issue" artists, Mr. Yurkerwich then makes a number of adjustments, which are intended to convert that actual *Ticketmaster* ticket sales number into how many ticket sales *Songkick* allegedly would have made for the same artists "but-for" the alleged interference.

24.    To "account for [the] uncertainty" regarding whether any given artist would have actually done business with Songkick regardless of any alleged interference by Ticketmaster, Mr. Yurkerwich applies a set of what he calls "probability of success" factors.[12]  Stated simply, he takes the Ticketmaster ticket sales and multiplies them by an arbitrary percentage, which varies according to his "type of interference" category.  According to Mr. Yurkerwich, these "probability of success" factors "are intended to reflect the likelihood of Songkick completing a presale contract with the 'at-issue' artist but-for Ticketmaster's behavior."[13] This step results in a revised baseline for the total number of at-issue tickets, which Mr. Yurkerwich calls the "Adjusted At-Issue Ticketmaster Primary Tickets."[14]

25.    Since third party presales are always limited to some fraction of the total primary tickets available for any given event, Mr. Yurkerwich next purports to calculate the number of tickets that would have allegedly been available to Songkick for an artist presale but-for Defendants' alleged conduct.  First, Mr. Yurkerwich calculates an average Ticketmaster sell-through rate for a subset of the 139 "at-issue" artists, and then he applies that average to the total "Adjusted At-Issue Ticketmaster Primary Tickets" in order to estimate the aggregate total "sellable capacity" for all artists and events included in his analysis.[15] Second, Mr. Yurkerwich multiplies his estimated total sellable capacity by an assumed Songkick pre-sale ticket allocation.[16]  He performs his calculations under three different

---

[12]   Yurkerwich Report, ¶ 83; *see also* ¶ 84 & Exhibit 9.0.

[13]   Yurkerwich Report, ¶ 83.

[14]   Yurkerwich Report, ¶¶ 83-84 & Exhibit 9.0.

[15]   Yurkerwich Report, ¶ 87 & Exhibits 6.4, 7.4, 8.4 and 9.1.

[16]   Yurkerwich Report, ¶ 88 & Exhibits 6.4, 7.4 and 8.4.

*Highly Confidential – Outside Counsel Only*

allocation scenarios—8%, 10% and 20%.[17]  Third, Mr. Yurkerwich estimates the number of artist presale tickets that Songkick would have sold by applying Songkick's historical average sell-through rates of 47% to 63%.[18]

26.   Mr. Yurkerwich then makes a further adjustment (i.e. an increase) to the number of at-issue tickets to account for sales Songkick purportedly lost at non-Ticketmaster venues.  In other words, he assumes that, for all 139 "at-issue" artists, Ticketmaster's actions resulted in Songkick's loss of presale tickets for all United States tour dates, including events at _both_ Ticketmaster _and_ non-Ticketmaster venues.[19]  To estimate the total number of presale tickets that Songkick would have sold at both Ticketmaster and non-Ticketmaster venues, Mr. Yurkerwich assumes Ticketmaster has a 70% market share, and makes a mathematical adjustment upward to account for the other 30%.[20]

27.   Finally, "[t]o account for any situations in which Songkick was able to secure some business for the at-issue artists outside Ticketmaster venues," Mr. Yurkerwich deducts Songkick's actual ticket sales for the "at-issue" artists to arrive at an estimate of Songkick's lost tickets, which he reports by "type of interference" category in annual periods 2012 through 2016.[21]  Mr. Yurkerwich does not provide a calculation of Songkick's alleged lost tickets by each "at-issue" artist.

28.   I address issues and criticisms related to Mr. Yurkerwich's calculation of the alleged lost presale tickets for U.S. events between 2012 and 2016 in **Section V.C** of this Rebuttal Report.

---

[17]   Yurkerwich Report, ¶ 88 & Exhibits 6.4, 7.4 and 8.4.

[18]   Yurkerwich Report, ¶ 89 & Exhibits 6.4, 7.4, 8.4 and 12.1.  As summarized on Mr. Yurkerwich's Exhibit 12.1, for all years except 2016, Songkick's average sell-through rates for artist presale tickets (47% to 63%) are below the 58% average sell-through rate that Mr. Yurkerwich calculates for Ticketmaster across all sales (presale and/or general on-sale tickets).

[19]   Yurkerwich Report, ¶ 90.

[20]   Yurkerwich Report, ¶¶ 90-91 & Exhibits 6.4, 7.4 and 8.4.

[21]   Yurkerwich Report, ¶ 92 and Exhibits 6.4, 7.4 and 8.4

8

### 3. *Songkick's Alleged Future Lost Presale Tickets for U.S. Events (2017-2021)*

29.     In the next step of his analysis, Mr. Yurkerwich includes in his damages calculation an estimate of the amount of presale tickets Songkick will allegedly continue to lose during the period of 2017 through 2021 (i.e., the period of alleged future lost profits).   Mr. Yurkerwich determines the number of Songkick's alleged presales tickets during that period by assuming that Songkick would have achieved "10% presale growth" per year.[22] It is not clear if Mr. Yurkerwich is assuming that Songkick would have achieved this 10% growth in presale tickets specifically for the 139 "at-issue" artists, or if he assumes that some or all of that growth would come from Songkick's presale tickets for other artists.

30.     I address issues and criticisms related to Mr. Yurkerwich's calculation of Songkick's alleged future lost presale tickets in **Section V.D** of this Rebuttal Report.

### 4. *Mr. Yurkerwich's "Global Adjustment"*

31.     Mr. Yurkerwich makes a final adjustment to the at-issue ticket sales to account for global sales.  Specifically, Mr. Yurkerwich argues, "[t]he loss of an artist's United States or North American business often leads to the loss of the global tour."[23]   In his calculation of Songkick's "global" lost profits, Mr. Yurkerwich assumes that Ticketmaster's alleged conduct caused Songkick to lose artist presale business in the U.S., as well as outside the U.S. ("O.U.S."), for *all* 139 "at-issue" artists.  To determine the number of global at-issue ticket sales, Mr. Yurkerwich examines Pollstar data for 2013 through 2015 for a subset of the 139 "at-issue" artists, and concludes that "a 1.58x multiple was needed to convert United States tickets to a comparable global figure."[24]   Accordingly, to determine the amount of artist presale tickets that Songkick lost for the "at-issue" artists on a global basis, Mr. Yurkerwich multiplies the number of tickets that he determined Songkick would have sold in the U.S. by 1.58, and subtracts Songkick's global presales for those artists.[25]  Mr.

---

[22]   Yurkerwich Report, ¶ 95 & Exhibits 6.4, 7.4 and 8.4.

[23]   Yurkerwich Report, ¶ 93.

[24]   Yurkerwich Report, ¶ 93 & Exhibits 9.4.

[25]   Yurkerwich Report, ¶¶ 93-94 & Exhibits 6.3, 7.3 and 8.3.

*Highly Confidential – Outside Counsel Only*

Yurkerwich then applies the same 10% assumed annual growth for periods 2017 through 2021 as he applies in his determination of Songkick's lost tickets for U.S. events.[26]

32.    I address issues and criticisms related to Mr. Yurkerwich's "global adjustment" in **Section V.E** of this Rebuttal Report.

### 5.    *Mr. Yurkerwich's Calculation of Songkick's Incremental Profit per Ticket*

33.    Having derived the number of allegedly at-issue ticket sales, Mr. Yurkerwich then endeavors to convert that into lost profits (i.e., dollars).  Mr. Yurkerwich estimates Songkick's "profits associated with the lost presale tickets" by calculating "Songkick's available average fees per ticket and gross profit."[27]  To determine Songkick's "available average fees per ticket," Mr. Yurkerwich calculates the average "total fees" related to Songkick ticket sales for U.S. events, including: booking fees; earn backs; artist earn backs; and credit card fees.[28]  Mr. Yurkerwich calculates an average Songkick fee per ticket ranging from $4.83 to $9.14 from 2012 through October 2016.[29]

34.    To determine the incremental profit per ticket that Songkick would have received, Mr. Yurkerwich multiplies his average fee per ticket by Songkick's reported post-merger gross profit margin of 69%, which he believes "is a fair reflection of the incremental profit rate that would have been realized on the past lost presale tickets."[30]  For the future periods of 2017 through 2021, Mr. Yurkerwich applies a gross margin of 61.5%, "to consider additional costs to scale the business further."[31]

---

[26]  Yurkerwich Report, Exhibits 6.3, 7.3 and 8.3.

[27]  Yurkerwich Report, ¶ 96.

[28]  Yurkerwich Report, Exhibit 12.0.  I understand that booking fees are generally fees retained by Songkick as its revenue [Deposition of Josh Block, March 7, 2017, pp. 320:7-322:2].  Earn backs and artist earn backs are rebates paid the venue, promoter or artist [Schiffer Deposition Exhibit 411, pp. 8-9].  Credit card fees are the "fees that CrowdSurge would pay [a credit card company] to process a ticket purchase transaction." [Schiffer Deposition Exhibit 411, p. 9].

[29]  Yurkerwich Report, Exhibit 12.0.

[30]  Yurkerwich Report, ¶ 96 & Exhibits 6.1, 6.2, 7.1, 7.2, 8.1 and 8.2.

[31]  Yurkerwich Report, ¶ 96.

10

35.     I address issues and criticisms related to Mr. Yurkerwich's calculation of Songkick's incremental profit per ticket in **Section V.F** of this Rebuttal Report.

### 6.     *Discount Rate and Lost Profits Conclusion*

36.     In calculating Songkick's total lost profit damages, Mr. Yurkerwich determines the present value, as of December 31, 2016, of Songkick's future lost profits in 2017 through 2021 by using a discount rate of 25%.[32]   Mr. Yurkerwich does not calculate Songkick's discount rate based on Songkick's reported financial information, but rather concludes that a rate of 25% is appropriate based on the range of average discount rates for startup companies reported in a 2016 "Private Capital Markets Report" issued by Pepperdine University.[33]

37.     Mr. Yurkerwich ultimately concludes that Songkick's lost profits are:[34]

---

[32]   Yurkerwich Report, Exhibits 6.1, 6.2, 7.1, 7.2, 8.1 and 8.2.

[33]   Yurkerwich Report, ¶ 97.

[34]   Mr. Yurkerwich also calculates Songkick's lost profits based on an assumed 10% and 20% artist presale allocation. *See* Yurkerwich Report, ¶¶ 98-99 & Exhibits 6 and 7.

11

*Highly Confidential – Outside Counsel Only*

**Table 2: Mr. Yurkerwich's Calculation of Songkick's Lost Profits**[35]



|  | U.S. Lost Profits | Global Lost Profits |
|---|---|---|
| **8% Allocation** | | |
| Past Damages | $11.0M | $16.9M |
| Present Value of Future Damages | $20.8M | $31.8M |
| **Total Lost Profit Damages** | **$31.8M** | **$48.7M** |
| **10% Allocation** | | |
| Past Damages | $14.0M | $21.6M |
| Present Value of Future Damages | $26.4M | $40.5M |
| **Total Lost Profit Damages** | **$40.3M** | **$62.2M** |
| **20% Allocation** | | |
| Past Damages | $28.8M | $45.0M |
| Present Value of Future Damages | $54.1M | $84.3M |
| **Total Lost Profit Damages** | **$82.9M** | **$129.4M** |

### B.     Mr. Yurkerwich's Calculation of Ticketmaster's Alleged Unjust Enrichment

38.     As it relates to Songkick's claims of misappropriation of confidential information and computer fraud and abuse, Mr. Yurkerwich calculates Songkick's damages based on Ticketmaster's alleged unjust enrichment—on both a global and U.S.-only basis.[36]  In his report, Mr. Yurkerwich claims that he has "estimated the scope of Ticketmaster's unjust enrichment by isolating the incremental profits associated with this behavior using two different approaches."[37]

---

[35]   Yurkerwich Report, ¶¶ 98-99 & Exhibits 6, 7 and 8.

[36]   Yurkerwich Report, ¶¶ 7 and 100 & Exhibits 3.1, 3.2.

[37]   Yurkerwich Report, ¶ 100.

12

*Highly Confidential – Outside Counsel Only*

### 1.    Mr. Yurkerwich's "New Business Model Approach"

39.    Under the first approach (which Mr. Yurkerwich calls the "New Business Model Approach"), Mr. Yurkerwich uses a "return analysis" contained in a single email written and exchanged by members of Ticketmaster's Artist Services/OnTour group in January 2014 that estimated the rate of return that the group might be able to achieve "[i]f we get everything we discussed in the new artist services strategy – reporting tool and upgraded fan engagement platform – by mid year."[38]   Mr. Yurkerwich concludes, "[t]he difference in Ticketmaster presale tickets with and without the investment in this model is a reflection of the gains Ticketmaster expected to achieve through its expanded and improved presale offering which they constructed with confidential and non-public information obtained from Songkick."[39]   In coming to his conclusion, Mr. Yurkerwich assumes that 100% of the difference between the OnTour group's presales in the years 2013 through 2015, and what is shown in the "return analysis" if the potential investments were not made, is attributable to Ticketmaster's alleged use of Songkick confidential data.   Notwithstanding the fact that the "return analysis" does not include data for years beyond 2016, Mr. Yurkerwich also assumes that Ticketmaster's presale ticket sales will increase 10% per year from 2017 through 2021, and that without the investment in the "reporting tool" (and the alleged corresponding use of Songkick confidential data), Ticketmaster would have experienced a 10% decline year-over-year through 2021.[40]

40.    Similar to his calculation of Songkick's alleged lost profits, Mr. Yurkerwich calculates Ticketmaster's alleged unjust enrichment on a global basis by applying a 1.58x multiple to the number of U.S. presale tickets in his calculation.[41]

41.    Finally, Mr. Yurkerwich uses an assumed revenue of $4 per ticket (a figure which he also gets from the same 2014 "return analysis" email), deducts certain incremental costs, and

---

[38]    Yurkerwich Report, ¶¶ 101-102; Email exchange between Zeeshan Zaidi, Greg Schmale and Rey del Valle, January 17-18, 2014, Re: Estimates, and attachment (TM00111626-631).  As explained in **Section V.D** below, Mr. Yurkerwich's use of this document and characterization of the amounts presented in the document as a Ticketmaster "business model" is inappropriate.

[39]    Yurkerwich Report, ¶ 103.

[40]    Yurkerwich Report, ¶ 103 & Exhibits 11.1 and 11.3.

[41]    Yurkerwich Report, ¶ 104 & Exhibit 11.1.

*Highly Confidential – Outside Counsel Only*

applies a discount rate of 8% for future sales.  Having made those adjustments, Mr. Yurkewich concludes that Ticketmaster's unjust enrichment according to his New Business Model Approach is:

**Table 3: Mr. Yurkewich's Calculation of Ticketmaster Unjust Enrichment New Business Model Approach[42]**

|  | U.S. Unjust Enrichment | Global Unjust Enrichment |
|---|---|---|
| Past Damages | $8.9M | $14.9M |
| Present Value of Future Damages | $31.1M | $50.3M |
| **Total Lost Profit Damages** | **$40.0M** | **$65.2M** |

### 2.      Yurkewich's "New Artist-Clients Approach"

42.     Under his second approach (which Mr. Yurkewich calls the "New Artist-Clients Approach"), Mr. Yurkewich identifies 191 artist-clients for whom Ticketmaster did not conduct presales in 2012 or 2013, but did conduct presales in 2014 and 2015.[43]  Without citing to any analysis or specifics concerning these artists, Mr. Yurkewich concludes that, "Ticketmaster was able to attract these new artist-clients at least in part due to their new and improved presale offering."[44]  In calculating Ticketmaster's unjust enrichment under this approach, Mr. Yurkewich assumes (without citing to any evidence or basis for his assumption) that 100% of the presale tickets sold for these 191 artists in 2014 and 2015 was a result of Ticketmaster's alleged use of Songkick confidential information.[45]

43.     As with his New Business Model Approach, Mr. Yurkewich assumes a 10% annual growth in the presale tickets for these new artist-clients (relying once again entirely on the same "return analysis" email from 2014 referenced above), and also applies a 1.58x

---

[42]   Yurkewich Report, ¶¶ 108-109 & Exhibits 11.1 and 11.3.

[43]   Yurkewich Report, ¶¶ 105-106.  There are actually 214, not 191, artists listed on Mr. Yurkewich's Exhibit 10.1.

[44]   Yurkewich Report, ¶ 106.

[45]   Yurkewich Report, Exhibits 10.0, 11.2 and 11.4.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 446**

multiple to estimate the number of global presale tickets Ticketmaster sold for these artist-clients.[46]

44.    Once again using an assumed revenue of $4 per ticket, deducting certain incremental costs, and applying a discount rate of 8%, Mr. Yurkerwich concludes that Ticketmaster's unjust enrichment according to his New Artist-Clients Approach is:

**Table 4: Mr. Yurkerwich's Calculation of Ticketmaster Unjust Enrichment New Artist-Clients Approach[47]**

|  | U.S. Unjust Enrichment | Global Unjust Enrichment |
|---|---|---|
| Past Damages | $14.6M | $24.0M |
| Present Value of Future Damages | $34.6M | $55.8M |
| **Total Lost Profit Damages** | **$49.2M** | **$79.8M** |

45.    I address issues and criticisms related to Mr. Yurkerwich's calculation of Ticketmaster's alleged unjust enrichment in **Section VI** of this Rebuttal Report.

### C.    Mr. Yurkerwich's Calculation of Songkick's Alleged Lost Business Value

46.    In his report, Mr. Yurkerwich also endeavors to "assess Songkick's lost business value."[48] It is not clear, however, if Mr. Yurkerwich is offering his calculation of "Songkick's lost business value" as a measure of damages related to any of Songkick's claims against Ticketmaster.[49]

47.    In any event, without providing or citing to any analysis (or evidence), Mr. Yurkerwich concludes that "[t]he effects of Ticketmaster's behavior on Songkick's ability to attract and retain artist-clients has drained cash resources and created market uncertainty surrounding its viability as a going concern."[50]   Mr. Yurkerwich then purports to calculate what Songkick's enterprise value would have been "but for" Ticketmaster's alleged

---

[46]   Yurkerwich Report, ¶ 107 & Exhibits 11.2 and 11.4.

[47]   Yurkerwich Report, ¶¶ 108-109 & Exhibits 11.2 and 11.4.

[48]   Yurkerwich Report, ¶¶ 110-115.

[49]   Yurkerwich Report, ¶ 14.

[50]   Yurkerwich Report, ¶ 110.

*Highly Confidential – Outside Counsel Only*

wrongdoing. That calculation is based solely on a multiple of Songkick's "but-for" annual gross transaction value (or "GTV"). Mr. Yurkerwich calculates a "GTV multiple" for five alleged "Comparable Transactions and Funding," and concludes that his results, ranging from 0.7 time to 1.3 times, "fall within what are considered industry averages."[51] Mr. Yurkerwich also calculates CrowdSurge and Songkick pre- and post-merger GTV Multiples based on valuation metrics used by Songkick investors related to their investment in Series C Preferred Equity at the time of the merger.[52] Mr. Yurkerwich ultimately concludes that the appropriate "GTV multiple" to apply in his calculation of the value of Songkick is 1.0 times GTV, although he also concludes, without explanation: "[i]t is likely that Songkick could have been valued at the high end of the industry multiple of 1.3 given its unique network and platform in the industry."[53]

48.    To calculate Songkick's alleged lost business value due to Ticketmaster's actions, Mr. Yurkerwich adds the gross transaction value that Songkick allegedly lost according to his lost profits calculations to Songkick's actual 2016 GTV to determine a "but for" GTV annual value, to which he applies a multiple of 1.0 times and 1.3 times. Mr. Yurkerwich calculates Songkick's alleged Lost Business Value as follows:

<table>
<tr><th colspan="4">Table 5: Mr. Yurkerwich's Calculation of<br>Songkick's Lost Business Value[54]</th></tr>
<tr><th></th><th>At 20% Presale Allocation</th><th>At 10% Presale Allocation</th><th>At 8% Presale Allocation</th></tr>
<tr><td>GTV Multiple of 1.0</td><td>$458M</td><td>$272M</td><td>$235M</td></tr>
<tr><td>GTV Multiple of 1.3</td><td>$595M</td><td>$354M</td><td>$305M</td></tr>
</table>

49.    I address issues and criticisms related to Mr. Yurkerwich's calculation of Songkick's alleged "lost business value" in **Section VII** of this Rebuttal Report.

---

[51]   Yurkerwich Report, ¶ 111 & Exhibit 14.0.

[52]   Yurkerwich Report, ¶¶ 112-113.

[53]   Yurkerwich Report, ¶ 115.

[54]   Yurkerwich Report, ¶ 115 & Exhibit 14.1. As Mr. Yurkerwich seems to equate what he calculates to be Songkick's "but-for" value with Songkick's lost business value, he is implicitly assuming that Songkick's current value is $0 because of the alleged actions of Ticketmaster.

16

# V.    ANALYSIS OF MR. YURKERWICH'S LOST PROFITS OPINIONS

50.    Mr. Yurkerwich's opinions on (and calculations of) Songkick's damages in terms of lost profits are significantly overstated and speculative—and, moreover, are fundamentally unreliable—for the following reasons, each of which is addressed in this section:

- Mr. Yurkerwich fails to demonstrate that any (let alone all) of the 139 "at-issue" artists would have conducted artist presales using Songkick "but for" Ticketmaster's actions;

- TMF interviewed the managers or agents for artists that make up a substantial share of Mr. Yurkerwich's damages, and they all directly refute Mr. Yurkerwich's assertions, including specifically Mr. Yurkerwich's assertion that those artists would have engaged Songkick "but for" something Live Nation or Ticketmaster did;

- Mr. Yurkerwich's conclusions as to the "type of interference" that allegedly caused Songkick damages with respect to the 139 "at-issue" artists are speculative and unsupported, are contradicted by the documents and evidence produced in this case, and are directly refuted by the "at-issue" artist representatives that TMF interviewed;

- Mr. Yurkerwich's so-called "probability of success" factors which he purports to use to adjust his lost profits calculations to account for the uncertainty regarding whether any of the 139 "at-issue" artists would have actually done business with Songkick but for the alleged interference have no methodological or factual basis.  To the contrary, they are arbitrary and unsupported;

- As a result of numerous methodological flaws and errors, Mr. Yurkerwich's calculation of the number of Songkick's alleged lost presale tickets for U.S. events between 2012 and 2016 is fundamentally unreliable;

- Mr. Yurkerwich's calculation of alleged future lost presale tickets and related lost profits is improper since it relies on a speculative and unsupportable growth rate;

- Mr. Yurkerwich's application of a "Global Adjustment" to include alleged losses for non-U.S. events is overstated and contrary to documents and information produced by the parties in this case;

- Mr. Yurkerwich significantly overstates the incremental profit per ticket that Songkick would have achieved if it had sold alleged lost presale tickets; and

*Highly Confidential – Outside Counsel Only*

- Because Mr. Yurkerwich has not separately calculated Songkick's lost profits for each of the 139 "at-issue" artists, but rather has calculated Songkick's lost profits for all of these artists in the aggregate, every flaw in his analysis impacts his entire analysis.   Moreover, because Mr. Yurkerwich's model relies on overall average statistics derived from all 139 "at-issue" artists, removing even one of those artists impacts and invalidates the output of the entire damages model.

## A.   Mr. Yurkerwich Fails to Provide Any Legitimate Justification for Including 10% or 20% Presale Allocation Scenarios

51.   As discussed above, Mr. Yurkerwich calculates Songkick's alleged lost profits under three different scenarios – assuming that Songkick would have received an allocation of 8%, 10% or 20% of the sellable capacity of the events included in his analysis.  As I discussed in the Meyer Initial Report, I understand that Ticketmaster enters into exclusive ticketing service contracts with venue-clients, and that the Ticketmaster Fan Club Policy includes conditions under which Ticketmaster will allow third-party ticketing service providers to sell tickets in an artist presale.[55]  Among other requirements, the Ticketmaster Fan Club Policy limits the number of artist presale tickets to 8% of the sellable seats for each event.[56]

52.   Mr. Yurkerwich's calculation of Songkick's alleged lost profits based on a 10% or 20% allocation presumes that Ticketmaster would be legally required to offer artist presale allocations for U.S. events based on either: (1) the alleged percentage allocation that competing ticketing service providers may offer;[57] or (2) the alleged percentage allocations that may be offered for events conducted "in the United Kingdom and other parts of the world."[58]

---

[55]   Meyer Initial Report, ¶¶ 25 and 27 (citing: Declaration of Cole Gahagan in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, April 11, 2016, pp. 4-6, ¶¶ 13-16; Declaration of Zeeshan Zaidi in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, April 11, 2016, pp. 1-6, ¶¶ 5-15; Deposition of Zeeshan Zaidi, January 24, 2017, p. 26:16-20, p. 28:6-16, pp. 29:21-30:8;  Deposition of Cole Gahagan, January 10, 2017, p. 222:15-22; Deposition of Jared Smith, January 27, 2017, pp. 65:12-66:4).

[56]   Meyer Initial Report, ¶ 28 (citing: Declaration of Zeeshan Zaidi in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, April 11, 2016, Exhibit A – Ticketmaster Fan Club Policies and Guidelines as of January 1, 2012).

[57]   Mr. Yurkerwich uses a 10% allocation because, "[n]on-Ticketmaster venues, however, historically offer the same third parties a 10% allocation." [Yurkerwich Report, ¶ 88].

[58]   Yurkerwich Report, ¶ 88.  I understand that the ticketing service industry in the United Kingdom and other countries operates under a significantly different model than in the U.S.  Specifically, while U.S. venues commonly

18

53.     I understand that Mr. Yurkerwich is not offering opinions as an expert in the ticketing service industry, nor does he provide any analysis to support an opinion on whether Ticketmaster's contracts are lawful and/or whether the 8% fan club allocation allowed by Ticketmaster for third-party fan club sales under certain conditions is lawful. Consequently, the 10% and 20% allocation scenarios that he discusses are unsupported hypotheticals based on speculation. As such, Mr. Yurkerwich's 10% and 20% allocation scenarios are inappropriate for the calculation of damages in this case.

54.     In addition, given that, on average, Songkick has only sold between 47% and 63% of the artist presale ticket inventory that it has been provided (when subject to Ticketmaster's 8% allocation limits),[59] it is inappropriate for Mr. Yurkerwich to assume that Songkick would have sold more artist presale tickets if it had, in the first instance, received a higher percentage allocation of the sellable capacity. Assuming Songkick would have sold more tickets is directly contrary to the factual record in this case (i.e., Songkick's own historical presale performance).[60]

55.     In the following sections of this Rebuttal Report, I discuss and demonstrate the impact of Mr. Yurkerwich's methodological flaws and errors on his lost profits calculation. My criticisms and adjustments to Mr. Yurkerwich's lost profit calculations apply equally to his calculations using an 8%, 10% or 20% allocation.

**B.     Mr. Yurkerwich Fails to Demonstrate that the 139 "At-Issue" Artists Would Have Used Songkick to Conduct Artist Presales "But For" Ticketmaster's Actions**

56.     In his calculation of Songkick's alleged lost profits related to the 139 "at-issue" artists, Mr. Yurkerwich implicitly assumes—without explanation or citation—that, "but for" Defendants' alleged actions: (a) the 139 "at-issue" artists would have chosen to conduct

---

enter into exclusive ticketing service contracts, venues in the United Kingdom and elsewhere may contract with several different ticketing service providers (referred to as an "allocation model") [Discussion with Jared Smith, David Marcus and Geoff Carns]. Mr. Yurkerwich does not address the significant differences in these industry models and their impact on U.S. and ex-U.S. sales.

[59]   Yurkerwich Report, ¶ 89 and Exhibit 12.1.

[60]   As I noted in the Meyer Initial Report, the first 10% of an event's ticket inventory—whether sold through an artist presale or a general public on-sale—tends to have a higher sell-through rate due to demand from an artist's most ardent fans. *See* Meyer Initial Report, ¶ 37 fn 42.

19

*Highly Confidential – Outside Counsel Only*

artist presales for all events / tours included in his analysis; and (b) Songkick would have conducted those artist presales.[61]  For many or all of the 139 "at-issue" artists, however, Mr. Yurkerwich's assumptions are incorrect and unsupported.

### 1. *Mr. Yurkerwich's Causation Determinations Are Entirely Speculative*

57.  Mr. Yurkerwich's opinion that Songkick would have done presales over a multi-year period for the 139 "at-issue" artists but for Defendants' alleged wrongful conduct has no basis in fact, and instead relies on multiple layers of speculation.

58.  In identifying his list of 139 "at-issue" artists, grouping those artists into categories of alleged "interference," and identifying what he claims to be the relevant period of interference, Mr. Yurkerwich relies largely (if not entirely) on one or two pieces of "evidence," many of which have nothing to do with the particular artist he's considering—and some of which do not even mention Live Nation or Ticketmaster.  This "evidence" typically consists of internal Songkick documents, e-mail communications, or entries by Songkick's sales personnel in an internal Salesforce database.[62]  Mr. Yurkerwich uses this "evidence" to draw conclusions about alleged causation—about whether, how, and when Ticketmaster's alleged actions affected the decisions of artists, artist managers, or other agents.  Mr. Yurkerwich, however, did not communicate with any artists, artist managers, agents, or other representatives in reaching these conclusions.  Rather, his conclusions are based on nothing more than his speculation about what these documents and sources mean, including what artists and their representatives wanted, thought, and did—and why.

59.  Below I further analyze Mr. Yurkerwich's causation opinions regarding the 139 "at-issue" artists according to the six categories of alleged "interference" that he groups these artists into.

---

[61]  I understand that Mr. Yurkerwich may allege that his "Probability of Success" factors account for the likelihood that an artist would elect to use Songkick.  However, Mr. Yurkerwich's calculation of Songkick's alleged lost profits do not allow for the disaggregation of damages by artist, and Mr. Yurkerwich includes data for all 139 "at issue" artists in his calculation of Ticketmaster's U.S. ticket sales by "Type of Interference" category, as well as in the calculation of the various average metrics used in his calculation – such as the Ticketmaster sell-through rate and "O.U.S. Multiplier."

[62]  Yurkerwich Report, Exhibit 9.5.

20

60.   At the outset, it is important to note that despite being the focus of this case, Mr. Yurkerwich identifies only 35 (out of 139) "at-issue" artists as being subject to alleged interference because of Ticketmaster's enforcement of its Fan Club Policy.[63]   The remainder of the "at-issue" artists—and the bulk of Mr. Yurkerwich's lost profits calculation—are assigned to three categories of alleged "interference" that have absolutely nothing to do with Ticketmaster's Fan Club Policy.   This is significant because, as I understand it, the present litigation centers on Ticketmaster's use and enforcement of that policy.

### a.   "LN / TM Relationship / Restrictions"

61.   Mr. Yurkerwich has identified 35 artists where Ticketmaster allegedly interfered with Songkick based on so-called "LN/TM Relationship/Restrictions."[64]   These 35 artists account for 33% of the total Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's lost profits calculation.[65]   Mr. Yurkerwich describes this category as including situations where "artists were restricted by Live Nation from having any presales off Ticketmaster's platform," or where "even without a contract present, some artists and artist managers were still hesitant to engage in any kind of activity that might raise issues with Live Nation and Ticketmaster."[66]

62.   Mr. Yurkerwich includes artists in his "LN/TM Relationship/Restrictions" category based on vague references in an email or a Songkick Salesforce Database entry that indicate that the artist is (or was) affiliated with Live Nation or is (or was) conducting a tour promoted by Live Nation).[67]   In these instances, Mr. Yurkerwich does not cite to any documents or information indicating that Defendants ever took any actions to prevent the artist from doing a presale with Songkick—or otherwise interfere with Songkick's relationship with

---

[63]   Specifically, only 35 of the 139 "at-issue" artists are categorized by Mr. Yurkerwich as "Fan Club Policy (Allocation Cap)'" "Fan Club Policy (Alleged Non-Compliance)" and "Fan Club Policy (Bundling or Merchandise)."  Yurkerwich Report, ¶ 81.

[64]   Yurkerwich Report, ¶ 81 and Exhibit 9.5.  These 35 artists account for 33% of the Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's analysis [**Schedule 8**].

[65]   **Schedule 8**.

[66]   Yurkerwich Report, ¶ 48.

[67]   *See* Yurkerwich Report, Exhibit 9.5; **Schedule 10.**

21

the artist.  Rather, he simply notes that some relationship with Live Nation existed.  In many cases, the artist's relationship with Live Nation pre-existed any interaction with Songkick.

63.  I understand that there is no allegation in this case that Live Nation's concert promotion contracts are unlawful.  I also understand that there is no allegation that Live Nation's business of managing artists is unlawful.  Consequently, I understand that a relationship with Live Nation, alone, is not sufficient grounds to include an artist in the list of "at-issue" artists that comprise Songkick's alleged damages.

64.  As it relates to artists in his "LN/TM Relationship/Restrictions" category, Mr. Yurkerwich has done nothing to examine (a) whether these artists reached mutually consensual agreements with Live Nation regarding concert promotion or artist management that were in the artists' best interests, (b) what the scope and terms of any such agreements were (e.g., whether they included any terms regarding artist presale ticketing, let alone restricted the artist from using third parties like Songkick), or (c) whether those artists ever had any interest in running an off-platform artist presale, let alone working with Songkick.  Stated simply, Mr. Yurkerwich has not shown that these artists were even subject to the alleged wrongful conduct at issue in this case (e.g., Defendants' conduct related to permitting Songkick to conduct fan club presales), let alone that these artists would have necessarily conducted artist presales with Songkick.  Inclusion of these artists in Songkick's lost profits analysis is inappropriate speculation.

65.  Furthermore, it is my understanding that, as a general matter, artists promoted by Live Nation, including those conducting "all Live Nation" tours, are permitted to use third parties to conduct their artist presales for events at Ticketmaster venues—provided that they comply with the Ticketmaster Fan Club Policy.[68]  In other words, I understand that the fact that an artist or tour is promoted by Live Nation does not change an artist's ability to conduct off-platform artist presales.  Examples of artists whose tours were promoted by Live Nation but nevertheless conducted off-platform artist presales include Blake Shelton,

---

[68]  Discussion with Zeeshan Zaidi and Mike Schmitt.  Further, David Marcus, Ticketmaster's 30(b)6 witness, testified that Live Nation plays no role in enforcing the Ticketmaster Fan Club Policy.  Deposition of David Marcus 30(b)6, February 17, 2017, p. 314:4-15.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 454**

Brantley Gilbert, Kelly Clarkson, Miranda Lambert, and Arcade Fire—just to name a few.[69]

66.     Moreover, as indicated, TMF interviewed managers and agents for many of the "at-issue" artists, including artists in Mr. Yurkerwich's "LN/TM Relationship/Restrictions" category. As discussed below, the artist representatives rejected the conclusions that Mr. Yurkerwich attempts to draw from the alleged "relationship" restriction "evidence."

67.     *Justin Timberlake.*  Mr. Yurkerwich alleges that Songkick was prevented from conducting artist presales for Justin Timberlake from 2014 onward because of alleged "LN/TM Relationship/Restrictions."[70]   As the bases for his claim, Mr. Yurkerwich cites to a May 2013 email exchange between Stu Smith of CrowdSurge and Brad Margolis of Tennman Digital, Mr. Timberlake's digital marketing company.[71]  Mr. Margolis' email to Mr. Smith states, "[a]s you can imagine, we have a big, complicated relationship with Live Nation and for now, we are going to keep all ticketing through Ticketmaster and its affiliated companies."[72]  Internal Songkick communications then boast that Songkick "beat out every other company they looked at," but ultimately lost the opportunity because of Justin Timberlake's "big, complicated relationship with Live Nation."[73]   Based on these emails from May 2013, Mr. Yurkerwich concludes that, but for Justin Timberlake's relationship with Live Nation, Songkick would have had a 75% probability of securing Justin Timberlake's presale business in 2014 and 2015 (and thus suffered damages).[74]

68.     TMF spoke with Mr. Margolis, as well as to Mr. Timberlake's music manager, Johnny Wright of Wright Entertainment Management.  Mr. Wright explained that he is the person on Justin Timberlake's team who ultimately makes and approves all deals and decisions, including those related to ticketing for Mr. Timberlake's events.[75]  Both Mr. Wright and

---

[69]   Discussion with Zeeshan Zaidi; *see* **Schedule 14**.

[70]   Yurkerwich Report, Exhibits 9.1 and 9.5.

[71]   Yurkerwich Report, Exhibit 9.5 (citing to SK00812086-087).

[72]   Email from Brad Margolis to Stu Smith, May 23, 2013, Re: LA // This Week (SK00812086-087, at 086).

[73]   Yurkerwich Report ¶ 51 (citing SK00999669).

[74]   Yurkerwich Report, ¶ 51 & Exhibits 9.0, 9.1 and 9.5.

[75]   Discussion with Johnny Wright (Wright Entertainment Group).

23

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 455**

Mr. Margolis directly refute Mr. Yurkerwich's conclusions that (1) Mr. Timberlake's relationship with Live Nation and Ticketmaster impacted Songkick's ability to conduct Mr. Timberlake's artist presales, and (2) absent some alleged actions by Ticketmaster or Live Nation, Mr. Timberlake would have used Songkick to conduct artist presales.[76] Therefore, Mr. Yurkerwich's inclusion of Justin Timberlake among his 139 "at issue" artists is improper and speculative.  Specifically, Mr. Wright and Mr. Margolis informed TMF that:[77]

- In early 2013, Mr. Margolis had a number of exploratory meetings with various companies to learn more about their offerings.  Songkick was one of those companies.

- Ultimately, based on that meeting, Justin Timberlake's team decided that Songkick's offering was not of any interest to them.

- Mr. Margolis and Mr. Wright emphasized that the decision not to work with Songkick had absolutely nothing to do with Live Nation or Ticketmaster.

- Songkick persisted in trying to follow-up with Mr. Margolis despite Mr. Margolis repeatedly telling them "no." Mr. Margolis' May 2013 email to Songkick referencing Mr. Timberlake's relationship with Live Nation was simply one of many ways in which Mr. Margolis politely told Songkick that he was not interested in Songkick's services.

- Mr. Margolis did not intend for this email to imply that Mr. Timberlake's relationship with Live Nation restricted them in any way, or that Live Nation or Ticketmaster had somehow pressured or coerced them in any way not to work with Songkick.

- Mr. Timberlake was happy working with Live Nation and Ticketmaster, with whom he had a great relationship involving many aspects of Mr. Timberlake's business, not just ticketing.

- Mr. Timberlake was never interested in running third-party presales, in part due to the confusion it may cause to his fan base.

- Songkick was never told that they had an opportunity to get Justin Timberlake's business in the U.S. or abroad, and there was never any

---

[76] Discussion with Johnny Wright (Wright Entertainment Group) and Brad Margolis (Tennman Digital).

[77] Discussion with Johnny Wright (Wright Entertainment Group) and Brad Margolis (Tennman Digital).

24

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 456**

discussion about conducting fan club presales for Mr. Timberlake's European Tour.

- Any communications between Mr. Margolis and Songkick that proposed advancing a potential business arrangement would have had to have been approved by Mr. Wright, and no such arrangement was ever proposed, discussed, or even considered.

- Mr. Timberlake's agreement with Live Nation does not restrict him from using other parties—his team was simply not interested in working with Songkick.

69.     Mr. Yurkerwich's conclusions with respect to Justin Timberlake—including that Songkick would have had a 75% probability of securing his presale business, but for Defendants' alleged conduct—are therefore incorrect.

70.     **Guns N' Roses.**  Mr. Yurkerwich also categorizes Guns N' Roses as subject to "LN / TM Relationship / Restrictions."[78]  In support of that categorization, Mr. Yurkerwich cites to an internal Songkick Salesforce Database entry, dated 2016, which states: "MJ [Matt Jones] was working with Tom Bennett to get it through Bravado but the agent / manager were too scared to ask LN for it.  Steve Herman at LN ultimately shut it down."[79]  Based on this one entry, Mr. Yurkerwich concludes that, but for alleged "LN/TM Relationship/Restrictions," Songkick would have had a 75% probability of securing Guns N' Roses presale business in 2016 (and thus has suffered damages).[80]

71.     In preparing this Rebuttal Report, TMF spoke to the manager of Guns N' Roses, Fernando Lebeis (Music Manager at Team Brazil Management, Inc.).  Mr. Lebeis directly refutes Mr. Yurkerwich's conclusions that (1) Guns N' Roses relationship with Live Nation and Ticketmaster impacted Songkick's ability to conduct their artist presales, and (2) absent some alleged actions by Ticketmaster or Live Nation, Guns N' Roses would have used Songkick to conduct artist presales.[81]  Therefore, Mr. Yurkerwich's inclusion of Guns N'

---

[78]   Yurkerwich Report, Exhibit 9.5.

[79]   Yurkerwich Report, Exhibit 9.5 (citing SK00978910).

[80]   Yurkerwich Report, Exhibits 9.0, 9.1 and 9.5.

[81]   Discussion with Fernando Lebeis (Team Brazil).

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 457**

Roses among his 139 "at issue" artists is improper and speculative.   Specifically, Mr. Lebeis informed TMF that:[82]

- He was never impressed by Songkick's work and did not see any comparison between what Songkick and Ticketmaster could offer.

- He rejected the notion that he (or anyone on Guns N' Roses' management team) would be "too scared to ask" anyone at Live Nation or Ticketmaster about anything, including asking about a fan club presale.

- He emphasized that he was free to make whatever business decisions that he thought were in the best interest of Guns N' Roses.

- Guns N' Roses are very satisfied with their relationship with Live Nation and Ticketmaster, including Ticketmaster's operation of the Guns' N Roses paid subscription fan club.

- Songkick's service has never been a service that Mr. Lebeis or his team was interested in using; Songkick was not an opportunity that made sense to Guns N' Roses.

72.   Mr. Yurkerwich's conclusions with respect to Guns N' Roses—including that Songkick would have had a 75% probability of securing their presale business, but for Defendants' alleged conduct—are therefore incorrect.

73.   *Maroon 5 / Other CAM Artists.*   Mr. Yurkerwich categorizes Maroon 5 as subject to "LN/TM Relationship/Restrictions."[83]   In support of that categorization, Mr. Yurkerwich cites to two internal Songkick emails from January 2014: (a) an internal email which states that Songkick thinks it has "real shot" at getting Maroon 5's business in the long-term, and (b) another internal email which says that Jared Rosenberg at Ticketmaster apparently made negative comments about Songkick while on a call with CAM, but which goes on to say that there is a lot of support internally from CAM for Songkick, and that getting "Maroon 5 is a possibility."[84]   These emails do not mention why (or even whether) Maroon 5 did not use Songkick.   Mr. Yurkerwich also cites an internal Songkick Salesforce

---

[82]   Discussion with Fernando Lebeis (Team Brazil).

[83]   Yurkerwich Report, Exhibit 9.5.

[84]   Yurkerwich Report, Exhibit 9.5, citing SK00820309-310 and SK00998977.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 458**

Database entry, dated 2016, which states: "We were aware the tour was coming, however this is a LN artist and there was no chance this opp would come to us due to their deal."[85] Based on this information Mr. Yurkerwich concludes that, but for alleged "LN/TM Relationship/Restrictions," Songkick would have had a 75% probability of securing Maroon 5's presale business in 2014, 2015, and 2016 (and thus has suffered damages).[86] Mr. Yurkerwich makes the same conclusion as to other CAM artists – Breaking Benjamin and Lana Del Rey.[87]

74.   TMF spoke with the manager of Maroon 5, Jordan Feldstein at Career Artist Management (CAM).  Mr. Feldstein directly refutes Mr. Yurkerwich's conclusions that (1) Maroon 5's relationship with Live Nation and Ticketmaster impacted Songkick's ability to conduct their artist presales, and (2) absent some alleged actions by Ticketmaster or Live Nation, Maroon 5 would have used Songkick to conduct artist presales.[88]  Mr. Feldstein or others at CAM also represent Break Benjamin, and Lana Del Rey, and Mr. Feldstein said that he also disagrees with Mr. Yurkerwich's conclusions as to those artists.[89]  Therefore, Mr. Yurkerwich's inclusion of Maroon 5, Breaking Benjamin and Lana Del Rey among his 139 "at issue" artists is improper and speculative.  Specifically, Mr. Feldstein informed TMF that:[90]

- CAM took a "courtesy" meeting with Songkick several years ago, but never seriously considered using them for Maroon 5 or any other CAM artists.

- Mr. Feldstein's disinterest in Songkick is not due to any pressure, threats or restrictions from Live Nation or Ticketmaster.  To the contrary, Mr. Feldstein made it clear than in his many years working with Live Nation, he has never been pressured by anyone at Live Nation to do anything.

- CAM artists, including Maroon 5 and others, are free to (and do) work with companies other than Live Nation and Ticketmaster.  For example, Maroon 5 works with other third parties to do their VIP ticket packages, and

---

[85]   Yurkerwich Report, Exhibit 9.5, citing SK00978910.

[86]   Yurkerwich Report, Exhibits 9.0, 9.1 and 9.5.

[87]   Yurkerwich Report, Exhibits 9.0, 9.1 and 9.5.

[88]   Discussion with Jordan Feldstein (CAM).

[89]   Discussion with Jordan Feldstein (CAM).

[90]   Discussion with Jordan Feldstein (CAM).

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 459**

Breaking Benjamin recently switched from having Live Nation handle their merchandising to doing it on their own.

- Maroon 5 has, by choice, a paid fan club that has been run by the same people for over a decade.

- No one at Live Nation or Ticketmaster has ever coerced Mr. Feldstein concerning business arrangements for Maroon 5 or any of his other artists. Mr. Feldstein and CAM does what is best for CAM's artist clients.

75. Mr. Yurkerwich's conclusions with respect to Maroon 5, Breaking Benjamin and Lana Del Rey—including that Songkick would have had a 75% probability of securing their presale business, but for Defendants' alleged conduct—are therefore incorrect

76. **Zac Brown Band.** Mr. Yurkerwich also categorizes Zac Brown Band as subject to "LN/TM Relationship/Restrictions."[91]  In support of that categorization, Mr. Yurkerwich cites to a February 2016 internal Songkick email and 2016 Songkick Salesforce Database that purport to quote Matt Maher from ROAR (a management firm) as stating: "We're getting ready to announce, but we did a deal with TM for this year … its [sic] been a year in the making, and there's some real good reasons why we sold our soul for the time being :)."[92]  Based on this one quote attributed to Mr. Maher, Mr. Yurkerwich concludes that, but for some alleged "LN/TM Relationship/Restrictions," Songkick would have had a 75% probability of securing Zac Brown Band's presale business in 2016 (and thus has suffered damages).[93]

77. TMF spoke to Mr. Maher from ROAR, as well as the Zac Brown Band's manager at ROAR, Bernie Cahill. Mr. Maher and Mr. Cahill directly refute Mr. Yurkerwich's conclusions that (1) the Zac Brown Band's relationship with Live Nation and Ticketmaster impacted Songkick's ability to conduct their artist presales, and (2) absent some alleged

---

[91]  Yurkerwich Report, Exhibit 9.5.

[92]  Yurkerwich Report, Exhibit 9.5 (citing SK00998986 and SK00978910) (ellipsis in original Songkick email).

[93]  Yurkerwich Report, Exhibits 9.0, 9.1 and 9.5.

*Highly Confidential – Outside Counsel Only*

28

actions by Ticketmaster or Live Nation, the Zac Brown Band would have used Songkick to conduct artist presales.[94]  Specifically, Mr. Maher and Mr. Cahill informed TMF that:[95]

- Songkick "cold called" ROAR in early 2016.

- ROAR was never interested in using Songkick for Zac Brown Band and Mr. Maher's response to Songkick was simply a way of politely saying that they were not interested in Songkick.

- Mr. Cahill would never consider doing a deal with Songkick because (in Mr. Cahill's opinion) they do not have the reach or the ability to provide the services that are required by artists like Zac Brown Band.

- Zac Brown Band has existing pre-sale partners and has arrangements that fit the strategic objectives and goals of the band.

- Both Mr. Maher and Mr. Cahill confirmed that they have never felt pressured, threatened, or restricted by Live Nation or Ticketmaster concerning any business relationships or arrangements for their artist clients.  For example, they recently did a deal with Epic Rights whereby Epic Rights now runs the band's fan club.

78.    As with the other artist representatives I spoke to, Mr. Yurkerwich's conclusions with respect to the Zac Brown Band—including that Songkick would have had a 75% probability of securing their presale business, but for Defendants' alleged conduct—are therefore incorrect.

79.    *RocNation Artists*.  Mr. Yurkerwich also categorizes Beyoncé and Jay-Z as subject to "LN/TM Relationship/Restrictions."[96]  In support of that categorization, Mr. Yurkerwich cites to a May 2014 internal Songkick communication stating, "In the end, it was pretty plain simple (and [l]ast-minute): because of the way the deal was finally confirmed, they were ultimately forced to run everything through Jay-Z's arrangement with Live Nation, which precluded any off-platform ticketing.  Had that not been the case, CrowdSurge was the chosen partner."[97]    Based on this information, Mr. Yurkerwich concludes that

---

[94]    Discussion with Matt Maher and Bernie Cahill (ROAR).

[95]    Discussion with Matt Maher and Bernie Cahill (ROAR).

[96]    Yurkerwich Report, Exhibit 9.5.

[97]    Yurkerwich Report, Exhibit 9.5 (citing SK00454438).

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 461**

Songkick would have had a 75% probability of securing Jay-Z's presale business in 2014, and Beyoncé's presale business in 2014 and 2016 (and thus has suffered damages).[98]

80. In preparing this Rebuttal Report, TMF spoke to Christina Suarez, Chief of Staff at RocNation. Ms. Suarez directly refutes Mr. Yurkerwich's conclusions that (1) Jay-Z's and Beyoncé's relationship with Live Nation and Ticketmaster impacted Songkick's ability to conduct their artist presales, and (2) absent some alleged actions by Ticketmaster or Live Nation, Jay-Z and Beyoncé would have used Songkick to conduct artist presales.[99] Specifically, Ms. Suarez informed TMF that:[100]

- RocNation does not manage Beyoncé; her affairs are managed separately from Jay-Z's arrangement with RocNation.

- RocNation never considered using Songkick to conduct artist presales for Jay-Z, including for Jay-Z's 2014 tour that was co-headlined by Beyoncé.

- Live Nation's agreements with RocNation and its artists do not restrict RocNation artists from working with other service parties—RocNation works with companies based on what they feel is in the best interest of the artist.

- Live Nation has never pressured or coerced RocNation concerning business arrangements for Jay-Z or any other RocNation artist; Live Nation has never pressured RocNation to not work with Songkick.

- In fact, RocNation's Digital team has met with Songkick, and Songkick has recently conducted artist presales for RocNation clients, including Dorothy and Kevin Garrett.[101]

81. The unsupported, speculative nature of Mr. Yurkerwich's analysis is further illustrated by an examination of the information that he relies on in placing artists in his so-called "LN/TM Relationship/Restrictions" category of interference.  On **Schedule 10,** I provide

---

[98]  Yurkerwich Report, Exhibits 9.0, 9.1 and 9.5.

[99]  Discussion with Christina Suarez (RocNation).

[100]  Discussion with Christina Suarez (RocNation).

[101]  Songkick reports presale tickets sold for Kevin Garrett in 2016.  *See* **Schedule 14.**  RocNation also recently considered using Songkick to conduct artist presales for Yandel.  However, that arrangement ultimately fell through due to timing and marketing issues.

*Highly Confidential – Outside Counsel Only*

30

observations about specific documents that Mr. Yurkerwich cites as support for the "at-issue" artists he includes in this category.

82.     For the reasons discussed in the preceding paragraphs and shown on **Schedule 10**, it is inappropriate for Mr. Yurkerwich to include these 35 artists in his lost profits calculations based on alleged Live Nation and Ticketmaster "relationship / restrictions."

b.      <u>"Harmed Manager or Agency Relationship"</u>

83.     Mr. Yurkerwich has identified 39 artists where Ticketmaster allegedly interfered with Songkick based on an alleged "Harmed Manager or Agency Relationship."[102]  Those 39 artists account for 31% of the total Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's lost profits calculation.[103]   Mr. Yurkerwich argues, "the loss of one manager's artist may also result in the loss of that manager's other artists because of the manager's negative experience with Songkick due to Ticketmaster's interference."[104]   In other words, for artists in this category, Mr. Yurkerwich concludes that Songkick lost the opportunity to sell tickets because Defendants somehow irreparably harmed Songkick's relationship with a manager or agent, such that those managers and agents refused to work with Songkick with respect to all artists that they represent.

84.     As an initial matter, Mr. Yurkerwich has failed to test his key assumption (i.e., "the loss of one manager's artist may also result in the loss of that manager's other artists") against Songkick's own sales data.  Specifically, Mr. Yurkerwich's "harmed manager or agency relationship" category includes a number of instances where Songkick conducted artist presales for "at-issue" artists *after* the incident that supposedly irreparably damaged the relevant manager or agency relationship.  In **Table 6** below, I have identified five artists for whom Songkick sold artist presale tickets in years subsequent to Mr. Yurkerwich's identified "Interference Begin Year," directly contradicting Mr. Yurkerwich's conclusion that Songkick lost business with these artists as a result of a harmed manager or agent relationship.

---

[102]   Yurkerwich Report, ¶ 81 and Exhibit 9.5.

[103]   **Schedule 8**.

[104]   Yurkerwich Report, ¶ 52.

*Highly Confidential – Outside Counsel Only*

**Table 6:  Songkick Artist Presales Conducted for Artists in Mr. Yurkerwich's "Harmed Manager or Agency Relationship" Category**

| Artist | Mr. Yurkerwich Interference Begin. Year[105] | Year with Songkick Artist Presale Tickets Sold (U.S. Events)[106] |
|---|---|---|
| Garbage (#585) | 2015 | 2016 |
| Keith Urban (#37) | 2016 | 2016[107] |
| The Doobie Brothers (#459) | 2014 | 2015[108] |
| Trampled by Turtles (#717) | 2016 | 2016 |
| Weezer (#85) | 2016 | 2016 |

85.    Furthermore, Mr. Yurkerwich's inclusion of the 39 artists in this category, and his conclusion about those artists, is unsupported and speculative.  In some cases, Mr. Yurkerwich cites to no documentation whatsoever, but rather relies only on what he was told by Songkick.  For most of the artists that Mr. Yurkerwich includes in this category, Mr. Yurkerwich only cites to an email or other documentation regarding a single instance with one artist, and then he uses that as the basis for his broad conclusion that Ticketmaster interfered with Songkick's ability to sell artist presale tickets for multiple other artists, simply because those other artists are affiliated with the same agency or management company.  This "evidence," however, does not support Mr. Yurkerwich's conclusions.  On **Schedule 10**, I provide observations about specific documents that Mr. Yurkerwich cites as support for his categorization of artists in his "Harmed Manager or Agency Relationship" category.

86.    More importantly, Mr. Yurkerwich has not communicated with any of the artists, artist managers, or agents about whom he is drawing these conclusions (including what they

---

[105]   Yurkerwich Report, Exhibit 9.5.

[106]   **Schedule 14**.

[107]   Mr. Yurkerwich identifies 2016 Songkick U.S. ticket sales for Keith Urban on his Exhibit 9.2.

[108]   Mr. Yurkerwich identifies 2015 Songkick U.S. ticket sales for The Doobie Brothers on his Exhibit 9.2.

*Highly Confidential – Outside Counsel Only*

thought and did, as well as their motivations for doing so).  By contrast, TMF spoke to a number of these artists' representatives, and they all rejected Mr. Yurkerwich's unsupported, speculative conclusions about Defendants' alleged interference and "harm" to Songkick relationships.  Below I discuss the facts from several of these artist interviews.

87.  *Azoff Management Artists.*[109]  Mr. Yurkerwich includes Bon Jovi, Don Henley, Gwen Stefani, Joe Walsh, Fleetwood Mac, Journey, Steely Dan, Earth, Wind & Fire, Van Halen, Dead & Company, The Doobie Brothers, and The Eagles in his list of 139 "at-issue" artists.[110]  Azoff Management manages all of these artists.[111]  For each, Mr. Yurkerwich categorizes the alleged interference as "Harmed Manager or Agency Relationship."[112]

88.  For each of the Azoff artists, Mr. Yurkerwich cites a single email from September 2013 (i.e., he cites to the *same* email for every Azoff artist) in support of his contention that Ticketmaster somehow (a) irreparably harmed Songkick's relationship with Azoff Management, and (b) thereby prevented Songkick from being able to obtain the presales for all of these artists over a multi-year period (i.e., 2014-2016).[113]  The 2013 email was written by an Azoff executive, Mr. Adam Flick.[114]  On its face, and without any context, Mr. Flick's 2013 email to Songkick states, "things got challenging with this Forum premiere night fan offer and in the end I was pressured to do things differently from what we had envisioned."[115]  Mr. Flick's email does not explain what the "fan offer" was (e.g., whether it involved artist presale tickets at all), what the original vision was, or even what artist was at issue with respect to the referenced "Forum premier night."  Furthermore, Mr. Flick's email does not say who pressured him, how he was pressured, why he was pressured, or what he was purportedly pressured to do.  Equally or more important, his

---

[109]  In his Report, Mr. Yurkerwich refers to Azoff MSG Entertainment as "Azoff Management."  For clarity and consistency, I will also refer to Azoff MSG Entertainment as "Azoff Management" here.

[110]  Yurkerwich Report, Exhibit 9.1.

[111]  Discussion with Adam Flick, Head of Digital at Azoff Management.

[112]  Yurkerwich Report, Exhibit 9.5.

[113]  Yurkerwich Report, Exhibit 9.5 (citing SK00999666).

[114]  Email from Adam Flick to Matt Jones, September 9, 2013, Re: LA soon? (SK00999666-667).

[115]  Email exchange between Adam Flick and Matt Jones, September 9, 2013, Re: LA Soon? (SK00999666-667, at 667).

33

*Highly Confidential – Outside Counsel Only*

email does not mention Ticketmaster or Live Nation at all.  Simply stated, there is absolutely nothing in this email to connect any of the Azoff artists to any alleged wrongdoing by Live Nation or Ticketmaster—let alone establish that these artists would have elected to run a presale with Songkick absent some unstated conduct on behalf of Defendants.

89.     Moreover, Mr. Flick's email—on its face—disclaims any indication that the relationship between Azoff Management and Songkick was in anyway damaged. Mr. Flick specifically states: "Still keeping my eye on the bigger opportunity prize with you guys so looking forward to how this comes together in our new world order."[116] After receiving this email, senior Songkick executives state "Good that we're getting this email," and add that Mr. Flick "asked me if I can do lunch Thursday or Friday."[117] Consequently, there is no rational basis for relying on this email as evidence of a damaged relationship.

90.     In preparing this Rebuttal Report, TMF interviewed the author of the 2013 email in question, Mr. Flick. Mr. Flick refuted Mr. Yurkerwich's characterization of his 2013 email—as well as any basis for including any of the Azoff artists in Songkick's lost profits calculation.  Specifically, Mr. Flick explained that:[118]

- The "Forum premiere night fan offer" referenced in the email was not even a presale, and had nothing to do with a "fan club."  Rather, the "Forum premiere night fan offer" was a lottery whereby concertgoers would enter a chance to win floor tickets for an Eagles concert on opening night for the newly remodeled Forum.[119] Azoff Management discussed the possibility of using Songkick (then CrowdSurge) to run the lottery. Azoff Management ultimately decided to go with a different vendor.[120]

- Neither Mr. Flick nor Azoff Management were ever pressured by Ticketmaster or Live Nation to do anything, let alone blacklist Songkick in some way.

---

[116] Email exchange between Adam Flick and Matt Jones, September 9, 2013, Re: LA Soon? (SK00999666-667, at 667).

[117] Email exchange between Adam Flick and Matt Jones, September 9, 2013, Re: LA Soon? (SK00999666-667, at 666).

[118] Discussion with Adam Flick (Azoff Management).

[119] Discussion with Adam Flick (Azoff Management).

[120] Discussion with Adam Flick (Azoff Management).

34

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 466**

- Mr. Flick's September 2013 email was simply a polite way of telling Songkick that Azoff Management was not going to use them for the lottery.[121]

- Mr. Flick has never had a conversation with Songkick about the possibility of running a presale for any of the Azoff artists on Mr. Yurkerwich's list, and he said he would never seriously consider hiring Songkick to do so.

- Generally, Azoff Management does not run third party artist presales, with any provider, for the artists that they manage.[122]

91.   In short, Mr. Yurkerwich's conclusions with respect to the Azoff Management artists—including that Songkick would have had a significant probability of securing these artists' presale business, but for Defendants' alleged conduct—are unsupported and incorrect.

92.   ***Maverick Management Artists.***   Mr. Yurkerwich includes artists managed by Maverick Management, including Madonna, U2, Jill Scott, Nicki Minaj, and Lil Wayne, in his list of 139 "at-issue" artists, and categorizes the alleged interference as "Harmed Manager or Agency Relationship."[123]   Again, Mr. Yurkerwich is claiming that Defendants allegedly harmed the relationship between Maverick Management and Songkick to the point where Maverick Management would not allow the artists it manages to work with Songkick.[124] For each of the Maverick artists, Mr. Yurkerwich provides the same citation as support of for his categorization: "Based on conversations with Josh Block [Songkick's Chief Strategy Officer], I understand Madonna [U2, Jill Scott, Nicki Minaj, or Lil Wayne] works with Maverick and Songkick has been interfered with through a harmed agency relationship."[125]   As such, Mr. Yurkerwich does not cite to any documents or other

---

[121]   Discussion with Adam Flick (Azoff Management).

[122]   This is consistent with a December 2015 email from Irving Azoff (Azoff Management) to Michael Rapino, in which Mr. Azoff wrote, "[t]here are no fan clubs anymore.  I'm sick of presales.  I don't want to do them anymore." and Mr. Rapino replied, "agree presales have had their day…" [Email exchange between Irving Azoff and Michael Rapino, December 7-8, 2015 (TM00035910-912, at 910)].

[123]   Yurkerwich Report, Exhibit 9.5.

[124]   Yurkerwich Report, ¶ 52 & Exhibit 9.5.

[125]   Yurkerwich Report, Exhibit 9.5.

*Highly Confidential – Outside Counsel Only*

contemporaneous information as potential support for his conclusion that Songkick would have had a 50% probability of securing these artists' presale business.

93.     In preparing this Rebuttal Report, TMF interviewed Guy Oseary, co-founder of Maverick Management and the manager to Madonna and U2.   Mr. Oseary directly refutes Mr. Yurkewich's conclusions that (1) Songkick's relationship Maverick Management was in some way "harmed" by Live Nation and Ticketmaster, and (2) absent some alleged actions by Ticketmaster or Live Nation, the Maverick artists would have used Songkick to conduct artist presales.[126]  Specifically, Mr. Oseary informed TMF that:[127]

- While Songkick has never even tried to pitch its presale business to Mr. Oseary or his artists, he would never consider (and has never considered) using Songkick—particularly for mega artists like U2 and Madonna.

- He would have no confidence handing a tour, particularly a tour for major artists like U2 and Madonna, over to a small player like Songkick.

- He did not see any value in using Songkick for artists such as U2 and Madonna, or for Maverick's other artists.  For example, Mr. Oseary explained that the last U2 tour sold out in a single day; as a result, he has no need for a service like Songkick to try to help him sell more tickets.

- Mr. Oseary, Maverick, and their artists have been very happy with their relationship with Ticketmaster.  As Mr. Oseary explained, using Ticketmaster has worked very well for over a decade so he has no interest in switching.

- Maverick is a company that works with many companies—the decision is based on whatever is best for the artist.

- Live Nation and Ticketmaster did not impact any relationship between Maverick and Songkick—Maverick is simply not interested in using Songkick for its artists.

- Mr. Oseary was unaware of whether Songkick had a good or bad relationship with Live Nation or Ticketmaster, and whether they did or did not was irrelevant to him.

---

[126]   Discussion with Guy Oseary (Maverick Management).

[127]   Discussion with Guy Oseary (Maverick Management).

36

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 468**

94.     In short, Mr. Yurkerwich's conclusions with respect to the Maverick Management artists—including that Songkick would have had a 50% probability of securing these artists' presale business, but for Defendants' alleged conduct—are unsupported and incorrect.

95.     **Rihanna.**   Mr. Yurkerwich includes Rihanna in his "Harmed Manager or Agency Relationship" category.  Mr. Yurkerwich cites to an October 2014 internal Songkick email discussing Eminem.  Mr. Yurkerwich indicates that the email is "referring to Eminem tour Rihanna would be co-headlining."[128]  Eminem's "Monster Tour," which was co-headlined by Rihanna, completed in August 2014—months before this email was written.[129]   In the email, Songkick indicates that the manager ("Eric") "wanted to touch base" and "said he'd be in touch soon so we can dive in on next steps."[130]  This email does not support Mr. Yurkerwich's conclusion that there was some sort of "Harmed Manager or Agency Relationship" related to Eminem, let alone Rihanna.

96.     Mr. Yurkerwich also cites to a 2014 Songkick Salesforce Database entry, which states, "Didn't do the Eminem tour, so couldn't get this.  Not chasing Rihanna independently because of RocNation."[131]  As discussed in **Section V.B.1(a)** above, TMF spoke with Ms. Suarez of RocNation and Ms. Suarez refuted Mr. Yurkerwich's conclusion that RocNation artists were somehow restricted from using Songkick due to RocNation's relationship with Live Nation and Ticketmaster.[132]   Mr. Yurkerwich's conclusions with respect to the Rihanna—including that Songkick would have had a 50% probability of securing Rihanna's presale business, but for Defendants' alleged conduct—are unsupported and incorrect.

97.     **CAA Artists.**  Mr. Yurkerwich includes several artists in his "Harmed Manager or Agency Relationship" category on the basis that Defendants have somehow harmed the relationship between Songkick and CAA.   Specifically, Mr. Yurkerwich refers to a "harmed

---

[128]   Mr. Yurkerwich Report, Exhibit 9.5.

[129]   http://www.eminem.com/news/monster-tour-ticket-info-2nd-shows-added.

[130]   Email from Stu Smith to Josh Block, October 15, 2014, Re: Eminem Call (SK00998805-806).  Mr. Yurkerwich improperly cites this email as being at SK00999595 (*see* Yurkerwich Report, Exhibit 9.5).

[131]   Mr. Yurkerwich Report, Exhibit 9.5 (citing SK00978910).

[132]   Discussion with Christina Suarez (RocNation).

*Highly Confidential – Outside Counsel Only*

37

**Exhibit 5, Page 469**

relationship" with CAA as having an impact on its ability to conduct artist presales for Rihanna, Ariana Grande, Keith Urban, Eminem and Garbage.[133]   I have analyzed Songkick's artist presale data for events in 2014 through 2016.  As shown on **Schedule 12,** I identified 127 CAA artists for whom Songkick has conducted artist presales since 2014 (the year that he says the "harmed relationship" began).[134]   The fact that Songkick has conducted artist presales for these CAA artists refutes Mr. Yurkerwich's conclusion that Songkick's relationship with CAA has been harmed.

98.   In sum, for the reasons discussed in the preceding paragraphs and shown on **Schedule 10,** it is inappropriate and speculative for Mr. Yurkerwich to include these 39 artists in his lost profits calculations based on an alleged "harmed manager or agency relationship."

c.   <u>"LN / TM Pressure / Threats / Leverage"</u>

99.   Mr. Yurkerwich identified 30 artists where Ticketmaster has allegedly interfered with Songkick based on alleged "LN / TM Pressure / Threats / Leverage."[135]   Those 30 artists account for 23% of the total Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's lost profits calculation.[136]   Mr. Yurkerwich did not interview any of the "at-issue" artists or their representatives.   Rather, Mr. Yurkerwich states that he reviewed e-mail communications and Songkick Salesforce records that he claims "indicate Ticketmaster threatened to pull marketing or other services for an artist if they chose not to run their presale through Ticketmaster."[137]

100.   Once again, TMF interviewed a number of the managers or agents for "at-issue" artists.   Each of them was specifically asked whether Live Nation or Ticketmaster ever pressured or threatened them in any way with respect to working with Songkick or even more

---

[133]   Yurkerwich Report, Exhibit 9.5.  Mr. Yurkerwich also cites to CAA as impacting Songkick's presales for artists in other "Type of Interference" categories, including Kid Rock; Dixie Chicks; Panic! At the Disco; Demi Lovato; Lady Gaga; Nick Jonas; Meghan Trainor; John Fogarty; and Blink 182.

[134]   For Rihanna, Ariana Grande and Eminem, Mr. Yurkerwich identifies the "Interference Begin. Year" as 2014 [Yurkerwich Report, Exhibit 9.5].

[135]   Yurkerwich Report, ¶ 81 and Exhibit 9.5.  These 30 artists account for 23% of the Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's analysis [**Schedule 8**].

[136]   **Schedule 8**.

[137]   Yurkerwich Report, ¶ 44.

*Highly Confidential – Outside Counsel Only*

generally with respect to conducting third party presales.  Each categorically refuted that suggestion.[138]  Moreover, the artist representatives confirmed that they were free to work with third parties like Songkick, if they elected to do so.[139]

101.   I understand from Ticketmaster executives that Ticketmaster does not threaten, and have not threatened, artists or their agents by pulling or reducing the level of marketing provided for the artist's tour if the artist chose to use a third party, such as Songkick, to conduct a compliant fan club presale.[140]  Rather, I understand that Ticketmaster provides the same base level of marketing for all events at Ticketmaster venues—irrespective of whether the artist conducts an artist presale on the Ticketmaster platform, conducts an off-platform presale using a third-party (such as Songkick), or does not conduct an artist presale at all.[141] If an artist decides to work with Ticketmaster's Artist Services / OnTour division,[142] Ticketmaster will provide *additional* marketing for that presale.[143]  If an artist decides to conduct an off-platform artist presale using a third-party such as Songkick—or, alternatively, if an artist keeps everything on Ticketmaster's platform, but does not elect to work with Ticketmaster's Artist Services / OnTour division—that artist will forego the opportunity to obtain these additional marketing services.  However, there is no reduction in the base level of marketing that Ticketmaster provides for all events at Ticketmaster venues.  In other words, Ticketmaster does not "pull marketing or other services" if an artist choses to not run their presale on the Ticketmaster platform.[144]  In addition, I

---

[138]   Discussion with Jordan Feldstein (CAM), Adam Flick (Azoff Management), Fernando Lebeis (Team Brazil), Matt Maher and Bernie Cahill (ROAR), Brad Margolis (Tennman Digital), Guy Oseary (Maverick Management), Christina Suarez (RocNation), Johnny Wright (Wright Entertainment Group).

[139]   Discussion with Jordan Feldstein (CAM), Adam Flick (Azoff Management), Fernando Lebeis (Team Brazil), Matt Maher and Bernie Cahill (ROAR), Brad Margolis (Tennman Digital), Guy Oseary (Maverick Management), Christina Suarez (RocNation), Johnny Wright (Wright Entertainment Group).

[140]   Discussions with Zeeshan Zaidi, Jared Smith, David Marcus, and Geoff Carns.

[141]   Discussion with Zeeshan Zaidi.  In addition, Ticketmaster will provide marketing services in support of venue presales or credit card presales.

[142]   Ticketmaster's Artist Services / OnTour division handles all products, services, and lines of businesses that Ticketmaster offers artists and their representatives, such as (for example) marketing, reporting tools, ticketing solutions, commerce offerings, and various presales—including artist presales [Declaration of Zeeshan Zaidi in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, April 11, 2016, ¶ 2].

[143]   Discussion with Zeeshan Zaidi.

[144]   Discussion with Zeeshan Zaidi.

39

*Highly Confidential – Outside Counsel Only*

understand that for artists conducting a Live Nation-promoted tour, Ticketmaster provides those artists with similar additional marketing assets.  This additional marketing is offered to artists irrespective of whether they conduct an off-platform presale, an on-platform artist presale, or no presale at all.[145]  Accordingly, the premise for Mr. Yurkerwich's contention that Defendants threaten to "pull marketing" is factually wrong.

102.  Finally, many specific documents cited by Mr. Yurkerwich do not support his conclusion that Defendants "threatened to pull marketing or other services" for those artists.  On **Schedule 10,** I provide observations on specific documents that Mr. Yurkerwich cites as support for his categorization of artists in his "pressure / threats / leverage" category.

103.  For the reasons discussed in the preceding paragraphs and shown on **Schedule 10**, it is inappropriate and speculative for Mr. Yurkerwich to include these 30 artists in his lost profits calculations based on alleged Live Nation and Ticketmaster "pressure / threats / leverage."

> d.   "Fan Club Policy (Allocation Cap)"

104.  As discussed above, Mr. Yurkerwich identifies 35 artists for which he concludes that Songkick lost the opportunity to sell artist presale tickets due to Ticketmaster's enforcement of various components of its Fan Club Policy.[146]  Mr. Yurkerwich categorizes nine of those 35 customers as "Fan Club Policy (Allocation Cap)."[147]  Those nine artists account for 7% of the total Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's lost profits calculation.[148]  For each of the nine artists, Mr. Yurkerwich cites to emails or other information indicating that the artist did not use Songkick because he/she wanted to be able to offer more than 8% of tickets for sale in an artist presale.[149]  For example, an internal Songkick Salesforce Database entry cited by Mr. Yurkerwich related to Taylor

---

[145]  Discussion with Zeeshan Zaidi.

[146]  *See* **Schedule 8** for a list of those 35 artists.

[147]  Yurkerwich Report, ¶ 81.

[148]  **Schedule 8**.

[149]  *See* Yurkerwich Report, Exhibit 9.5.

*Highly Confidential – Outside Counsel Only*

40

Swift states: "[t]hey want to sell more than 8% in presale and are there for [sic] keeping everything on Ticketmaster platform."[150]

105.  As discussed in the Meyer Initial Report, I understand that, notwithstanding Ticketmaster's exclusive ticketing rights with respect to a venue, Ticketmaster typically nevertheless allows "off-platform" sales—i.e., sales by third-party ticketing service providers like Songkick—in certain circumstances and subject to certain conditions.[151]   One of those conditions is that the number of artist presale tickets is limited to 8% of the sellable seats for the event.[152]   Unless it is found by the Court that Ticketmaster has interfered with Songkick solely by setting a limit on the percentage of tickets that can be sold off-platform in an artist presale, the nine artists included in this category should not be included in the calculation of Songkick's alleged lost profits.

e.    "Fan Club Policy (Alleged Non-Compliance)"

106.  Mr. Yurkerwich categorizes 21 artists as having an alleged "Type of Interference" of "Fan Club Policy (Alleged Non-Compliance)," for which he concludes Songkick lost the opportunity to sell artist presale tickets due to Ticketmaster's enforcement of the various components of the Fan Club Policy, aside from the allocation cap.[153]   Those 21 artists account for 5% of the total Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's lost profits calculation.[154]   Mr. Yurkerwich does not provide any analysis or citation to documentation, testimony, or other information that demonstrates that these 21 artists were in fact compliant with Ticketmaster's Fan Club Policy.[155]   Rather, Mr. Yurkerwich only cites to emails or similar information indicating that Ticketmaster had determined that the artist did not comply with the policy, and therefore was not permitted to run an off-platform

---

[150]  Yurkerwich Report, Exhibit 9.5, citing SK00978910 and SK00999737.

[151]  Declaration of Zeeshan Zaidi in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, April 11, 2016, pp. 1-6, ¶¶ 5-15; Deposition of Zeeshan Zaidi, January 24, 2017, p. 28:6-16, pp. 29:21-30:8; *see also* Deposition of Jared Smith, January 27, 2017, pp. 65:12-66:4.

[152]  Declaration of Zeeshan Zaidi in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, April 11, 2016, Exhibit A – Ticketmaster Fan Club Policies and Guidelines as of January 1, 2012.

[153]  Yurkerwich Report, ¶ 81.

[154]  **Schedule 8**.

[155]  *See* Yurkerwich Report, Exhibit 9.5.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 473**

artist presale.  Unless the Court concludes that Ticketmaster's contracts and/or Fan Club Policy are unlawful, such that Ticketmaster does not have the right to apply and enforce its Fan Club Policy, any artists that do not have a qualifying fan club should not be included in the calculation of Songkick's alleged lost profits.

107.   Furthermore, as shown on **Schedule 13**, Mr. Yurkerwich improperly includes several artists in this category for whom Songkick actually conducted their artist presales in the year(s) at issue.  For example, the artist Brantley Gilbert, the most significant artist (in terms of ticket sales) included in this category, has been a client of Songkick since 2014 and should be removed from the analysis of damages entirely.[156]   Similarly, Mr. Yurkerwich also includes Miranda Lambert, Modest Mouse, Of Monsters and Men, Rancid, The 1975, The XX, and TV On The Radio in this category—despite the fact that Songkick conducted their artist presales, including at Ticketmaster venues, in the year(s) at issue.[157]  Consequently, it is improper for Mr. Yurkerwich to include these artists in any calculation of Songkick's alleged lost profits.

108.   Another example of Mr. Yurkerwich's flawed methodology is his inclusion of Modest Mouse as an "at-issue" artist based on an internal 2016 Songkick Salesforce entry, which states: "[w]hile he said that the reason they didn't want to do the presale with us was because of the Ticketmaster lawsuit, *it's a pretty safe assumption that the actual reason is because they wanted to do it on Ducat King.*  Presale went up today on that platform."[158]  This entry indicates that Songkick itself does not believe that it lost the opportunity due to any action by Ticketmaster.

109.   For the reasons discussed in the preceding paragraphs, Mr. Yurkerwich's analysis of artists in this category is unreliable and speculative.

---

[156]   Yurkerwich Report, Exhibits 9.2 and 9.3; Discussion with Zeeshan Zaidi and Michael Schmitt.

[157]   Yurkerwich Report Exhibits 9.2 and 9.3; Meyer Initial Report, Schedule 2.

[158]   Yurkerwich Report Exhibit 9.5, citing SK00978910 and SK00999737 (emphasis added).

42

f.     "Fan Club Policy (Bundling or Merchandise)"

110.   Mr. Yurkerwich categorizes five artists as having a "Type of Interference" of "Fan Club Policy (Bundling or Merchandise)."[159]   Those five artists account for 2% of the total Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's lost profits calculation.[160]

111.   It is my understanding that, from time to time, artists may want to provide purchasers of tickets to their events (whether by presale or in the general on sale) with a free download of the artist's album.[161]   An album bundle is an ancillary service that goes beyond regular ticketing service, requiring additional labor and other costs associated with various marketing, redemption, and fulfillment services.[162]   Ticketmaster's Artist Services / OnTour division offers to provide those album bundling services.  One of the terms of the deal by which Ticketmaster performs that ancillary work is that the artist keeps 100% of their tickets on the Ticketmaster platform.[163]   Alternatively, if the artist instead wants to use a third party to fulfill and distribute the album to customers, it is free to do so.  Metallica is an example of an artist that recently elected to do so.[164]   If the album bundles is associated with a third party presale, the ticket sales must comply with Fan Club Policy.[165]

112.   As indicated on Mr. Yurkerwich's Exhibit 9.5, artists included in this category expressed an interest in an album bundle.  I understand that, at the artists' request—for at least Dierks Bentley, Incubus and John Legend—Ticketmaster administered the distribution of a free album download to all ticket purchasers.[166]   Those artists elected to keep 100% of their ticketing on the Ticketmaster platform as part of that arrangement.  In addition, as shown

---

[159]   Yurkerwich Report ¶ 81.

[160]   **Schedule 8**.

[161]   Discussion with Zeeshan Zaidi and Michael Schmitt.

[162]   Discussion with Zeeshan Zaidi and Michael Schmitt.

[163]   Discussion with Zeeshan Zaidi and Michael Schmitt.  In addition to cost considerations, part of Ticketmaster's rationale for wanting 100% of tickets on platform if it runs an album bundle is that Ticketmaster cannot incur the risk of marketing (and thus in effect guaranteeing) an album bundle to all ticket purchasers with a third party is responsible for supplying the album in conjunction with tickets being sold off platform.

[164]   Discussion with Zeeshan Zaidi and Michael Schmitt.

[165]   Discussion with Zeeshan Zaidi and Michael Schmitt.

[166]   Discussion with Zeeshan Zaidi and Michael Schmitt.

43

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 475**

on **Schedule 8**, of these five artists, I understand that only Dierks Bentley has a fan club that complies with the Ticketmaster Fan Club Policy.  Therefore, the other four artists (Kelly Clarkson, Billy Currington, Incubus and John Legend) would not be able to conduct an off-platform artist presale in any case.  Unless it is found by the Court that Ticketmaster has interfered with Songkick solely by offering an album-bundling service in exchange for on-platform ticketing, or solely by requiring presale tickets bundled with an album purchase to comply with other conditions of the Ticketmaster Fan Club Policy, the five artists included in this category should not be included in the calculation of Songkick's alleged lost profits.

g.       Summary: Mr. Yurkerwich's "Type of Interference" Categories

113.    For the reasons discussed above, and in consideration of the observations shown on **Schedules 10, 11, 12** and **13** to this Rebuttal Report, Mr. Yurkerwich's conclusions as to (a) which artists are "at-issue," (b) the alleged "type of interference" by Ticketmaster, and (c) his determination of whether there is evidence of interference at all, are unreliable, unsupported, and speculative.  In many cases, the available facts and information indicate that the artist should be excluded from Mr. Yurkerwich's lost profits analysis.  Moreover, because Mr. Yurkerwich does not perform a separate lost profits calculation for each "at-issue" artist, any removal or reclassification of a specific artist or artists necessitates a re-running of Mr. Yurkerwich's entire analysis, including his calculation of Ticketmaster's average sell-through rate and "O.U.S. Multiplier."  As a result, Mr. Yurkerwich's improper conclusions as to causation impact his entire lost profits calculation.

**2.       *Additional Reasons Why Mr. Yurkerwich's Causation Determinations are Unsupported and Inappropriate***

114.    For the reasons discussed below, many of the artists that Mr. Yurkerwich identifies and uses to calculate Songkick's lost profits should be excluded from any list of "at-issue" artists.

*Highly Confidential – Outside Counsel Only*

a.      Mr. Yurkerwich Inappropriately Includes Artists That Conducted
Artist Presales with Third Parties Other Than Songkick, or
(Alternatively) Did Not Conduct Any Artist Presales

115.    For several of Mr. Yurkerwich's 139 "at-issue" artists, neither Ticketmaster nor Songkick
conducted an artist presale during the relevant years of Mr. Yurkerwich's analysis.
Therefore, either those artists (a) conducted qualifying artist presales off the Ticketmaster
platform using a third party other than Songkick, or (b) decided not to conduct an artist
presale at all.

116.    In cases where another third party may have conducted the artist presale, Mr. Yurkerwich
does not provide any explanation or analysis as to why, "but for" Defendants' alleged
actions, the "at-issue" artist would have selected Songkick over the other third party that
the artist actually selected.

117.    Similarly, in cases where the artist chose not to conduct an artist presale at all, Mr.
Yurkerwich does not provide any analysis to support his assumption that "but for"
Defendants' alleged actions, the artist would have decided to do an artist presale (let alone
an artist presale with Songkick).

118.    As shown on **Schedule 9**, 26 of Mr. Yurkerwich's 139 "at-issue" artists did not conduct an
artist presale on the Ticketmaster or Ticketstoday platforms during the period of 2012
through 2016.  These 26 artists account for 9% of the total Ticketmaster U.S. ticket sales
that serves as the starting point for Mr. Yurkerwich's lost profits calculation.[167]   Eight of
these 26 artists also did not conduct any artist presales using Songkick for events in any
year from 2012 through 2016.[168]   For the reasons stated above, it is improper for Mr.
Yurkerwich to include artists that (a) elected to run artist presale on a third party platform
other than Songkick, or (b) chose not to conduct an artist presale at all in his calculation of
Songkick's lost profits.

---

[167] 2,269,474 [**Schedule 9**] ÷ 26,017,975 [Yurkerwich Report, Exhibit 9.1] = 0.09.

[168] **Schedule 9**.

*Highly Confidential – Outside Counsel Only*

45

        **b.**     <u>Mr. Yurkerwich Improperly Includes Artists for Which Ticketmaster Runs and Operates a Paid Subscription Fan Club</u>

119.    I understand that, for some of Mr. Yurkerwich's "at-issue" artists, Ticketmaster's OnTour division runs and operates a paid subscription fan club for the artist (and in some of those instances, also runs the artist's website).[169]  This includes the Dixie Chicks, Guns N' Roses, Madonna, Maroon 5, U2 and the Zac Brown Band.[170]  Of those artists, OnTour also ran the artist website for Guns N' Roses, Madonna, and U2.[171]  As one part of that broader service / product, Ticketmaster conducts artist presales for those artists at Ticketmaster venues.[172]

120.    These artists specifically sought out and entered into contracts with Ticketmaster to setup, operate, and run subscription based, paid fan clubs (and in some cases, the artist's entire website)—not simply to conduct artist presales.[173]  It is my understanding that Songkick does not offer this service / product.  Therefore, there is no basis to assume that, in the "but-for" world, these artists would have foregone the service / product they actually desired (i.e., a company that sets up and runs a paid fan club for them) in order to simply run an artist presale with Songkick.  Mr. Yurkerwich's assumption that these artists would have worked with Songkick but-for Ticketmaster's alleged interference is therefore contrary to the factual record and unsupportable.  As a result, these six artists, which account for 11% of the total Ticketmaster U.S. ticket sales in Mr. Yurkerwich's lost profits calculation, should be excluded from any calculation of Songkick's alleged lost profits from lost artist presales.[174]

---

[169]  Discussion with Zeeshan Zaidi and Michael Schmitt.

[170]  Discussion with Zeeshan Zaidi and Michael Schmitt.  *See also*, Ticketmaster Artist Services Update (TM00016373-391, at 375).

[171]  Discussion with Zeeshan Zaidi and Michael Schmitt.

[172]  Discussion with Zeeshan Zaidi and Michael Schmitt.  I understand that third-party providers may handle artist presales for events at non-Ticketmaster venues.

[173]  Discussion with Zeeshan Zaidi and Michael Schmitt.

[174]  **Schedule 8**.  [455,945 (Dixie Chicks) + 798,521 (Guns N' Roses) + 217,017 (Madonna) + 554,676 (Maroon 5) + 400,617 (U2) + 343,933 (Zac Brown Band) = 2,770,709 tickets.  2,770,709 ÷ 26,017,975 = 11%].

46

*Highly Confidential – Outside Counsel Only*

c.      Mr. Yurkerwich Improperly Includes Artists that Do Not Have a Fan Club which Complies with Ticketmaster's Fan Club Policy

121.    I understand that the vast majority of the 139 "at-issue" artists identified by Mr. Yurkerwich do not have a fan club that meets the requirements of the Ticketmaster Fan Club Policy, and therefore, even in the absence of any alleged interference, Songkick would not have been able to conduct artist presales for those artists at Ticketmaster venues.[175]  Mr. Yurkerwich, however, completely fails to consider this when he assumes that but-for Ticketmaster's alleged interference, all 139 "at-issue" artists would have otherwise ran an off-platform presale with Songkick.

**C.      As a Result of Numerous Methodological Flaws and Errors, Mr. Yurkerwich's Calculation of the Number of Songkick's Alleged Lost Presale Tickets for U.S. Events is Unreliable**

122.    Even if one were to assume that Mr. Yurkerwich's 139 "at-issue" artists were properly included in his lost profits analysis, which I do not agree with for the reasons discussed above, Mr. Yurkerwich's calculation of Songkick's alleged lost profits related to those artists is flawed and unreliable.  As discussed in **Section IV.A.2** of this Rebuttal Report, Mr. Yurkerwich's calculation of the number of artist presale tickets that Songkick allegedly lost as a result of Defendants' actions is comprised of several steps.  In this section, I address issues and errors present in those steps.

*1.      Mr. Yurkerwich's "Probability of Success Factors" Are Unsupported*

123.    Mr. Yurkerwich explains in his report that he applied "probability of success" factors "to reflect the likelihood of Songkick completing a presale contract with the at-issue artists but-for Ticketmaster's behavior."[176]  Rather than analyze the specific situations of each concert tour and presale activity, and evaluating the likelihood that Songkick would successfully reach a deal with each artist, Mr. Yurkerwich simply applies "probability of success" factors broadly by "type of interference" category, without providing any

---

[175]   *See* **Schedule 8**.  As addressed above, six of the "at-issue" artists with qualifying fan clubs are artists for whom Ticketmaster Artist Services/OnTour runs the fan club.

[176]   Yurkerwich Report, ¶ 83.

47

explanation for why those factors are appropriate, or what they are based on.  There is no methodological or factual basis for the percentages ("probabilities") he applies.

**Table 7: Mr. Yurkerwich's "Probability of Success" Factors**

| "Type of Interference" Category | "Probability of Success" |
|---|---|
| LN/TM Pressure/Threats/Leverage | 90% |
| LN/TM Relationship/Restrictions | 75% |
| Harmed Manager or Agency Relationship | 50% |
| Fan Club Policy (Allocation Cap) | 90% |
| Fan Club Policy (Alleged Non-Compliance) | 90% |
| Fan Club Policy (Bundling or Merchandise) | 90% |

124.    Overall, across all categories, Mr. Yurkerwich's calculation assumes a Songkick "probability of success" of 73%.[177]  Again, Mr. Yurkerwich does not provide _any_ analysis to support this conclusion.  For example, Mr. Yurkerwich provides no analysis of Songkick's historical sales win-loss rates or other relevant data (or anything else for that matter).  Indeed, Mr. Yurkerwich offers no data or analysis to support the conclusion that Songkick could have even gotten an opportunity to pitch all of these artists, let alone to support his conclusions as to Songkick's likelihood of actually closing deals with 73% of the 139 "at-issue."

125.    As discussed in **Sections V.B.1(a)** and **V.B.1(b)** above, TMF interviewed the managers or agents for artists that make up a substantial share of the damages that Mr. Yurkerwich derives from his analysis of the 139 "at-issue" artists.[178]  The managers and agents for these artists directly refute Mr. Yurkerwich's "probability of success" assumptions.  Where Mr. Yurkerwich is assuming that, on average, 73% of the time Songkick would have sold artist

---

[177]    $18,932,612 \div 26,017,975 = 0.73$ [Yurkerwich Report, Exhibit 9.0].

[178]    See **Schedule 11** for a list of artists addressed in TMF interviews with managers or agents.

_Highly Confidential – Outside Counsel Only_

presale tickets for the "at-issue" artists "but for" some alleged wrong doing by Live Nation or Ticketmaster, the managers and agents that actually make those business decisions for these artists placed the probability of working with Songkick in any "but for" world at 0%.[179]

126.   For example, for Mr. Yurkerwich's "LN/TM Relationship/Restrictions" category, artist managers and agents that TMF interviewed account for 50% of the Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's calculation of Songkick's alleged lost profits.[180]  All of the managers and agents interviewed indicated that the likelihood of Songkick conducting presales for those artists is 0%.[181]  Therefore, Mr. Yurkerwich's assumption that 75% of the artists included in this category would have conducted artist presales with Songkick but for any alleged actions of Defendants is speculative and wrong.

127.   Similarly, for Mr. Yurkerwich's "Harmed Manager or Agency Relationship" category, artist managers and agents that TMF interviewed account for 58% of the Ticketmaster U.S. ticket sales included in Mr. Yurkerwich's calculation of Songkick's alleged lost profits.[182]  All of the managers and agents interviewed indicated that the likelihood of Songkick conducting presales for those artists is 0%.[183]  Therefore, Mr. Yurkerwich's assumption that 50% of the artists included in this category would have conducted artist presales with Songkick but for any alleged actions of Defendants is speculative and wrong.

128.   Moreover, as discussed in **Section V.B.2(c)** above, and shown on **Schedule 8** to this Rebuttal Report, I understand that a significant majority of Mr. Yurkerwich's 139 "at-issue" artists do not have a fan club that complies with the Ticketmaster Fan Club Policy. Therefore, for Songkick to have any success in conducting an artist presale for those artists

---

[179]   Discussion with Matt Maher and Bernie Cahill (ROAR), Adam Flick (Azoff Management), Guy Oseary (Maverick Management), Jordan Feldstein (CAM), Fernando Lebeis (Team Brazil), Johnny Wright and Brad Margolis (Wright Entertainment Group and Tennman Digital).  *See* **Section V.B.1** of this Rebuttal Report.

[180]   4,292,512 [**Schedule 11**] ÷ 8,595,447 [**Schedule 8**] = 0.5.

[181]   Discussion with Jordan Feldstein (CAM), Fernando Lebeis (Team Brazil), Johnny Wright and Brad Margolis (Wright Entertainment Group and Tennman Digital, respectively).  *See* **Section V.B.1(a)** of this Rebuttal Report.

[182]   4,627,600 [**Schedule 11**] ÷ 7,985,621 [**Schedule 8**] = 0.58.

[183]   Discussion with Matt Maher and Bernie Cahill (ROAR), Adam Flick (Azoff Management), Guy Oseary (Maverick Management).  *See* **Section V.B.1(b)** of this Rebuttal Report.

*Highly Confidential – Outside Counsel Only*

at Ticketmaster contracted venues, it would first need to resolve any fan club compliance issues.  In coming to his high rates for the "probability of success," Mr. Yurkerwich does not appear to consider how Songkick would address those compliance issues.

129.   In addition, as discussed in **Section V.B.2(a)** above, eight of the "at-issue" artists did not conduct an artist presale in the periods at issue on the Ticketmaster, Ticketstoday or Songkick platforms,[184] nor does Mr. Yurkerwich claim that they conducted an artist presale at all, with anyone.  Therefore, to the extent that those eight artists chose not to run an artist presale at all, Songkick would first need to convince the artist of the value of running an artist presale.  In coming to his "probability of success" factors, Mr. Yurkerwich does not address this issue.

130.   Mr. Yurkerwich also fails to consider situations where, prior to the alleged time of interference, the artist had voluntarily entered into a contract—for that artist's benefit—with Ticketmaster or Live Nation whereby the artist chose to have Ticketmaster sell all tickets for events at Ticketmaster venues as part of a larger agreement for concert promotion, artist management, and/or paid subscription fan club or other services.  For those artists, Songkick's "probability of success" during the periods at issue was likely zero; again, however, Mr. Yurkerwich does not address this issue.

131.   Finally, Mr. Yurkerwich's "probability of success" conclusions are also improper in light of "exemplary" documents and information cited by Mr. Yurkerwich.  For example, Mr. Yurkerwich categorizes the band Kings of Leon as "LN/TM Pressure/Threats/Leverage" and therefore applies a probability of success of 90%.[185]  However, Songkick's internal Salesforce database (cited only in part by Mr. Yurkerwich) states that Kings of Leon's manager "doesn't love presales.  He never has—it has nothing to do with us.  The only effective presale he's seen, as of late, was the Amex one. (sic) that he said moved ~70% of MSG's seats.  He understands them but he feels like for a band like [Kings of Leon] and the audience that they attract, they don't make a ton of sense …. It doesn't make sense to

---

[184]   **Schedule 9**.

[185]   Yurkerwich Report, Exhibits 9.0 and 9.5.

50

keep chasing this as a viable opportunity."[186]  I have summarized in **Schedule 15** examples of situations where Mr. Yurkerwich's assumed "probability of success" is contrary to the very evidence that he cites.

> ### *2.    Mr. Yurkerwich's Determination of the Aggregate Sellable Capacity of "At-Issue" Events Is Unreliable*

132.    In an effort to estimate the total number of tickets available for the events of the 139 "at-issue" artists, Mr. Yurkerwich divides his total amount of "Adjusted At-Issue TM Primary Tickets" by his estimate of Ticketmaster's sell-through rate of 58%.[187]  Mr. Yurkerwich derives the 58% sell-through rate based on data available for a subset of the "at-issue" artists and related events.[188]  Thus, rather than use the artist specific sell-through rates to estimate the sellable capacity specific to those artists for which data was available, Mr. Yurkerwich broadly applies his calculated overall average of 58% to all Ticketmaster ticket sales in his calculation.

133.    Mr. Yurkerwich's failure to perform these calculations on an individual-artist basis results in a sell-through rate that is imprecise and inaccurate.  Specifically, for several of the 139 "at-issue" artists that have the most significant impact on Mr. Yurkerwich's lost profits calculation (i.e. they account for the largest amounts of Ticketmaster ticket sales in his calculation), Mr. Yurkerwich is understating the actual sell-through rate.  This, in turn, means Mr. Yurkerwich is overstating his calculation of the total sellable capacity that would have been available for artist presale allocations (which causes him to improperly inflate the alleged damages).  For example, Mr. Yurkerwich did not calculate the actual sell-through rate for the following significant ticket selling artists in Mr. Yurkerwich's calculations, all which had sell-through rates of much higher than 58%:

- Beyoncé / Jaz-Z:  Beyoncé has the second highest amount of Ticketmaster ticket sales in Mr. Yurkerwich's analysis, and Jay-Z has the eleventh highest.  In 2014, Beyoncé and Jay-Z toured together for the "On the Run

---

[186]   Yurkerwich Report, Exhibit 9.5 (citing SK00978910).

[187]   Yurkerwich Report, ¶ 87 and Exhibits 6.4, 7.4, 8.4 and 9.1.

[188]   Yurkerwich Report, Exhibit 9.1 (citing to TM00067645-648 (capacity data); TM00111420-425 and TM00125510 (Ticketmaster ticket sales)).

*Highly Confidential – Outside Counsel Only*

Tour," which grossed $96 million from 19 sold-out shows.[189]  In addition, Beyoncé's 2016 Formation tour also sold out and was "one of the hottest tours of 2016."[190]  Mr. Yurkerwich, however, shows only an 85% sell-through rate for Beyoncé.  Therefore, the input he uses in calculating his sell-through average is not accurate, and his damages calculations ultimately rely on his improper assumption that Beyoncé and Jay-Z's sell-through was the overall average of 58%.[191]

- Taylor Swift:  Taylor Swift has the third highest amount of Ticketmaster ticket sales in Mr. Yurkerwich's analysis.  I understand that her "1989 World Tour" grossed over $250 million in 2015 and sold out all, or nearly all, U.S. events.[192]  Regardless, Mr. Yurkerwich calculations assume that the relevant sell-through was only 58%.

- Coldplay:  Coldplay has the ninth highest amount of Ticketmaster ticket sales in Mr. Yurkerwich's analysis.  Coldplay sold out all shows of its North American leg of the "Head Full of Dreams" tour in 2016—i.e., the sell-through rate was 100%.[193]  Once again, contrary to his own data and the available evidence, Mr. Yurkerwich uses an average 58% sell-through rate for this artist.

134. In summary, Mr. Yurkerwich's calculation of the sellable capacity of "at-issue" events is unreliable, which has a cascading effect making the rest of his lost profits analysis inaccurate and unreliable.[194]

---

[189]  "Beyoncé & Jay Z Sell Out Stadium Tour." http://www.billboard.com/articles/columns/chart-beat/6243672/beyonce-jay-z-sell-out-stadium-tour, dated 9/4/2014.

[190]  "Beyoncé's Formation Tour Joins Top 20 Highest-Grossing with Least Amount of Dates." https://www.axs.com/beyonc-s-formation-tour-joins-top-20-highest-grossing-with-least-amount-108281, dated 10/15/2016.

[191]  Yurkerwich Report, Exhibit 9.1.

[192]  "2015 Pollstar Year End Top 20 Worldwide Tours." https://www.pollstarpro.com/files/charts2016/011816Top20WorldwideTours.pdf; Discussion with Michael Schmitt.

[193]  "Current Boxscore." https://web.archive.org/web/20161004192754/http://www.billboard.com/biz/current-boxscore, archived from 10/04/2016.

[194]  Because Mr. Yurkerwich uses an average, his calculation of the sellable capacity of at-issue events is also wholly inaccurate if applied to the calculation of Songkick's alleged lost profits related to any particular artist in Mr. Yurkerwich's population of 139 "at-issue" artists.

*Highly Confidential – Outside Counsel Only*

### 3. *Mr. Yurkerwich's Assumption that Defendants' Alleged Actions Resulted in Songkick Losing Artist Presales for Events at Non-Ticketmaster Venues Is Unsupported and Contrary to Information Cited by Mr. Yurkerwich*

135.   As discussed in **Section IV.A.2** above, Mr. Yurkerwich grosses up the number of Ticketmaster tickets available for artist presales in the U.S. based on his assumption that Ticketmaster's actions caused Songkick to lose artist presales at both Ticketmaster and non-Ticketmaster venues. To do so, Mr. Yurkerwich simply divides the number of tickets in his analysis by an assumed Ticketmaster market share of 70%.[195] Mr. Yurkerwich has done no analysis of the specific artists' tours included in his damages calculation to confirm that those tours included a 70/30 split of Ticketmaster and non-Ticketmaster venues. Therefore, Mr. Yurkerwich's gross up for non-Ticketmaster venues is completely speculative.

136.   Further, Mr. Yurkerwich does not cite to any evidence to support his claim that, "the loss of an artist's Ticketmaster tour dates often leads to the loss of the artist's non-Ticketmaster tour dates,"[196] nor does Mr. Yurkerwich provide any support for why something which purportedly may happen "often" should therefore be assumed to have happened for *all* 139 of his "at-issue" artists. Contrary to Mr. Yurkerwich's unsupported assertion, I understand that it is not uncommon for an artist to use multiple ticketing service providers to handle their artist presales for a particular tour; many artists choose to use whichever ticketing service provider is handling the general sale for the particular venue, while others may use a third party for a portion of the venues.[197] For example, I understand that Bon Jovi, which has a qualifying fan club, conducts its artist presales for Ticketmaster venues on the Ticketmaster platform, and uses OneLive for their artist presales at non-Ticketmaster venues.[198]

---

[195]   Yurkerwich Report, ¶ 91 & Exhibits 6.4, 7.4 and 8.4.

[196]   Yurkerwich Report, ¶ 90.

[197]   Discussion with Zeeshan Zaidi and Michael Schmitt; Deposition of David Marcus 30(b)6, February 17, 2017, pp. 191:15-193:22.

[198]   Discussion with Michael Schmitt.

53

*Highly Confidential – Outside Counsel Only*

137.    In addition, documents cited by Mr. Yurkerwich related to certain of his 139 "at-issue" artists contradict his own assumption here.  For example, a 2017 Songkick Salesforce Database entry related to country artist Eric Church states that "they have decided that they will be keeping all tickets on the venue systems."[199]  Keeping presale tickets on the venue systems means that the artist is using whatever primary ticketing system the venues utilize, which in turn means that the artist is using multiple providers for presales.

138.    In summary, Mr. Yurkerwich's broad assumption that Songkick lost presale ticketing opportunities at both Ticketmaster and non-Ticketmaster events is unsupported generally, and specifically not based on any analysis of the 139 "at issue" artists.[200]

### D.    Mr. Yurkerwich's Calculation of Alleged Future Lost Profits Is Improper and Speculative

139.    As discussed above, Mr. Yurkerwich calculates Songkick's future lost profits for the period of 2017 to 2021.  Mr. Yurkerwich states that he has "assumed that Songkick could have achieved at least the same 10% presale growth expected by Ticketmaster."[201]  I am not aware of any document or testimony indicating that Ticketmaster expects (or ever expected) 10% annual growth in artist presales.  In other areas of his report, Mr. Yurkerwich cites to a Ticketmaster email chain and attached "return analysis" for the Artist Services division prepared in January 2014.[202]  Mr. Yurkerwich's use of this document as support for a Ticketmaster expectation of 10% annual growth in artist presales is inappropriate for the following reasons:

- This "return analysis" is not a thorough and vetted "business model," but rather consists of rough estimates of high-level assumptions for the purpose of preparing a presentation;[203]

---

[199]   Yurkerwich Report, Exhibit 9.5 (citing SK00978910; SK00999737 (Songkick Salesforce Databases)).

[200]   Since it is not based on any analysis of the 139 "at issue" artists, Mr. Yurkerwich's 70% would not necessarily be appropriate for a calculation of Songkick's alleged lost profits related to any specific artist included in his 139 "at-issue" artists.

[201]   Yurkerwich Report, ¶ 95.

[202]   Yurkerwich Report, ¶ 102 (citing Email from Rey del Valle to Zeeshan Zaidi and Greg Schmale, January 18, 2014, re: Estimates and attachments (TM00111626-631)).

[203]   Discussion with Zeeshan Zaidi.

54

*Highly Confidential – Outside Counsel Only*

- The projected number of tickets is for the Artist Services/OnTour division in general—it is not specific to artist presale ticketing, but rather includes other forms of tickets sales (e.g., "VIP" ticketing);[204]

- Ticketmaster personnel responsible for Artist Services/OnTour believe, and have testified, that artist presales will be less common in the future as the industry is moving away from time-based distribution to identity-based distribution and other avenues of ticket distribution; consequently, even if hypothetically a projected 10% growth rate might have been reasonable in 2014, important shifts in industry dynamics mean that growth will be less than 10% going forward, and decreasing over time, as presales in general become a thing of the past.;[205]

- Even on the face of the document cited by Mr. Yurkerwich, there is no indication that Ticketmaster believed that artist presales would have grown at a 10% rate after 2017;[206]

- The document cited by Mr. Yurkerwich bases its projected growth on investments in two things (a reporting tool and an upgraded fan engagement platform), only one of which is alleged to involve Songkick confidential information (the reporting tool);[207] and

- I understand that the investments that were contemplated in the "return analysis" – i.e., developing a specific artist presale reporting tool and upgrading its fan engagement platform – were never made.  I understand that Ticketmaster instead built its reporting tool using its existing venue reporting tool (TM 360).[208]

---

[204] Discussion with Zeeshan Zaidi.

[205] Discussion with Zeeshan Zaidi; Discussion with Jared Smith, David Marcus, and Geoff Carns; Deposition of David Marcus 30(b)6, February 17, 2017, pp. 89:11-22 and 112:8-113:19.  I understand that time-based ticketing rewards the first potential ticket buyers that are able to access a particular form of distribution, often to the detriment of the artists and fans, as it suffers from purchases by ticket brokers and exploitation in secondary ticket market sales.  I understand that identify-based ticketing focuses on efforts to identify and meet the demand and wishes of those ticket buyers most interested in a particular artist.  These potential ticket buyers are less sensitive to ticket price issues and want to also be informed about other possible fan connections to artists.  Identity-based ticketing has become possible with the growth of digital ticketing and the cost effective availability of consumer historical purchase and other data.  Additionally, the growth in social media has diminished the needs of artists to promote fan clubs for awareness and to create ticket demand.

[206] Email from Rey del Valle to Zeeshan Zaidi and Greg Schmale, January 18, 2014, re: Estimates and attachments (TM00111628-631, at 626).

[207] Mr. Yurkerwich does not attempt to disaggregate the projected revenue based on the unchallenged / lawful behavior (updated fan engagement platform) from the allegedly unlawful behavior (revenue from aspects of a misappropriated reporting tool).

[208] Discussion with Zeeshan Zaidi.  I understand that Ticketmaster modified its existing TM 360 reporting tool and never invested in the contemplated fan engagement platform.

55

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 487**

140. In addition, as discussed in **Section IV.A.3** above, it is unclear if Mr. Yurkerwich assumes that Songkick would have achieved this 10% growth in presale tickets specifically for the 139 "at-issue" artists, or if he assumes that some or all of that growth would come from Songkick presale tickets for other artists.  In either case, Mr. Yurkerwich's assumptions render his calculation of Songkick's alleged future lost profits speculative and unreliable.  As it relates to the 139 "at-issue" artists, Ticketmaster or any other ticketing service provider has no control over the number of tickets that will be available for sale for a given artist in a given year, because the artist (along with managers and agents) determines the tour timing (if any) and routing.[209]  Any growth in the tickets available for the 139 artists would therefore require that those artists to add more and more shows each year, tour more frequently, or increase the size of the venues that they are playing in.

### E.    Mr. Yurkerwich's Application of a "Global Adjustment" Is Overstated and Contrary to Documents and Information Produced by the Parties

141. As discussed in **Section IV.A.4** above, Mr. Yurkerwich applies a multiple of 1.58 to his calculation of Songkick's lost U.S. presale tickets based on his broad, unsupported assumption that "[t]he loss of an artist's United States or North American business often leads to the loss of the global tour."[210]  I understand that, as a general premise, this assumption is incorrect in these circumstances due to the following:

- Concert ticketing policies and practices overseas are different from in the U.S.  For example, in the United Kingdom, venues do not contract directly with ticketing companies, but rather distribute tickets through various promoters (i.e., use an "allocation" method).  Tickets for each venue are generally not sold on a centralized platform, and thus Mr. Yurkerwich's assumption that Ticketmaster's activities in the U.S. somehow block Songkick sales overseas is speculative;[211]

---

[209]   Discussion with Jared Smith, David Marcus and Geoff Carns; Discussion with Zeeshan Zaidi and Michael Schmitt.

[210]   Yurkerwich Report, ¶ 93.

[211]   Discussion with Jared Smith, David Marcus and Geoff Carns. *See also* Deposition of Jared Smith, January 27, 2017, p. 265:2-11; Deposition of Michael Rapino, January 19, 2017, pp. 206:23-207:13.

56

- Ticketmaster's North American operations, which are at issue in this case, are run completely separately from Ticketmaster's operations overseas;[212]

- Ticketmaster does not have operations in all regions where the 139 "at issue" artists may have toured during the period at issue – in particular, Ticketmaster does not have a presence in Asia;[213] and

- Ticketmaster's market share outside the U.S. varies by region and is lower than in the U.S.[214]  Therefore, it is improper for Mr. Yurkerwich to assume that Ticketmaster would account for the same percentage of O.U.S. tickets as it does in the U.S.

142.   Songkick's own ticket sale results also contradict Mr. Yurkerwich's assumption.  As shown on **Schedule 16** to this Rebuttal Report, there seems to be no correlation in the growth of Songkick's artist presales for U.S. and O.U.S events.  For example, while Songkick's artist presale tickets for U.S. events grew by 67,801 tickets (16%) from 2015 to 2016, Songkick's artist presales for O.U.S events grew by 294,090 tickets (163%) during that same period.[215]

143.   Further, in his report, Mr. Yurkerwich only discusses two of his 139 "at-issue" artists where Songkick documents purportedly indicate that it lost the ticketing opportunity related to non-U.S. tours – Justin Timberlake and Lady Antebellum.[216]  He then extrapolates these two examples to all 139 artists.[217]  Mr. Yurkerwich, however, provides no analysis to support why it is appropriate to assume that Songkick lost opportunities for non-U.S. tours for 100% of his 139 "at-issue" artists.  To the contrary, documents cited by Mr. Yurkerwich related to a number of his 139 "at-issue" artists contradict Mr. Yurkerwich's conclusion that a "Global Adjustment" or "O.U.S. Multiplier" is even applicable (i.e., these documents demonstrate that Songkick did *not* lose an international presale opportunity because of

---

[212] Specifically, Ticketmaster LLC operates solely in the North American market, while Ticketmaster International, which is headquartered London, runs Ticketmaster's operations overseas, and the two divisions rarely work together on international tours.  [Discussion with Jared Smith, David Marcus and Geoff Carns].

[213] Discussion with Jared Smith, David Marcus and Geoff Carns.

[214] Discussion with Jared Smith, David Marcus and Geoff Carns.

[215] **Schedule 16.**

[216] Yurkerwich Report, ¶¶ 51 and 61.

[217] As discussed in **Section V.B.1(a)** above, Mr. Wright and Mr. Margolis informed TMF that there was never any discussion with Songkick about conducting artist presales for Mr. Timberlake's U.S. or O.U.S. tours.

57

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 489**

something that Live Nation or Ticketmaster allegedly did).   For example, Mr. Yurkerwich's Exhibit 9.5 cites to the following:

- **Trans-Siberian Orchestra:** A 2015 Songkick Salesforce Database entry states, "Schmale spoke to Adam Lind who said that because of the nature of their relationship with Live Nation here in North America, that they are not willing to rock the boat with them [and] thus will not [be using] a provider like Songkick.  However, he wants to work with us in Europe."[218] Trans-Siberian Orchestra is the fourth largest "at-issue" artist in Mr. Yurkerwich's calculation based on the number of Ticketmaster U.S. ticket sales.

- **Taylor Swift:** A 2014 Songkick Salesforce Database entry states, "They are open to using us in EU/UK so shifting our focus there."[219] Taylor Swift is the third largest "at-issue" artist in Mr. Yurkerwich's calculation based on the number of Ticketmaster U.S. ticket sales.

- **Beyoncé:** A 2014 Songkick Salesforce Database entry states, "Management said they want to circle back with us mid summer or early fall to discuss the EU and AUS tours, as well as future N. America Beyoncé tours."[220] Beyoncé is the second largest "at-issue" artist in Mr. Yurkerwich's calculation based on the number of Ticketmaster U.S. ticket sales.

- **Ariane Grande:** A 2014 Songkick Salesforce Database entry states, "We are continuing the conversations with Scooter and are looking ahead to international touring."[221] Ariana Grande is the twenty-third largest "at-issue" artist in Mr. Yurkerwich's calculation based on the number of Ticketmaster U.S. ticket sales.

- **Incubus:** A 2017 Songkick Salesforce Database entry states, "Joe still wants to work with us on Ex-US Incubus dates …"[222]

- **Slipknot:** Internal Songkick communications and a 2015 Songkick Salesforce Database entry indicate, "Out for the US tour, mainly due to this being a Live Nation tour.  Focusing our attention to the EU/UK and the rest of the world." [223]

---

[218]   Yurkerwich Report, Exhibit 9.5.

[219]   Yurkerwich Report, Exhibit 9.5.

[220]   Yurkerwich Report, Exhibit 9.5.

[221]   Yurkerwich Report, Exhibit 9.5.

[222]   Yurkerwich Report, Exhibit 9.5.

[223]   Yurkerwich Report, Exhibit 9.5.

58

*Highly Confidential – Outside Counsel Only*

144.  In each of these cases, the "evidence" Mr. Yurkerwich cites and relies on actually refutes his assumption that Songkick lost the opportunity to run non-U.S. presales for the artist at issue.

145.  Furthermore, one of the two examples relied on by Mr. Yurkerwich for applying a "global adjustment" to his damages calculation is Justin Timberlake.[224]  As discussed above, I interviewed the manager for Justin Timberlake, and he directly refuted Mr. Yurkerwich's assumption that any conduct by Live Nation or Ticketmaster had anything to do with Mr. Timberlake's decision not to engage Songkick in either the U.S. or internationally. According to Justin Timberlake's manager, Songkick was never a consideration—in part because Justin Timberlake had no interest in an off platform artist presale.[225]

146.  In addition, for four of Mr. Yurkerwich's "at issue" artists (Bon Jovi, John Mayer, Red Hot Chili Peppers and Band of Horses), Ticketmaster did not sell any tickets (presale or general on sale) for the artist after the alleged beginning year of interference.[226]  However, Mr. Yurkerwich includes those artists in his calculation of the overall average Ticketmaster "O.U.S. Multiplier."[227]  Independent of everything else discussed above, this makes the calculation inaccurate.

147.  Mr. Yurkerwich's broad application of a 1.58x multiple is also inappropriate for the calculation of Songkick's alleged lost profits for any specific artist of the 139 "at-issue" artists because Mr. Yurkerwich has made no determination if each of those artists actually toured outside the U.S. in the periods in which he calculated damages related to that artist. Data presented on Mr. Yurkerwich's Exhibit 9.4 highlights this issue.  For example, several artists did *not* tour outside the U.S. at all during 2012 through 2015 according to the Pollstar data shown on Mr. Yurkerwich's Exhibit 9.4 (e.g., Kid Rock, Van Halen, Dead & Company, Slightly Stoopid, Kelly Clarkson, and Rebelution).[228]  Nevertheless, Mr.

---

[224]  Yurkerwich Report, ¶ 51.

[225]  Discussion with Johnny Wright (Wright Entertainment Group).

[226]  *See* Yurkerwich Report, Exhibit 9.1.

[227]  Yurkerwich Report, Exhibit 9.4.

[228]  Yurkerwich Report, Exhibit 9.4.

59

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 491**

Yurkewich applies a 1.58x multiple to those artists based on the assumption that they conducted international shows, even though they did not.

148.    In addition, for other "at-issue" artists, Mr. Yurkewich includes in the calculation of his 1.58x multiple, data related to the artist's international touring in years *prior to* Mr. Yurkewich's "Interference Begin. Year."  The inclusion of these artists leads to an overestimation of the "global multiplier."  For example, Mr. Yurkewich improperly includes the following in his calculation of the 1.58x multiplier:

- **Rihanna:** Rihanna toured almost entirely outside the U.S. in 2013, resulting in an "O.U.S. Multiplier" of 5.86.  No touring data is reported for 2014 and 2015 (i.e., she did not tour again until 2016)[229] and Mr. Yurkewich's "Interference Begin. Year" for Rihanna is 2014.[230]  Consequently, it is improper to use 2013 Rihanna data in calculating an "O.U.S. Multiplier."

- **Red Hot Chili Peppers:** The Red Hot Chili Peppers toured almost entirely outside the U.S. in 2013, resulting in an "O.U.S. Multiplier" of 13.41. However, they did not tour outside the U.S. at all in 2014 or 2015, and Mr. Yurkewich's "Interference Begin. Year" is not until 2016.[231] Consequently, it is improper to use 2014 and 2015 data for the Red Hot Chili Peppers in calculating an "O.U.S. Multiplier."

149.    In summary, Mr. Yurkewich's broad assumption that Songkick lost presale ticketing opportunities outside the U.S. because of Ticketmaster's alleged actions is unsupported and speculative, and further his calculation even on its own terms is wholly inaccurate because it contains numerous methodological flaws.  Therefore, Mr. Yurkewich's assumed 1.58x "Global Adjustment" makes his damages calculation unreliable.[232]

---

[229]  Yurkewich Report, Exhibit 9.4.

[230]  Yurkewich Report, Exhibit 9.1.

[231]  Yurkewich Report, Exhibits 9.1 and 9.4.

[232]  Here again, the flaws in Mr. Yurkewich's analysis not only render the *aggregate* damages calculation presented in his report unreliable, these same failures would apply to any attempt to calculate lost profits related to any particular artist in Mr. Yurkewich's population of 139 "at-issue" artists.

60

*Highly Confidential – Outside Counsel Only*

### F.   Mr. Yurkerwich Significantly Overstates the Incremental Profit per Ticket that Songkick Would Have Achieved if it Had Sold the Alleged Lost Presale Tickets

150.   As a result of two major flaws, Mr. Yurkerwich significantly overstates Songkick's alleged incremental profit per ticket that it would have earned on lost artist presale tickets: (1) Mr. Yurkerwich overstates Songkick's average fee revenue per ticket, and (2) Mr. Yurkerwich understates the amount of additional costs Songkick would have incurred to make those lost artist presales.

### 1.   Mr. Yurkerwich Significantly Overstates Songkick's Average Fee Revenue per Ticket

151.   In his determination of Songkick's "Average Fee per Ticket," Mr. Yurkerwich includes booking fees, earn backs, and credit card fees.[233]  As explained in the Meyer Initial Report, I understand that Songkick retains, as its revenue, only the "booking fee" that it charges consumers who purchase artist presale tickets.[234]  Consequently, by including earn back and credit card fees, Mr. Yurkerwich includes in lost revenue Songkick fees that Songkick never retains as its own revenue.

152.   I have recalculated Mr. Yurkerwich's "Incremental Profit per Ticket" to correctly include only Songkick's booking fee revenue.  For illustrative purposes only, as shown on **Schedule 17**, because of this error, Mr. Yurkerwich overstates Songkick's alleged incremental profit per ticket, on average, by $1.80 per ticket.  As summarized in **Table 8**, for illustration, this error has a significant impact on Mr. Yurkerwich's lost profits calculations.

---

[233]   Yurkerwich Report, Exhibit 12.0.  I understand that booking fees are generally fees retained by Songkick as its revenue [Deposition of Josh Block, March 7, 2017, pp. 321:10-322:2].  Earn backs and artist earn backs are rebates paid to the venue, promoter or artist [Schiffer Deposition Exhibit 411, p. 8].  Credit card fees are "the credit card fees that CrowdSurge would pay to process a ticket purchase transaction" [Schiffer Deposition Exhibit 411, p. 9].

[234]   Meyer Initial Report, ¶ 47, citing Deposition of Josh Block, March 7, 2017, pp. 321:10-322:2.

*Highly Confidential – Outside Counsel Only*

**Table 8: Illustration Only - Mr. Yurkerwich's Lost Profits Calculations
Corrected for Songkick's Incremental Profit per Ticket**

|  | Mr. Yurkerwich[235] | Corrected for Incremental Profit per Ticket[236] |
|---|---|---|
| **8% Allocation** | | |
| U.S. Lost Profits | $31.8M | $21.7M |
| Global Lost Profits | $48.7M | $33.3M |
| **10% Allocation** | | |
| U.S. Lost Profits | $40.3M | $27.6M |
| Global Lost Profits | $62.2M | $42.5M |
| **20% Allocation** | | |
| U.S. Lost Profits | $82.9M | $56.6M |
| Global Lost Profits | $129.4M | $88.5M |

> ### 2. *Mr. Yurkerwich Understates the Amount of Additional Costs Songkick Would Have Incurred if it Had Made the Alleged Lost Presales*

153.    Mr. Yurkerwich states that he believes that Songkick's 69% gross margin "is a fair reflection of the incremental profit rate that would have been realized on the past lost presale tickets."[237]   For future lost presale tickets in the period 2017 to 2021, Mr. Yurkerwich lowers that margin to 61.5% "to consider additional costs to scale the business further."[238]   In the first instance, Mr. Yurkerwich provides no quantitative or qualitative analysis to support these margin figures.  They are entirely speculative.

154.    Moreover, even under his 8% allocation model, Mr. Yurkerwich is proposing that Songkick would have *more than doubled* the number of U.S. presale tickets from its existing sales

---

[235]  Yurkerwich Report, ¶¶ 9-11 & Exhibits 6.1, 6.2, 7.1, 7.2, 8.1 and 8.2.

[236]  **Schedules 17.1, 17.2** and **17.3**.

[237]  Yurkerwich Report, ¶ 96.

[238]  Yurkerwich Report, ¶ 96.  It is unclear as to how Mr. Yurkerwich derives his 61.5% from the document that he cites (SK00675311).

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 494**

levels in 2014, 2015, and 2016.[239]   Given that significant increase in volume, it is
unreasonable to assume that Songkick would not have incurred greater infrastructure and
other costs to handle that additional volume than the modest amounts implicitly included
in his calculation – especially given that Mr. Yurkerwich agrees with the general premise
that there are costs "to scale the business further."[240]   Therefore, Mr. Yurkerwich's
Incremental Profit per Ticket is overstated, even after correcting for his fee revenue error
discussed above.

### G.   Mr. Yurkerwich's Lost Profits Analysis – Conclusion

155.   For all of the reasons discussed above, Mr. Yurkerwich's lost profit damages are
contradicted by Songkick's financial data, documents, and the representations of artists
included in Mr. Yurkerwich's calculation.  As a result, Mr. Yurkerwich's opinions related
to Songkick's alleged lost profits are unreliable and speculative.

## VI.   ANALYSIS OF MR. YURKERWICH'S UNJUST ENRICHMENT OPINIONS

156.   As it relates to "Ticketmaster's misappropriation of confidential and non-public
information through a prior Songkick employee, Stephen Mead," Mr. Yurkerwich puts
forward damages measured by Ticketmaster's alleged unjust enrichment from the use of
that "confidential and non-public information."[241]   Mr. Yurkerwich alleges that
Ticketmaster benefitted economically from the use of the following Songkick documents
and information:[242]

- Artist toolboxes;

- Artist presale "test sites";

- Historical Songkick financial information;

- Historical weekly head of department reports, and other internal strategy
  documents;

---

[239]   Comparing the "SK Lost Tickets (U.S.) on Mr. Yurkerwich's Exhibit 8.2 to Songkick's "Total Tickets Sold" on
his Exhibit 12.0.

[240]   Yurkerwich Report, ¶ 96.

[241]   Yurkerwich Report, ¶¶ 12, 63 and 100.

[242]   Yurkerwich Report, ¶ 67.

63

*Highly Confidential – Outside Counsel Only*

- Board presentations; and

- Customer lists and artist pipelines.

157. Mr. Yurkerwich's analysis is unreliable and speculative. As an initial matter, Mr. Yurkerwich does not even attempt to assess damages associated with any of the individual (alleged) elements of confidential information listed above. Mr. Yurkerwich also fails to analyze and identify any specific alleged economic benefit that Ticketmaster may have received from having seen or had access to the specific Songkick documents and information that Ticketmaster is accused of misappropriating. Further, Mr. Yurkerwich has not addressed the fundamental issue of whether Ticketmaster, through its Artist Services/OnTour division, could have earned its same revenues and profits without access to the alleged Songkick confidential information. Further, Mr. Yurkerwich has not addressed the following issues:

- What is unique and novel about the alleged confidential information, if anything?

- How specifically does Songkick use the alleged confidential information to gain additional revenues or other benefits?

- Is the confidential information proprietary to Songkick and not known in the ticketing industry?

- How much of the alleged confidential information can be accessed in the public record and from ticketing industry sources in the normal course of business?

158. In addition, Mr. Yurkerwich fails to consider the testimony of Ticketmaster witnesses, and instead assumes that *all* changes and additions that Ticketmaster allegedly made to the service offerings of its Artist Services/OnTour division (which offers a range of services and products beyond artist presales) are entirely based on and attributable to Ticketmaster's alleged use of Songkick confidential information. Mr. Yurkerwich, however, provides no basis for this broad assumption.

159. Furthermore, in both of his unjust enrichment damages models, Mr. Yurkerwich makes errors and additional improper speculative assumptions, resulting in significant

64

*Highly Confidential – Outside Counsel Only*

overstatement of the economic benefit, if any, that Ticketmaster may have received.  I
discuss the flaws of Mr. Yurkerwich's analysis in detail in the following sections.

A.   **Mr. Yurkerwich Fails to Analyze and Identify Any Specific Alleged Economic
     Benefit that Ticketmaster May Have Received from Having Seen or Had
     Access to the Specific Songkick Documents and Information**

160.   In his report, Songkick's expert, Mr. Kyle Cunningham, concludes that Ticketmaster
       accessed, without authorization, Songkick artist toolboxes and test sites.[243]   Mr.
       Yurkerwich does not identify any specific information that was obtained from the access
       discussed in Mr. Cunningham's report, and neither Mr. Cunningham nor Mr. Yurkerwich
       present any specific evidence that Ticketmaster benefitted economically due to having
       access to data and information from Songkick that Ticketmaster did not have previous
       knowledge of, or that was not known in the ticketing service and music artist service
       industry.  Moreover, both Mr. Cunningham and Mr. Yurkerwich fail to consider that no
       conclusions can be drawn regarding whether Ticketmaster or Live Nation accessed
       Songkick's artist toolboxes or whether such access was unauthorized, as the alleged access
       discussed in Mr. Cunningham's report was, in many instances, authorized access by
       management companies affiliated with Live Nation to toolboxes created for them by
       Songkick, or was access originating from more than 70 Ticketmaster/Live Nation-affiliated
       venues, offices, and guest WiFi networks whose individual users cannot be identified.[244]
       Although Mr. Yurkerwich states that he has "performed a detailed review of Ticketmaster's
       presale offerings before and after the alleged misappropriation,"[245]  his report contains only
       vague references to changes made to Ticketmaster's Artist Services/OnTour presale
       ticketing offerings in and around 2013 through 2014.  Without any analysis or support, he
       then attributes all of those changes and additions solely to Ticketmaster's alleged use of
       Songkick confidential information.

---

[243]   Expert Report of Kyle P. Cunningham, CISSP, March 13, 2017 (the "Cunningham Report"), ¶¶ 9, 11, 91 and 99-
        102.

[244]   Expert Report of Vincent D'Agostino and Matteo Tomasini, April 24, 2017 (the "D'Agostino Report"), ¶ 10.

[245]   Yurkerwich Report, ¶ 67.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 497**

### 1. Songkick's "Artist Toolbox" / Reporting Tool

161. While he makes brief mention of various types of confidential information and documents that Songkick alleges were misappropriated by Ticketmaster, Mr. Yurkerwich focuses much of his discussion on the Songkick "artist toolbox."[246] Mr. Yurkewich concludes, "it is likely that Defendants' OnTour platform was created and able to scale quickly as a result of Defendants' use of client data that it extracted from Songkick's artist toolbox."[247] In the first instance, Mr. Yurkerwich is assuming that Ticketmaster "extracted" data from the artist toolbox without authorization—which as discussed in the D'Agostino Report, is highly speculative.[248] More generally, Mr. Yurkerwich provides no basis or backup for his opinion that "Defendants' OnTour platform was created and able to scale quickly" as the result of information allegedly improperly obtained from Songkick, nor does he have expertise to reach this opinion. In his report, Mr. Yurkerwich provides a very high-level comparison of services offered for ticketing, marketing, and fan engagement by Ticketmaster's Artist Services division before and after they were re-branded as "OnTour."[249] Mr. Yurkewich appears to be taking the position that in the absence of information about the Songkick "Artist Toolbox" provided by Mr. Mead, Ticketmaster's OnTour division would not have offered very basic features that I understand are common throughout the ticketing industry, such as timing and frequency of ticket sales, revenue reporting, purchaser data, a reporting tool dashboard, and upsell functionality, eg. merchandise revenue.[250] This conclusion is not supported by any analysis—it is entirely speculative.

162. I understand Ticketmaster did not in fact design its OnTour reporting tool based on Songkick's "Artist Toolbox," but rather created it by removing inapplicable features from a preexisting reporting tool that Ticketmaster had developed and deployed to its venue-

---

[246] *See* Yurkewich Report, ¶¶ 68-76.

[247] Yurkewich Report, ¶ 75.

[248] D'Agostino Report, ¶ 10.

[249] Yurkewich Report, ¶ 76.

[250] Yurkewich Report, ¶ 76; Expert Report of Jeff Kline, April 24, 2017 (the "Kline Report"), ¶¶ 58-60; Discussion with Zeeshan Zaidi.

66

*Highly Confidential – Outside Counsel Only*

clients prior to any alleged misappropriation of Songkick confidential information.[251] Ticketmaster's reporting tool, Ticketmaster 360 ("TM 360") was developed in 2012 to provide clients with "[i]nteractive reports that present[ed] various data metrics spanning from Web Activity, Fan Profiling and Sales Performance."[252]   This data included fan demographics, ticket sales, consumer web activity, and venue, organization, and artist-related social trending.[253]   In April 2013, Ticketmaster rolled out a version of TM 360 specifically designed for artists, which was identical to the prior version, except that two reporting features relevant only to venues (ticket resales and ticket delivery method) were turned off.[254]   TM 360 for artists was fully rolled out in June 2015, with all the same features offered to Ticketmaster's artist clients in April 2013.[255]

163.   Additionally, I understand that Songkick routinely gave certain Live Nation employees (e.g. Live Nation Artist Managers) access to Songkick's client-facing reporting tool (with Songkick's express permission), and therefore the features provided in Songkick's "Artist Toolbox" were not confidential.   To the contrary, they were in fact widely known to Defendants.[256]

164.   Furthermore, Mr. Yurkerwich presents no analysis or evidence that any key features of the Songkick "Artist Toolbox" were features unique to Songkick and not known to others in the music ticketing industry.   In his report, Mr. Yurkerwich refers to a January 2014 Ticketmaster "Artist Ticketing" presentation that provides a comparison of CrowdSurge, Ticketstoday, and Ticketmaster Artist Services offerings.[257]   Mr. Yurkerwich identifies "advantages" of the CrowdSurge offering in terms of its "Consumer-facing platform," "Client-facing platform," and "Reporting/Data."[258]   However, Mr. Yurkerwich has not

---

[251]   Discussion with Zeeshan Zaidi; TM00126733; TM00125532; Deposition of Zeeshan Zaidi, p. 163:12-22.

[252]   Ticketmaster "Client Analytics Official Kick-Off" presentation (TM00126735-746, at 738).

[253]   Ticketmaster "Client Analytics Official Kick-Off" presentation (TM00126735-746, at 741).

[254]   Discussion with Zeeshan Zaidi.

[255]   TM00125532-534.

[256]   Deposition of David Marcus 30(b)6, February 17, 2017, pp. 258:17-261:21; Kline Report, ¶ 66.

[257]   Yurkerwich Report, ¶ 68 (citing Ticketmaster Artist Ticketing presentation, January 2014 (TM00111512-532, at 513)).

[258]   Yurkerwich Report, ¶ 68.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 499**

provided any analysis demonstrating that these aspects of the CrowdSurge offering would not be known to others in the ticketing industry as features that may be of interest to an artist presale client.[259]   Josh Block, Songkick's corporate representative, testified that Songkick freely disclosed the features and functionality of the Artist Toolbox in presentations to potential clients, without requiring those clients to sign confidentiality agreements.[260]  In addition, Mr. Yurkerwich's characterization of the single document that he does cite is misleading.  Two slides later in the same presentation quoted by Mr. Yurkerwich, that same document assesses the strengths and weaknesses of the "Competitive Space," and shows that Ticketmaster Artist Services has (or has under development) all the "key features" that its competitors have, and more.[261]   Comparisons are made to CrowdSurge, Ground(ctrl), and sparkart.[262]

165.   In addition, I understand that according to Defendants' ticketing industry expert, Jeff Kline, the features of Songkick's Artist Toolbox reporting tool—including ticket revenue and financial information, merchandise revenue, personal information regarding customers, ticket sell-through rates, timing and frequency of ticket purchases, and maps—are not unique and are basic requirements found in any data reporting tool in the industry.[263]

166.   Finally, Daniel Miller, an artist manager at Red Light Management whose clients include Lady Antebellum and Martina McBride, testified that an artist/manager-facing toolbox is not a key factor in the decision to select a presale provider.[264]

167.   Consequently, the record evidence in this case does not support the conclusion that access to allegedly confidential information regarding Songkick's artist reporting toolbox would have benefitted Ticketmaster economically.

---

[259]   Mr. David Marcus, Ticketmaster's EVP and Head of Music and one of the creators of Ticketmaster's Artist Services group, testified that there was nothing unique about the features of the Songkick reporting tool [Deposition of David Marcus 30(b)6, February 17, 2017, pp. 263:14-264:14].

[260]   Deposition of Josh Block 30(b)(6), March 8, 2017, pp. 611:6-614:8, 619:22-620:21.

[261]   Ticketmaster Artist Ticketing presentation, January 2014 (TM00111512-532, at 515).

[262]   Ticketmaster Artist Ticketing presentation, January 2014 (TM00111512-532, at 515).

[263]   Kline Report, ¶¶ 58-65.

[264]   Deposition of Daniel Miller, March 2, 2017, pp. 12:14-24, 30:18-31:2 and 120:12-121:10.

68

*Highly Confidential – Outside Counsel Only*

## 2. Artist Presale "Stores" and "Test Sites"

168.  Mr. Yurkewich also cites Ticketmaster's alleged access to Songkick "stores" (including "test sites") found at public URL addresses.  I understand that these URL addresses were publicly viewable.[265]  Indeed, Mr. Block testified that the stores, including the test sites, could be accessed without a username or password.[266]  While I am not offering an opinion on the law, I understand that public information cannot form the basis for a trade secret claim.  Regardless, Mr. Yurkewich does not identify or calculate what, if any, economic benefits Ticketmaster derived from its access to these "stores" and/or "test sites" found at public URL addresses.

169.  To the extent Songkick alleges that Ticketmaster benefitted from accessing the "test sites" and gaining early knowledge of potential Songkick presale opportunities, Ticketmaster's unjust enrichment would be limited to artist presale situations where, as a result of having advanced knowledge, Ticketmaster ultimately replaced Songkick in conducting the presale.  Any damage amounts related to such situations would already be included in Mr. Yurkewich's lost profit claim for the 139 "at issue" artists and therefore would not result in a separate damages claim.  If in these situations the potential Songkick presale was not compliant with the Ticketmaster fan club policy, and if the Court determines that Ticketmaster's fan club policy related to artist presales is appropriate, there would not be any damages suffered by Songkick.

## 3. Other Songkick Documents and Information Alleged to be Confidential Information Used by Ticketmaster

170.  Mr. Yurkewich alleges that Ticketmaster benefitted from the misappropriation of other alleged confidential information, including Songkick financial information, weekly head of department reports and other internal strategy documents, Board Presentations, and customer lists and Artist Pipelines.[267]  However, Mr. Yurkewich provides no specific analysis or information about how Ticketmaster allegedly used that data for its economic

---

[265]  Deposition of Joshua Block, March 8, 2017, pp. 567:5-568:17; *see also* Deposition of Stephen Mead, January 13, 2017, pp. 221:2-22.

[266]  Deposition of Joshua Block, March 8, 2017, pp. 564:3-565:8, 567:5-568:1.

[267]  Yurkewich Report, ¶ 67.

69

*Highly Confidential – Outside Counsel Only*

benefit, and does nothing to tie those documents or that information to any calculations of unjust enrichment. I understand that the alleged confidential Songkick documents and information in these categories was outdated (Mr. Mead departed Songkick in mid-2012) and, in any event, was not used by Ticketmaster.[268] As an example, I understand that a Songkick weekly "Head of Department Report" from the 25th week of 2012 is among the materials allegedly misappropriated in mid-2014.[269] Consequently, at the time this information was shared, it was outdated and stale. Mr. Yurkerwich has not identified any Songkick historical data from 2012 as being unique and novel, and had not identified any economic benefit that Ticketmaster obtained from Mr. Mead's possession of that information.

171.   To the extent Songkick and/or Mr. Yurkerwich provides additional detail as to the alleged use and economic benefit that Ticketmaster derived from this alleged confidential information, I will review and provide rebuttal opinions as warranted.

**B.     Mr. Yurkerwich's "New Business Model Approach" Is Improper and Speculative**

172.   As discussed in **Section IV.B.1** above, Mr. Yurkerwich's "New Business Model Approach" relies on figures found in a so-called "return analysis" set forth in a single email circulated in January 2014. Mr. Yurkerwich's characterization of this document as Ticketmaster's "New Business Model" is fundamentally inaccurate, and his use of it as the basis for his unjust enrichment calculation is inappropriate and speculative for all of the reasons discussed in **Section V.D**. Further, Mr. Yurkerwich's "New Business Model Approach" relies upon his unsupported conclusion that "[t]he difference in Ticketmaster presale tickets with and without the investment in this model is a reflection of the gains Ticketmaster expected to achieve through its expanded and improved presale offering which they constructed with confidential and non-public information obtained from Songkick."[270] As discussed above, Ticketmaster never made the investments under

---

[268]   Deposition of Zeeshan Zaidi, January 24, 2017, pp. 104:13-105:9; Deposition of Stephen Mead, January 13, 2017, pp. 154:12-20.

[269]   TM00076068-074; Deposition of Stephen Mead, January 13, 2017, pp. 156:14-20.

[270]   Yurkerwich Report, ¶ 103.

70

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 502**

consideration in this "return analysis," as this was not a finalized, approved business approach / strategy.[271]  Rather, I understand that TM 360 for artists, which was OnTours' reporting tool, was simply adapted from the  Ticketmaster venue reporting tool (TM 360) that Ticketmaster had in place for its venue clients since 2012 (i.e. before the alleged misappropriation took place).[272]  Moreover, as indicated above, the discussed investment in and revenues generated by the "upgraded fan engagement" platform is totally separate from any confidential information allegedly obtained from Songkick, and Mr. Yurkerwich does nothing to take account for this fact.

173.   In addition, as discussed in **Section V.D** above, Mr. Yurkerwich's assumption of a 10% annual growth rate through 2021 is completely unsupported, as well as contrary to testimony and viewpoints of Ticketmaster management.   Ticketmaster personnel responsible for Artist Services/OnTour believe, and have testified, that artist presales will be much less common in the future, as the industry is moving away from time-based distribution to identity-based distribution and other avenues of ticket distribution.[273] Likewise, Mr. Yurkerwich's assumption that Ticketmaster's artist presales would have experienced a 10% annual decline without the alleged "theft" of Songkick's confidential information fails for all the same reasons (e.g., contrary to Mr. Yurkerwich's assertion, it relies entirely on a single email from 2014, not a Ticketmaster "business model").[274]

174.   In addition, I understand that the ticket sales figures presented in the "return analysis" reflect only incremental ticket sales (i.e., capped at 8% of the sellable capacity of artist events)[275] and therefore Mr. Yurkerwich's comparison of Ticketmaster's "total" presale ticket sales to the figures in this "return analysis" is inappropriate.

175.   Mr. Yurkerwich's "New Business Model Approach" to the calculation of Ticketmaster's alleged unjust enrichment is thus improper and speculative.

---

[271]   Discussion with Zeeshan Zaidi.

[272]   Discussion with Zeeshan Zaidi.

[273]   Discussion with Zeeshan Zaidi; Discussion with Jared Smith, David Marcus, and Geoff Carns; Deposition of David Marcus 30(b)6, February 17, 2017, pp. 89:6-12 and 112:13-113:9.

[274]   *See* Yurkerwich Report, Exhibits 11.1 and 11.3.

[275]   Discussion with Zeeshan Zaidi.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 503**

### C.   Mr. Yurkerwich's "New Artist-Clients Approach" Is Improper and Speculative

176.   As discussed above in **Section IV.B.2**, under his "New Artist-Clients Approach," Mr. Yurkerwich identifies 191 artists who had no Ticketmaster presales from 2012 through 2013, but did have Ticketmaster presales in 2014 through 2015.[276]   Based on this comparison, he concludes that those artists are "new Ticketmaster artists."[277]   Mr. Yurkerwich summarily concludes, "Ticketmaster was able to attract these new artist-clients at least in part due to their new and improved presale offering."[278]  Mr. Yurkerwich, however, does not cite to any analysis, documentation, or testimony in support of this conclusion.  For example, Mr. Yurkerwich presents no analysis or specific evidence that any of the 191 alleged "new Ticketmaster artists" became a client because of the use of Songkick's alleged confidential and non-public information.  Likewise, Mr. Yurkerwich provides no discussion or analysis to support his implicit assumption that any "new and improved presale offering" by Ticketmaster was solely the result of Ticketmaster's alleged misappropriation of Songkick confidential information; instead, Mr. Yurkerwich is speculating.  For these reasons alone, Mr. Yurkerwich's "New Artist-Clients Approach" to measure Ticketmaster's alleged unjust enrichment is speculative and inappropriate.

177.   I have reviewed Ticketmaster presale data for Mr. Yurkerwich's alleged "net Ticketmaster artists" for 2009 through 2015.   As shown on **Schedule 18** to this Rebuttal Report, I have identified 62 of Mr. Yurkerwich's alleged "new Ticketmaster artists" that had conducted presales on the Ticketmaster platform in 2009 through 2013.[279]   Even assuming (though there is no basis to do so) that Mr. Yurkerwich's conclusion that the alleged misappropriation of Songkick confidential information was the sole driver behind

---

[276]   Yurkerwich Report, ¶¶ 105-106.  There are actually 214, not 191, artists listed on Mr. Yurkerwich's Exhibit 10.1.

[277]   Yurkerwich Report, ¶¶ 105-106.

[278]   Yurkerwich Report, ¶ 106.

[279]   I understand that Mr. Yurkerwich excluded "fan club presales with third parties on platform, such as Artist Arena, SparkArt, etc." [Yurkerwich Report, Exhibit 10.2; TM00067606 – CRA Modified Copy.xls].  However, I understand that all artist presales listed on TM00067606 were conducted on the Ticketmaster platform and therefore these 62 artists were not "new" to Ticketmaster in 2014 or 2015.  As an example, Mr. Yurkerwich includes U2 and Madonna as "Ticketmaster 2014-2015 New Presale Artist-Clients" [Yurkerwich Report, Exhibit 10.1].  Mr. Orseay, the manager for U2 and Madonna, informed TMF that U2 and Madonna have used Ticketmaster for the last decade [Discussion with Guy Orseay (Maverick Management)].

*Highly Confidential – Outside Counsel Only*

72

**Exhibit 5, Page 504**

Ticketmaster's acquisition of new artists, these 62 artists should not be included in Mr. Yurkerwich's calculation.

178. Mr. Yurkerwich makes an additional error and significantly overstates any alleged unjust enrichment because he bases his calculation on the total presale tickets sold by Ticketmaster's Artist Services/OnTour division for the alleged "net Ticketmaster artists," rather than limiting his calculation to the incremental amount of tickets that Ticketmaster sold (i.e., capped at 8% of the sellable capacity of each event).[280]   Specifically, if Ticketmaster did not conduct artist presales, the maximum number of tickets that could have been sold off the Ticketmaster platform would have been 8% of the event sellable capacity, as that is the maximum amount allowed under the Ticketmaster Fan Club Policy. Therefore, the maximum amount of incremental tickets that Ticketmaster could have benefitted from would be limited to that same 8%.   The Ticketmaster file used by Mr. Yurkerwich containing Ticketmaster presale data tracks the number of "Incremental Tickets Sold" by artist, by year.[281]   However, Mr. Yurkerwich's calculations of Ticketmaster's unjust enrichment uses the much higher "Total Tickets Sold" for the artists in his calculation.  I have summarized the "Incremental Tickets Sold" for Mr. Yurkerwich's remaining "new Ticketmaster artists" (i.e., excluding the 62 artists discussed above) on **Schedule 18.1** to this Rebuttal Report.

179. As shown on **Schedule 18.2** to this Rebuttal Report for illustrative purposes, if Mr. Yurkerwich had excluded the 62 artists discussed above, and used the "Incremental Tickets Sold" for his remaining "new Ticketmaster artists," his calculation of Ticketmaster's alleged U.S. unjust enrichment would be reduced from $49.2 million through 2021,[282] to $13.3 million.[283]

180. Finally, independent of all other flaws, as discussed in **Sections V.D** and **VI.B** above, Mr. Yurkerwich's assumption of a 10% annual growth rate through 2021 is unsupported and

---

[280]   Yurkerwich Report, Exhibits 10.1, 11.2 and 11.4.

[281]   *See* TM00067606.

[282]   Yurkerwich Report, ¶ 13 & Exhibit 11.0.

[283]   **Schedule 18.1**.

*Highly Confidential – Outside Counsel Only*

contrary to the testimony and positions of Ticketmaster management regarding the future of concert ticketing.

181.    In summary, Mr. Yurkerwich's "New Artist-Clients Approach" to the calculation of Ticketmaster's alleged unjust enrichment is improper, significantly overstated, and speculative.

> **D.    Mr. Yurkerwich's Adjustment for "Global Unjust Enrichment" is Speculative and Inappropriate**

182.    Mr. Yurkerwich explains in his report that "[c]onsistent with my lost profits damages … I have used a 1.58x multiple to adjust United States damages to global damages" for unjust enrichment.[284]  The application of a 1.58x multiple is speculative and inappropriate for all of the same reasons that I discuss in **Section V.E** of this Rebuttal Report.

## VII.    ANALYSIS OF MR. YURKERWICH'S DETERMINATION OF SONGKICK'S ALLEGED LOST BUSINESS VALUE

183.    As discussed in **Section IV.C** above, Mr. Yurkerwich endeavors to calculate "Songkick's should have been value without the alleged harm."[285]  Mr. Yurkerwich refers to this "should have been value" as "Songkick's lost business value."[286]  Therefore, Mr. Yurkerwich is implicitly assuming that Songkick's current business value is zero.  It is not clear if Mr. Yurkerwich is offering his calculation of "Songkick's lost business value" as a measure of damages related to any of Songkick's claims against Ticketmaster.

184.    Mr. Yurkerwich's calculation of Songkick's "should have been value" is unreliable and speculative.  Specifically, his calculation suffers from the following methodological and calculation errors, which are addressed in more detail in the following sections of this Rebuttal Report:

- Mr. Yurkerwich's assumption that Songkick's current business value is zero is unsupported;

---

[284]   Yurkerwich Report, ¶¶ 104 and 107.

[285]   Yurkerwich Report, ¶ 14.

[286]   Yurkerwich Report, ¶ 115.

74

- Mr. Yurkerwich's valuation analysis is incomplete and fails to follow applicable valuation standards;

- Mr. Yurkerwich provides no support that valuing a company based on a "GTV Multiple" is an accepted methodology;

- Mr. Yurkerwich's calculation of Songkick's "2016 Should Have Been GTV" is based on his determination of Songkick's alleged lost presale tickets and revenues, and therefore suffers from the same flaws I identified in my analysis of his lost profits opinions; and

- In calculating any "Lost Business Value," the actual Songkick business value needs to be deducted from Mr. Yurkerwich's alleged "should have been" business value. Therefore, even assuming that Mr. Yurkerwich's methodology was correct, Mr. Yurkerwich overstates Songkick's "lost business value" by at least $100 million.

## A.    Mr. Yurkerwich's Assumption That Songkick's Current Business Value is Zero is Unsupported

185.   In his discussion of Songkick's alleged "lost business value," Mr. Yurkerwich concludes, "The effects of Ticketmaster's behavior on Songkick's ability to attract and retain artist-clients has drained cash resources and created market uncertainty surrounding its viability as a going concern."[287]   Mr. Yurkerwich does not cite to any produced documents or information, or to any analysis performed by him, that supports this conclusion.   Mr. Yurkerwich does not provide any analysis of Songkick's cash resources, financial position, or "viability as a going concern." Notwithstanding this lack of support or analysis of Songkick's financial position and prospects, Mr. Yurkerwich effectively concludes that Songkick's business value is zero – and that all of Songkick's alleged diminution in business value is a result of the alleged actions of Defendants.   Mr. Yurkerwich's conclusions are unsupported, and are contrary to information produced in this case.

### 1.    Songkick Valuations and Projections Do Not Support a Zero Business Valuation

186.   In conjunction with the June 2015 business combination of CrowdSurge and Songkick, the combined entity (referred to as "CSK") sought funding through a Series C Preferred Equity

---

[287]   Yurkerwich Report, ¶ 110.

75

*Highly Confidential – Outside Counsel Only*

issuance.[288]   Investors, including CrowdSurge's largest existing investor – Access Industries, invested $16.7 million in the Series C issuance at a pre-money valuation of $100 million.[289]   Further, for the six-month period of January through June 2015, CrowdSurge and Songkick combined reported a gross transaction value of $36.7 million.[290]   A Songkick 2015 Annual Report indicates that despite "increased anticompetitive pressures" from the Defendants, the GTV of the combined entity "grew 79% year-over-year, from $56.7 million in 2014 to $101.7 million in 2015," and that "Songkick exceeded its post-Merger 2015 GTV projection of $88.0 million."[291]   Consequently, documents produced in this case refute Mr. Yurkerwich's assumptions.

187.   I have seen no evidence to support Mr. Yurkerwich's conclusion that the value of Songkick has been diminished to zero as a result of Defendants' alleged actions, which were present in 2015 and were acknowledged at the time of the $100 million pre-money valuation.

---

288   Email from Adam Ray to CrowdSurge Board Members, May 29, 2015, Re: CrowdSurge/Songkick Combination: Shareholder Disclosure Statement, and attached Shareholder Disclosure Statement (ACCESS00003918-966, at 918, 920, 928); Email from Javier Martinez to Jorg Mohaupt and Alex Zubillaga, March 2, 2015, Re: CSK Investment Memo, and attachment (ACCESS00015783-789, at 786); Deposition of Javier Martinez, February 24, 2017, p. 119:9-21.

289   Songkick 2015 Annual Report (ACCESS00005222-235, at 233); Deposition of Javier Martinez, February 24, 2017, p. 119:9-21. A "CrowdSurge/Songkick Proposed Business Combination and Proposed Fundraising: Shared Disclosure Statement" related to the Series C issuance provided a summary of "Risk Factors" related to "the proposed CSK business" [Email from Adam Ray to CrowdSurge Board Members, May 29, 2015, Re: CrowdSurge/Songkick Combination: Shareholder Disclosure Statement, and attached Shareholder Disclosure Statement (ACCESS00003918-966, at 943-951)].   One of the disclosed risk factors was that "CSK's access to ticket inventory in the US may be subject to 'fan club' policies of inventory and box office managers such as Ticketmaster.   Such fan club policies may change, enforcement of them may be arbitrary, and requirements to comply with them may hinder CSK's ability to sell tickets and generate revenues" (at ACCESS00003945). Similarly, a March 2015 Access Industries investment memorandum acknowledged that "Ticketmaster has been aggressively campaigning with artists to keep the 8% artist pre-sale allocation in the US on the Ticketmaster system" [Email from Javier Martinez to Jorg Mohaupt and Alex Zubillaga, March 2, 2015, Re: CSK Investment Memo, and attachment (ACCESS00015783-789, at 788)].   These documented risks would be known to investors at the time of the $100 million pre-money valuation of the combined CrowdSurge/Songkick entity [Deposition of Javier Martinez, February 24, 2017, pp. 119:13-120:16].

290   CS & SK Consolidated Profit and Loss Detail (SK00616469)

291   Songkick 2015 Annual Report (ACCESS00005222-235, at 223, 225).   In addition, I have reviewed and analyzed a "Songkick 2016 Draft Business Model."[291]   That Business Model, which appears to include 2015 actual financial results, projected Songkick's GTV to increase from $101.4 million in 2015 to $1,872.6 million in 2020 [Songkick 2016 Draft Business Model (SK00675311), tab "Very Basic"].   It also projects Songkick to have Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $69.3 million in 2020.   Given that this Business Model appears to have been prepared after 2015, and therefore after Songkick filed its complaint against the Defendants in December 2015, I would expect that these projections would take into account the anticipated impact Defendants' alleged wrongful actions would have on Songkick's future growth and profitability.

76

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 508**

### 2. *Songkick Artist Presale Ticket Sales Do Not Support a Zero Business Valuation*

188.    Songkick sells tickets globally, and a substantial portion of Songkick's ticket sales are for events outside the U.S.  As summarized on **Schedule 16** to this Rebuttal Report, I have reviewed and analyzed Songkick's global ticket sales from 2012 through 2016 based on financial data produced by Songkick and relied upon by Mr. Yurkerwich.  In 2016, Songkick artist presale tickets sales for U.S. events comprised only 36% of Songkick's total 2016 ticket sales,[292] while the remaining 64% was comprised of artist presales for events outside the U.S. (35%),[293] and worldwide promoter ticket sales (29%).[294]   Mr. Yurkewich fails to address how Songkick's value, as a global company, could be diminished to zero as a result of Defendants' alleged actions related to artist presale tickets in the U.S.

### B.    Mr. Yurkerwich's Analysis is Incomplete and Fails to Follow Applicable Valuation Standards

189.    Mr. Yurkerwich is a Certified Public Accountant, Accredited in Business Valuation (CPA-ABV) and a Certified Valuation Analyst.[295]  In addition, Mr. Yurkerwich is a member of the American Institute of Certified Public Accountants (AICPA) and the National Association of Certified Valuation Analysts ("NACVA"). [296]

190.    Members of the AICPA are required to follow Statement on Standards for Valuation Services No. 1, "Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset" ("SSVS No. 1") "when they perform engagements to estimate value that culminate in the expression of a conclusion of value or a calculated value."[297]  SSVS No.

---

[292]    **Schedule 16**.  487,685 ÷ 1,351,437 = 0.36.

[293]    **Schedule 16**.  474,378 ÷ 1,351,437 = 0.35.

[294]    **Schedule 16**.  389,374 ÷ 1,351,437 = 0.29.

[295]    Yurkerwich Report, Exhibit 1.0, p. 1.

[296]    Yurkerwich Report, Exhibit 1.0, p. 1.

[297]    AICPA Statement on Standards for Valuation Services No. 1, "Valuation of a Business, Business Ownership Interest, Security or Intangible Asset," June 2007 ("SSVS No. 1"), p. 5.  *See also* ¶ 2, "As described in this Statement, the term engagement to estimate value refers to an engagement or any part of an engagement (for

77

1 states, "In developing the valuation, the valuation analyst should consider the three most common valuation approaches," the Income approach, the Asset approach and the Market approach.[298]  SSVS No. 1 defines these three valuation approaches as follows:[299]

- Income Approach – "A general way of determining a value indication of a business, business ownership interest, security, or intangible assets using one or more methods that convert anticipated economic benefits into a present single amount."

- Asset Approach – "A general way of determining a value indication of a business, business ownership interest, or security using one or more methods based on the value of the assets net of liabilities."

- Market Approach – "A general way of determining a value indication of a business, business ownership interest, security, or intangible assets using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold."

191.   In calculating Songkick's "Lost Business Value" based on the determination of a "GTV Multiple" of "Comparable Transactions and Funding," Mr. Yurkerwich appears to have used a form of the Market Approach.  As it relates to the Market Approach, SSVS No. 1 states, "In applying the methods listed in paragraph 36 [Market Approach] or other methods to determine valuation pricing multiples or metrics, the valuation analyst should consider: qualitative and quantitative comparisons; arm's-length transactions and prices; and the dates and, consequently, the relevance of the market data."[300]

192.   Mr. Yurkerwich provides no quantitative or qualitative analysis to support his presumption that the "Comparable Transactions and Funding" considered in his calculation are indeed comparable.  For example, Mr. Yurkerwich fails to address the significant difference in the

---

example, a tax, litigation, or acquisition-related engagement) that involves estimating the value of a subject interest."

[298]   SSVS No. 1 ¶ 31.  A description of the income, asset and market approaches is provided in paragraphs 33-36.  The NACVA also maintains Professional Standards, with which its members are required to comply, that recognize these common valuation methods – income, asset and market approaches [NACVA "Professional Standards," effective August 1, 2015].

[299]   SSVS No. 1 Appendix B ("International Glossary of Business Valuation Terms").

[300]   SSVS No. 1 ¶ 37.

*Highly Confidential – Outside Counsel Only*

size of the alleged "comparable" entities that were compared to Songkick.[301]  As showed on Mr. Yurkerwich's Exhibit 14.0, the five companies that he considered have GTV's ranging from $155 million to $1 billion—which is 2.5 times to 16 times the post-merger GTV of Songkick.[302]  Mr. Yurkerwich also fails to discuss and address differences between primary ticketing companies, secondary market ticketing companies, diverse ticketing companies and companies that primarily transact in artist presale tickets.

193.    Mr. Yurkerwich also considers the "GTV Multiple" implied by the $100 million "pre-money" valuation of Songkick that was used for the purpose of investors' purchase of Series C Preferred shares at the time of the CrowdSurge/Songkick merger.[303]  Mr. Javier Martinez, Vice President at Songkick's largest investor – Access Industries, testified at his deposition that while a pre-money valuation reflects the value at which Access is willing to invest for a certain amount of ownership, it does not necessarily represent an accurate value of the company.[304]  Another valuation of CrowdSurge around the time of the June 2015 merger with Songkick highlights this issue.  A valuation of CrowdSurge shares by the accounting firm of Citrin Cooperman as of March 31, 2015, which employed both the income and market valuation approaches, concluded that the 100% non-control, marketable value of CrowdSurge at that time was only $14.55 million – significantly lower

---

[301]  The five companies considered by Mr. Yurkerwich have business models that are different from Songkick. StubHub, TicketsNow, and SeatGeek are online ticket marketplaces were fans can buy and sell tickets to various events ["eBay Inc. (NasdaqGS:EBAY) > Transaction Details > Merger/Acquisition," S&P Global Market Intelligence, accessed 3/27/2017; "Ticketmaster Entertainment LLC > Transaction Details > Merger/Acquisition," S&P Global Market Intelligence, accessed 3/27/2017; "SeatGeek Inc. > Transaction Details > Private Placement," S&P Global Market Intelligence, accessed 3/27/2017].  Eventbrite is an event technology platform where users are able to: organize, promote and manage events; handle onsite operations; and sell tickets to events on the Eventbrite platform ["Eventbrite." crunchbase.com/organization/eventbrite, accessed 4/20/2017].  Ticketfly provides ticketing, marketing, and analytics that help promoters and venues book talent, improve operations and sell tickets. It also provides consumers with the ability to find and purchase tickets to events ["Ticketfly, Inc. > Transaction Details > Merger/Acquisition," S&P Global Market Intelligence, accessed 3/27/2017].

[302]  Yurkerwich Report, Exhibit 14.0.  $155M ÷ $61.8M = 2.5; $1,000M ÷ $61.8M = 16.

[303]  Yurkerwich Report, ¶¶ 112-113 & Exhibit 14.0.

[304]  Deposition of Javier Martinez, February 24, 2017, pp 147:6-148:7.

79

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 511**

than the $50 million in "pre-money" investment value that was attributable to CrowdSurge.[305]

194. SSVS No. 1 describes types of nonfinancial and financial information that a valuation analyst should obtain, "as available and applicable to the valuation engagement."[306] SSVS No. 1 also states, "In arriving at a conclusion of value, the valuation analyst should: (a) Correlate and reconcile the results obtained under the different approaches and methods used; (b) Assess the reliability of the results under the different approaches and methods using the information gathered during the valuation engagement; (c) Determine, based on items *a* and *b*, whether the conclusion of value should reflect (1) the results of one valuation approach and method or (2) a combination of the results of more than one valuation approach and method."[307]  Mr. Yurkerwich does not value Songkick under any other valuation method, nor does he address relevant financial and nonfinancial information described in in the applicable standards, such as: Songkick's historical and prospective financial information (e.g., budgets, forecasts, and projections); economic outlook of the industry; competition; business risks; and strategy and future plans.[308]

195. If Mr. Yurkerwich had considered other commonly accepted valuation methods – namely the income approach – he would have come to significantly lower estimations of Songkick's alleged "lost business value."  Mr. Yurkerwich's lost profits analysis includes future lost profits through 2021, and therefore, it can be compared to a discounted cash flow valuation under the income approach.[309]  At an assumed 8% presale allocation, Mr.

---

[305] Complete Entertainment Resources Limited Trading As CrowdSurge, Fair Market Value of Various Classes of Equity as of March 31, 2015 (ACCESS00007135-198, at 159).  Citrin Cooperman certified that their report complied with the disclosure requirements of SSVS No. 1 (*see* ACCESS00007135-198, at 164).

[306] SSVS No. 1 ¶¶ 27, 29.

[307] SSVS No. 1 ¶ 42.

[308] SSVS No. 1 ¶¶ 27, 29.  Mr. Yurkerwich concludes, "It is likely that Songkick could have been valued at the high end of the industry multiple of 1.3 given its unique network and platform in the industry."  [Yurkerwich Report, ¶ 115].  However, he does not provide any discussion or analysis of Songkick's "unique network and platform" as compared to its competitors and other industry players.

[309] An income approach includes a terminal value if sustainable annual earnings are demonstrated for the company.  Mr. Yurkerwich has not demonstrated whether Songkick would ever achieve sustainable earnings in the future.  *See* **Schedule 19**.

80

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 512**

Yurkerwich concludes that Songkick's global lost profits resulting from Ticketmaster's alleged actions are no more than $48.7M through 2021.[310]  However, at that same assumed 8% presale allocation, Mr. Yurkerwich concludes that Songkick's lost business value due to Ticketmaster's alleged actions is between $234.9M and $305.3M.[311]  His lost business value analysis is fundamentally inconsistent with his own lost profits analysis.

196.    In addition, Mr. Yurkerwich has not accounted for the historical rate of failure of startup companies regardless of the causes of action in this case. Mr. Yurkerwich identifies Songkick as a startup company.[312]  Professor Domadoran of New York University, who has studied and addressed valuation issues related to startup and growth stage companies, states, "Young companies are difficult to value for a number of reasons…As a result, many of the standard techniques we use to estimate cash flows, growth rates and discount rates either do not work or yield unrealistic numbers.  In addition, the fact that most young companies do not survive has to be considered somewhere in the valuation."[313]  Mr. Yurkerwich has not analyzed and considered all of the factors that have, and will, impact Songkick and its future value, including changes to and evolution in the ticketing industry, artist presales in the future, artists' reliance on social media, and current and potential competitors.  Songkick has never had annual profits.

197.    Songkick—including the Songkick and CrowdSurge pre-merger entities—has never been profitable.  Mr. Yurkerwich's Exhibit 13.0 shows EBIDTA losses on a consolidated basis pre-merger of $7.67 million in 2013, $10.53 million in 2014, $6.80 million for 6 months in 2015, and then losses of $22.64 million post-merger for the 12 months from July 2015 through June 2016.[314]  Songkick has never operated at a profit.  In fact, in every period presented on Mr. Yurkerwich's Exhibit 13.0, its net revenues were exceeded by its

---

[310]  Yurkerwich Report, ¶ 11 & Exhibit 5.

[311]  Yurkerwich Report, ¶ 115 & Exhibit 14.1.

[312]  Yurkerwich Report, ¶ 97.

[313]  Aswath Damodaran, "Valuating Young, Start-Up and Growth Companies: Estimation Issues and Valuation Challenges," p. 2, Stern School of Business, New York University; May 2009.  See **Schedule 19** for additional excerpts.

[314]  Yurkerwich Report, Exhibit 13.0.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 513**

compensation and benefits expenses, alone.[315] Additionally, Songkick's consolidated balance sheet as of June 30, 2016 shows historical Songkick losses of over $50 million.[316] Songkick's highest combined annual net revenue pre-merger was approximately $8 million in 2014 and only $9.5 million post-merger from July 2015 to June 2016.[317] From an overall perspective, Songkick's historical financial performance, when combined with the fact that Mr. Yurkerwich has not demonstrated artist presale impacts due to the causes of action and alleged interferences, indicates his opinion of Songkick's "but-for" business value of $235 million to $595 million is entirely unjustified.

198.    In addition, Mr. Yurkerwich provides no analysis or evidence identifying what, if anything, provides Songkick with unique and proprietary positioning in the ticketing industry: Songkick has no industry required intellectual property; Songkick has no investment in infrastructure and ticketing technology in venues; major artist managers and agents do not recognize any unique benefits of Songkick's business; other companies can enter and compete for its artist customers; and the industry is moving to identity-based ticketing, which will impact and obsolete time based ticketing in the future, including artist presales as they have been conducted in the past.

### C.    Mr. Yurkerwich Provides No Support That Valuing a Company Based on a "GTV Multiple" Is an Accepted Methodology

199.    Mr. Yurkerwich does not provide any support for his position that a "GTV Multiple" is "a benchmark used in the industry" to value companies.  While I understand that one metric used to measure the scope of a ticketing service provider or secondary market ticketing company may be the gross transaction value of the tickets transacted by that company, Mr. Yurkerwich provides no support that a "GTV Multiple" is a commonly recognized way of valuing those businesses.[318]  I understand that Ticketmaster's experience is that company values are based on revenues and profits earned by the ticketing company, not the total

---

[315]   Yurkerwich Report, Exhibit 13.0.

[316]   Songkick 2015 – June 2016 Financials (SK00675310.xls), tab "Balance Sheet"

[317]   SK00616469 and SK00675310.

[318]   Discussion with Jared Smith, David Marcus and Geoff Carns.

82

*Highly Confidential – Outside Counsel Only*

ticket value charged to the consumer.  Ticketmaster does not monitor its "GTV Multiple" as a metric of company value.[319]

200.   A company's revenue or EBITDA multiples are commonly referenced in the valuation of a business.  I have calculated the revenue multiples for Mr. Yurkerwich's five "Comparable Transactions and Funding."  As shown on **Schedule 20**, the revenue multiples of those five companies range from 3.1 to 8.0, with an average of 6.0.  In contrast, Mr. Yurkerwich's calculation of Songkick's "Global Business Value" at a "GTV Multiple" of 1.0 yields a revenue multiple for Songkick of 11.6 to 12.6[320]—essentially double that of his five "Comparable Transactions and Funding."   This comparison indicates that Mr. Yurkerwich's "GTV Multiple" results contradicted by a revenue multiple approach.

### D.   Mr. Yurkerwich's Calculation of Songkick's "Lost Business Value" Suffers from the Flaws of His Lost Profits Analysis

201.   Mr. Yurkerwich's ultimate conclusion as to Songkick's alleged "lost business value" is based on the volume of global presale tickets Songkick allegedly lost per Mr. Yurkerwich's lost profits analysis.[321]  Therefore, Mr. Yurkerwich's conclusions as to Songkick's "Should Have Been GTV" suffers from the same flaws discussed in **Section V** of this Rebuttal Report, where I address Mr. Yurkerwich's lost profits opinions.

### E.   Even Assuming that Mr. Yurkerwich's Methodology Was Correct, Mr. Yurkerwich Overstates Songkick's "Lost Business Value" by At Least $100 Million

202.   For the reasons discussed above, Mr. Yurkerwich's conclusion that Songkick's business value is zero is unsupported.  I do not agree with Mr. Yurkerwich's valuation methodology for the reasons discussed in the above sections.  However, even if Mr. Yurkerwich's methodology was appropriate, Songkick's "Lost Business Value" should be limited to Mr. Yurkerwich's "GTV Multiple" applied to his calculated "Lost GTV," rather than applied to his calculated "Should Have Been GTV."[322]  For illustrative purposes only, with this

---

[319]   Discussion with Jared Smith, David Marcus and Geoff Carns.

[320]   **Schedule 20.1**.

[321]   Yurkerwich Report, Exhibit 14.1 (citing Exhibits 6.1, 7.1 and 8.1 for the "SK 2016 Lost Ticket Estimates").

[322]   *See* Yurkerwich Report, Exhibit 14.1.

83

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 515**

single correction, using a "GTV Multiple" of 1.0, Mr. Yurkerwich would have concluded that Songkick's "Lost Global Business Value" was ==$134.9 million== to ==$357.9 million,== based on an an 8% to 20% allocation, respectively.[323]   Consequently, even if Mr. Yurkerwich's methodology was appropriate (it is not), he overstates Songkick's "Lost Business Value" by at least $100 million.

203.   Mr. Yurkerwich states that "it is likely that Songkick could have been valued at the high end of the industry multiple of 1.3 given its unique network and platform in the industry."[324]   Mr. Yurkerwich's conclusion provides no analysis of such "unique network and platform."   Therefore, for this reason as well, his determination of Songkick's alleged "lost business value" based on a 1.3 "GTV Multiple" is unsupported and speculative.

## VIII.   SUMMARY – ANALYSIS OF MR. YURKERWICH'S OPINIONS

204.   Mr. Yurkerwich's damages opinions are unsupported, unreliable, overstated, and seculative.

205.   As it relates to Mr. Yurkerwich's opinions on Songkick's alleged lost profits, Mr. Yurkerwich fails to demonstrate that the 139 "at issue" artists would have used Songkick to conduct artist presales "but for" the alleged actions of the Defendants.   Mr. Yurkerwich's lost profit damages are directly contradicted by documents and the representations of managers and agents for artists included in his lost profits calculation.   In addition, Mr. Yurkerwich's lost profits analysis contains methodological flaws and errors.   As a result, his opinions related to Songkick's alleged lost profits are unreliable and speculative.

206.   In his determination of Ticketmaster's unjust enrichment related to its alleged use of Songkick's purported confidential information, Mr. Yurkerwich fails to analyze and identify any specific alleged economic benefit that Ticketmaster may have received from having seen or had access to the specific Songkick documents and information. Furthermore, Mr. Yurkerwich's "New Business Model Approach" and "New Artist-

---

[323]   *See* Yurkerwich Report, Exhibit 14.1.

[324]   Yurkerwich Report, ¶ 115.

*Highly Confidential – Outside Counsel Only*

**Exhibit 5, Page 516**

Clients Approach" to calculating Ticketmaster's alleged unjust enrichment are improper, overstated, and speculative.

207.   Finally, Mr. Yurkerwich's opinions as to Songkick's alleged "Lost Business Value" are unsupported, unreliable, and speculative.  Mr. Yurkerwich's analysis of Songkick's alleged "Lost Business Value" is incomplete, and Mr. Yurkerwich fails to follow applicable valuation standards set forth by the AICPA.

85

*Highly Confidential – Outside Counsel Only*