QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Frederick A. Lorig (Bar No. 057645)
  fredlorig@quinnemanuel.com
  Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
  Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Complete
Entertainment Resources LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Complete Entertainment Resources LLC d/b/a Songkick,<br><br>Plaintiff,<br><br>v.<br><br>Live Nation Entertainment, Inc.; Ticketmaster LLC,<br><br>Defendants. | CASE NO. 15-cv-9814 DSF (AGRx)<br><br>**CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT PLAINTIFF COMPLETE ENTERTAINMENT RESOURCES LLC'S MOTION FOR SANCTIONS** |
| Ticketmaster LLC,<br><br>Counter Claimant,<br><br>v.<br><br>Complete Entertainment Resources LLC d/b/a Songkick,<br><br>Counter Defendant. | Pre-Trial Conference:  October 23, 2017<br><br>Trial Date:  November 14, 2017<br><br>**REFILED PURSUANT TO COURT ORDER (DKT. NO. 395)** |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.  BACKGROUND ............................................................................................. 3

    A.   Defendants Admit These Documents Should Have Been Produced During Fact Discovery .............................................................. 3

    B.   Defendants Previously Represented to the Court That They Closely Monitored and Double-Checked the Document Review .......... 4

    C.   Defendants' New Production Is Highly Relevant................................. 5

III. LEGAL STANDARD ................................................................................... 10

IV.  THE SUBSTANCE AND TIMING OF DEFENDANTS PRODUCTION JUSTIFY THE LIMITED SANCTIONS SONGKICK SEEKS ............................................................................................................. 11

    A.   Defendants Acted With "Recklessness" Combined with "Frivolousness" By Withholding a 4,000-Document Collection of "Hot" Documents.................................................................................. 11

    B.   Defendants' Failure to Timely Produce the New Documents Until Subpoenaed in a Parallel Criminal Case Was Not Substantially Justified, and it Prejudiced Songkick............................. 13

    C.   Targeted Sanctions Are Appropriate as the Only Remedy Now Available to Songkick.................................................................... 15

V.   CONCLUSION ............................................................................................ 18

1

## **TABLE OF AUTHORITIES**

2
**Page**

3
## **Cases**

4
*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) ...............................................................11

5
*Dey, L.P. v. Ivax Pharm., Inc.*,
6
    233 F.R.D. 567 (C.D. Cal. 2005) ........................................13

7
*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001) .........................................10, 12

8
*Fjelstad v. Am. Honda Motor Co.*,
    762 F.2d 1334 ........................................................................11
9

*Gagnon v. Teledyne Princeton, Inc.*,
10
    437 F.3d 188 (1st Cir. 2006) ................................................14

11
*Goodyear Tire & Rubber Co. v. Haeger*,
    137 S. Ct. 1178 (2017) ..........................................................10
12

*Haeger v. Goodyear Tire & Rubber Co.*,
13
    813 F.3d 1233 (9th Cir.), *rev'd and remanded on other grounds*,
    137 S. Ct. 1178 (2017) ....................................................11, 12

14
*InfoSpan, Inc. v. Emirates NBD Bank PJSC*,
15
    2016 WL 9150622 (C.D. Cal. June 8, 2016) ..................13, 15

*Knickerbocker v. Corinthian Colleges*,
16
    298 F.R.D. 670 (W.D. Wash. 2014)......................................15

17
*Laukus v. Rio Brands, Inc.*,
    292 F.R.D. 485 (N.D. Ohio 2013) ........................................11
18

*Malone v. U.S. Postal Serv.*,
19
    833 F.2d 128 (9th Cir. 1987)..................................................18

20
*N. Am. Watch Corp. v. Princess Ermine Jewels*,
    786 F.2d 1447 (9th Cir. 1986)................................................14

21
*Roadway Express, Inc. v. Piper*,
    447 U.S. 752 (1980) ..............................................................10
22

*Scarborough v. Eubanks*,
23
    747 F.2d 871 (3d Cir. 1984)...................................................18

24
*Starline Windows Inc. v. Quanex Bldg. Prod. Corp.*,
    2016 WL 4485568 (S.D. Cal. Aug. 19, 2016) ......................17

25
*Wong v. Regents of Univ. of California*,
    410 F.3d 1052 (9th Cir. 2005)................................................14
26

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
27
    259 F.3d 1101 (9th Cir. 2001)................................................11

28

Case No. 15-cv-9814-DSF-AGRx
                              SONGKICK'S CORRECTED MOTION FOR SANCTIONS

*Zest IP Holdings, LLC v. Implant Direct Mfg., LLC,*
  2013 WL 6159177 (S.D. Cal. Nov. 25, 2013) ................................................ 15

### **Rules and Regulations**

Fed. R. Civ. P. 37 ........................................................................... 4, 11, 14, 17

Plaintiff Complete Entertainment Resources LLC formerly d/b/a Songkick ("Songkick") respectfully submits this motion for sanctions against Defendants Live Nation Entertainment, Inc. and Ticketmaster LLC (collectively, "Defendants").

## I.   PRELIMINARY STATEMENT

This motion is occasioned by Defendants' September 11, 2017 production of a collection of highly relevant documents that undermine Defendants' defenses and arguments, and bolster and expand the scope of Plaintiff's claims.  Although Defendants claim this failure arose from inadvertence, that is questionable given that Defendants admitted in correspondence surrounding the production the documents (1) were responsive to Songkick's initial discovery requests; (2) were reviewed by contract attorneys trained and overseen by Defendants' counsel of record; and (3) were originally withheld as "non-responsive."  Defendants claim they only identified these issues *after* the DOJ sought them in a related grand jury investigation, even though, as discussed below, they could not be more clearly responsive to Songkick's documents requests.

Prior to the discovery cutoff, Defendants produced only ***26,080*** documents in response to Songkick's requests.  The new September 11, 2017 production—six months after the close of fact discovery, after the parties completed summary judgment briefing and Defendants filed a *Daubert* motion, and even after the parties exchanged initial pretrial disclosures—constitutes nearly 4,000 more highly relevant and responsive documents.  The new documents—each of which specifically mentions "Songkick," "CrowdSurge," or an abbreviation of those companies' names—provide never-before-seen direct evidence supporting multiple aspects of Songkick's claims, and directly contradict several points Defendants have made in their pending partial summary judgment and *Daubert* motions.  It would have been questionable to withhold any of these documents – much less thousands of them.  And these documents buttress ***all*** of Songkick's claims – notably, antitrust, unfair competition, trade secret misappropriation, and hacking claims.  The production also

1  contradicts earlier representations Defendants' counsel made to Magistrate Judge

2  Rosenberg, when Songkick questioned why so few documents had been produced.

3  *See*, *e.g.*, Declaration of Adam B. Wolfson ("Wolfson Decl."), Ex. 26 (11/8/2016

4  Hr'g Tr. 84:16-24) ("We have searched everything [the agreed document

5  custodians] have in terms of electronic documents, ran the agreed-upon search

6  terms, ***and produced the existing documents***.") (emphasis added).[1]

7          This state of affairs is highly prejudicial to Songkick.  Defendants' last minute

8  production of thousands of relevant documents, only two months before trial, leaves

9  Songkick no choice but to seek sanctions under both the Court's inherent power and

10  Rule 37(c)'s self-executing provisions.  This is not a request Songkick makes

11  lightly.  Defendants withheld a treasure trove of documents until the eleventh hour.

12  All the while, Defendants' counsel reassured the Court that they had reviewed and

13  produced all responsive documents.  The Court reasonably relied on these

14  representations in either denying or limiting Songkick's motions to compel.

15  Songkick proceeded through fact and expert discovery missing key evidence.

16          Sanctions are the only way to remedy Defendants' apparent subversion of the

17  litigation process.  Songkick respectfully seeks that the Court (a) allow Songkick to

18  reopen the depositions of Zeeshan Zaidi and Stephen Mead on an expedited basis,

19  _____

20      [1]  By way of example, one of the newly-produced documents shows that

21  Ticketmaster internally admitted in mid-2015 that the music artist, Kenny Chesney, has a "compliant fan club," *id.*, Ex. 8, even though Ticketmaster claimed to

22  CrowdSurge several months earlier he did not comply with the fan club policy.  *Id.*, Ex. 7.  Similarly, Songkick's trade secret and hacking claims focus on former

23  CrowdSurge Vice President, Stephen Mead, who brought 85,000 confidential

24  CrowdSurge documents with him when he joined Ticketmaster and shared many those documents and the confidential information they contained with Defendants

25  senior executives.  In the newly-produced documents, Ticketmaster Executive Vice

26  President, Zeeshan Zaidi, admitted "we're not supposed to tip anyone off that we

27  have this view into Crowdsurge's activities."  *Id.*, Ex. 13.  Songkick did not have access to such an admission from Mr. Zaidi before deposing him.  For further

28  discussion, please see Section II.C., *infra*.

and, on good cause shown, also reopen the depositions of Michael Rapino and/or Jared Smith; (b) instruct the jury regarding adverse inferences from the misconduct as detailed below; and (c) award Songkick its attorneys' fees for the review of the new production and for briefing this motion.  *See* Section IV.C, *infra*.  Importantly, these sanctions are tailored so as not to delay trial; any postponement of the trial date would work to punish Songkick and benefit Defendants – not address the prejudice Songkick has suffered.

## II.     BACKGROUND

### A.     Defendants Admit These Documents Should Have Been Produced During Fact Discovery

Defendants have admitted that these documents should have been produced before the discovery cutoff.  Wolfson Decl. Ex. 1 (stating these documents "were responsive and should [have] been produced").  A review of these late-produced documents confirms they must have been collected pursuant to what is literally the first search string on the list of terms Defendants agreed to in early 2016, and also the most basic; specifically, every single document hits on a variation of Songkick's business name or a related acronym (*e.g.*, "SK" or "CS"), which are commonly used in the industry to refer to Songkick.[2]  Songkick first proposed this basic search in April 2016, Defendants agreed to run the search, and on December 29, 2016, Defendants' counsel represented without reservation to Magistrate Judge Rosenberg that Defendants were "done with our productions" for the agreed-upon terms.  Wolfson Decl. ¶ 5; Ex. 25 (Dec. 29, 2016 Hrg. Tr. 57:6-8).  The new production is

_____

[2]   Every single document produced by Defendants either hits on the following basic search string, or is a family member of a document that hits on this basic search:  "Songkick OR SK OR KickSong OR (Song* W/2 Kick*) OR Crowdsurge OR CS OR SurgeCrowd OR (Crowd* W/2 Surg*) OR "Complete Entertainment Resources" OR CER OR "Complete Entertainment."  *See* Wolfson Decl., Ex. 24 (Aug. 1, 2016 J. English Email to T. O'Mara) (attaching list of search terms and noting Defendants had already agreed to this and other terms); Wolfson Decl. ¶ 4.

therefore composed of documents that were part of the initial collections in this case, but withheld until they had to be produced to the Department of Justice.

### B. Defendants Previously Represented to the Court That They Closely Monitored and Double-Checked the Document Review

At multiple points during discovery, Songkick was forced to move to compel due to what it perceived as Defendants' failure to comply with their discovery obligations. Defendants said they had checked and double checked and wrongly claimed all relevant documents had been produced. "We have searched everything [the agreed document custodians] have in terms of electronic documents, ran the agreed-upon search terms, *and produced the existing documents*." *Id.* Wolfson Decl., Ex. 26 (11/8/2016 Hr'g Tr. 84:16-24). Defendants stated at multiple points during various meet and confers that they did not intend to withhold responsive documents collected through agreed search procedures. *Id.* ¶ 6; Ex. 34 (1/27/2017 Meet and Confer Tr.) at 21:3-8 ("[I]f it's responsive and it had the search terms, it would have been produced.").

Defendants also made the same representations to the Court. On October 19, 2016, Defendants' counsel represented that they "trained 40 contract attorneys on how to review for responsiveness, and created extensive document tagging for them to use; those reviewers then conducted a first-level review for responsiveness, confidentiality, and privilege." Dkt. 103 ¶ 12. They continued, "Latham attorneys subsequently performed a second-level review on documents reviewed by the review attorneys, including (for example) targeted searches and random sampling to identify and designate responsive documents, and find and correct mistakes in first-level review designations. Defendants also used statistical metrics to monitor the quality of the review and review team, and make any adjustments as necessary." *Id.*

At the hearing on the motion to compel prompting the above declaration, which centered on Defendants' document preservation, Defendants' counsel acknowledged that, "[t]he argument that plaintiff's counsel is making here today is

they -- is essentially that they think there's gaps in [Defendants' production] and that therefore somehow that they should – if there had been a duty to preserve, that there would be more documents in some way and that therefore they ought to get a forensic search." Wolfson Decl., Ex. 26 (11/8/2016 Hr'g Tr. 84:19-24).  He then stated to the Court, "We have searched everything [the agreed document custodians] have in terms of electronic documents, ran the agreed-upon search terms, *and produced the existing documents*." *Id.* at 84:16-19 (emphasis added).  He also stated that any documents demonstrating "some sort of issue about compliance, where there was any pressure being put on an artist about complying [with the fan club policy] or not, that would have been produced." *Id.* at 23:13-15.  Counsel then tried to discourage the Court from finding that documents "weren't reviewed properly in this case and produced if they were responsive." *Id.* at 95:20-21.

## C.   Defendants' New Production Is Highly Relevant

On September 7, 2017, Defendants informed Songkick that Defendants intended to make a supplemental document production – six months after the fact discovery cut off.  Wolfson Decl., Ex. 1.  Defendants explained that they "found" these documents in the process of responding to the Department of Justice in a criminal investigation paralleling this case.  *Id.*  Defendants admitted that they would produce nearly 4,000 documents – previously collected and reviewed, but withheld as "non-responsive." *See* Wolfson Decl. Exs. 1-3 (correspondence between Fred Lorig and Dan Wall regarding these issues).  Defendants blamed "contract attorneys" for the mis-tagging and claim they produced the documents as soon as they learned they had produced the documents in the criminal investigation but not in this case.  *Id.*  Based on initial review by Songkick's attorneys, more than half of the documents in Defendants' late production have *new* material and qualify as "hot" (i.e., highly relevant) or were part of document families that contained one or more such documents; an overwhelming majority qualified as "hot" irrespective of whether it was old or new information.  *Id*. ¶ 3.

1   Songkick's trade secret misappropriation and CFAA claims focus on former
2   CrowdSurge Vice President, Stephen Mead, who brought 85,000 confidential
3   CrowdSurge documents with him when he joined Ticketmaster and shared those
4   documents and the confidential information they contained (including access to
5   Songkick's computer systems) with various employees of Ticketmaster (including
6   Senior Vice President, Zeeshan Zaidi).  This group of Ticketmaster employees in
7   turn used Songkick's confidential information to create a clone of CrowdSurge's
8   business model at the direction of Live Nation's CEO, Michael Rapino, and
9   Ticketmaster's President, Jared Smith. In  the newly produced Documents, TM
10  Senior Vice President Zaidi states "we're not supposed to tip anyone off that we
11  have this view into Crowdsurge's activities." *Id.* Ex. 13.

12  Before the withheld documents, Songkick's proof of this fact was largely
13  circumstantial.  The extent of the evidence available to it largely consisted of a
14  January 2014 email, a few follow ups, a series of presentations that incorporated
15  screenshots of Songkick's confidential information, and a forensic examination of
16  Songkick's own IP logs.  The January 2014 email referenced above was one in
17  which Mr. Mead circulated a series of usernames and passwords to Songkick's
18  confidential client-facing toolboxes to his new colleagues at Ticketmaster, walked
19  those new colleagues through the confidential toolboxes, and stated, *inter alia*, "I
20  must stress that as this is access to a live CS tool I would be careful in what you
21  click on as it would be best not the [sic] giveaway that we are snooping around."
22  Dkt. 158 ¶ 159.  In expert discovery, Songkick identified nearly 840 other events of
23  unauthorized access similar to this event, but did not have direct evidence from
24  Defendants' files establishing those accesses originated from Ticketmaster or Live
25  Nation and were used to Songkick's detriment.[3]  The documents Defendants

26  _____

27  [3]   The circumstantial evidence is strong, but direct evidence could only come
28  from Defendants' files.

produced on September 11, however, provide exactly this sort of direct evidence, given that they show the exact same sort of group access based on Mead's direction and confidential login information. *See* Ex. 41. Indeed, Mead reiterated the exact same warning to his colleagues about not tipping Songkick off that they were "snooping around." *Id.*

The newly-produced documents establish a number of other critical points for Songkick's trade secret and CFAA claims as well. Each day of review yields new and important finds, but some of the most important revelations to date from the new production include:

- Recently-produced documents show that, on *multiple* occasions (as opposed to the single instance previously included in Defendants' document production), Stephen Mead sent emails to his Ticketmaster co-workers containing usernames and passwords to Songkick's confidential artist toolboxes. In each of those emails (again, rather than the single instance Songkick previously had), Mr. Mead encouraged his Ticketmaster co-workers to "feel free to screen-grab the hell out of" Songkick's password-protected systems, and also warned them that because ***this is access to a live CS tool, I would be careful in what you click on as it would be best not [to] giveaway that we are snooping around***." Wolfson Decl. Ex. 14 and 41 (emphasis in both originals).

- Defendants recently produced what appears to be the very first communication between Mr. Mead and Mr. Zaidi. Even in that initial exchange from November 2013, Mr. Mead offered to "pass on as much information as you need about Crowdsurge." *Id.* Ex. 15.

- Mr. Zaidi acknowledged the secrecy of Songkick's test sites. Mr. Zaidi explicitly told Ticketmaster's Senior Director of Artist Services, Jared Rosenberg, that "we're not supposed to tip anyone off that we have this view into Crowdsurge's activities." *Id.* Ex. 13.

- One day after a "Call re: CrowdSurge v. Ticketmaster Lawsuit," which the parties previously briefed to this Court and Defendants convinced Magistrate Judge Rosenberg did not cause Defendants to reasonably anticipate litigation for document preservation purposes, *see* Dkt. 126 at 6 n.5, Mr. Mead forwarded his Separation Agreement with CrowdSurge—which prohibited him from retaining or sharing CrowdSurge's confidential information—to Zeeshan Zaidi. Wolfson Decl., Exs. 16 and 17.

- Although Defendants previously produced Mr. Rapino's May 8, 2014 email stating "Zeeshan – Crowd surge [sic] pushing hard – I need to see exact plan for our fan club product…,," Dkt. 158 ¶ 169, Defendants wrongfully withheld portions of the same thread. For example, Defendants did not produce Mr. Zaidi's subsequent email to

Ticketmaster's President Jared Smith stating, "I read [Mr. Rapino's request] as Rapino asking about 'fan clubs' as it relates to beating Crowdsurge. That's not just about a fan club platform, but also ticket registration pages, data sharing, reporting (the TM 360 artist reporting view), etc. — all together to trump what Crowdsurge offers." Nor did Defendants previously produce the portion of this chain in which Mr. Zaidi informed Mr. Smith that Mr. Mead would be giving "everyone a [CrowdSurge] demo" (see below). *Id.* Ex. 18.

- The newly-produced evidence proves that Ticketmaster utilized Mr. Mead's knowledge of and access to confidential Songkick information and computer systems to "create [a] comparable platform[]" to Songkick. For example, Mr. Mead offered to "pull together a list of the [Songkick] log-ins and URL[]s that I still have access to" so that "I can give the [Ticketmaster] team as much insight as possible." *Id.* Ex. 19.

- Newly-produced documents similarly evidence that Mr. Mead provided a "Crowdsurge tutorial/demo" at the Ticketmaster Artist Services team's summit in San Francisco on May 14, 2014. The goal of that summit was "to pow-wow about strategy and [Ticketmaster's] platform plan to trump Crowdsurge." *Id.* It appears that, on the same day, multiple San Francisco-based IP addresses accessed at least one of Songkick's artist toolboxes whose usernames and passwords Mr. Mead improperly retained and circulated to his Ticketmaster co-workers.

- Similarly, Mr. Zaidi acknowledged that, "multiple times," he has "done an assessment of where [Songkick is] and what they are offering compared to [Ticketmaster]," and that Ticketmaster was "working on getting to parity with [Songkick's] tools, etc." *Id.* Ex. 20.

- Defendants recently-produced documents reveal that Mr. Mead circulated links to dozens of confidential "test sites" that Songkick built for its artist-clients' unannounced tours and/or for pitches to potential artist-clients. *Id.* Ex. 21 (Mead circulating links to multiple test sites along with message noting, "[a] handful of new CS sites have gone live today… they look to be preparing for pitches or incoming tours"); Ex. 22 (Mead circulating links to multiple test sites along with message noting, "[t]hese URL links went up in the last 24hrs"). Defendants' belated production further confirms that Mr. Mead taught others at Ticketmaster how to track and monitor Songkick's test sites, and that these employees regularly used that knowledge to do the same. *See, e.g., id.* Ex. 23 (Ticketmaster's Rich Palmese sending a link to a Songkick test site for Garth Brooks, and Mead responding, "[l]ooks like [Songkick is] pitching for the business…").

The late-produced documents, coming long after the summary judgment pleadings were filed, also bolster and directly refute a number of arguments Defendants raise in their pending summary judgment and *Daubert* motions, including:

- In what appears to be one of the very first documents he ever created at Ticketmaster, Zeeshan Zaidi put together an extensive business plan

that asked, in **2013**, how Ticketmaster could "coordinate to defeat this threat/insurgent," referring to CrowdSurge. *Id*. Ex.4 at -486. He then strategized ways to do so, while noting that artists revolted at Ticketmaster's definition of a fan club (underscoring the restrictive nature of the definition). He noted that Ticketmaster's goal was to keep all tickets "on platform" (underscoring anticompetitive intent), and that Ticketmaster would not compete on fees. *Id*. All of these points directly refute arguments Defendants made in the pending summary judgment motion. *See* Dkt. 220-1 (MSJ) at 48-51.

- Defendants admitted that Ticketmaster was reluctant to "share consumer data with artists"—one of Songkick's defining competitive features, *see* Dkt. 232-1 (MSJ OPP)at 12, and that "we can't beat Crowdsurge without that." Wolfson Decl., Ex. 5.

- Defendants noted the many different offers Songkick provided its artist-clients that distinguished it from Ticketmaster, and that "[t]he offering is half the story on why they are winning business"; *i.e.*, beating Ticketmaster in the market (contrary to what Defendants claim in their summary judgment motion and *Daubert* motion). *Compare id.* Ex. 6; *with* Dkt. 220-1 (MSJ) at 59-62.

- In their summary judgment motion, Defendants submit the Declaration of Mike Schmitt, a Ticketmaster employee charged with interpreting and applying Ticketmaster's fan club policy. Dkt. 220-141. Mr. Schmitt claims, *inter alia*, that "[i]f a fan club satisfies the necessary requirements, Ticketmaster allows artists to run a presale on a ticketing platform other than Ticketmaster's—only to members of the fan club—subject to certain requirements." *Id*. ¶ 7. The image Mr. Schmitt tries to convey is that Ticketmaster applies the fan club policy in a fair and impartial way, and that it only sought to stop sales from "illegitimate" fan clubs. *See generally id.*

  Songkick contends as a factual matter that Ticketmaster (via Mr. Schmitt and others) used the fan club policy as a pretense to interfere with competitors' artist presales. The new production demonstrates this handily. In January 2015, Mr. Schmitt emailed Songkick claiming that Kenny Chesney did not have a valid artist presale. Wolfson Decl., Ex. 7. In the latest production, however, Defendants produced a never-before-seen document from Zeeshan Zaidi (Schmitt's boss) to him just four months later, citing Kenny Chesney's fan club as an example for CrowdSurge that is "Perfect because these motherfuckers [CrowdSurge] took it away from us and ***it's actually a compliant fan club***." *Id*. Ex 8 (emphasis added).

  This example—which was heretofore unavailable to Songkick—neatly underscores Mr. Schmitt's (and Defendants') credibility issues with respect to the "balls and strikes" they called on Songkick-run artist presales, and why this is an inherently factual issue for the jury.

- Michael Rapino conceded that Ticketmaster should stop interfering with third party artist presale ticketing service providers, although he and Ticketmaster President, Jared Smith, agreed that they should leave those parties alone only until Defendants could "change the rules" and take over as the dominant service provider. *Id*. Ex. 9.

- Mike Schmitt, the fan club policy's enforcer, discussed internally that an artist manager explained that "***ultimately he feels like artists are being strong-armed here***," to which Schmitt replied, "I told him the fact was, that they are TM tix, and ***we can dictate how artists sell them***." *Id.* Ex 10. These are Songkick's exact points regarding anticompetitive effects, the lack of non-pretextual procompetitive effects of the fan club policy, and the availability of less restrictive alternatives. *See* Dkt. 231-1 (MSJ OPP.) at 46.

- Zeeshan Zaidi and Jared Smith discussed that Ticketmaster's refusals to permit artists to run album bundles on artist presales—which are not proscribed by the fan club policy and are one of the venue ticketing services Ticketmaster provides directly to artists—caused Songkick to lose business. Wolfson Decl., Ex. 11. They also admitted that refusals to provide other types of venue ticketing services had similar effects. *Id.* This is further factual proof underscoring Songkick's tying claims and the coercion Defendants applied to artists.

- Ticketmaster's President, Jared Smith, in criticizing his former employee, Greg Schmale, for joining Songkick, acknowledged Songkick was a "competitor," in direct contradiction to Defendants' antitrust standing arguments on summary judgment. *Compare id.* Ex. 42; *with* Dkt. 220-1 (MSJ) at 44-46.

## III.    LEGAL STANDARD

The Court has the inherent power to sanction a party for improper conduct. *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001). Sanctions available under the Court's inherent power are flexible and may—but need not—include attorneys' fees incurred as a result of the litigation misconduct, *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017).

The Court may sanction a party under its inherent power when the party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)). That is, "sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith," which can be found "for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Id.* at 994.

Federal Rule of Civil Procedure 37 also provides the court the power to sanction a party when that "party fails to provide information or identify a witness as required by Rule 26(a) or (e) … unless the failure was substantially justified or is

harmless." Fed. R. Civ. P. 37(c)(1).[4]  Sanctions under Rule 37 do not require willfulness, fault, or bad faith if the sanction is less than dismissal, and the burden is on the non-moving party to prove substantial justification or lack of harm.  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001).  The Ninth Circuit gives "particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Id.* at 1106.

## IV.  THE SUBSTANCE AND TIMING OF DEFENDANTS PRODUCTION JUSTIFY THE LIMITED SANCTIONS SONGKICK SEEKS

### A.  Defendants Acted With "Recklessness" Combined with "Frivolousness"  By Withholding a 4,000-Document Collection of "Hot" Documents

A finding of "bad faith" is the basis for sanctions under the court's inherent powers – although not required for the Rule 37 sanctions (except dismissal).  As the Ninth Circuit observed, "[w]e have found bad faith in a variety of conduct stemming from "a full range of litigation abuses." *Haeger v. Goodyear Tire & Rubber Co.*, 813 F.3d 1233, 1244 (9th Cir.), *rev'd and remanded on other grounds*, 137 S. Ct. 1178 (2017) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 47 (1991).

There could have been no reasonable or proper basis to withhold the documents.  ***Each*** mentioned CrowdSurge, Songkick, or some abbreviation of those companies' names.  *See* Wolfson Decl. ¶ 4.  Their relevance and responsiveness was therefore self-evident.  Defendants nevertheless admit that each document was marked "non-responsive" and withheld on that basis.  Faulting contract attorneys for overlooking ***4,000*** documents is not a satisfactory answer.  *See Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1343 (9th Cir. 1985) ("We consistently have held that sanctions may be imposed even for negligent failures to provide discovery.") (citations omitted); *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485 (N.D. Ohio 2013)

---

[4]  Here, Songkick moves for Rule 37(c) sanctions pursuant to Defendants' failure to timely supplement their document production pursuant to Rule 26(e).

1  (imposing dismissal sanctions where client's attorneys conducted deficient

2  document collection and production during discovery, and only produced a

3  reasonable collection of responsive documents later, when preparing for trial and

4  using a different, heightened standard to review the documents).

5        *Haeger* is particularly instructive, because it involved a situation (like here)

6  where a defendant collected relevant documents responsive to the plaintiff's request,

7  (like here) withheld those documents despite knowing of them, (like here)

8  convinced the Court in representations on previous motions to compel that it had

9  complied—or was in the process of complying—with its discovery obligations, (like

10  here) waited until after expert discovery completed relating to plaintiff's claims, and

11  (like here) only then produced the documents. *Haeger*, 813 F.3d at 1245-46.

12  Unlike here, in *Haeger* there were only very few withheld materials (a few

13  important test results). *Id.* Also unlike here, the sanctionees in *Haeger* did not wait

14  to produce the relevant materials until just two weeks before pretrial disclosures

15  were due. Nevertheless, on even the more limited facts present in that case, the

16  Ninth Circuit held that the trial court was well within is discretion to find bad faith

17  discovery abuses. *Id.*

18        This situation is especially grave given defense counsel's repeated statements

19  to the Court in response to Songkick's discovery complaints that they (a) directly

20  oversaw and quality-checked their document reviewers' work, and (b) produced all

21  documents collected and responsive to Songkick's requests. Dkt. 103 ¶ 12. If (a) is

22  true, then it means Defendants were reckless with respect to their document

23  productions and hid that fact from the Court, which is tantamount to bad faith and

24  warrants appropriate sanctions under the Court's inherent power. *Fink*, 239 F.3d at

25  994; *Haeger*, 813 F.3d at 1245-46.

26

27

28

### B. Defendants' Failure to Timely Produce the New Documents Until Subpoenaed in a Parallel Criminal Case Was Not Substantially Justified, and it Prejudiced Songkick

Defendants can neither prove substantial justification nor disprove prejudice as is necessary to escape sanctions.

First, there is no substantial justification for withholding a treasure trove of 4,000 "hot" documents that help Songkick and undermine Defendants' arguments. Defendants *now* claim that it was their contract attorneys' fault – but when attempting to escape discovery obligations, it represented to the Court it double-checked these responsiveness calls.  Defendants cannot justify having "missed" such a large, highly relevant body of documents during fact discovery.

Second, to evaluate the prejudice to the party seeking sanctions, courts consider (1) the surprise to the [receiving party]; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence, and (5) the nondisclosing party's explanation for its failure to disclose the evidence.  *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 2016 WL 9150622, at *2 (C.D. Cal. June 8, 2016) (granting sanctions against same defendant counsel as in this case) (quoting *Dey, L.P. v. Ivax Pharm., Inc.*, 233 F.R.D. 567, 571 (C.D. Cal. 2005)).  As shown below, each factor builds on the other and shows that Defendants' late production prejudiced Songkick.

*Surprise.*  There is no question regarding surprise here.  Songkick harbored strong suspicions that Defendants possessed materials such as those they just recently produced, but it could not know exactly what was in Defendants' files, particularly because Defendants (a) made such strong representations to the Court about the strength of their collection and review efforts, *see* Section II.B, *supra*, and (b) began a widespread document deletion campaign in mid-2015 (after Stephen Mead forwarded his separation agreement with Songkick to his boss, Zeeshan Zaidi, in response to hearing that Songkick might sue Ticketmaster, *see* Exs. 43 and 44).

1   *See* Dkt. 89-1 at 7-11.  Defendants also made numerous statements in their pending

2   summary judgment motion—and, more recently, their *Daubert* motion—that

3   implied they were not withholding documents.  Songkick briefed its summary

4   judgment opposition in reliance on Defendants' good faith in at least that regard.

5   The parties then entered pretrial disclosure with not a word from Defendants until

6   after initial exchanges.  None of these actions indicated to Songkick it would receive

7   more than 13% of Defendants' document production just weeks before the pretrial

8   deadlines.

9       **Ability to Cure.**  Fact discovery closed almost six months ago.  Songkick has

10  already responded to Defendants' motion for partial summary judgment.  The initial

11  pretrial disclosures are past.  Defendants just filed a *Daubert* motion on Songkick's

12  damages opinions that directly implicates many of the documents Songkick has

13  located in this most recent production.  Given its inability to reopen discovery, the

14  already-briefed summary judgment motion, and the impending pretrial deadlines,

15  Songkick has no ability to cure the prejudice stemming from Defendants' late

16  production.  *Wong v. Regents of Univ. of California*, 410 F.3d 1052, 1062 (9th Cir.

17  2005) ("Disruption to the schedule of the court and other parties in that manner is

18  not harmless.").  Indeed, diverting attorneys to review the newly-produced

19  documents has caused even more prejudice by taking away precious resources at a

20  time when Songkick needs to focus on pretrial and trial preparation.

21      **Disruption of Trial.**  The parties are near the end of the pretrial process and

22  have already long passed the initial exchange deadline.  They have also long

23  completed summary judgment briefing, which necessarily needs to take into account

24  the newly-produced evidence.  In order to remedy the late production, Songkick

25  would need to be afforded the opportunity to reopen the depositions of the most

26  pertinent players in the newly-produced documents, including the two individuals at

27  the center of Songkick's antitrust, intentional interference, trade secret, and hacking

28  claims:  Zeeshan Zaidi and Stephen Mead.  Given the disruption this will cause to

the pretrial schedule, the added expense it will cause Songkick, and the need to add briefing on the summary judgment motion, all of these facts demonstrate that the late production will disrupt the trial here.  *Wong*, 410 F.3d at 1062; *See N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) (endorsing district court's finding that "willful violation of the discovery order had, given the imminence of the trial date, prejudiced [movant's] ability to prepare for trial"); *see also Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 197-198 (1st Cir. 2006) (observing that the advisory committee notes to the 1993 amendments to Rule 37(c) "suggest a fairly limited concept of 'harmless,'" and noting that the "multiplicity of pertinent factors" includes an "assessment of what the late disclosure portends for the court's docket").

   ***Importance of Evidence.***  As discussed at length in Section II.C, *supra*, the new production includes a large amount of incredibly important evidence for Songkick's claims.

   ***Non-Producing Party's Explanation.***  Defendants admit they collected and reviewed the documents they just recently produced.  They also admit the documents are clearly responsive to Songkick's original discovery requests. Defendants admit they oversaw their document reviewers.  "This is not a case where the evidence suddenly became known.  Here it was long known, but simply not produced," which strongly supports a finding of prejudice.  *InfoSpan*, 2016 WL 9150622, at *3 (internal citations omitted).

### C.    Targeted Sanctions Are Appropriate as the Only Remedy Now Available to Songkick

   Songkick proposes one or more of the following sanctions as "commensurate to the sanctioned party's degree of fault and the other party's prejudice." *See Knickerbocker v. Corinthian Colleges*, 298 F.R.D. 670, 681 (W.D. Wash. 2014) (citing *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, 2013 WL 6159177, at *7 (S.D. Cal. Nov. 25, 2013)).

- The right to reopen the depositions of Zeeshan Zaidi and Stephen Mead and, if good cause shown from those depositions, Michael Rapino and Jared Smith;

- A jury instruction informing the jury of Defendants' discovery misconduct and that they may draw adverse inferences from that misconduct for each of the claims for relief;

- An adverse jury instruction that the Court deems the following facts as having been proven:

  o The materials Stephen Mead forwarded to his colleagues at Ticketmaster are Songkick's trade secrets;

  o Ticketmaster is responsible for Mr. Mead's misappropriation and breach of his CrowdSurge separation agreement;

  o Ticketmaster did not independently create the equivalent of Songkick's trade secrets; and

  o Defendants used Songkick's trade secrets.

- Songkick's attorneys' fees for reviewing the latest production and filing this motion for sanctions.

Given the content of the recently-produced documents, *see* Section II.C, *supra*, each of these sanctions is directly tied to the misconduct at issue and tailored to dissuade future litigants from committing similar misconduct. The reasons why are discussed below.

**_Reopening the depositions of Zeeshan Zaidi, Stephen Mead, and Michael Rapino and/or Jared Smith._**  Songkick respectfully submits that the bare minimum sanction is that the Court order Zeeshan Zaidi and Stephen Mead to each sit for another deposition in early October, so that Songkick may ask them about the documents and facts revealed by the latest production.  Songkick was foreclosed from doing so before and is entitled to full and fair discovery on all issues directly implicating both of these Ticketmaster employees.

Similarly, the latest production demonstrates that Messrs. Rapino and Smith directed and encouraged the trade secret misappropriation and hacking at the center of multiple aspects of Songkick's claims. Nevertheless, at their respective depositions, both individuals feigned ignorance as to the specifics of these wrongful acts. *See, e.g.*, Wolfson Decl., Ex. 27 (Rapino Dep.) at 157:1-23, 201:11-24 (claiming that he "was never told along the way" and that he "[w]ould have fired them all on the spot" had he known), 205:9-15; Ex. 28 (Smith Dep.) 171:9-173:4. Songkick was therefore demonstrably unable to obtain full and fair deposition testimony based on the previous productions. Depending on the testimony given at the additional Zaidi and Mead depositions, and upon good cause shown, Songkick thus requests the right to seek additional depositions from Rapino and/or Smith.

**Jury instruction regarding Defendants' misconduct and the inferences the jury may draw from that misconduct.** Given the scope and direct relevance of the previously-withheld documents, it is clear that Defendants attempted to shield them from Songkick's review and use in this case. As Rule 37(c)(1)(B) provides, the Court may instruct the jury regarding this failure. Here, this is an appropriate sanction because there was no good faith basis to withhold these documents and they are, in fact, highly relevant to Songkick's claims. Given Songkick's previous inability to ask witnesses about the documents and Defendants' failure to produce them until the last instant, it is only equitable for the jury to learn of Defendants' misconduct and the inferences they may draw from it.

**Adverse jury instruction that Defendants circulated and used Songkick's trade secrets.** During fact discovery, Defendants' witnesses tried to claim that Songkick's confidential information was: not actually secret; common in the industry; something that Defendants independently created; not something Defendants ever used for their business; and did not help Defendants generate any additional revenues or otherwise enrich themselves. *See, e.g.*, Wolfson Decl., Ex. 30 (Kline Report) at ¶¶ 66-67; Ex. 29 (Marcus Dep.) at 267:5-24; Ex. 31 (April 24,

2017 Meyer Report) at ¶ 162; Ex. 32 (Zaidi Dep.) at 102:1-3, 163:12-22; Ex. 33 (Schmale Dep.) at 268:11-16.   The recently-produced documents, however, provide the exact opposite evidence (*see* Section II.C, *supra*) and would have been available to Songkick during depositions, had Defendants produced them during discovery.

The crux of this sanction request is deterrence from future litigants repeating this type of behavior.  *See Starline Windows Inc. v. Quanex Bldg. Prod. Corp.*, 2016 WL 4485568, at *7 (S.D. Cal. Aug. 19, 2016) (noting, in the spoliation context, that the "deterrence rationale" underlies an adverse inference sanction).  Defendants have tried to excoriate Songkick for having the audacity to claim it had protectable trade secrets Defendants stole and then used to steal away clients and push Songkick out of business.  But their own documents—which they withheld—negate those accusations.  An adverse instruction affirming what the documents show is appropriate to prevent future abuses of the type at issue on this motion.

*Attorneys' fees for the latest production and this motion.*  Given Defendants' bad faith, *see* Section IV.A, *supra*, the Court is within its inherent power to award Songkick all attorneys' fees arising out of the bad faith conduct.  Songkick's fees for this motion are directly related to the bad faith conduct.  So, too, are fees related to Songkick's emergency review of the recently-produced documents.  Attorneys' fees for these tasks are therefore warranted.  *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 131 (9th Cir. 1987) (prejudice includes "irremediable burdens or costs imposed on the opposing party") (quoting *Scarborough v. Eubanks*, 747 F.2d 871, 876 (3d Cir. 1984)).

## V.   CONCLUSION

For the foregoing reasons, Songkick requests that the Court impose one or more of the requested sanctions against Defendants for their litigation misconduct.

1  Dated:  September 28, 2017

2

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:  */s/ Frederick A. Lorig*
3       Frederick A. Lorig
        Kevin Y. Teruya
4       Adam B. Wolfson

5       Attorneys for Plaintiff
        COMPLETE ENTERTAINMENT
6       RESOURCES LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28