UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

| | | | |
|---|---|---|---|
| Case No. | CV 15-9814 DSF (AGRx) | Date | 10/25/17 |
| Title | Complete Entertainment Resources LLC v. Live Nation Entertainment, Inc., et al. | | |

| | |
|---|---|
| Present: The Honorable | DALE S. FISCHER, United States District Judge |

| | |
|---|---|
| Debra Plato | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** (In Chambers) Order GRANTING IN PART and DENYING IN PART Motion to Exclude Plaintiff's Damages Expert David Yurkerwich (Dkt. No. 278)

Defendants seek to exclude the testimony of Plaintiff's damages expert David Yurkerwich.

Plaintiff bears the burden of establishing that its expert's testimony is admissible. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 & n.10 (1993). "The court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible." Fed. R. Evid. 104(a). "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-49 (1999) (extending Daubert' s gatekeeping obligation to all expert testimony). "[T]he district court acts as a gatekeeper, excluding bad science that does not carry sufficient indicia of reliability for admission under Rule 702." Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 840-41 (9th Cir. 2001) (internal quotations omitted). The gatekeeping requirement helps ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152.

"Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire Co., 526 U.S. at 141-42. When "expert testimony is based on specialized as distinguished from scientific knowledge, the Daubert factors are not intended to be exhaustive or unduly restrictive." Sullivan v. U.S. Dep't of the Navy, 365 F.3d 827, 834 (9th Cir. 2004). The focus of the inquiry "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1017 n.14 (9th Cir. 2004). However, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (italics in original).

Initially, it is important to recognize that the claims at issue have a somewhat relaxed damages causation standard because it is difficult to impossible to construct the but-for world where antitrust violations or trade secret theft did not occur. As for antitrust, "[d]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The [Supreme] Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 565–66 (1981). And as for unjust enrichment for trade secret misappropriation, "[r]ecovery is not prohibited just because the benefit cannot be precisely measured. But as with any other pecuniary remedy, there must be some reasonable basis for the computation." Ajaxo Inc. v. E*Trade Fin. Corp., 187 Cal. App. 4th 1295, 1305 (2010).

Yurkerwich's lost profit analysis methodology is largely acceptable and most of Defendants' objections about it either go to the weight of the evidence or involve Defendants' general disagreement with Plaintiff about the substantive merits of the case. There is at least some evidence in the record that the artists Yurkerwich identifies either stopped using Plaintiff's services or did not start using Plaintiff's services because of interference from Defendants that Plaintiff claims violated the various laws at issue in the case. It is up to the jury to decide whether it believes that a given artist's business was lost because of any wrongful conduct by Defendants.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

However, Yurkerwich also sorts the allegedly lost business into several categories by type of alleged interference. He then assigns each category a percentage that reflects Yurkerwich's estimate of the likelihood Plaintiff could have gotten the business of artists in that category. The Court finds that Yurkerwich has no particular expertise to establish such categories, sort artists into the categories, or assign likelihoods of success across the categories. Yurkerwich is an accountant, and, while there is nothing logically wrong with his approach to the problem, he, personally, has no base of specialized knowledge in the industry from which he can apply this analysis with the authority of an expert.

Given the elimination of the category construct, Yurkerwich's lost profit testimony would now consist of only his artist-by-artist results that he used as the inputs to his categories. Because the jury may or may not accept that all (or none) of the artists would have worked with Plaintiff absent Defendants' allegedly illegal behavior, Yurkerwich cannot present his testimony in its present form. Defendants argue that the need for a change from the way data was presented in the report would render Yurkerwich's testimony inadmissible. But nothing about the underlying analysis for each artist is being changed. Previously, Yurkerwich aggregated the artist data by category first and applied a discount for each category. Now he would keep the artist data unaggregated with no category based discount but would otherwise follow the same logic he discusses in his report for each artist individually. The only "additions" would follow directly from what has been disclosed[1] and would allow the jury to avoid an undue amount of its own math if it only partially agrees with Plaintiff's argument.

The Court agrees with Defendants that the conduct discussed at paragraphs 47-51 of Yurkerwich's report appears to involve negative effects that may come from Live Nation using its influence as a concert promoter to benefit Ticketmaster and harm Plaintiff. This type of claim was abandoned by Plaintiff and Yurkerwich cannot base his damages assessment on it.

Defendants also argue that Yurkerwich's lost business value calculation is methodologically flawed because he valued Plaintiff's business based on gross transaction value (GTV) alone. The Court agrees. Yurkerwich failed even to attempt to demonstrate that people in finance or the ticketing industry value a ticketing company based on a multiplier of GTV alone. The evidence cited by Yurkerwich shows that GTV is a metric used when judging the general performance of a ticketing company. But it

---

[1] Ticket data by artist is provided in Exhibits 9.1-9.4 and incremental profit per ticket is provided in Exhibit 8.2.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

does not provide any support for the notion that GTV, or a multiplier thereof, is even a primary driver of the value of a ticketing company, let alone the only metric one would need to consider. At best, Yurkerwich shows that one could reverse engineer a range of GTV multipliers within which ticketing companies tend to be valued. But this is no substitute for an actual reason to believe that GTV is driving those valuations. Because the Court finds that Yurkerwich's methodology on this point is unsupported, he will not be allowed to testify regarding business value based on a GTV multiplier.

However, the Court sees no reason to prevent Yurkerwich from testifying as to the implied valuation of Plaintiff at the time of 2015 Crowdsource/Soundkick merger. The merger occurred shortly before this case was filed and was contemporaneous to much of the conduct at issue in the case. The merger valuation was discussed in Yurkerwich's report and was a starting point for his analysis. To be clear, Yurkerwich will not be allowed to extrapolate a hypothetical future value from that merger valuation because such a calculation was not disclosed in his reports other than through the gross transaction value method discussed above. He will, at most, be allowed to opine that the implied merger valuation was 'X' and the current valuation is 'Y.'

Defendants also claim that Yurkerwich's current valuation testimony is unduly speculative. But after expert reports were filed, Plaintiff's remaining assets were sold and the price is known. Defendants may quibble around the edges of that, but an actual, real world sale of the remaining assets of a closed business is obviously strong evidence of the remaining value of that business.[2]

As for unjust enrichment damages, there is no bar to the admissibility of Yurkerwich's "business model approach." The business model approach is based on internal Ticketmaster estimates that if it improved its artist presale offerings, it could expect to grow its artist presale business by 10% per year and if it did not, it could expect to lose 10% per year. There is also at least some evidence from internal Ticketmaster documents that it was important to Ticketmaster to improve its offerings to match those offered by Plaintiff and that Ticketmaster was using Plaintiff's proprietary information to do so. While Defendants would obviously like to discount this evidence, it provides a foundation for the assertion that gains by Ticketmaster were due to its unjust enrichment from trade secret misappropriation.

---

[2] The Court understands that Defendants have filed a motion to exclude the sale amount, but this has no bearing on the propriety of Yurkerwich relying on it if it is to be admitted.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

However, the Court agrees with Defendant that Yurkerwich's testimony regarding his "new artist-clients approach" lacks sufficient foundation. Yurkerwich appears to assume that every artist for which Ticketmaster did not conduct a presale in 2012 or 2013, but did in 2014 or 2015, became a Ticketmaster client because of the alleged misappropriation of trade secrets. There is no foundation for this assumption and, as the record in this case attests, there was simply too much going on in this business to assume that all new Ticketmaster presale business was due to Plaintiff's trade secrets. There has to be some connection between Defendant's profits and the trade secret misappropriation beyond the fact that one came after the other.

The motion is GRANTED IN PART and DENIED IN PART consistent with this order.

IT IS SO ORDERED.